No. 21-15521

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COLE JOSEPH SPENCER,

*Plaintiff-Appellant*,

v.

AARON PEW, et al.

*Defendants-Appellees*.

On Appeal from the United States District Court
For the District of Arizona
District Court No. 2:20-CV-00385-PHX-DGC-CDB
The Honorable David G. Campbell

## REPLACEMENT OPENING BRIEF OF APPELLANT

H.R. Fitzmorris and Hannah Garland
*Student Participants (Admitted per Circuit Rule 46-4)*

Professor Jeffrey M. Feldman, WA Bar No. 47535
Professor Elizabeth G. Porter, WA Bar No. 51567
*Faculty Advisors, Ninth Circuit Appellate Advocacy Clinic*

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
4293 Memorial Way NE
Seattle, WA 98195
Telephone: (206) 543-3434

*Counsel for Appellant Cole Spencer*
PRO BONO

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED...............................................................................1

STATUTES AND RULES RELIED UPON .............................................2

INTRODUCTION ....................................................................................5

STATEMENT OF THE CASE..................................................................6

    I.     FACTS.............................................................................6

    II.    PROCEDURAL HISTORY ................................................21

STANDARD OF REVIEW .....................................................................21

SUMMARY OF THE ARGUMENT .....................................................21

ARGUMENT ..........................................................................................23

    I.     THE DISTRICT COURT ERRED BY FAILING TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO SPENCER, THE NON-MOVING PARTY.......................................23

    II.    PROPERLY VIEWED, THE EVIDENCE ESTABLISHES GENUINE DISPUTES OF MATERIAL FACTS AT THE CORE OF SPENCER'S FOURTH AMENDMENT CLAIMS. ...................26

    III.   QUALIFIED IMMUNITY DOES NOT SHIELD THE OFFICERS BECAUSE A REASONABLE JURY COULD FIND THAT THEY VIOLATED CLEARLY ESTABLISHED FOURTH AMENDMENT LAW.......................................................33

IV.  THE SUPREME COURT'S RECENT DECISION IN *RIVAS-VILLEGAS V. CORTESLUNA* DOES NOT UNDERMINE CLEARLY ESTABLISHED NINTH CIRCUIT LAW HOLDING THAT KNEELING ON A SUBDUED SUSPECT CAN CONSTITUTE EXCESSIVE FORCE.................................................42

V.  SHALL AND MACKLIN WERE INTEGRAL PARTICIPANTS IN THE EXCESSIVE FORCE USED AGAINST SPENCER...........47

CONCLUSION.........................................................................................50

STATEMENT OF RELATED CASES.................................................51

CERTIFICATE OF COMPLIANCE...................................................52

Certificate of Service for Electronic Filing.................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullahi v. City of Madison*,
  423 F.3d 763 (7th Cir. 2005) ...........................................................44

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................23

*Blankenhorn v. City of Orange*,
  485 F.3d 463 (9th Cir. 2007) ............................................. 47, 48, 49

*Boyd v. Benton County*,
  374 F.3d 773 (9th Cir. 2004) ............................................. 47, 48, 49

*Brosseau v. Haugen*,
  543 U.S. 194 (2004)........................................................................33

*Bryan v. MacPherson*,
  630 F.3d 805 (2010)........................................................... 35, 36, 37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................23

*Champion v. Outlook Nashville, Inc.*,
  380 F.3d 893 (6th Cir. 2004) ...........................................................44

*Chew v. Gates*,
  27 F.3d 1432 (9th Cir. 1994) ...........................................................37

*Chuman v. Wright*,
  76 F.3d 292 (9th Cir. 1996) .............................................................47

*Cortesluna v. Leon*,
  979 F.3d 645 (9th Cir. 2020) ............................................. 42, 44, 45

*Davis v. City of Las Vegas*,
  478 F.3d 1048 (9th Cir. 2007) .........................................................36

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) .........................................................35

*Drummond ex rel. Drummond v. City of Anaheim*,
    343 F.3d 1052 (9th Cir. 2003) .................................................................. passim

*George v. Morris*,
    736 F.3d 829 (9th Cir. 2013) ...........................................................................35

*Graham v. Connor*,
    490 U.S. 386 (1989).................................................................................. passim

*Green v. City and Cty. of San Francisco*,
    741 F.3d 1039 (9th Cir. 2014) ................................................................... 48, 49

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).........................................................................................33

*Hopkins v. Bonvicino*,
    573 F.3d 752 (9th Cir. 2009) ...........................................................................48

*Jones v. Las Vegas Metro Police Dep't*,
    873 F.3d 1123 (9th Cir. 2017) ................................................................... 39, 40

*LaLonde v. County of Riverside*,
    204 F.3d 947 (9th Cir. 2000) ................................................................... passim

*Lolli v. County of Orange*,
    351 F.3d 410 (9th Cir. 2003) ...........................................................................25

*Mattos v. Agarano*,
    661 F.3d 433 (9th Cir. 2011) ..................................................................... 36, 37

*McCue v. City of Bangor*,
    838 F.3d 55 (1st Cir. 2016).............................................................................43

*Mendoza v. Block*,
    27 F.3d 1357 (9th Cir. 1994), *as amended* (May 31, 1994) .............................33

*Newmaker v. City of Fortuna*,
    842 F.3d 1108 (9th Cir. 2016) ........................................................................25

*Rivas-Villegas v. Cortesluna*,
    142 S. Ct. 4 (2021).................................................................................. passim

*Romero v. Kitsap County*,
931 F.2d 624 (9th Cir. 1991) ...................................................................33

*Saucier v. Katz*,
533 U.S. 194 (2001)...................................................................................33

*Scott v. Harris*,
550 U.S. 372 (2008)...................................................................................38

*Seidner v. de Vries*,
39 F.4th 591 (9th Cir. 2022) ....................................................................36

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005) ...................................................................37

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
330 F.3d 1110 (9th Cir. 2003) .................................................................21

*Tabares v. City of Huntington Beach*,
988 F.3d 1119 (9th Cir. 2021) .................................................................25

*Tennessee v. Garner*,
471 U.S. 1 (1985).......................................................................................34

*Tolan v. Cotton*,
572 U.S. 650 (2014).......................................................... 21, 24, 25, 26

*Torres v. City of Los Angeles*,
548 F.3d 1197 (9th Cir. 2008) .................................................................48

*Watson-Nance v. City of Phoenix*,
CV-08-01129-PHX-ROS, 2011 WL 13152466 (D. Ariz. June 16, 2011) ........41

*Weigel v. Broad*,
544 F.3d 1143 (10th Cir. 2008) ...............................................................44

**Statutes**

28 U.S.C. § 1291 ...............................................................................................2

28 U.S.C. § 1343 ...............................................................................................2

28 U.S.C. § 1343(a)(3).......................................................................................1

42 U.S.C. § 1983 ...........................................................................3, 6

Ariz. Rev. Stat. § 13-2907.01 .....................................................35

**Rules**

9th Cir. R. 27-14 ...........................................................................9

Fed. R. App. P. 4 ...........................................................................5

Fed. R. App. P. 4(A)(1)(a) ...........................................................1

Fed. R. App. P. 4(a)(1)(B), 4(a)(4), and 4(c) ...........................5

Fed. R. Civ. P. 56 ...........................................................................3

Fed. R. Civ. P. 56(a)................................................... 21, 22, 23

Fed. R. Civ. P. 56(c)....................................................................26

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 2714 (4th ed. 2022).............................................................23

# JURISDICTIONAL STATEMENT

The United States District Court for the District of Arizona granted the defendants' motion for summary judgment and entered final judgment in this case on March 11, 2021. 1-ER-002; 28 U.S.C. § 1343(a)(3). Appellant timely filed a notice of appeal on March 22, 2021. 3-ER-422; Fed. R. App. P. 4(A)(1)(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court erred in granting summary judgment by failing to view the evidence in the light most favorable to the non-moving party, Appellant Cole Spencer.

2. Whether the district court erred in granting summary judgment when there were genuine disputes of material fact.

3. Whether, taking the facts in the light most favorable to Spencer, a reasonable jury could conclude that officers Pew and Rozema used excessive force in violation of clearly established Fourth Amendment law when they tased and beat Spencer, kneed him in the head and face, and knelt on his neck and back, both before and after he was handcuffed.

4. Whether the Supreme Court's decision in *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam), undermines clearly established Ninth

Circuit law holding that prolonged kneeling on a prone, unarmed suspect constitutes excessive force.

5. Whether, taking the facts in the light most favorable to Spencer, a reasonable jury could conclude that Deputy Sheriffs Shall and Macklin were integral participants in the violation of Spencer's Fourth Amendment rights.

## STATUTES AND RULES RELIED UPON

### 28 U.S.C. § 1291 – Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

### 28 U.S.C. § 1343 – Civil rights and elective franchise

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b) For purposes of this section—

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## 42 U.S.C. § 1983 – Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## Federal Rules of Civil Procedure Rule 56. Summary Judgment:

(a) Motion for Summary Judgment or Partial Judgment. A party may move for summary judgment, identifying each claim or defense — or

the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

> (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

. . .

**Federal Rules of Appellate Procedure Rule 4. Appeal as of Right—When Taken**

(a) Appeal in a Civil Case.

> (1) Time for Filing a Notice of Appeal.

> > (A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

. . .

## INTRODUCTION

This case concerns the application of the settled summary judgment standard to an excessive force claim against two Mesa Police Department Officers and two Maricopa County Sheriff's Deputies.

The plaintiff, Cole Spencer, was a passenger in a vehicle pulled over by Mesa Police Department Officers Aaron Pew and Jacob Rozema for a traffic violation. Rozema asked Spencer to identify himself and, when he determined that Spencer provided a false name, he ordered Spencer out of the vehicle to arrest him for "false reporting."

Spencer exited the vehicle and, as directed by Rozema, put his arms behind his back. Rozema aggressively grabbed Spencer's arm and painfully wrenched his wrist. Spencer attempted to re-position his arm from the painful position and to create space between himself and Rozema. In response, Rozema punched Spencer in the face, causing him to fall to the ground. Rozema and Pew—with assistance

from two sheriff's deputies—then beat Spencer senseless using their fists, knees, body weight, and two types of tasers. Even after Spencer was handcuffed, Pew continued to kneel on his back. Spencer sustained serious injuries, including fractures of his nasal bone, septum, left eye socket and two parts of his spine.

Spencer brought this 42 U.S.C. § 1983 action pro se, seeking damages for the officers' and deputies' use of excessive force in violation of the Fourth Amendment. The district court granted the defendants' motions for summary judgment, holding that they were protected by qualified immunity.

The district court's grant of summary judgment was erroneous. The court failed to view the evidence in the light most favorable to Spencer, the non-moving party, instead resolving material factual disputes in favor of the officers. Under a proper view of the evidence, a jury reasonably could find that all four law enforcement officers violated clearly established Fourth Amendment law.

## STATEMENT OF THE CASE

### I.    FACTS

On March 21, 2018, Mesa Police Department Officers Aaron Pew and Jacob Rozema were on duty in a residential area of Mesa, Arizona in an unmarked police truck. 2-ER-273:1; 2-ER-276:1. Neither officer was wearing a body camera. Driving down 90th Place, they observed Jamie Kern back his vehicle out of his driveway. 2-ER-276:2; 2-ER-279 para. 3. Cole Spencer sat in the front passenger

seat of the vehicle. 2-ER-276:8–9. The officers followed Kern's vehicle out of the neighborhood and onto a main road. 2-ER-273:5. Pew activated his police lights and pulled Kern over approximately a half-mile from his driveway because they believed that Kern had failed adequately to check traffic before backing out. 2-ER-273:3–5.

While Pew spoke with Kern, Rozema approached the passenger side of the vehicle where Spencer sat, and asked Spencer to identify himself. 2-ER-273:7–8. Spencer appeared sweaty and nervous, which Pew interpreted as indicating that Spencer "was either on drugs or planning on making bad decisions and running or fighting with us." 2-ER-276:9–10. When asked, Spencer told Rozema his name was "Kenneth Cory." 2-ER-273:8; 2-ER-280 para. 6. Rozema went to the police vehicle, checked DMV records, and determined that Spencer had provided a false name. 2-ER-273:9–10.

Rozema returned to the passenger side of the SUV and ordered Spencer to get out of the car. 2-ER-280 para. 7. As Spencer complied and exited the vehicle, Rozema told him to place his hands behind his back, without informing him why he was being arrested. 2-ER-042 para. 10. Spencer again complied. 2-ER-301 para. 8. Rozema then aggressively wrenched Spencer's left wrist behind his back "in a direction it did not bend." 2-ER-280 para. 7. In response, Spencer jerked his arm and shoulder to reduce the pain and create some space between himself and

Rozema.[1] 2-ER-280 para. 8; 2-ER-302 para. 10. At no point did Rozema lose contact with Spencer. 2-ER-280 para. 8.

In response to Spencer moving his arm, Rozema immediately punched him several times in the face. Spencer fell to the ground, where he remained for the duration of the beating that then unfolded. *Id.*

As Rozema knocked Spencer to the ground, Pew joined the fray. 2-ER-276:18. Pew punched, kicked, and kneed Spencer repeatedly in the head and face. 2-ER-276:28; 2-ER-277:1; 2-ER-281 para. 9; 3-ER-362 para. 7. Spencer attempted to shield his face and head from the unrelenting blows. 2-ER-281 para. 9. Within approximately one minute of Rozema first asking Spencer to put his hands behind his back, Spencer had been battered in the head and face approximately nine times with the officers' fists, feet, and knees. None of this is disputed.[2] *See* 2-ER-273– 74; 2-ER-276–77.

---

[1] Spencer later accepted a plea deal for aggravated assault against Rozema. During the plea hearing, Spencer agreed that he "pushed" Rozema. 2-ER-268:12– 13, 20.

[2] *See* 2-ER-273:14 (Rozema's Incident Report states ". . . I punched [Spencer] one time on the left cheek of his face with my closed right fist"); 3-ER-362 paras. 7, 9 (Pew's Declaration states "when I approached . . . Mr. Spencer was on his back. . . . I then struck Mr. Spencer in the face" and describes his second punch to Spencer's head as occurring "roughly a minute" into "wrestling with Spencer" after he ran around the SUV); 2-ER-276–77 (Pew's Incident Report states that Pew "delivered three kicks to [Spencer's] face and shoulder" before using his knee to "deliver[] 3-4 knee strikes to [Spencer's] head").

As the beating continued, Pew shot Spencer multiple times at close range with a probe taser. 2-ER-281 para. 10; 3-ER-362 para. 10; 3-ER-364 para. 9. Pew shot two darts into Spencer's leg, and then shot two additional darts into his upper body. 2-ER-277:4; 2-ER-281 para. 10; 3-ER-362 para. 10. Pew also used the taser directly on Spencer's neck. 2-ER-277:5–6; 2-ER-281 para. 10.

Maricopa County Sheriff Deputy Shall arrived, wearing a body camera.[3] Video A at 00:00:49. The body camera video reveals the following, which also is established by Spencer's affidavits.

As Shall ran toward the activity, Pew cocked his knee back for yet another strike to Spencer's face. Video A at 00:01:01. Pew's taser buzzed audibly while Spencer yelled "I have a pacemaker!" between shrieks of pain. Video A at 00:01:08–13. Spencer writhed on the ground, his legs flailing, as he tried to pull himself into a fetal position. Video A at 00:01:15. Rozema stood, pulling Spencer's

---

[3] Four body camera videos are referenced in this brief. Video A was recorded by Shall and lasts for 00:30:31. Video B was recorded by Macklin and lasts for 00:01:37. Video C was recorded by Clark and lasts for 00:17:08. Video D is the second section of the body camera footage recorded by Macklin and lasts for 00:21:29.

Physical copies of the body camera videos were added to the district court record. 2-ER-107–08. Physical exhibits that are not capable of transmission in PDF format cannot be included in the Excerpts of Record. Appellant has filed a motion with this Court for leave to provide the Court with USB drives containing copies of the body camera videos as a Supplemental Excerpt of Record. *See* 9th Cir. R. 27-14.

right arm up and away from the ground while Pew knelt, pressing Spencer's face into the dirt. Video A at 00:01:16.

Maricopa County Sheriff Deputy Macklin arrived, and his body camera video recorded Rozema continuing to kick Spencer in the spine before dropping his knee onto Spencer's hip. Video B at 00:00:36–00:00:38. Rozema then cocked his fist and struck Spencer in the lower stomach as Pew held Spencer's arms from above. Video B at 00:00:38–00:00:40.

Pew, straddling Spencer's head from behind, pressed his hand to the side of Spencer's head and ground his face into the gravel. Video B at 00:00:56. Macklin assisted Rozema and Pew by maneuvering his body weight onto Spencer's lower half, pressing him into the dirt and turning him facedown. Video B at 00:01:00. Spencer can be heard wailing. Video B at 00:00:55–00:01:00.



**Rozema and Pew hold down Spencer while Rozema prepares to punch Spencer in the stomach. Screen capture, Video B at 00:00:39.**

Pew continued to press Spencer's head into the dirt as he slammed his knee into Spencer's face twice more. Video B at 00:01:03–00:01:05. By this point, Pew's pants were covered in Spencer's blood. *Id.*[4] Spencer screamed and squirmed, reacting to the strikes, while Pew picked up Spencer's head and smashed it into the ground. Video B at 00:01:06–00:01:07. With his hand around the back of Spencer's neck, Pew maneuvered his knees to again straddle Spencer's head. Video B at 00:01:16–00:01:29. Pew then lifted Spencer by the neck and slammed his head face-first into the ground four more times in immediate succession. Video B 00:01:29–00:01:32.



**Pew shoves Spencer's head into the ground. Screen capture, Video B at 00:00:55.**

---

[4] There is no evidence that any officer suffered an injury requiring medical attention. 2-ER-137.

Despite Spencer's strained breathing and shrieks of pain—all audible on the body camera footage—one of the defendants off-camera egged Pew on, encouraging him to "Give 'em a ride again." Video A at 00:02:41; Video D at 00:00:10–00:00:11. Pew obliged, cramming his taser against Spencer's neck at the same time another defendant yelled for Spencer to put his hands behind his back, somehow expecting Spencer to comply despite the taser at his throat. Video D at 00:00:14–00:00:23; *see also* 2-ER-277:10–11 (Pew's incident report states, "I retrieved the taser . . . stuck it on [Spencer's] neck near his carotid and held the trigger.") At about this point, Maricopa County Sheriff Deputy Clark arrived wearing a body camera. *See* Video C 00:35:00.[5]

Pew then placed his hands at Spencer's throat and choked him. Video C at 00:01:35–00:01:42; *see also* 2-ER-277:21–22 (Pew stated, "[I] placed my hands on the sides of his neck where I believed his carotid artery was located and squeezed. . . . hoping Cole would go unconscious."). Pew held his thumbs to the back of Spencer's neck, circled his fingers around the front and used his full body weight to bear down on Spencer's neck. Video D at 00:32:00–00:34:00. Spencer responded with a guttural, choking sound. Video D at 0:00:34.

---

[5] Clark is not a defendant in this action.

Pew leaned into his hands, holding Spencer's face pressed into the dirt as he choked him. Video C at 00:01:40. Blood pooled underneath Spencer's face and further soaked Pew's uniform. *Id.* Spencer audibly struggled to breathe. Video D at 00:00:41–00:00:51. Spencer then went slack. Video D at 00:00:51. A voice in the background muttered "Fuckin' asshole" at Spencer's unmoving body. Video D at 00:00:51–00:00:52. Pew rocked back on his heels, reached up to adjust his hat, and put his sunglasses back on. Video D at 00:00:53–00:00:56.

Rozema stood up and placed his boot between the shoulder blades of Spencer's beaten and completely still body. Video D at 00:00:53–00:00:56.



**Pew holds Spencer's head between his legs while Macklin holds Spencer's right arm and Rozema stands with his foot on Spencer's back. Screen capture, Video D at 00:00:57.**

Spencer had now been punched, kicked, and kneed in the head or face at least twelve times. *See generally* 2-ER-276–77; 2-ER-280–81; 3-ER-362 paras. 7, 9; Video B 00:00:36–00:01:37. He had been kicked in the spine at least once. Video B at 00:00:36–00:00:38. He had been tased in four places by probes. 2-ER-228; 2-ER-277:3–5; 2-ER-281 para. 10; 3-ER-364 para. 9. He had also been tased in drive stun mode in the neck—in violation of Mesa Police Department Policy[6]— at least three more times, despite telling the officers he had a pacemaker. Video A at 00:01:08–00:01:13; Video D at 00:00:14–00:00:27; 2-ER-277:10–11; 2-ER-281 paras. 10, 12; 2-ER-282 para. 14. Pew had slammed or ground Spencer's face into the gravel at least five times before choking him unconscious. Video B 00:01:06– 00:01:07, 00:01:29–00:01:32; Video C at 00:01:35–00:01:43; *see* 2-ER-277:21–22.

Spencer was then placed in handcuffs. Video D at 00:00:46–00:00:50 (in the audio of body camera footage an officer can be heard saying "clasp it, clasp it" and then "there you go"). For the next 15 seconds Spencer lay face down—handcuffed and immobilized—in a pool of his own blood. Video D at 00:00:55–00:01:10. Macklin moved from lying to kneeling on Spencer's back. *Id.* Pew kept his hand on the back of Spencer's head and continued to press Spencer's face and upper body into the ground. *Id.* Spencer stirred, moaning, and crying. Video D at

---

[6] 2-ER-119 ("The primary target area is the back of the subject, *below the neck line*. Secondary targets include, in order, the side and the front (lower enter mass) of the subject.") (emphasis added).

00:01:16–00:01:20. An off-camera voice stated, "We're going to fuck you up unless you put your hands behind your back," even though Spencer's wrists *were already cuffed*. Video D at 00:01:15–01:17.

"I'm dying," Spencer moaned, to which Pew responded "Hey, hey, next time don't lie about your name." Video D at 00:01:27–01:35. He pressed Spencer's face into the ground again. *Id.* Although Spencer was handcuffed on the ground and pleading for his life, Pew, Rozema, and Shall all continued to physically restrain him. Video A at 00:03:33.



**Pew holds Spencer's face to the ground. Macklin puts his right knee on Spencer's back and holds Spencer's right arm. Rozema stands with his foot on Spencer's back. Screen capture, Video A at 00:03:33.**

Pew then shifted his right knee onto the middle of Spencer's back, and his left knee to Spencer's shoulder and neck. Video D at 00:01:37. Macklin remained kneeling on the small of Spencer's back. *Id.*

An officer repeatedly taunted Spencer: "Hey you gonna tell me your name? You gonna tell me your name?" to which Spencer gasped, "Cole Spencer." Video D at 00:01:38–00:01:44. Pew continued to drive his knee into Spencer's upper back, putting pressure onto Spencer's neck for almost a minute, even after Spencer correctly and clearly identified himself, and despite the fact that he was handcuffed. Video D at 00:01:38–00:02:26. Spencer cried, "Please stop!" Video D at 00:02:07.



**Pew kneels on Spencer's neck as Spencer lays bloodied on the ground. Screen capture of Video D at 00:02:06.**

Pew then moved his body so that his right knee was on Spencer's head and neck, and his left knee on Spencer's back. Video D at 00:02:35–00:03:35.



**Pew kneels with his right knee on Spencer's head and neck and his left knee on Spencer's back. Screen capture, Video D at 00:03:00.**

Macklin pressed his entire weight onto Spencer's lower body while Shall retrieved leg shackles from his car and placed them on Spencer's ankles. Video A at 00:04:53–00:05:15. With Macklin still flattening Spencer's lower body, and Pew digging his knees into his back, Spencer says, "I can't breathe." Video A at 00:05:40. A voice can be heard responding, "If you are talking, you can breathe." Video A at 00:05:40–00:05:42. "Please help me, please," Spencer moaned, trying to lift his bloodied face off the ground. Video D at 00:04:05–00:04:06. "I'm begging you," he implored. Video D at 00:04:07.



**Macklin sits on Spencer, who is visibly handcuffed, while Pew kneels on Spencer's back and neck. Screen capture, Video A at 00:05:13.**

By now, Spencer was bloodied, his face had been battered to the point of being unrecognizable, he had sustained multiple fractures, he had been tased repeatedly, and he was handcuffed and shackled. Video A at 00:06:36. An officer told Spencer, "Man, you got your ass whooped." Video D at 00:08:43.

"Did he throw any blows or anything like that?" one of the deputies asked. Video A at 00:20:59. Shall responded with a single word: "No." Video A at 00:21:00. Spencer never punched, kicked, or otherwise moved offensively towards either officer during the beating. 2-ER-283 para. 17.

After nearly twelve minutes of Spencer begging the defendants to loosen his restraints because his left arm was in extreme pain, EMTs loaded a bloodied and

18

battered Spencer into an ambulance. Video A at 00:11:46–00:26:45. Spencer was transported to Banner Baywood Medical Center. 3-ER-332. Due to the severity of his injuries, doctors immediately transferred him to another facility, Banner Desert Hospital, to be seen by a trauma surgeon. 2-ER-275:5.

Spencer sustained fractures of both his nasal bone and his septum. 2-ER-207–08. Both of his sinus cavities were packed with "high density material," which likely was the gravel and debris plainly visible on the ground in the four body camera videos. 2-ER-207. Spencer also sustained an "acute fracture of [his] left orbital floor," meaning the officers broke his left eye socket. 2-ER-207. A CT scan of Spencer's chest revealed additional fractures of his left L1 and L2 transverse processes—in other words, the officers broke portions of Spencer's spine in two places. 2-ER-208.

As a result of this beating, Spencer experiences ongoing, serious health issues. He still suffers problems with his vision in both eyes, including "black spots." 3-ER-419. He suffers chronic pain in his shoulders and elbow, and pain and numbness in his back, neck, feet, hands, and face. *Id.* He also experiences complications with his heart condition and pacemaker, and he has required cryo-ablation cardiac surgery. *Id.*



Spencer at Banner Baywood
Medical Center immediately
post-arrest. 2-ER-146.



Spencer at Banner Baywood
Medical Center immediately
post-arrest. 2-ER-152.



Pew displaying his "leg injury." 2-
ER-136; *see also* 2-ER-135 (crime
scene report states that Pew had
"small red marks on both knees"
and the specialist "did not see any
other injuries").



Rozema displaying his "arm
injury." 2-ER-174; *see also* 2-ER-
135 (crime scene report states
that Rozema had "red marks on
left arm, small red marks on
both knees" and the specialist
"did not see any other injuries").

## II.   PROCEDURAL HISTORY

On February 21, 2020, Spencer filed this section 1983 suit pro se alleging

that the officers used excessive force under the Fourth Amendment when they beat,

tased, choked, and kneeled on his back while arresting him for providing a false

name. 3-ER-409–421.

The officers and deputies moved for summary judgment. 3-ER-347–56; 3-

ER-383–96. The district court granted defendants' motion for summary judgment

on the ground of qualified immunity. 1-ER-013–14. Spencer timely appealed.

3-ER-422.

## STANDARD OF REVIEW

The court reviews district court decisions relating to summary judgment de

novo. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110,

1131 (9th Cir. 2003). Summary judgment is inappropriate unless there are no

genuine issues of disputed fact and judgment can be made as a matter of law.

Fed. R. Civ. P. 56(a); *see Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).

## SUMMARY OF THE ARGUMENT

The district court did not properly view the facts in the light most favorable

the non-moving party, Spencer, when it assessed the defendants' summary

judgment motion. This error alone requires reversal. *See Tolan v. Cotton*, 572 U.S.

650, 655–56 (2014). The error caused the district court to ignore genuine disputes

of material fact that went to the core of Spencer's excessive force claim and made summary judgment inappropriate. Fed. R. Civ. P. 56(a). Viewing the evidence with the proper standard, a reasonable jury could find that Pew and Rozema violated clearly established Fourth Amendment law by beating, tasing, and brutalizing Spencer, and by kneeling on Spencer's back after he was handcuffed and lying face down.

A body of settled case law, including this Court's decision in *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000), has long established that kneeling on the back of a subdued, unarmed suspect constitutes excessive force. This Court directed the parties to address the question of whether the Supreme Court's recent decision in *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam), undermines the holding in *LaLonde* as it applies to this case. As explained below, it does not. *See infra* pp. 42–46.

Lastly, the two sheriff's deputies are not shielded by qualified immunity because they were not mere bystanders, but rather were integral participants in Pew's and Rozema's unconstitutional conduct.

For these reasons, this Court should reverse the district court's grant of summary judgment.

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY FAILING TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO SPENCER, THE NON-MOVING PARTY.

Summary judgment cannot be granted when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This limitation is rooted in the Seventh Amendment's command that juries, and not judges, make credibility determinations and resolve factual disputes. Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2714 (4th ed. 2022) ("[I]n order to assure that [the right to a jury trial] is protected, the federal courts take great care not to deny the nonmoving party a full trial once it is shown that a genuine issue of fact exists or that the judgment ultimately may depend on the credibility of witnesses.")

To avoid summary judgment, the nonmoving party's only burden is to provide admissible evidence establishing that material facts are genuinely disputed warranting resolution by the trier of fact at trial. *See Anderson*, 477 U.S. at 248; Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U. S. at 249.

This standard applies with undiluted force in section 1983 cases, which implicate the doctrine of qualified immunity. In *Tolan v. Cotton*, a section 1983 excessive force suit against police, the Supreme Court reaffirmed that courts reviewing summary judgment motions must view the evidence in the light most favorable to the nonmoving party, and that the failure to do so is reversible error. 572 U.S. 650 (2014). In *Tolan*, the district court held that Cotton, a police officer, was entitled to summary judgment on the ground of qualified immunity. *Id.* at 651. The Fifth Circuit affirmed. *Id.* The Fifth Circuit's ruling was based on its view that Tolan was "verbally threatening" the officer, "moving to intervene" with the officer's actions, and in a "crouch" or a "charging position." *Id.* at 658–59. But as the Supreme Court found, Tolan had introduced admissible evidence that told a very different story. *Id.* The lower court's disregard of Tolan's version of events led the Supreme Court "to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id.* at 659. On the ground of this fatal flaw, the Court summarily reversed the Fifth Circuit's decision. *Id.* at 660.

Like the Supreme Court in *Tolan*, the Ninth Circuit reverses grants of summary judgment where district courts fail to take the evidence in the light most favorable to the non-moving party. For example, in *Newmaker v. City of Fortuna*,

842 F.3d 1108 (9th Cir. 2016), this Circuit reversed summary judgment in a qualified immunity case where the plaintiff proffered evidence that conflicted with statements offered by the defendants. *See also*, *e.g.*, *Tabares v. City of Huntington Beach*, 988 F.3d 1119 (9th Cir. 2021) (reversing summary judgment in qualified immunity case when district court failed to view evidence in favor of non-moving party); *Lolli v. County of Orange*, 351 F.3d 410, 416 (9th Cir. 2003) (reversing summary judgment when plaintiff met burden of submitting evidence from which a reasonable jury could conclude use of force was excessive).

In this case, the district court made precisely the same error the Supreme Court corrected in *Tolan*: It nominally acknowledged the summary judgment standard, 1-ER-004, but "neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan*, 572 U.S. at 660. As shown below, *see infra* pp. 33–42, there is ample evidence in the record—including in affidavits and incident reports, as well as in body camera footage from three sheriff's deputies—from which a reasonable jury could find that the officers used force far beyond what the situation called for, and far beyond what is permitted by clearly established law, when they arrested Spencer for providing a false name. Yet the district court, like the lower courts in *Tolan*, credited *only* the police officers' view of the beating.

The district court ignored disputed facts,[7] viewed the evidence in the light most favorable to the officers, not Spencer,[8] and resolved factual disputes by uncritically accepting and adopting the officers' claims and their view of the facts outright.[9]

These errors require reversal. *Tolan*, 572 U.S. at 659 (reversing "because the opinion below reflects a clear misapprehension of summary judgment standards in light of our precedents").

## II. PROPERLY VIEWED, THE EVIDENCE ESTABLISHES GENUINE DISPUTES OF MATERIAL FACTS AT THE CORE OF SPENCER'S FOURTH AMENDMENT CLAIMS.

The district court's failure to follow the dictate of *Tolan v. Cotton* was not merely an academic error. The record contains substantial evidence establishing disputes of material fact that go to the heart of Spencer's excessive force claims. This evidence, submitted in full compliance with Federal Rule of Civil Procedure 56(c), includes affidavits, police and medical reports, and body camera footage. Based on this evidence, a reasonable jury could find that the officers violated

---

[7] *See, e.g.,* 1-ER-10 (the district court did not sufficiently address evidence that indicates Spencer was not experiencing superhuman strength nor a heightened pain tolerance).

[8] *See, e.g.,* 1-ER-010 ("Although Plaintiff argues that his actions were "involuntary" because he could not move his harm, this is not supported by the video.").

[9] *See, e.g.,* 1-ER-011 ("Defendants assert that Plaintiff struck the arresting officer and began to run toward the nearby residential area, and, because of his drug use, was extremely difficult to detain.").

Spencer's Fourth Amendment rights by employing a level of force that was excessive and in violation of clearly established law.

The following material factual disputes should have resulted in a denial of defendants' motion for summary judgment.

***Whether Spencer attempted to flee after exiting the vehicle was disputed.***

Spencer stated that "he was not trying to run" after exiting the vehicle. 2-ER-043 para. 11. In addition, Spencer stated under oath that he only "nudged [Rozema] with [his] shoulder to create separation" after Rozema sharply wrenched his arm, and that Rozema never lost contact with his wrist. 2-ER-280 para. 8. A jury reasonably could believe Spencer's account over that of the officers.

In the video, the officers tackled and beat Spencer immediately adjacent to the car that he exited. *See* Video B at 00:00:36 (showing Spencer's proximity to the vehicle). A jury reasonably could infer from this evidence that, contrary to the officers' claims, Spencer never moved more than a couple of feet from the passenger side of the car and did not attempt to flee at all.

In addition, the defendants' claims that Spencer attempted to flee are undermined by being significantly inconsistent with one another and self-serving.[10]

---

[10] Rozema said that Spencer began to run away after pushing Rozema in the chest. 3-ER-364 para. 6. But Pew's original report offered a different description. His report said that Spencer made "a fast movement . . . as if he was trying to run" but Rozema was able to prevent Spencer from getting away by grabbing Spencer's arm. 2-ER-276:16–17. Subsequently, in contrast with what he initially described,

A jury reasonably could infer from those inconsistencies that the officers' accounts were not credible, reinforcing the existence of a genuine factual dispute about the officers' claim that Spencer attempted to flee.

### *Whether Spencer resisted being handcuffed once he was on the ground was disputed.*

Spencer acknowledged nudging Rozema with his shoulder at the outset of the incident. 2-ER-280 para. 8. However, Spencer denied resisting arrest, 2-ER-047 para. 16, and he stated under oath that his movements were involuntary as a result of being beaten and tased multiple times. 2-ER-281 para. 11. He explained that he had "little to no control over [his] body" and that "[his] legs and arms were going in and out of being locked up." *Id.*

Spencer also stated that his voluntary movements were not resistance, but an attempt "to block punches" and that he was moving in an effort "to avoid being hit." 2-ER-281 paras. 9–10.

The video recordings of the incident are entirely consistent with and corroborative of Spencer's description. *See* generally Video A, B, C, D. The video

---

Pew offered a still different description and reversed the order of events, stating that Spencer "shoved Officer Rozema in the chest and began to flee" and that Rozema immediately tackled Spencer to the ground. 3-ER-362 para. 5. Shall offered yet another version of events, stating that as he drove by, he "observed the passenger of the car jump out and begin to run" with two officers giving chase. 3-ER-334 paras. 3–4. All of these varying and conflicting versions cannot possibly be true.

footage, for example, shows that Spencer was ordered by one officer to place his arms behind his back, despite the fact that his arms were being held down at that time by another officer. Video B at 00:00:39. The videos also show the officers continuing to use force against Spencer even after he was handcuffed. Video D at 00:01:38–00:02:26.

Based on Spencer's sworn statements and a fair viewing of the video evidence in the light most favorable to Spencer, a jury reasonably could conclude that Spencer was not actively resisting arrest and refusing to comply, but instead was unable to comply with the officers' demands because of the onslaught of blows he was receiving, the fact his arms were being held down, and the repeated tasings he received.

### *Whether Spencer exhibited "superhuman strength" and a high pain tolerance was disputed.*

The officers justified their use of excessive force in part by claiming that Spencer displayed "superhuman strength" and a "high pain tolerance." 3-ER-363 para. 14; 3-ER-365 para. 13. That claim was disputed.

In contrast, Spencer stated under oath that "(his) heart felt like it was going to give out," 2-ER-280 para. 14, that "(he) could not breathe and it felt like (his) throat was being crushed," 2-ER-282 para. 15, and that "(his) arm also felt like it was broke[n]," 2-ER-283 para. 16. It is also undisputed that Spencer informed the officers that he had a pacemaker—an indication of some degree of physical

limitation rather than superhuman strength. 2-ER-281 para. 12; Video A at 00:01:10. Spencer's serious injuries—which caused him to lose consciousness and required his transfer to a trauma hospital—are consistent with a person who was the victim of extreme violence, not of a person with "superhuman strength."

The video recordings are consistent with and support Spencer's testimony. Spencer moaned "I'm dying," Video D at 00:01:30, and repeatedly wailed in pain and begged for reprieve. Nothing in any of the videos depicts Spencer exhibiting "super-human strength." *See* Video D at 00:01:16–00:01:20, 00:02:07, 00:04:05–00:04:07.

Based on the above evidence, a jury reasonably could find that the officers' statements that Spencer possessed superhuman strength and had a high pain tolerance were a hyperbolic, post-hoc justification for their use of extreme force during their arrest of an unarmed suspect of a non-violent crime. A jury could instead view this evidence and reasonably conclude that Spencer was scared, badly beaten, in severe pain with multiple broken bones and injuries, fearful of cardiac arrest given his pacemaker, and exhibiting no signs at all of "superhuman strength."

***Whether Spencer attempted to hit the officers was disputed.***

The officers asserted that Spencer attempted to hit and kick them. 2-ER-273:13; 2-ER-276:20; 2-ER-277:14–15; 3-ER-362 para. 7. Spencer directly

disputed this claim, stating under oath that he did not "throw[] a punch, a kick or any type of strike" once he was punched to the ground. 2-ER-283 para. 17. Spencer admits only that he pushed Rozema with his shoulder when Rozema first wrenched his arm behind his back. 2-ER-280 para 8.

Here again, the video recordings corroborate Spencer's description. The video shows the officers engaging in a near constant barrage of strikes against Spencer with hands, feet, knees, and tasers. *See* Video B at 00:00:38–00:01:10. No portion of the recorded videos from any of the body cameras shows Spencer striking officers or deputies, or even attempting to do so.

Significantly, on the video, someone asked Shall if Spencer had "throw[n] any blows or anything like that."

His answer: "No." Video A at 00:21:57.

This inconsistency alone reasonably could cause a jury to doubt the credibility of the officers' assertions and claims – not just about whether Spencer attempted to hit the officers, but as to all of the officers' claims.[11]

---

[11] Juries routinely are instructed that "[I]f you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said." *See* 9th Cir. Jury Instr. 1.14 – Credibility of Witnesses.

***Whether the officers assaulted Spencer punitively was disputed***.

The officers justified their actions by claiming that Spencer resisted and was aggressive, but a jury reasonably could conclude that the officers' actions were instead punitive. First, as explained above, there is ample evidence, including the video recordings, that contradicts the officers' claims that Spencer resisted or was aggressive. Second, the manner and extent of the beating, and the injuries inflicted on Spencer, are inconsistent with the officers' claims that they acted in response to Spencer resisting or being aggressive. Third, statements and threats the officers made throughout the beating are not consistent with their explanation for why they inflicted the beating on Spencer; rather, they are consistent with the officers having beaten Spencer as punishment for his having provided a false name when asked to identify himself.

For example, toward the end of the violence, an officer taunts Spencer while he is bloodied on the ground: "Hey, hey, next time don't lie to me about your name." Video D at 00:01:32–00:01:34. The same officer continues to taunt Spencer: "Hey you gonna tell me your name? You gonna tell me your name?" to which Spencer responds, gasping, "Cole Spencer." Video D at 00:01:38–00:01:44.

The above factual disputes go to the heart of Spencer's claims that the officers used force that was wildly disproportionate to what the circumstances of

this case called for. These factual disputes should be resolved by a jury, not a court.

## III. QUALIFIED IMMUNITY DOES NOT SHIELD THE OFFICERS BECAUSE A REASONABLE JURY COULD FIND THAT THEY VIOLATED CLEARLY ESTABLISHED FOURTH AMENDMENT LAW.

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier,* 533 U.S. at 201). Whether the law was clearly established is a pure question of law for the court to decide. *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994), *as amended* (May 31, 1994) (citing *Romero v. Kitsap County*, 931 F.2d 624, 628 (9th Cir. 1991)).

In this case, it was error for the district court to grant summary judgment to the officers on qualified immunity grounds because, properly viewing the evidence

in the light most favorable to Spencer, a jury reasonably could find that it would have been clear to a reasonable officer that the use of force against Spencer was unconstitutionally excessive. It is undisputed that the police used a significant degree of force against Spencer. *See* 1-ER-11:1–3; 3-ER-362–65; 2-ER-273–77. The question is whether the government's interest in arresting Spencer rendered the officers' prolonged use of force reasonable, both before and after Spencer was handcuffed. Under clearly established Ninth Circuit law, it did not.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures," including arrests. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)). Analysis of reasonableness under the Fourth Amendment requires "careful attention to the facts and circumstances of each particular case" and "is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (citations omitted).

In *Graham*, the Supreme Court set forth a three-part framework for analyzing the government's interest in using force to make an arrest. *Id.* Under that framework, the nature and degree of force used by government officials is balanced against the government interest in using that force, which depends on: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the

suspect] is actively resisting arrest or attempting to evade arrest by flight."

*Id.* at 396–97. The "'most important' factor under *Graham* is whether the suspect

posed an 'immediate threat to the safety of the officers or others.'" *George v.*

*Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*,

630 F.3d 805, 826 (2010)).

The reasonableness inquiry is objective: "The question is whether the

officers' actions are 'objectively reasonable' in light of the facts and circumstances

confronting them . . . ." *Graham*, 490 U.S. at 397 (citations omitted). Analyzing

reasonableness under the *Graham* framework "nearly always requires a jury to sift

through disputed factual contentions, and to draw inferences," meaning that

summary judgment "should be granted sparingly." *Drummond ex rel. Drummond*

*v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003); *see also, e.g.*, *Deorle v.*

*Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 396–

97).

The first *Graham* factor—the severity of the crime—weighs strongly against

finding the use of force reasonable in this case. Officers sought to arrest Spencer

for the non-violent misdemeanor of "false reporting." Ariz. Rev.

Stat. § 13-2907.01; 3-ER-364 para. 5. Under clearly established Ninth Circuit law,

this was not a severe crime meriting extreme tactics. *See, e.g.*, *LaLonde v. County*

*of Riverside*, 204 F.3d 947, 951–53 (9th Cir. 2000) (kneeling on back of plaintiff

was excessive during arrest for "impeding a police investigation" even though plaintiff resisted arrest and engaged in a "scuffle" with officer); *Bryan*, 630 F.3d at 829 (plaintiff's seatbelt infraction and offenses of "resisting a police officer, failure to comply with a lawful order, and using or being under the influence of any controlled substance" were not "inherently dangerous or violent" and could not justify the officer's taser use); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (trespassing and obstructing a police officer were "minor" crimes); *cf. Seidner v. de Vries*, 39 F.4th 591, 601 (9th Cir. 2022) (jury could not be compelled to conclude that officer's use of police car to stop cyclist fleeing traffic stop was reasonable).

Under clearly established law, the second and most important *Graham* factor—the immediacy of the threat to officers or the public—also fails to justify the force used in this case. Indeed, the district court recognized that a reasonable jury could find that Spencer did not pose a threat: "Given the number of officers who were present and the amount of force used, the court cannot conclude as an undisputed fact that Plaintiff posed an immediate threat to safety that justified the force used." 1-ER-011:6–8.

The district court was correct. It is undisputed that Spencer was unarmed and at all times outnumbered by armed officers. *See* 3-ER-362–65; 2-ER-273–77. In *Mattos v. Agarano*, 661 F.3d 433, 449 (9th Cir. 2011) (en banc), this Court found

an officer's tasing of a suspect excessive when officers had no objective reason to believe the suspect was armed. The Court held that although officers perceived the suspect to have pushed an officer when she used her arm to block the officer from pressing against her chest, and she was later charged with harassment and obstructing government operations, she "posed no threat to the officers." *Id.*; *see also Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) ("The record does not reveal any basis for believing that Smith was armed or that he posed an immediate threat to anyone's safety.")

In his report, Pew stated that he thought Spencer "was either on drugs or planning on making bad decisions and running or fighting with us." 2-ER-276:10. Pew stated that he formed this impression *before* Spencer even exited the car. *See* 2-ER-276–77. However, "[a] simple statement by an officer that he fears for his safety, or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826; *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994) (holding that a reasonable jury could find unarmed individual posed no immediate safety threat even though he fled from traffic stop and hid).

In contrast, significant force may be merited when an arrestee poses an imminent threat of harm to police officers or others. *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (holding use of beanbag guns and kneeling on suspect did not violate clearly established law when officers were

responding to domestic violence call by woman and children barricaded in their house against plaintiff, who allegedly had a chainsaw); *Scott v. Harris*, 550 U.S. 372, 384 (2008) (finding that ramming plaintiff's vehicle was reasonable when "it is clear from the videotape that [plaintiff] posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase").

The officers and the district court justified the use of force in this case on the third factor—whether the suspect was attempting to resist arrest or flee. *Graham*, 490 U.S. at 396–97; 3-ER-388:5. The district court found that it was not clearly established "that officers cannot use significant force when an arrestee actively resists arrest, shows unusual strength, and refuses to submit to handcuffing." 1-ER-012:12–13.

There are genuine factual disputes about all of these issues—disputes that the district court incorrectly resolved in favor of the defendants. Taking factual inferences in Spencer's favor, he did not attempt to run, he never struck a blow or attempted to strike a blow at an officer, and he did not resist arrest. 2-ER-043 para. 11 (Spencer "was never able to run and was not trying to run"). He also denies that he refused to submit to handcuffing during the beating. 2-ER-303 para. 17 ("After the first four electrocution cycles, Mr. Spencer had little to no control over his body.").

Moreover, even assuming that Spencer's reaction to having his arm wrenched could justify some degree of force, the sustained beating and tasing of Spencer by multiple officers went far beyond what could have been necessary. The video evidence shows Spencer attempting to protect himself from a barrage of blows after being beaten, kneed, and repeatedly tased. *See e.g.*, Video A at 00:01:10–01:01:15. It does not show Spencer throwing a punch, kick, or any other offensive motion toward any officer. The police audio recording confirms this. *See* Video A at 00:21:57 (Shall was asked if Spencer had "throw[n] any blows or anything like that." His answer, simply, was, "No.") 2-ER-283 para. 17 ("by the end of this incident [Spencer] had not thrown a punch, a kick, or any type of strike towards any officer").

In *Jones v. Las Vegas Metro Police Department*, defendant Hatten pulled over Jones for a routine traffic stop. *Jones v. Las Vegas Metro Police Dep't*, 873 F.3d 1123, 1127 (9th Cir. 2017). He ordered Jones out of the car and Jones obeyed. *Id.* But when Jones started to turn toward Hatten, Hatten drew his gun and pointed it at Jones, at which point Jones fled. *Id.* Hatten pursued Jones and fired his taser twice, causing Jones's body to lock up and fall to the ground face down with his hands beneath him. *Id.* The officer then knelt on Jones's back to apply handcuffs, keeping his taser pressed to Jones's thigh and repeatedly pulling the

trigger. *Id.* Three backup officers arrived, and Hatten continued to tase Jones while another officer applied a taser to Jones's upper back. *Id.*

The Ninth Circuit held that Hatten's initial taser use when Jones fled was reasonable. *Id.* at 1130. However, by the time Jones was prone and surrounded by multiple officers, there was "a triable issue of fact as to whether the officers were reasonable in the degree of force they deployed at that point." *Id.* ("As the situation evolved, however, the justification for the use of force waned."). Under *Jones*, even assuming that Rozema's initial use of force could be justified, there is a triable issue of fact as to whether the lengthy and significant use of force against Spencer by Rozema, Pew, Macklin and Shall was objectively reasonable.

Finally, once Spencer was prone and in handcuffs, Pew continued to kneel on his back for almost a minute. *See* Video D at 00:01:38–00:02:38. This violated clearly established law. In *LaLonde v. City of Riverside*, this Court established that kneeling on the back of a suspect of a minor crime to the point of injury when he or she is unarmed is a significant use of force that a jury could find excessive even if the suspect is resisting arrest. 204 F.3d at 959.[12]

Other cases reaffirm *LaLonde*. In *Drummond*, officers apprehended a mentally ill individual, shackling and handcuffing him. 343 F.3d at 1053–54. The

---

[12] As explained below the Supreme Court's recent decision in *Cortesluna*, 142 S. Ct. 4, did not overrule this well-established precedent, *see infra* pp. 42–46.

Ninth Circuit held that, even if the man may initially have been a threat, once he was "knock[ed] . . . to the ground with his arms cuffed behind his back as [he] lay on his stomach," a jury could reasonably find that he posed only a minimal threat to anyone's safety. *Id.* at 1057-58. Thus, this Court ruled, "the officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.* at 1059; *see also Watson-Nance v. City of Phoenix*, CV-08-01129-PHX-ROS, 2011 WL 13152466, at *11 (D. Ariz. June 16, 2011) (denying summary judgment on qualified immunity grounds where officers, after subduing individual resisting arrest who had been spinning, kicking, and attempting to strike officers, continued applying force to her upper body despite several warning signs of positional asphyxiation).

Under *LaLonde* and *Drummond*, Pew should have been on notice that kneeling on Spencer's back after he was subdued constituted excessive force. Like the plaintiff in *LaLonde*, Spencer was being arrested for a minor offense and was unarmed. 3-ER-364 para. 5; *LaLonde*, 204 F.3d at 959; *Drummond*, 343 F.3d at 1057. Like the plaintiff in *Drummond*, Spencer was handcuffed on the ground, begging for air. Video D at 00:06:53 ("I promise I'm not squirming; I can't breathe!"); *Drummond*, 343 F.3d at 1057–58. Like in *LaLonde*, Spencer suffered serious injuries to his back as a result of the officers' force. 2-ER-206–07 (two

fractured vertebrae); *LaLonde*, 204 F.3d at 959. Like the plaintiffs in both *LaLonde* and *Drummond*, officers knelt on Spencer even after he was unarmed, subdued, and handcuffed. *See, e.g.*, Video B at 00:00:36–00:01:37; Video D at 00:01:38– 00:02:38.; 2-ER-281–82; 2-ER-273–74; 2-ER-276–77.

The significant use of force in this case is not justified by the reasonableness factors in *Graham*. Because the law is well-established, the officers should not be shielded from qualified immunity.

## IV. THE SUPREME COURT'S RECENT DECISION IN *RIVAS-VILLEGAS V. CORTESLUNA* DOES NOT UNDERMINE CLEARLY ESTABLISHED NINTH CIRCUIT LAW HOLDING THAT KNEELING ON A SUBDUED SUSPECT CAN CONSTITUTE EXCESSIVE FORCE.

The Ninth Circuit has directed the parties to address the application to this case of the decisions in *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000), and *Cortesluna v. Leon*, 979 F.3d 645 (9th Cir. 2020), *rev'd sub nom. Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam). Both cases address the constitutionality of a particular form of force used by police: kneeling on prone suspects. And both cases provide support for the denial of qualified immunity to the officers in this case.

Two decades ago, in *LaLonde*, the Ninth Circuit held that a jury could find that a police officer used excessive force when he knelt on the back of a man being arrested for obstructing a police investigation into a residential noise complaint,

even when that suspect resisted arrest. 204 F.3d at 959. In *LaLonde*, officers knocked on the plaintiff's door around one in the morning, responding to a neighbor's noise complaint. *Id.* at 951. LaLonde answered the door in his underwear, eating a sandwich. *Id.* His roommate was reading, and her three children were asleep. *Id.* at 950. The responding officer asked LaLonde to step out of the apartment and he refused, asking to speak with the officer's watch commander. *Id.* at 951. Instead, the officer told LaLonde he was being placed under arrest for obstructing a police investigation, grabbed LaLonde, knocked him to the ground, and straddled LaLonde to place him in handcuffs. The two then engaged in "a scuffle." *Id.* at 952. The officer sprayed LaLonde in the face with pepper spray, putting an end to LaLonde's resistance. *Id.* A second officer entered the apartment. *Id.* In the course of handcuffing LaLonde, the second officer "forcefully put his knee into LaLonde's back, causing him significant pain" and injury. *Id.* The Ninth Circuit found that the reasonableness of the police actions in kneeling on LaLonde presented a triable issue of fact. *Id.* at 959.

Other circuits agree with the Ninth Circuit that the act of kneeling on prone suspects is a serious and high-risk form of force. *See, e.g., McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (holding that "it was clearly established in September 2012 that exerting significant, continued force on a person's back 'while that [person] is in a face-down prone position after being subdued and/or

incapacitated constitutes excessive force'" (citation omitted)); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (finding it clearly established "that applying pressure to [a subject's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions"); *Abdullahi v. City of Madison*, 423 F.3d 763, 764–66 (7th Cir. 2005) (ruling that the record supported an inference of deadly force when an officer restrained a mentally ill individual in the prone restraint position with bodyweight force for thirty to forty-five seconds until the individual lost consciousness); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (finding it clearly established that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constituted excessive force").

Two years ago, in *Cortesluna v. Leon*, 979 F.3d 645 (9th Cir. 2020), the Ninth Circuit relied on *LaLonde* when it denied qualified immunity to an officer in an excessive force case involving kneeling. In *Cortesluna*, police officers were responding to a domestic violence call made by a 12-year-old girl who was barricaded in a room with her mother and sister. 979 F.3d at 649. The girl informed the 911 operator that her mother's boyfriend was "always drunk," was "really mad," and had a chainsaw; sawing noises could be heard in the background. *Id.*

When the police arrived and ordered Cortesluna out of the home he was carrying a metal tool. *Id.* at 650. The police ordered Cortesluna to put his hands up and drop it, which he did. *Id.* However, as this was happening an officer shouted that Cortesluna had a knife in his pocket. *Id.* Instead of complying with officers' orders, Cortesluna lowered his hands. *Id.* An officer responded by shooting him twice with beanbags, after which Cortesluna finally lay down. *Id.* Before handcuffing Cortesluna, an officer knelt on his back for approximately eight seconds near the place where the knife was located. *Id.* at 660 (Collins, J., concurring in part and dissenting in part).

The Ninth Circuit denied qualified immunity. It held that *LaLonde* put the officer on notice that kneeling on Cortesluna's back violated clearly established law. *Id.* at 654 (majority opinion). Judge Collins dissented in part, finding the officer's actions in *Cortesluna* distinguishable from *LaLonde* given that "the knife was loosely sitting in the large pocket of Cortesluna's baggy pajama bottoms— meaning that Cortesluna could have fit his hand into the pocket to reach the handle." *Id.* at 661 (Collins, J., concurring in part and dissenting in part).

The Supreme Court granted certiorari and reversed. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam). The Court agreed with Judge Collins that "neither *LaLonde* nor any decision of this Court [was] sufficiently similar" to

clearly establish that kneeling on Cortesluna's back for eight seconds when he was armed with a knife constituted excessive force. *Id*. at 9.

The Supreme Court's decision in *Cortesluna* does not overrule *LaLonde*; nor does it render *LaLonde* inapplicable to this case. *LaLonde* may not have put the officers in *Cortesluna* on notice that kneeling briefly to disarm a domestic violence suspect armed with a knife was unreasonable. However, *LaLonde* and *Drummond do* place officers on notice that kneeling on the back of an unarmed person being arrested for a non-violent misdemeanor offense for an extended period of time, after the suspect has been handcuffed and absent a serious safety risk—like the risk of a weapon in *Cortesluna*—is excessive.

The Supreme Court's ruling in *Cortesluna* affirms that facts and circumstances lie at the core of Fourth Amendment reasonableness analyses. *Graham v. Connor*, 490 U.S. 386, 387 (1989). The facts and circumstances of Spencer's case, which align closely with *LaLonde* and *Drummond*, put the defendants on notice that their conduct violated clearly established law.

The Supreme Court's decision in *Cortesluna* does not change this. To the contrary, the Court's emphases on the very short duration of the kneeling, the volatility of the surrounding circumstances, and the presence of a weapon, serve to highlight the unreasonableness of the force used against Spencer here.

## V. SHALL AND MACKLIN WERE INTEGRAL PARTICIPANTS IN THE EXCESSIVE FORCE USED AGAINST SPENCER.

To be liable under section 1983, an officer must be an "integral participant" in the unconstitutional conduct. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). Integral participation requires "some fundamental involvement in the conduct that allegedly caused the violation" but does not require that each participant's actions, taken on their own, rise to the level of a constitutional violation. *Id.* Mere bystanders are not liable. *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996).

The Ninth Circuit has found integral participation when officers provided armed backup for another officer who utilized a flash-bang device during the execution of a search warrant in violation of the Fourth Amendment. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). In *Boyd*, the secondary officers "stood armed" behind the officer who deployed the flash-bang device. *Id.* In addition, the secondary officers were "aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed." *Id.*

The Ninth Circuit has also found integral participation when an officer's actions are instrumental in gaining control of a suspect, thus allowing other officers to use excessive force. *See Blankenhorn*, 485 F.3d at 481 n.12 (the defendant's help in handcuffing Blankenhorn was "of course" meaningful participation in the

arrest, as his own declaration indicates); *Green v. City and Cty. of San Francisco*, 741 F.3d 1039, 1051 (9th Cir. 2014) (officer restraining an individual who is being held at gunpoint by another officer is an integral participant).

In contrast, the Ninth Circuit declined to find integral participation when an officer participated in neither the planning nor the execution of an unconstitutional search, and instead interviewed a witness outside. *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009) . The Ninth Circuit has also declined to find integral participation when an officer is not present for the violation. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir. 2008) (officer who arrives after an allegedly unlawful arrest and did not consult with the arresting officers before the arrest was made was not an integral participant); *Blankenhorn*, 485 F.3d at 481 n.12 (same when officers arrived after the unlawful arrest had been made or only provided crowd control).

Applying this standard, a reasonable jury could conclude that deputies Shall and Macklin were integral participants in the violence against Spencer.

- Macklin provided armed backup for Rozema and Pew. 3-ER-353:2–5. Under clearly established law, a jury could find that providing this armed backup rendered Macklin an "integral participant." *Boyd*, 374 F.3d at 780.

- Macklin also participated directly in the violence against Spencer. Specifically, he laid and sat on top of Spencer, allowing Pew and Rozema to continue tasing and beating Spencer. Video B at 00:01:00; Video A at 00:05:13. This prevented Spencer from complying with Pew and Rozema's directions to place his hands behind his back. Video C at 00:01:09–00:01:17; *see Green*, 741 F.3d at 1051.

- Shall provided armed backup for Rozema, Pew and Macklin. 3-ER-353:2–5. Under *Boyd*, 374 F.3d at 780, Shall can be found an integral participant.

- Shall also participated directly by retrieving leg shackles and placing them on Spencer to further restrain him, as Macklin sat on Spencer and Pew kneeled on Spencer's back. Video A at 00:04:45–00:05:19. Under *Blankenhorn*, this action indicates Shall's integral participation. *See* 485 F.3d at 481 n.12.

Based on the above evidence, under clearly established Ninth Circuit law, a reasonable jury could find that Shall and Macklin were integral participants in the violation of Spencer's Fourth Amendment rights.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's granting of summary judgment for the defendants and Spencer's Fourth Amendment and excessive force claims against the officers should be remanded for trial.

Dated: November 10, 2022

| | |
|---|---|
| H. R. Fitzmorris and Hannah Garland | /s/ Jeffrey M. Feldman |
| *Student Participants (Admitted per Circuit Rule 46-4)* | Jeffrey M. Feldman (WA Bar No. 47535) |
| Student Participants | UNIVERSITY OF WASHINGTON |
| UNIVERSITY OF WASHINGTON | SCHOOL OF LAW |
| SCHOOL OF LAW | 4293 Memorial Way NE |
| Ninth Circuit Appellate Advocacy | Seattle, WA 98195 |
| Clinic | (206) 543-3434 |

/s/ Elizabeth G. Porter

Elizabeth G. Porter (WA Bar No. 51567)
UNIVERSITY OF WASHINGTON
SCHOOL OF LAW
4293 Memorial Way NE
Seattle, WA 98195
(206) 543-3434

*Attorneys for Appellant*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the Appellant represents that he is not aware of any other related cases pending in this Court within the meaning of that Rule.

November 10, 2022

/s/ Jeffrey M. Feldman
Jeffrey M. Feldman
*Counsel of Record for Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** _____ 21-15521 _____

I am the attorney or self-represented party.

**This brief contains __10,930__ words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jeffrey M. Feldman      **Date** 11/10/2022 _____
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Service for Electronic Filing

**9ᵗʰ Cir. Case Number:**       21-15521

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒   I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐   I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

      Opening Brief of Appellant; Appellant's Excerpts of Record (index; three volumes).

**Signature** s/ Jeffrey M. Feldman            **Date** 11/10/2022
*(use "*s/[typed name]*" to sign electronically-filed documents)*