No. 21-15521

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COLE JOSEPH SPENCER,

Plaintiff/Appellant,

v.

AARON PEW, ET AL.,

Defendants/Appellees.

On Appeal from the United States District Court
for the District of Arizona
District Court No. 2:20-CV-00385-PHX-DGC-CDB
The Honorable David G. Campbell

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 2 OF 3

H.R. Fitzmorris and Hannah Garland
*Student Participants (Admitted per Circuit Rule 46-4)*

Professor Jeffrey M. Feldman, WA Bar No. 47535
Professor Elizabeth G. Porter, WA Bar No. 51567
*Faculty Advisors, Ninth Circuit Appellate Advocacy Clinic*

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
4293 Memorial Way NE
Seattle, WA 98195
Telephone: (206) 543-3434

*Counsel for Appellant Cole Spencer*
PRO BONO

THIS DOCUMENT IS NOT FILED ACCORDING TO FEDERAL AND/OR LOCAL RULES AND PRACTICES AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE: LRCiv 7.1(a)(1), 5.4
(Rule Number/Section)

___ LODGED
___ RECEIVED  ___ COPY

FEB 1 9 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT OF ARIZONA

| | |
|---|---|
| Cole J. Spencer, | CV-20-00385-DGC-CDB |
| V. | Plaintiffs Additional Material Facts supporting opposition to Defendants Shall and Macklins Motion for Summary Judgment |
| Aaron Pew, et. al. | |

(PAMF) - "Plaintiffs Additional Material Facts"

(PAMF #1) - Mr. Spencer has made several claims to the court that the defendants produced "Edited" or "Doctored" footage as evidence. Then the defendants lied to the court, stating that the footage provided to spencer was in fact actual "AXON" footage as it would come directly from Axon. This is false. Before an explaination is given it is important that whoever is reading this understands that the reason that Spencer didn't bring this point up at his criminal proceedings for this case, was because there was no body-cam videos produced as evidence by prosecution. Spencer asked his lawyer 3 times for Body-cam videos and was told there wasn't any. [Exhibit E - page 3] Highlighted in the middle of the page is the Date that the footage was sent to the "Maricopa county Attorney's office"

①

which was [MAY 14 2018]. Spencer wasn't sentenced untill later that year on [OCT 30 2018]. It was strategicaly withheld. Now, the same entity that withheld this evidence and prosecuted Mr. Spencer, [Maricopa County Attorney's office] is now representing the defendants in this 1983 civil action. .... and altering evidence and lying to the court. ***
Simple mathmatics can proove that Deputies Shall and Macklin have engaged in vendictive behavior in regards to Macklins body-cam footage. [Exhibit E - page 1] is the, [Axon Body-cam spreadsheet] for the [4] body-cam videos that are seen in [Exhibit 22]. As you will notice, there are [2] videos for [Deputy Macklin, Justin] (There are creases in the page so the times are hard to read. The times are also printed on [Exhibit E - page 2 and 5])
In any event, its easy to conclude that Macklins first video starts at [21 Mar 2018 - 17:24:44] and the duration is [1 min 37 sec]. So, the first video would end at ...
... [17:26:21] ← This number is Important... remember it!
Now lets take a look at the other video submitted by Macklin.... [Exhibit E - page 1 and 5] ... This video starts at [21 Mar 2018 17:26:00] If you compare the start time of the second video ↑ with the time that the first video ended ... [17:26:21] you will notice that these videos should overlap by 21 seconds. This is a serious problem! Now go back and watch the videos. [Exhibit 22 - videos B, D] There is no point where the two videos overlap eachother.

②

They also cut out the Sound at the beginning of the second video. It is also obvious why they removed the "information Bars from the corner of the footage, which is universaly standard with all "AXON" footage. IF the Info-Bar were there and the clock were visible, we would be able to see that the times the video ends and re-starts would not match up and thus, we would conclude that a portion of the video is missing.

THIS DOCUMENT IS NOT IN PROPER FORM
ACCORDING TO FEDERAL AND/OR LOCAL RULES
AND PRACTICES AND IS SUBJECT TO REJECTION
BY THE COURT.

REFERENCE: LRCiv 7.1(a)(i)  5.4
(Rule Number/Section)

FILED ___ LODGED
___ RECEIVED ___ COPY

FEB 1 9 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ MB ___ DEPUTY

IN THE UNITED STATES DISTRICT COURT OF

CV-20-00385-DGC-CDB

Cole J. Spencer,

Plaintiffs "Disputed" statement
of facts in support of opposition
to defendants Motion for
Summary Judgment

V.

Aaron Pew, et. al,

Pursuant to LRCiv 56.1 plaintiff submits the following "separate statement of facts" in opposition to defendants motion for summary Judgment. Each paragraph corresponding to the defendants [16] statments of facts.

"Plaintiffs Disputed Statement of Facts" (PDSOF)
"Defendants statement Of Facts" (DSOF)

1. (DSOF) - No Dispute

2. (DSOF) - No Dispute

3. (PDSOF) - This claim is disputed. Any observer can easily conclude from the body-cam footage [Exhibit 22] that the beating took place no more than 10-15 feet

①

from the vehicle. Mr Spencer never had a chance to run as the defendants claim. Also, the Mesa defendants original report [Exhibit 2 and 4] contradict this claim. They state that Spencer put his hands behind his back then pushed Rozema, then started to run. Shall and Macklin are now claiming that Spencer exited the vehicle and started to run, completly failing to aknowledge that any events took place following spencer exiting the vehicle. It should also be noted that Pew and Rozemas charactarization of this event in both of their original reports is also inaccurate, but to say that spencer immediatly exited the vehicle and ran is even more innaccurate. For a detailed chain of events surrounding this portion of the incident see [Exhibit 1]

4. (DSOF) - No Dispute

5. (PDSOF) - This claim is disputed. Deputy Shall activated his body-cam well before he exited his vehicle. See [Exhibit 22 - video A]

6. (PDSOF) This claim is disputed. It should be made clear that upon Shall's initial arrival on scene, it would have been impossible for Deputy Shall to have known what had transpired prior to his arrival, so it might have appeared to him that Spencer was "resisting" as opposed to what he was really doing....which was — moving to avoid the beating.

②

Shalls charactarization of Spencer's resistance can only
stand true for a short period of time – maybe 15 seconds.
That would be an efficient amount of time for shall to
process what was happening in front of him. Spencer cried
out, pleading for the beating to stop... "O.k, O.k. -Cant move
my hands". "I have a Pacemaker". These are cries for help.
Then in a quick succession, elevated levels of force are
applied to spencer. Puches, Kicks, Knee's, tazing, Face slamming,
strangulation then positional Asphyxia. Given the circumstances
and the number of officers present [5], this was
not reasonable behavior and could not be charactarized
as effectuating an arrest. So there is no way spencer
could be "resisting arrest" when by definition, what the
officers were doing was not an arresting him.

7) (DSOF) – NO Dispute

8) (DSOF) – NO Dispute

9) (This claim is not Disputed) But the defendants were not
the one's who put the leg chains on Spencer. Clark was.

10) (DSOF) – NO Dispute

11) (PDSOF) – This claim is disputed. Deputy shall was present
for all of the following uses of force involving Mesa PD

③

and Deputy Macklin: ① Spencer pleads for help by saying "O.K , O.K", Can't Move my hands" and "I have a Pacemaker". see [Exhibit 22-video A-01:00 to 01:12] ② Pew pins spencer to the ground while Rozema punch's and kicks Spencer's face. These are not proper arrest procedures. see [Exhibit 22-video B at 00:34 to 00:39] ③ With Macklin laying on top of him and 4 officers present, Pew knee's spencer in his face 6-7 times. A knee strike to the face is an extreme use of force which should only be used when an officer does not have back-up and reasonably beleives his life is in danger.... not when 4 officers are present, the suspect is in a prone position, profusely bleeding and has already been tazed 4 times. See [Exhibit 22-video B - at 00:39 to 01:37] ④ Officer Pew wraps his hands around Spencer's throat and begin's slamming spencer's face into the ground repeatedly. Any observer will notice the profanity that Pew uses while carrying out this sadistic act.... "Mother fucker"! This was done with malicious intent with the purpose to cause harm. You can even hear spencer choking at one point in the video. It's hard to hear, so listen close. See [Exhibit 22-video B at 01:00 to 01:37]. ⑤ Pew picks up the taser and sticks it to spencer's carrotid artery for 13 seconds. Given what had transpired prior to this, this was not an acceptable option because their was no [need] for an elevated application of force since spencer was drasticaly outnumbered and effectivly subdued. In addition, the acceptable target area for a [drive-stun] ~~area~~ is below the

④

neckline. All of these factors mixed with the fact that this was the [7th] electrocution cycle, leans heavily in concluding that this amount of force was unreasonable. SEE [Exhibit 22-video C-at 01:13 to 01:36] and [exhibit 22-video D at 00:08 to 00:28] ⑥ Pew sets down the tozer and wraps his hands around Spencer's throat and strangles him untill he goes unconscious. This is an egregious violation of Police Conduct. See [Exhibit 22-video C at 01:37 to 02:20] and [Exhibit 22-video D at 00:27 to 01:05] Both, Shall and Macklin denied in the "Admission" statement that they had ever been taught by MCSO, to wrap their hands around a suspects throat and squeeze. [See Exhibit B-page 4 - #1 and #5] also see [Exhibit-C-page 4 and 5 - #1, #3, #5]. They also admit that during the entire incident, they never witnessed Spencer throw a single punch. They also lie about witnessing Pew apply lethal force on Spencer. ⑦ After Spencer was strangled unconscious, he woke up handcuffed with an officer driving a knee into his face and neck. Spencer told the officer multiple times that he "couldn't breathe" and even told Pew that he felt like he was "DYING", to which Pew said... "Then Next time don't lie about your name". Pew suffocated spencer for over 2½ min. All 7 of these actions by Pew and Rozema and Macklin were in clear sight of defendants Shall and Macklin and they failed to intervene. These are not "standard Tactical Maneuvers"! In fact, Police and sheriff offices across this country train officers and Deputies how to properly apply chokeholds and the effects

⑤

of positional Asphyxia. The actions Mr. Spencer was sub-jected to during this incident contradict all prior training and should have caused the defendants to Intervene. See [Exhibit #22 - video D at 01:00 to 03:52] For the Positional Asphyxia Evidence.

12. (PDSOF) - This claim is Disputed. This statement is the exact same as the statement made in [SOF 11]. The only difference is that now, Macklin is claiming to have witnessed only "standard tactical Maneuvers" by the Mesa defendants. Since they were both present for the same incident, I refer the reader back to the previous answer that was given in (PDSOF #11). I find no point in writing all of it again.

13. (DSOF) - No Dispute

14. (DSOF) - No Dispute

15. (DSOF) - NO Dispute

16. (PDSOF) - This claim is disputed. [Exhibit D - page 3] shows exactly what spencer said. Spencer told legal counsel for the defendants that he hadn't seen all the videos and that "he couldn't answer that question."

⑥                                   ER 025

THIS DOCUMENT IS NOT IN PROPER FORM
ACCORDING TO FEDERAL AND/OR LOCAL RULES
AND PRACTICES AND IS SUBJECT TO REJECTION
BY THE COURT.

REFERENCE: LRCiv 7.1(a)(i), 5.4
(Rule Number/Section)

LODGED _____
RECEIVED _____ COPY

FEB 1 9 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ mm _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

CV-20-00385-DGC-CDB

Cole J. Spencer

V.

Aaron Pew, et. al.,

Plaintiffs response in Opposition to defendants Motion for Summary Judgment (shall and Macklin)

This is a 1983 excessive force case brought by an incarcerated individual. Defendants shall and Macklin are not entitled to Summary Judgment because they violated the plaintiffs clearly established rights. As such, they are not entitled to qualified immunity and this case should be decided by a jury of their peers.

## Plaintiffs Statement Of Facts

Mr Spencer is currently incarcerated in the Arizona Department of Corrections in Yuma. [SOF 1] On March 21st 2018, defendants shall and Macklin arrived on scene of an incident involving Cole Spencer and defendants Pew and Rozema. [SOF 2] Shall's body-cam shows that he arrived on scene at the exact time the first four discharge cycles from officer

Pew's taser were ending. [SOF 3] Everything from this point untill the E.M.T.'s arrived is on shall's body-cam, he was present and within 15 feet of everything that occured in this incident.([SOF][4]) After the initial electrocutions, Mr. Spencer had little to no control over his body. Officer Pew was pinning Spencers arms to the ground while Rozema Punched and Kicked Spencers Face. [SOF 5]

At this point Deputy Macklin arrived on scene. He was present for everything after this point of the incident. [SOF 6] Mr. Spencer ended up on his Knees in an attempt to block the officers strikes, and was electrocuted [2] more times. [SOF 7] Mr. Spencer informed the officers he had a pacemaker as he felt he was going into cardiac arrest. He also told the officers, "O.K., o.k.... Cant move my Hands". ([SOF][8]) Because of the traumatic intensity of this incident it is possible that the events described in [SOF 7 and 8] could have happened before Macklin arrived, but in any event it has no bearing on either Deputies liability as they were present for everything after this point which is when the more egregious parts of this incident ocurred. [SOF 9]

Around this time Deputy Macklin was laying on top of Mr. Spencer and had flatened him out. Spencer was then knee'd in the face 6-7 times by Pew. [SOF 10] Mr. Spencer was in shock and loosing his motor function abilitys.

②

During this time officer Pew wrapped his hands around Mr. Spencer's throat and slammed Spencer's face into the ground repeatedly. [SOF 11] Then Mr. Spencer felt the probes in the back of his body begin to electrocute him for the 7th time. At the same time the officer stuck the tip of the stun-gun to his carrotid artery and held the trigger for around 20 seconds. [SOF 12] At this time Mr. Spencer's heart felt like it was going to give out. [SOF 13] Immediatly after the electrocution was over, Spencer was face down and officer Pew wrapped his hands around Spencer's throat and strangled him untill he went unconscious. [SOF 14] When Spencer woke up he was hancuffed and an officer was driving his knee into the back of his neck with all of his body weight. [SOF 15] Mr. Spencer informed the officer that "He couldn't Breathe" several times and also told the officer that he was "DYING", to which Pew said "Then next time, Dont lie about your name". [SOF 16]

By the end of the incident Spencer had not thrown a single punch or strike and to this day this incident stands as the most traumatic experience of Mr. Spencer's life. [SOF 17] Mr. Spencer was not under the influence of drugs at the time of this incident. [SOF 18] Deputies Shall and Macklin were present and self-aware of all events described in this "Statement of Facts" and failed to intervene and stop the mesa officers from brutaly beating Mr. Spencer. [SOF 19]

③

## Qualified Immunity

"In resolving questions of qualified Immunity at summary Judgment, courts engage in a two-pronged inquiry." [Tolan], 134 S.Ct. at 1865. "The first asks whether the facts, taken in the light most favorable to the NON-Moving party,.... show the officers conduct violated a federal right." Id (Bracketts Omitted) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L. ED. 2D 272 (2001) "The Second prong of the of the qualified Immunity analysis asks whether the right in question was clearly established at the time of the violation".

"In "Graham V. Connor" the Supreme Court established a balancing test to determine when the use of force is un-reasonable. SEE (Graham, 490 U.S. at 396, 109 S.Ct. 1865) Under the "Graham" test, courts must balance, "the nature of the quality of the intrusion on the individuals fourth amendment interests against the countervaling governmental interests at stake"." Relevant considerations include: (1) The severity of the crime at issue (2) whether the Suspect poses an immediate threat to the safety of the officers or others. (3) whether [the Suspect] is actively resisting arrest or attempting to evade arrest by flight."

"Deputy Shall And Macklins Inactions Were Not Reasonable"

Out of shear necessity, the defendants claim that they

④

witnessed the Mesa defendants inflict only "standard tactical manuevers" on mr. Spencer in their attempts to hand-cuff him. This is an insult to anyone's intelligence who watches the footage from this incident. Mr. Spencer was punched, kicked, knee'd, electrocuted, strangled and ultimatly suffocated for nearly 3 minutes while officer Pew drove his knee into spencers neck, all while Spencer pleaded with officers, proclaiming he "couldn't breathe". Completley dismissing all prior training regarding "positional Asphyxiation." The nature of the force inflicted on Mr. Spencer was extreme and far more severe than what was necessary to effectuate the arrest. In fact, this incident is a prime example of a case with such an egregious constit-utional violation, the defendants shouldn't have needed guidance from 9th circuit or Supreme Court case law to know that the behavior they were engaging in was unlawful. SEE [Deboer v. Pennington, 206 F.3d 857, 864-865 (9th Cir 2000)

Shall and Macklin's only defence is to claim that they didn't see what was happening directly in front of them. Since there is body-cam footage from both deputies that show exactly what was ocurring directly in front of them, this arguement that they are making is acinine. Both officers were asked if they felt their lives were in danger at any time during this incident. They both answered [NO] in Spencer's request for "admissions" and "interrogatorries." SEE [Exhibit B and C]. Both defendants had a clear opportunity

to intervene and stop the Mesa defendants from brutaly beating Mr. Spencer, and in Macklins case he even helped the Mesa defendants by laying on top of Spencer while Pew strangled spencer unconscious. There were [5] officers present while these acts were occuring. Spencer posed [NO] threat to any officer in this incident. He was face down in a pool of blood being beaten and strangled. These circumstances do not favor the defendants. Neither do the Graham factors, as they all lean in Spencer's favor. The following is the Graham factor analysis for this incident.

## First Graham Factor: Severity Of Crime

As Shall and Macklin have stated many times through the course of this case, they had no information regarding what had transpired before they arrived. The underlying crime of aggrevated assault that Spencer was charged with is irrelevant because it happened before they arrived. All that matters is what the defendants observed upon their arrival. Both defendants admit that Spencer never threw any punches During this incident, instead when we watch the body-cam videos we can hear spencer begging for the beating to stop... "OK, ok cant move my hands ..... I have a pacemaker"... and we observe fellow officers teeing-off on spencers face for sport, excessivly tazing him and strangling him. Since this is a balancing test and on one side of the scale we have the

minor crime of a shoulder 'push' compared to the application of deadly force and brutal face strikes on the other side. The defendants can not demonstrate that spencer's underlying crimes ever rose to a level that would justify this level of force, for this reason this "Graham" factor favors plaintiff.

### Second Graham Factor - Immediate Threat Posed

"The most significant factor under "Graham" is whether the ~~busp~~ suspect poses an immediate threat to the safety of the officers or others." [Chew v. Gates, 27 - F. 3d 1432, 1441 (9th Cir 1994] This Graham factor favors Spencer the most. This is because of what both defendants admitted when asked if they felt their lives were in danger..... they said [NO]. We must not forget that this is a "deadly force" case. The Supreme Court along with the 9th circuit has made it very clear that the use of any chokehold constitutes the use of deadly force. SEE [Lyons, 461 U.S. at 117 n. 7, 103 S. Ct. 1660 (Marshall, J. dissenting). "For these reasons, the application of any chokehold is properly considered the application of deadly force". SEE ALSO [Nava v. Dublin, 121 F.3d 453, 458 (9th Cir. 1997). We must also consider the supreme court holding in [Scott, 550 U.S. at 384, 127 S. Ct. 1769] that.... "An officer may use deadly force where a suspect [poses an actual and imminent threat] to the lives of the officers or others." In other words, for the defendants to have justifiably applied lethal/Deadly force to Spencer,

Spencer would have had to threaten the lives of the officers present.... and since both Shall and Macklin admitted that Spencer never threw a single punch and that they never felt their lives were in danger, they cannot justify standing by while officer Pew strangled Mr. Spencer or when Pew drove his knee into Spencers neck, suffocating him while spencer cried out proclaiming he couldn't breathe. Spencer was offering ZERO resistance when this force was applied therefor he posed [NO] threat to any of the officers involved. For these reasons, this Graham factor favors Mr. Spencer.

Third Graham Factor - Active Resistance or Attempts to Flee

Finally, the last Graham factor favors Mr. Spencer. Multiple District courts have consistently concluded that a suspects initial resistance does not justify the continuation of force once the resistance ceases. SEE [Perea, 817 F.3d at 1203 "(although use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not"). Any individual that is tased [7] times, kicked in the face, kneed in the face, punched in the face and has his face slammed into the ground repeatedly is going to naturally move or "squirm". Spencer has an undeniable right to protect himself and preserve his life. Fortunatly there is body-cam footage from this incident, and even if the defendants make claims that when they arrived it "appeared to them that

⑧

Spencer was resisting", this excuse will only suffice for the first 10-20 seconds upon their arrival. After that, both defendants are expected to metabolize situations they encounter and act accordingly. It would have been blatently obvious to any reasonable minded officer that encountered these exact circumstances ~~known~~ that spencer was not resisting arrest at the time the force was applied to him. How could Spencer be resisting arrest when by definition, what the officers were doing to him could not be defined by anyone as effectuating an arrest. For these reasons, this graham factor favors Mr. Spencer.

## Integral Participant Standard

Yes! Both Deputies were integral participants in this incident. It is undeniable that Macklin was more involved than shall, but nonetheless they both were in an appropriate proximity to realize what was happening and react accordingly. [Blackenhorn v. city of Orange, 485 F.3d 463, 481 n.12 (9th Cir 2007) Made it clear that, "an officer who is an integral participant in unlawful conduct ~~may~~ may be held liable even if the officer's isolated actions do not rise to the level of a constitutional violation". For example: SEE [Lolli v. city of Orange, 351 F.3d at 417-418] Which held that... ... "where multiple officers collectivly beat on idividual, all of them may be held liable for contributing to the overall use of excessive force" — [i.e. - Deputy Macklins actions of

⑨

of holding Spencer down while Pew kneed, punched, kicked, tased and strangled Spencer] Similarly in [Hopkins v. Bonvicino, 573 F.3d (quoting Boyd v. Benton City, 374 F.3d 773, 780 (9th Cir 2004)].... "An officer who stands outside a residence "armed with [a] gun, while other officers conduct [an unlawful] search" qualifies as an integral participant in that search." — (i.e. – Deputy shall standing by while Macklin, Pew and Rozema subjected spencer to excessive force.) When viewing this evidence in the light most favorable to Mr. Spencer, a reasonable fact finder could conclude each officer was an integral participant in the overall use of force.

## Available Caselaw Favors Plaintiff

Because of the severity of the force inflicted on Mr. Spencer, it is hard to find a case with exact circumstances that would portray what occured in this incident. After an extensive search of what caselaw Mr. Spencer had access to, not one case involves a plaintiff being strangled with an officers bare hands. However there were 2 cases with similar circumstances. But in both of these cases as with any case where the victim is subjected to the amount of force similar to what Mr. Spencer was, they unfortunatly did live to tell the story. The first is [Martinez v. City of Pittsburg (9th Cir. 2019) and [Ingram v. Shipman-Meyer] (D.C. Circuit 2017). Both of these cases paint a clear picture that it is unconstitutional to

(10)

subject any individual to a lethal chokehold, when the individual does not pose an imminent threat to the lives of officers or others involved. It is obvious that Pew and Rozema physically subjected Mr. Spencer to such force that would be considered excessive. What is now needed is a 9th Circuit case that "squarly governs" on incident involving officers who fail to intervene." We now turn to [Knapp's v. city of Oakland, N.D. Cal 2009, 647 F.Supp 2d 1129. In this case it is made clear that ony peace officer acting under the color of state law who has a "realistic opportunity and ability to intercede in another officer's unjustified [use of force]" can be held liable under 1983 for violating a suspects fourth Amendment rights.

When considering the (9th Circuits) stance on "failing to intervene" that has been established in [Knapps], mixed with Shall and Macklins proximity to Spencer as well as the duration and extent of the force he was subjected to, it is clear that the defendants violated Mr. Spencers constitutional rights accordingly meeting the criteria needed to satisfy the first prong of this inquiry.

Second Prong: Clearly Established law Would Have put Defendants on Notice

The second prong of this inquiry is to determine if Mr. Spencers rights were clearly established at the time of this incident. A "clearly

ER 036

established" right is one that is "sufficiently clear that every reasonable official would have understood that what He/she is doing violates that right." [Mullenix v. Luna, 136 S. Ct. 305, 308, 193 (2015) Quoting - [Reichle v. Howards, 566 U.S. —, —, 132 S. Ct. 2088, 2093 (2012)

The following cases and the principles that have been established as a result, would have put Deputies Shall and Macklin on notice, that "Failing to intervene" while a fellow officer [s] violates a suspects constitutional rights is unlawful.

Ninth circuit case law in effect prior to Spencer's 2018 arrest establishes that the officer's alleged conduct in this case is a constitutional violation. SEE [Blackenhorn v. City of Orange, 485, F. 3d 463, 481 (9th Cir. 2007) ... ("In assessing the state of the law at the time of Blackenhorn's arrest, we need look no further than "Graham's" holding that force is only Justified when there is a [need] for force"]. Both defendants stated that they did not feel that their lives were in danger during this incident. Spencer was in a prone position pleading with officers to stop. Punches, Knees, Kicks, Head slammed to the ground, tazing, strangulation then suffocation via "positional asphyxiation". The force inflicted on spencer consistantly increased while spencer's resistance remained at a constant... Zero! There was no Justifiable [need] for these increased levels of force.

Drummond v. City of Anaheim, 343 F. 3d 1052 (4th cir 2003 (It was excessive force for two officers to sit on subject - causing him "Positional asphyxiation" after he had been subdued). Also Weigel v. Broad, 544 F. 3d 1143 (10th cir. 2008) (sitting on subject after he had been subdued, causing asphyxiation, constitutes excessive force), cert denied, 556 U.S. 1236, 129 S. Ct. 2387, 173 L. Ed. 2d 1295 (2009).... The principles established in "Drummond and Weigel" would have gave both defendants fair notice that "positional Asphyxiation" on a subdued individual is unlawful, and because they were both "Integral participants" in this incident, they are liable for the force that Spencer was subjected to. The standard that governs their liability is the "Duty to Intervene" standard". The following is a robust consensus of cases of persuassive presedent that should have made it blatantly clear to both defendants that they had a "Duty to Intervene" when a fellow officer violates a suspects constitutional rights by subjecting that suspect to excessive force during a seizure.

"City police officer and sergeant had realistic opportunity and the ability to intercede in another officers unjustified use of a wrist lock in restraining a battery suspect, and thus were liable under 1983 for violation of suspects fourth amendment rights in connection with use of wrist lock, given their proximity to other officer, length of other officers use of hold, and fact that suspect complained that wrist lock was

(13)

hurting". [Knapps v. City of Oakland, N.D. Cal 2009, 647 F. Supp 2d 1129]

"An officer who fails to intercede is liable under 1983 for preventable harm caused by the actions of other officers where that officer observes or has reason to know: (1) that excessive force is being used (2) that a citizen has been unjustifiably arrested (3) that any constitutional violation has been commited by a law enforcement official. [Mack v. Town of WallKill], S.D.N.Y. 2003, 253 F. Supp 2d 552

"Police officer present at scene of civil rights violation who does not take reasonable steps to protect victim from fellow officers excessive use of force may be liable under 1983 for his nonfeasance." [Medez-Marrero v. Toledo, D. Puerto Rico 1997 968 F. Supp 27]

These clear principles would have given both defendants fair notice that their [Actions] or [Inactions] were unlawful. Thus meeting the criteria of the second prong of this inquiry.

Conclusion

Defendants Shall and Macklin can claim they did not see the Mesa defendants engage in excessive uses of force, but we know this is said only with self-

(14)

preservating motives because their own body-cameras show that this is not true. If Macklin did not witness any foul behavior from the Mesa Defendants, then why wouldn't he submit his Body-cam videos as evidence? Why do they now submit only Shall's video, who was the furthest away from the Beating? The answer to this is clear.... Macklin and clarks videos are damning to their case, so much so that the defendants have altered the videos and provided false footage and lied about it to the courts. Both defendants are responsible for the excessive force Spencer was subjected to in this case, and because the rights in question were clearly established at the time of this incident, both defendants are not entitled to Qualified Immunity and Summary Judgment should be denied.

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
REFERENCE _CJVLL S.4, 7, ((a)(4)_
(Rule Number/Section)

FILED ____ LODGED
RECEIVED ____ COPY

DEC 2 8 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT OF ARIZONA

| | |
|---|---|
| Cole J. Spencer,<br>(Plaintiff) | CV-20-00385-DGC-CDB |
| V. | Plaintiffs "Disputed" Statement of facts in support of opposition to Defendants Motion for Summary Judgment |
| Aaron Pew et al,<br>(Defendants) | |

Pursuant to LRCiv 56.1 Plaintiff submits the following "separate statement of facts" in opposition to defendants motion for summary Judgment. Each paragraph corresponding to the defendants [30] statement of facts.

* Attention *

[Exhibit 22] is in a separate manilla envelope and is the main source of most of the disputes made in this response. However. There are [4] separate videos on one disc. And there is no way to tell the videos apart from eachother. Enclosed in the manilla envelope with the CD is a "Key" to help ease the confusion.

"Plaintiffs Disputed Statement of Fact" (PDSOF)
"Defendants Statement of Fact" (DSOF)

# 1 (DSOF) = No Dispute



#2 (DSOF) - No Dispute

#3 (DSOF) - No Dispute

#4 (DSOF) - No Dispute

#5 (pdSOF) - This claim is disputed. Defendants claim that Mr. Spencer was looking for a potential escape route. This is a subjective opinion. These officers are not mind readers. [Exhibit 1 - paragraph 4 and 6] explains exactly why Mr. Spencer was Nervous.

#6 (DSOF) - No Dispute

#7 (DSOF) - No Dispute

#8 (DSOF) - No Dispute

#9 (DSOF) - No Dispute

#10 (PDSOF) This claim is disputed. Rozema never told Spencer what he was under arrest for. Rozema simply told spencer "yer under Arrest C.J.". [see Exhibit 1 - paragraph 7] Also, the defendants make it very clear to the officers who respond they do not know who the plaintiff is. This is because of how for overboard they went with their use of force.

2

If it would have came out that they knew who the plaintiff was, it would look premeditated. see [Exhibit 22]

#11 (PDSOF) Plaintiff disputes this claim. Plaintiff put his hands behind his back and Rozema grabbed his left wrist and bent it upward. When Rozema said Spencer's name, Spencer panicked and pushed Rozema with his left shoulder to create separation between the two of them. [See Exhibit 1 - paragraph 7 and 8] Rozema's actions were unnessecary. Rozema never lost control of plaintiffs left wrist. Spencer was never able to "run and was not trying to run, but rather create separation from what he perceived was a toxic situation. *** Officer Pew told a completely different story in his original [IR] Incident Report [Exhibit 2 - lines 15-18]. There he states; "...place his hands behind his back. Cole started to turn [then] made a fast movement towards the north as if he was trying to run. Officer Rozema was able to grab an arm to prevent Cole from getting away. As soon as Cole realized officer Rozema had a hold of his arm, he turned and impact pushed officer Rozema in the chest..." In the version that the defendants submited in their motion for Summary Judgment as well as their Declarations, they both make it clear that the shove happened first, then Spencer ran in a North Direction. Pew changed the order of events. This is just one of many changes and mixups in their story.

3

#12 (PDSOF) This claim is disputed. As mentioned in the previous paragraph, Spencer's left wrist [left wrist] never broke free of officer Rozema's grasp. [see Exhibit 1 - paragraph 8] Mr. Spencer never "ran away from the scene" so it would have been impossible for Rozema to have ever "caught up" to the plaintiff, as Mr. Spencer was right in front of him. A quick examination of [Exhibit 22] any observer can easily conclude that the beating wasn't more than 10ft from the vehicle.

#13 (PDSOF) This claim is disputed. The following is very confusing as I will be cross-referencing the defendants claims using both defendants original "Incident Reports" as well as both their Declarations [Exhibits 2,3,4,5]. Also, quoting lines from defendants Motion for Summary Judgment [Exhibit 6]. *** The defendants are claiming that Mr. Spencer "flipped over onto his back and swung his fist". This is false. Rozema painted a completely different picture in his original report, see [Exhibit 4 - lines 12-20]. First off, rozema Never mentions that Spencer threw a punch. Secondly, All any observer has to do is compare the "Kick" to Mr. Spencer's face in [SOF 15] and that Some [Kick] in Rozema's report. In Rozema's original report he states that "officer Pew applied a strike with his foot to cole's face." Rozema then goes on saying that he used his right knee to the [back] and left side of [coles] face. Which would imply that Spencer was face down when Pew applied the strike to cole's face.

4

This is also evident on lines [17 and 18]. Rozema says "Pew tased cole several times"... then says "...I do know he tased cole in the neck and [BACK] area." How could Pew tase Spencer in his back if Spencer was "flipped over on his back throwing a punch." To top it all off, on [lines 19 and 20] Rozema goes on to say "Cole was able to roll over to his back despite me and Pew's best efforts to control him." So now we know that when Pew kicked spencer in his face, we have a clear understanding that Spencer was on his stomach, contradicting their claims in [SOF 13 and 15] which imply's that Spencer was on his back and threw a punch. The point of all of this is to point out that spencer was on his stomach when Pew kicked spencer's face, not on his back like the defendants are now claiming. The "Punch" was just an add-on to their story. Also this part of the incident is layed out in the "plaintiffs Declaration" [Exhibit 1 - paragraphs 8, 9, 10] *** The following ⬤ ⬤ is an examination of the "punch" itself. The defendants have made claims in both of their original reports, Declarations and Motion for Summary Judgement, [all] of which are different. The first is in [Exhibit 2 - lines 19 and 20] Officer Pew states "I observed cole throw [a] punch which [appeared] to have hit Officer Rozema." Then in Rozemas report [Exhibit 4 - line 13] He states "cole Flung his [arms] back at me and Nearly struck my face." And never mentions any type of punches. Now in their #13 SOF they say "the

5

ER 045

plaintiff then flipped over onto his back and swung his [Fists] at Rozema's face [Several] times. How does it go from [arms] to [fists] and from [a] punch to [Several] punches. But the officer who was supposedly being punched at, Never mentions it. in his original Report. These added threats of resistance weren't added till Pew wrote his report 14 days after the incident. Or even more puzzling is in the defendants motion for summary Judgement [Exhibit 6 - page 5 - lines 12-16] and also [lines 17-21]. They now state that mr. Spencer "pushed and [struck] Officer Rozema in the face". Now implying that Spencer actually made contact with one or multiple punches. Everytime the stakes raise in this case, so does Mr. Spencers level of resistance. There was never a punch or any Kind of strike made by Mr. Spencer and that is clearly stated in [Exhibit 1 - paragraph 17] ****

Beyond the many inconsistancies in the defendants stories, there is another set of facts that contradict their current version of this incident. And these facts cannot be disputed. Unfortunatly for the defendants, this case was already decided in the superior court of Arizona. Mr. Spencer was charged with Aggrevated Assault on Jacob Rozema. He pled guilty to that crime. At Spencers settlement conference he entered into a plea. The transcrips of this hearing are attatched as [Exhibit 7]. The Judge (Kathleen Mead) asked legal counsel for Mr. Spencer, (Mathew Leathers), to give a "factual basis" for the crime of Aggrevated Assault. SEE

⑥

[Exhibit 7 - page 12, line 19 through page 14 - line 10]. Mr. Leathers said the following, "He pushed the officer and made a sudden movement." There were no punches, No kicks, No separate acts of aggression that have now surfaced, now that Pew and Rozema are defendants in a civil matter. There time for that has come and gone. * * * * Defendants are also claiming that Mr. Spencer attempted to [throw] Rozema off of him. This is false. Nowhere in their original reports [Exhibit 2 and 4] Do they ever mention that Spencer attempted to "throw" anyone off of himself. This is a self-serving [Add-on] to raise Spencers level of resistance.

#14 (DSOF) - No Dispute

#15 (PDSOF) - This claim is disputed. Defendants portrayal is inaccurate, and misleading. To say that Pew [struck] Spencer in his head in an attempt to subdue him, is not appropriate. [Exhibit 2 - line 28] Pew states that he delivered 3 kicks to cole's face and shoulder. Also See [Exhibit 1 - paragraph 9]

#16 (PDSOF) This claim is disputed. [See Exhibit 1 (in its Entirety] From the time after Mr. Spencer pushed Rozema, till the incident was over, Mr. Spencer was not resisting and for sure was not fighting. The Defendants were not following their protocols for effectuating on arrest. So how could Spencer be resisting Arrest, when what the defendants

⑦

were doing could not be characterized as an arrest. He was simply moving to avoid being hit. [See Also Exhibit 22] The Body-Cam footage paints a different scenario than what the defendants portray. And yes, the defendants Did order Spencer to give up his hands, and spencer told the officers that his hands were locked up, as was Most of his body. At this point in the incident, Spencer had been Tazed 4 times out a total of 7, and Spencer was experiencing N.M.I. Nuero-Muscular Incapocitation. [See Exhibit 1]

#17 (PDSOF) This claim is disputed. Pew and Rozema admit to hitting Spencer many times in their reports. [See Exhibit 2 in its entirely]. He [Pew] admits to applying Knee strikes on 2 Separate occasions, each occasion consisting of 3-4 Knee strikes. Also Admits to slamming spencers Head into the ground. as well as Kicking spencers face 3 times. Also, See [Exhibit 22 - video's A B and D]. The Defendants portrayal that they struck Spencer is vague. And again, Spencer was in Survival Mode, not resisting and Not fighting. [See Exhibit 1 -paragraph 10] It is also important to point out that with every application of force that the defendants applied, they never aknowledge that what they were doing was affecting Mr. Spencer. This is easily prooven false by [Exhibit 22 - video A] In this video any observer con easily conclude that spencer is screaming and in extreme Distress.

⑧

#18 (PDSOF) This claim is disputed. The way the defendants characterized this statement is misleading as it implies that Mr. Spencer was tased only once. This is not true. See [Exhibit 8]. This is the usage history from the taser that was used in this incident. [Exhibit 8 - page 18 - Seq. #509-523 is the data from this incident. At [seq. 509 to 510], under [cartridge Info] it says that [c1 and c2] were both deployed. Each cartridge contains 2 probes that are shot into the skin. So at this time, Spencer had [4] taser probes shot into his body. The use of force report [Exhibit 9] [page 4] lays out these facts. [Exhibit 8 page 18 - Seq #509 - 512] are [4] separate Deployment cycles lasting a total of 19 seconds. [Exhibit 23] Is Mesa PD training Manual pertaining to the use of ECD's. It should be noted that this manual was printed off the internet because the defendants refused to produce a copy of the 2017 taser re-certification course, but there are not any differences or changes to the 2017 version and this 2019 version. As you will see, the [seq #509 to 512] were continuous. There were no breaks in between each discharge cycle. [Exhibit 23 - page 5] clearly states the following: "Deploy [one] standard Discharge cycle". Then it goes on to say: "Reassess the situation to determine if further applications of the CEW are Necessary." This is a clear violation of their own policy. It also states that "Avoid repeated or continuous exposures beyond 15 seconds absent reasonably perceived immediate threat and increased justification. See [page 8]. Mr. Spencer was excessively tased by the defendants.

9

ER 049

This is only the first [four] discorge cycles. There were [7] total. [See Also Exhibit 1 - paragraphs 10-12-14]

#19 (PDSOF) Plaintiff disputes this claim. This claim by the defendants is false. But even if it were true, why would you keep tasing a suspect (7 times!) if it was having zero effects on the suspect? The taser shocks were having serious effects on Mr. Spencer. [See Exhibit 22 - video A - 01:00 to 01:12]. This is in between the 5th and 6th taser shocks. Mr. Spencer tells the Defendants, "O.K. - O.K." "Cant move my Hands" "I have a pacemaker." Mr. Spencer was pleading with these officers as well as screaming throughout [video A]. This is all included in [Exhibit 1 - paragraph 10 and 12]. Spencer also explains the effects that the taser was having on his heart in paragraph [12 and 14]

#20 [PDSOF] This claim is disputed. This is Fabriccated and false. [Exhibit 2 and 4] when completely read, ony a reoder can conclude that nowhere in the writing, did Pew and Rozema ever claim that Spencer "ripped" 4 taser probes out of his body and toss them aside. In [Exhibit 2 - line 3-7 on page 2] Pew states... "deployed a set of probes to coles legs [and] immediatly to his upper body... I held the trigger of the taser and I moved it to contact another part of his body...] Pew pressed the tip of the stun-gun to spencers carrotid artery, which is an option for the taser's operator. (To tase a suspect in

ER 050

10

probe mode and simultaneously apply a Drive-stun shock.)
At this point Spencer was able to move the stun-gun off his neck
as it was crushing his throat and making it hard to breath.
[See exhibit 1 - paragraph 10]. Also see [Exhibit 22 - video A -
07:14] At the [07:14] mark, 'pause' the video. There you
will see, on Mr. Spencers hip, one of the taser probes
on the outside of spencers pants. Also in [video A at
08:05 to 09:15] There are separate instances that you
can see the wires from the [4] probes all tangled in
the handcuffs, and the defendants cut the probes loose.

#21 (PDSOF) This claim is disputed. Defendants are claiming
that they tased spencer 3 additional times in "Drive-stun" mode.
This is false. As mentioned in [Exhibit 1 - paragraph 10 and 14]
the defendants were pressing the tip of the stun-gun to Spencer's
artery and body as well as shocking him through the "probes."
Every shock was catagorized as "Probe mode." [Exhibit 8 - page
18 - Seq 509 - 523] will all show that the [Event Type] all
read "Trigger" which is probe mode as it also says "Deployed."
When Drive-stun is used in isolation without the probes, it
will read [ARC] as it does on [Exhibit 8 - page 18 - Seq 505]
*** Also, the order in which the defendants are portraying in
this incident is false. The first mention of their taser is in [SOF 18].
and ends in [SOF 21] This is innaccurate. Their were 7 seperate
Discharge cycles, all of which were not completed at the
same time. Some were minutes apart. Fortunatly, any observer
can use the Taser usage history [Exhibit 8] and the
ll

Video A [Exhibit 22] to figure out exactly what times
Spencer was being tazed During this incident. To start, Go
to [Exhibit 22 - video A - at 00:09 and press pause] There
on the left side of the screen you can see Officer Pew
running around the vehicle where he admits to Kicking Spencer
3 times in his original Report. This is just so that the
observer can understand and have a benchmark as to how for
into the incident the arriving officer (shall) was at the
time He arrived. The defendants have previously claimed that
only Half of the incident was on camera. This is not true.
Next. Go to [Exhibit 22 - video D - at 00:08] Here you will
hear Rozema Say "Give him another ride" and Pew picks up the
tazer and sticks the tazer to Spancers carrotid artery and holds
it there for [13 Seconds]. This is also laid out in [Exhibit 8 -
page 18 - Seq 521] This was the final discharge cycle of the
incident. [seq 521] occured at (17:36:02). We also Know
that [seq 509] began at [17:33:43]. This is a 2 minute
and 19 second gap between the last Discharge cycle and
the first. lets put the 2 min 19 sec Gap aside for a second.
Now go to [video A]. Go to [02:45] and you will
hear Rozema Say "Give him another ride". So now we Know
that the Final discharge [seq 521] occured at [02:45 of video
A]. Now lets rewind that 2 min 19 sec and go back to
the initial Discharge cycle [seq 509]. As you con see, Spencer
was being tazed shortly ofter Pew ran around the vehicle at
[00:26] all the way to [00:44]. *** The reason that
this was mentioned in this dispute and not in the "Additional
12

Material Facts" was because this info. shows that there were considerable gaps between the taser deployments, yet the defendants explained their use of their taser from (SOF 18 -21) and then claim the MCSO Deputies showed up in (SOF 22), After they were done using the tazer. This is false. The defendants' recollection of this event and their portrayal of their actions is false.

# (PDSOF) # 22. This claim is disputed. Defendants claim that [2] MCSO Deputies arrived on scene. This is false. There were 3 sheriffs deputies present. [Exhibit 10] clearly reveals that besides deputies and Macklin, there was also a sheriff present named Sergeant Clork. Also see (Exhibit 22 - videos A, B, C, D).

#23 (DSOF) - No Dispute

#24 (DSOF) - No Dispute

# 25 (PDSOF) - This claim is disputed. Defendants claim that Spencer was on powerful drugs is false and merritless. [Exhibit 1 - paragraph 19] clearly lays out that Mr. Spencer was not on anything at the time of this incident. Plaintiff also Disputes the fact that the defendants claim Spencer had a Heightened pain Toleronce. This is easyly proolen false by watching [Exhibit 22 - video A]. Plaintiff also disputes the claim that he had Super-Human strength. The First opportunity that The defendants got to recieve help, they

13

Turned down the assistance by informing Deputy Shall to "Keep an eye on the Driver." If Mr. Spencer had super-Human strength like the defendants claim, they would have accepted Shall's Help. [Exhibit 10 - page 1]

#2b (PDSOF) Plaintiff Disputes this claim. Spencer states in his Declaration [Exhibit 1] that he was not under the influence of any drugs at the time of the incident. See [Exhibit 1-paragraph 19]

#27 (PDSOF) This claim is disputed. This is the most important claim that the defendants make in this case. They have based all of their case law off the [fact] that Mr. Spencer was alledgedly on DMT and Hullucinating at the time of this incident. These claims are false. [Exhibit 11] is the Medical Records from Bonner Baywood Hospital, where Spencer was taken via ambulance immediatly following the beating. The first mention of [D.M.T] is made by Rozema in his original report. See [Exhibit 4 - page 2 - lines 21-27] Rozema claims that he read Spencer his "Miranda" at [19:13] and Spencer made a detailed statement as a result of being interrogated after the miranda warning. The following is a detailed synopsis of the records that will show that 'Miranda' was not clearly established at [19:13] during this alledged conversation and in all likelyhood, Did not take place at all and is a complete self-serving fabrication to propetuate a narritive that Mr. Spencer was "out of it" on Hullucinogens. The Defendants claim that

14

"Spencer said he had used DMT [4] minutes prior to being pulled over at [Jaimie's House]. The medical Records [Exhibit 11 - page 1] will show that this was _NOT_ the first mention of DMT. In fact, [page 1] shows that at [18:25 MST] (48 min. prior to the alledged 'DMT' statement by spencer), Dr. Joel Betz mentions that "Pt is altered on a drug called DMT [per Him]". Dr. Betz was conducting an initial examination of Spencer. On [page 1], Highlited is the [History Source] section. This is the list of people, by which Dr. Betz was receiving the medical information that is contained in these medical records. listed there is: 'Patient' and 'Police' (Spencer and Pew, Rozema). The question to ask is: why would the Defendants be listed as a source pertaining to Spencers medical history? This question can be answered by going to page [25] of [Exhibit 11]. At the bottom of the page, the [Glasgow Coma Score] was conducted at [18:19] and [18:25], which is the exact time that Dr. Betz made his statement on [Page 1] about the "DMT". The "Glasgow Coma Score" is a gauge for medical personnel to rate a patients level of consciousness. The score ranges from 0-15. As you will see Mr Spencer's Score was [0]. Spencer was completly unconscious at the time Dr. Betz made his statement on [page 1]. That means that the Defendants took it upon themselves to speak for Spencer. A self-serving fabrication that would lay the ground work for their Hullucination narrative. Think about what was going through their minds as they sat in the emergency room looking at Mr. Spencer

15

see [Exhibit 24] and [Exhibit 12-page 2-21]. Imagine how overboard that they must have realized that they took their use of force in this incident. So much so that they made up a story about spencer being on hallucinogens to help Justify their actions. This is not the only lie that was told pertaining to this "DMT" statement. The following is an examination of Spencers Mindstate and medical Diagnosis immediatly preceding the [19:13] claim that. Spencer alledgedly made after miranda was read. Any reasonable minded trier of fact could easily conclude that not only is it highly unlikely that spencer would be able to wake up out of a dead sleep and make such a detailed statement like Rozema claims in his Incident report [Exhibit 4-page 2-lines 21-27], but it is also Highly probable that miranda was never read at all! — As mentioned earlier, at [18:25] Mr. Spencer scored a [zero] on the `Glasgow Coma Score` and was unconscious. see [Exhibit 11-page 25] Also on the top of the same page in the [Free-text] section it states that Spencer had an [altered Mental status]. Then on page [5] at [18:42] the Doctor states that "patient felt afraid or concerned about Safety" and also states that Spencer was "cognitivly unable to answer". At the bottom of that same page under the [Nuerological] section the Doctor states, "patient was somewhat slurred speech and Mildly Ataxic on examination". On page [6] the Doctor states that Spencer had, "Not appropriate Mood and Affect" and "Not normal Judgement". Mr. Spencer had taken over 25 knees, Kicks, and punches to the head and

16

ER 056

face, as well as having his face slommed into the ground, endured 7 electrocution cycles for a total of 36 seconds and was stangled till he was unconscious. The liklihood of Spencer waking up and giving a detailed explaination like the one that Rozema is claiming does not seem possible. In fact if you look at the crime scene photos [Exhibit 12-page 1-21] you will see that Spencer was completly asleep through all the pictures and did not move. As you will see on page [1] the C.S.S. employee [C. Zomojtel # 13553] begon taking photos at [18:40]. There were 60 photos taken of Spencer and both defendants. If Zomojtel started his examination at [18:40] then he must have started with the defendants first, because we know from the medical records that the doctor was examining Spencer at [18:42] on [Page 5]. In any event, [exhibit 13] (page 1) shows that Zomojtel finished taking the [60] photos at [19:05], [8 minuts] prior to Rozema's alledged Miranda reading. As we can see in the photos, spencer was not conscious. [See Exhibit 12]. *** Also, the following is a statement that the defendants made to the hospital staff [27] minutes prior to the alledged miranda statement. See [exhibit 11-page 2]. There the doctor states at [18:46] that "police reports that [He] was more alert on their arrival to the scene, However, the patient is having a more difficult time answering Questions." So, [27] minutes prior to reading spencer his miranda warning, the defendants admit that spencer was having trouble answering Questions, and that he was alert when they arrived on scene of the incident. This

17

ER 057

raises 2 issues and key points. ① It completly debunks their theory and claim that spencer was high on hullucinogens at the time of the incident. People who are on hullucinogens are not charactorized as "Alert". It also rules out the possibility that drugs had anything to do with Spencers medical conditions and mindstate layed out in the banner Medical Records. In other words, whatever altered mindstate that the Doctors documented in the records, was a direct result of the beating, not drug use. ② This statement raises doubts in the defendants character, integrity and their underlying motives. If the defendants admit that spencer was having a hard time answering questions, then why would they attempt to speak with him [27 min] later, or even more, attempt to read something as important as Miranda warning and actually beleive it was established? A reasonable minded officer would not have done this. It is easy to conclude that this whole conversation, never took place, likely because Spencer was asleep.

#28 (PDSOF) This claim is disputed. Defendants Pew and Rozema possess zero evidence that that could lead them to beleive that anything found in the vehicle in question, let alone a backpack with drugs, belonged to Mr. Spencer. First, and most importantly, Rozema's original Report [Exhibit] [4] - page 2 - line 27], mr. Spencer denies that the drugs found were his. Spencer was initially charged with the drugs by the defendants, but the charges were dismissed at spencer's Initial court proceeding as the

18

Judge found "No probable cause". Spencer was a passenger in the vehicle and the vehicle was not in his name. In addition, the drugs found were analyzed in the forensic lab. [Exhibit 14-pages 1-5] are the documents from the analysis. It is easy to conclude from a breif scan of these pages that there is [zero] evidence linking Mr. Spencer to these items. Another key fact is that the defendants claim in (SOF 28) that the drugs were found in the "plaintiffs backpack". This is false. If the defendants honestly beleived that this "backpack" was the plaintiffs as they say, then why wasnt it kept with Spencers property? [Exhibit 15] is the plaintiffs "Prisoner Property Inventory Form". There is no mention of a backpack. This backpack did not belong to the plaintiff. This is yet another Self-Serving statement fabricated by the defendants.

#29 (DSOF) No Dispute

#30 (DSOF) No Dispute

Spencer, Cole Joseph (MR # 0104034855)                                    Encounter Date: 03/24/2018
Patient Care Timeline (3/24/2018 22:19 to 3/25/2018 00:50:58) (continued)

| 3/24/2018 | Event | Details | User |
|---|---|---|---|
| 22:29:48 | ED Notes | Patient with c/o palpitations & concerns for opiate withdrawal. Patient placed on cardiopulmonary monitor. Patient is A&Ox4 with no signs of distress. Patient with previous bruising to face from injury 2 days prior. | Tiffany B Wilson, RN |
| 22:29:58 | First Provider Evaluation | | Daniel Orosco, DO |
| 22:30:59 | Registration Complete | | Erika Elmore |
| 22:31:25 | Assign Attending | Murtaza Akhter, MD assigned as Attending | Murtaza Akhter, MD |
| 22:31:44 | Home Medications Reviewed | | Tasha D Fleming, RN |
| 22:33:08 | ED Note Filed | ED Note filed by Tiffany B Wilson, RN | Tiffany B Wilson, RN |
| 22:33:10 | ED Notes | Dr. Lentini at bedside. | Tiffany B Wilson, RN |
| 22:33:15 | ED Note Filed | ED Note filed by Tiffany B Wilson, RN | Tiffany B Wilson, RN |
| 22:39:51 | Assign Nurse | Tasha D Fleming, RN assigned as Registered Nurse | Tasha D Fleming, RN |
| 22:44 | PCP Verification | PCP Verification<br><br>The PCP on file was verified as the current PCP?: Yes | Erika Elmore |
| 23:00 | ED Vital Signs | Vital Signs<br><br>Heart Rate: 60 (Device Time: 22:59:34)　Heart Rate source: Pulse Ox; Monitor<br>Resp: 18　SpO2: 100 % (Device Time: 22:59:34)<br>Pulse Oximetry Type: Continuous　Oximetry Probe Site Changed: No<br>BP: 135/88 (Device Time: 23:02:27)　Mean Arterial Pressure: 104 mm HG<br>BP Location: Left arm　BP Method: Automatic<br>Patient Position: Lying<br>Oxygen Therapy<br><br>Respiratory Support: None (Room air)<br>Nitric Oxide<br><br>SpO2: 100 % (Device Time: 22:59:34) | Tiffany B Wilson, RN |
| 23:00 | Vitals Reassessment | Vitals Assessment<br><br>Automatic Resart Vitals Timer: Yes | Tiffany B Wilson, RN |
| 23:04 | Lab Ordered | PHOSPHORUS SERUM, MAGNESIUM, SERUM, TROPONIN I, BASIC METABOLIC PANEL | Tim Lentini, MD |
| 23:04 | XR Ordered | XR CHEST PA AND LATERAL | Tim Lentini, MD |
| 23:04 | Imaging Exam Ordered | | Tim Lentini, MD |
| 23:04 | Orders Placed | XR CHEST PA AND LATERAL ; Basic Metabolic Panel Vein Blood ; Troponin I Vein Blood ; Magnesium, Serum Vein Blood ; Phosphorus Vein Blood | Tim Lentini, MD |

Printed on 3/25/18 12:50 AM                                                      Page 6

Page 1

Spencer, Cole Joseph (MR # 0104034855)                                    Encounter Date: 03/24/2018

Patient Care Timeline (3/24/2018 22:19 to 3/25/2018 00:50:58) (continued)

| 3/24/2018 | Event | Details | User |
|---|---|---|---|
| 22:28 | Gastrointestinal | Abdominal/GI | Tiffany B Wilson, RN |
| | | Gastrointestinal (WDL): **Visually Within Defined Limits** | |
| 22:28 | Genitourinary | Genitourinary | Tiffany B Wilson, RN |
| | | Genitourinary (WDL): **Within Defined Limits** | |
| 22:28 | Musculoskeletal | Musculoskeletal | Tiffany B Wilson, RN |
| | | Skeletal/Ortho (WDL): **Within Defined Limits** | |
| 22:28 | Psychosocial | Psychosocial | Tiffany B Wilson, RN |
| | | Psychosocial (WDL): **Within Defined Limits** | |
| 22:28 | Peripheral Vascular | Peripheral Vascular | Tiffany B Wilson, RN |
| | | Peripheral Vascular (WDL): **Within Defined Limits** | |
| 22:28 | Suicide/Despression Screening | How often has the patient had the following symptoms during the past 2 weeks? | Tiffany B Wilson, RN |
| | | Little interest or pleasure in doing things: **Not at all** — Feeling down, depressed, or hopeless: **Not at all** | |
| 22:28 | Suicide Screen | Suicide Screen | Tiffany B Wilson, RN |
| | | Over the past 2 weeks have you felt down, depressed, or hopeless?: **No** — Over the past 2 weeks have you thought about killing yourself?: **No** | |
| | | Have you ever attempted to kill yourself?: **No** | |
| 22:28:11 | Re-Eval Assessment | Patient with c/o palpitations. | Tiffany B Wilson, RN |
| 22:28:17 | Re-Eval Assessment | | Tiffany B Wilson, RN |
| 22:28:19 | Re-Eval Assessment | | Tiffany B Wilson, RN |
| 22:28:21 | Re-Eval Assessment | | Tiffany B Wilson, RN |
| 22:28:24 | Re-Eval Assessment | | Tiffany B Wilson, RN |
| 22:28:26 | Re-Eval Assessment | | Tiffany B Wilson, RN |
| 22:28:29 | Re-Eval Assessment | | Tiffany B Wilson, RN |
| 22:28:35 | History Reviewed | Sections reviewed - Medical, Surgical, Family, Alcohol, Tobacco, Drug Use, Sexual Activity | Tasha D Fleming, RN |
| 22:29 | First ED Provider Contact | **First Meaningful Physician Contact** | Daniel Orosco, DO |
| | | Completed First Provider Evaluation: **Yes** | |
| 22:29:31 | Assign Resident | Tim Lentini, MD assigned as Resident | Tim Lentini, MD |

SPENCER, COLE JOSEPH T445334





page 2

ER 061

Spencer, Cole Joseph (MR # 0104034855) ACC NO:<Patient not registered>

### Family History as of 3/25/2018

No family-history on file.

### Social History as of 3/25/2018

**Tobacco Use**

Current Every Day Smoker.
Smokeless Tobacco: Never used smokeless tobacco.

**Alcohol Use**

Yes.

**Drug Use**

Yes; Heroin, Methamphetamines.

**Sexual Activity**

Defer.

### ED Orders (720h ago through future)

| Start | Ordered | | Status | Ordering Provider |
|-------|---------|--|--------|-------------------|
| 03/25/18 0900 | 03/25/18 0020 | **magnesium oxide (MAG-OX) tab 400 mg** Daily | Last MAR action: Given | LENTINI, TIM |
| 03/25/18 0025 | 03/25/18 0020 | **potassium chloride (KLOR-CON) tab 20 mEq** Once | Last MAR action: Given | LENTINI, TIM |
| 03/25/18 0025 | 03/25/18 0021 | **Discharge to Custody** Once | Completed | LENTINI, TIM |
| 03/24/18 2315 | 03/24/18 2310 | **Blue Top Tube-Hold Blood** Once | In process | STOWELL, JEFFREY RANDAL |
| 03/24/18 2315 | 03/24/18 2310 | **Lavender Top Tube-Hold Blood** Once | In process | STOWELL, JEFFREY RANDAL |
| 03/24/18 2305 | 03/24/18 2304 | **XR CHEST PA AND LATERAL** 1 time imaging Comments: Additional clinical info for Radiologist: | Preliminary result | LENTINI, TIM |
| 03/24/18 2305 | 03/24/18 2304 | **Basic Metabolic Panel Vein Blood** Once | Final result | LENTINI, TIM |
| 03/24/18 2305 | 03/24/18 2304 | **Troponin I Vein Blood** Once | Final result | LENTINI, TIM |
| 03/24/18 2305 | 03/24/18 2304 | **Magnesium, Serum Vein Blood** Once | Final result | LENTINI, TIM |
| 03/24/18 2305 | 03/24/18 2304 | **Phosphorus Vein Blood** Once | Final result | LENTINI, TIM |
| 03/24/18 2305 | 03/24/18 2304 | **acetaminophen (TYLENOL) tab 650 mg** Once | Last MAR action: Given | LENTINI, TIM |
| 03/24/18 2225 | 03/24/18 2221 | **EKG 12 lead unit performed** Once | Preliminary result | AKHTER, MURTAZA |

### ECG - All Results

Resulted: 03/24/18 2224, Result status: Preliminary result

**EKG 12 lead unit performed [75468431]**

Ordering provider: Murtaza Akhter, MD 03/24/18 2221      Order status: Completed

Resulting lab: MIHS RAD

Narrative:

Atrial-paced rhythm with prolonged AV conduction

Abnormal ECG

No previous ECGs available

Components

Printed on 3/25/18 12:50 AM          Maricopa Integrated Health System

SPENCER, COLE JOSEPH T445334

Page 3

Spencer, Cole Joseph (MR # 0104034855) ACC NO:<Patient not registered>

## ECG - All Results (continued)

Resulted: 03/24/18 2224, Result status:
Preliminary result

### EKG 12 lead unit performed [75468431] (continued)

| Component | Value | Reference Range | Flag | Lab |
|---|---|---|---|---|
| Ventricular Rate | 60 | BPM | — | MIHS RAD |
| Atrial Rate | 60 | BPM | — | MIHS RAD |
| P-R Interval | 224 | ms | — | MIHS RAD |
| QRS Duration | 106 | ms | — | MIHS RAD |
| Q-T Interval | 440 | ms | — | MIHS RAD |
| QTC Calculation(Bezet) | 440 | ms | — | MIHS RAD |
| Calculated P Axis | 70 | degrees | — | MIHS RAD |
| Calculated R Axis | 86 | degrees | — | MIHS RAD |
| Calculated T Axis | 83 | degrees | — | MIHS RAD |

## Imaging - All Results

Resulted: 03/24/18 2342, Result status:
Preliminary result

### XR CHEST PA AND LATERAL [75468442]

Ordering provider: Tim Lentini, MD  03/24/18 2304
Resulted by:
Mary J Connell, MD
Cody R Larson, MD
Accession number: 3028797
Narrative:
EXAM DESCRIPTION:
XR CHEST PA AND LATERAL
Accession # 3028797

Order status:  Completed
Performed:  03/24/18 2325 - 03/24/18 2336

Resulting lab:  MIHS RAD

COMPARISON:
None.

CLINICAL HISTORY:
Palpitations

TECHNIQUE:
AP, Lateral Chest

FINDINGS:
 SUPPORT DEVICES:  Dual lead cardiac pacer device projects over the upper left chest wall,
distal lead tips projecting over the right atrium and right ventricle.
HEART: Normal.

LUNGS: Clear.  No consolidation, effusion or pneumothorax.

VASCULATURE: Normal.

MEDIASTINUM: Normal.

SOFT TISSUES: Normal.

BONES: Normal.

Impression:
IMPRESSION:
No acute cardiopulmonary disease.

Printed on 3/25/18 12:50 AM           Maricopa Integrated Health System
     SPENCER, COLE JOSEPH T445334

CHS-0048

Page 4



MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES
234 North Central Ave.
Phoenix, AZ 85004

# HEALTH ASSESSMENT (HISTORY) - Completed by: RN, 1246H on 3/24/2018 4:27:25 AM MST;

Signed by: PA-C Med; HS388 on 3/24/2018 10:39:55 PM MST

| Patient: SPENCER, COLE JOSEPH | #: T445334 | Lang: |
|---|---|---|
| DOB: 10/23/1985 (Age=34) | Sex: M | Race: W |
| Housing: 4AVE0 HAN00000 | SSN#: **HIDDEN** | Type: |
| Status: NOT ACTIVE | Booking Date: 3/23/2018 2:23:00 PM MST Release: 4/15/2018 3:46:08 AM | |

### Current Allergies

Peanut Oil

☐ **Patient Refused**

☐ **V.S. Reviewed**

☐ **V.S. Not Needed**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 134 / 92 | na | 68 | 16 | 97 | na | na | 6 |
| Height(in) | Weight | BMI | MAP | | | | |
| 0 | na | 0.0 | 106.00 | | | | |

Review the Receiving Screening

Receiving Screen

Reviewed ☑ Yes

## 1) Who can we contact in case of an emergency?

Name:

Kelly

## 2) What is their phone number?

480-450-8903

## 3) What is their relation to you?

Other

SPENCER, COLE JOSEPH T445334

CHS-0145

Other:

girlfriend

4) Do you have medical insurance?

☑ Yes

☐ No

☐ No Response

## Please Select:

AHCCCS/Medicaid

Insurance ID Number:

unknown

If Other selected, enter insurance name:

4a) Would you like help enrolling for insurance?

☐ Yes

☐ No

☐ No Response

5) Have you ever been homeless?

☐ Yes

☑ No

☐ No Response

## If so, when:

6) Have you slept in a shelter in the past year?

☐ Yes

☑ No

☐ No Response

7) Have you slept on the street in the past year?

☐ Yes

☑ No

☐ No Response

8) Have you slept at a friends house, not paying rent, in the past year?

☐ Yes

☑ No

SPENCER, COLE JOSEPH T445334

CHS-0146



☐ No Response

9) Are you currently homeless?

☐ Yes

☑ No

☐ No Response

10) Do you suffer from any medical condition with or without prescription medications?

☑ Yes

☐ No

☐ No Response

| | | |
|---|---|---|
| ☐ Asthma/Lung Problems | ☐ Cancer Case Management | ☐ Diabetes |
| ☐ End Stage Liver Disease | ☐ Dialysis/End Stage Renal Disease | ☐ Heart Disease/Hyperlipidemia |
| ☐ HIV/AIDS | ☐ Hypertension | ☐ Seizure |
| ☐ Sickle Cell | ☐ Chronic Pain/Fibromyalgia | ☐ GERD/PUD |
| ☐ Hepatitis B | ☐ Hepatitis C | ☐ IBS/Crohn's/Ulcerative Colitis |
| ☐ Pancreatic Disease | ☐ Rheumatoid Arthritis/Osteoporosis | ☐ Thyroid Disease |
| ☐ Other | | |

Describe illness, medications and/or treatments:

pacemaker-implanted Oct 2017

takes metoprolol 25mg PO BID and asprin 81mg PO daily- last doses 3/23/18

GERD- pantoprazole 40mg PO daily, rantidine 150mg PO daily, and sucralfate 1g PO QID 30 minutes before mealslast doses 3/23

11) Are you taking any medical or mental health medications and when was your last dose(s)? (Describe)

☑ Yes-Psych Oral

☐ Yes-Psych Injectable

☐ Yes-Medical

☐ No

☐ No Response

trazodone, sertraline

12) Do you use Tobacco? (Describe)

☑ Yes

☐ No

☐ No Response

cigarettes

SPENCER, COLE JOSEPH T445334

CHS-0147

Page 3

**12a) What type of tobacco do you use?**

☑ Smoke          ☐ Chew          ☐ Vape

**12b) How often do you smoke?**

☑ Every day          ☐ Some days          ☐ Former smoker

**12c) How often do you chew?**

☐ Every day          ☐ Some days          ☐ Former chewer

**12d) How often do you vape?**

☐ Every day          ☐ Some days          ☐ Former user

**13) How often do you have a drink containing alcohol? A drink is defined as: 12 ounces of beer, 5 ounces of wine, or 1.5 ounces of spirits.**

○ Never
○ Monthly or less
○ 2-4x a month
○ 2-3x a week
◉ 4 or more per week

**14) How many drinks containing alcohol do you have on a typical day when you are drinking?**

○ 1 or 2
○ 3 or 4
○ 5 or 6
○ 7-9
◉ 10 or more

**15) How often do you have five or more drinks on one occasion?**

○ Never
○ Less than monthly
○ Monthly
○ Weekly
◉ Daily or almost daily

AUDIT-C Score

Positive

**16) How many times in the past year have you used an illegal drug or used a prescription medication for non-medical reasons? (If asked what non-medical reasons means you can say because of the experience or feeling the drug caused.)**

SPENCER, COLE JOSEPH T445334

CHS-0148

⦿ 0

◯ 1 or more

Single-Item Drug Screen

Negative

17) Do you currently use any of the following drugs?

☐ Yes

☑ No

☐ No Response

☐ Amphetamines/Stimulants          ☐ Bath Salts              ☐ Benzo's

☐ Cocaine                          ☐ Heroin                  ☐ Opiate pain meds

☐ LSD                              ☐ Methadone/Suboxone      ☐ Methamphetamine

☐ Spice                            ☐ Other

Explain type, quantity, and frequency of use:

## Mental Health Screening

18) Have you ever been hospitalized for drug or alcohol detoxification?

☐ Yes

☑ No

☐ No Response

19) Have you ever had substance abuse treatment?

☐ Yes

☑ No

☐ No Response

20) Have you ever served in the military?

☐ Yes

☑ No

☐ No Response

20a) Have you ever been in or around combat situations? (Describe situations)

☐ Yes

☐ No

☐ No Response

21) Have you ever been treated for a mental health or emotional problem(s)?

☑ Yes

☐ No

SPENCER, COLE JOSEPH T445334

CHS-0149

Page 5

☐ No Response

If YES,:

- **21a) When:** 2009
- **21b) Where:** Prison
- **21c) What was your diagnosis** anxiety, depression

22) Have you ever been hospitalized for a mental health or emotional problem(s)?

☐ Yes

☑ No

☐ No Response

If YES,:

- **22a) When:**
- **22b) Where:**
- **22c) What was your diagnosis**

22d) Do you have a case manager and/or guardian?

☐ Yes

☐ No

22e) Name and contact information:

22f) Other:

23) Have you ever been designated as SMI to get services? If yes, what clinic?

☐ Yes

☑ No

☐ No Response

24) Have you experienced what you consider a significant loss within the last 6 months?

☐ Yes

☑ No

☐ No Response

25) Are you thinking of hurting or killing yourself?

☐ Yes

☑ No

☐ No Response

26) Have you considered suicide in the past year?

☐ Yes

☑ No

☐ No Response

SPENCER, COLE JOSEPH T445334

CHS-0150

page 6

27) Have you ever attempted suicide?

☐ Yes

☑ No

☐ No Response

If YES,

- 27a) How many times:
- 27b) When was the last time:

## 27c) Have you ever tried to kill yourself by:

☐ Hanging               ☐ Gunshot               ☐ Other

Other:

28) Has a family member/close friend ever attempted or commited suicide?

☑ Yes

☐ No

☐ No Response

29) Have you ever hurt yourself without trying to kill yourself?

☐ Yes

☑ No

☐ No Response

30) Have you ever been victimized?

☐ Yes

☑ No

☐ No Response

30a) Was it in an institutional setting?

☐ Yes

☐ No

☐ No Response

30b) Do you want to talk to someone about having been victimized?

☐ Yes

☐ No

☐ No Response

31) Do you feel you are at risk of being assualted or sexually abused while in custody?

☐ Yes

☑ No

SPENCER, COLE JOSEPH T445334

CHS-0151

Page 7

☐ No Response

32) Have you ever participated in, or been, convicted of sexual assualt or sexual abuse? (Describe)

☐ Yes

☑ No

☐ No Response

33) Have you ever used violence to obtain a goal? (Describe)

☐ Yes

☑ No

☐ No Response

34) Have you ever used aggressive behavior due to interpersonal conflict? (Describe)

☐ Yes

☑ No

☐ No Response

35) Were you ever in special education classes? (Describe)

☐ Yes

☑ No

☐ No Response

36) Have you ever suffered a serious head injury/TBI? (Describe)

☑ Yes

☐ No

☐ No Response

currently has head trauma. seen and medically cleared at BAnner Desert Medical Center. Orbital and nasal fractures.

37) Does the person have difficulty answering questions due to cognitive impairment or diminished intellectual function? (Describe)

☐ Yes

☑ No

38) Does the patient have any mental or physical disability or appear to be at risk of being sexually assualted or sexually abused?

☐ Yes

☑ No

Does the patient need a referral to Mental Health?

☐ Yes

☑ No

39) Does the patient assessment or emotional response to incarceration indicate a need for a referral to mental health?

SPENCER, COLE JOSEPH T445334

CHS-0152



☐ Yes

☑ No

## PHYSICAL ASSESSMENT

### General:

☑ A+O X 3

☑ NAD

☐ Vital signs notes

☐ Other

Other:

### Skin:

☐ No Rash, wounds, contusions, or jaundice

☑ Abrasions

☐ Abscess

☐ Burn Wounds

☑ Contusions

☐ Lacerations

☐ Puncture Wounds

☐ Sutures/Staples

☐ Tattoo(s)

☑ Other

Other:

"raccoon eyes"

scabbing present to majority of nose. No sign of infection.

abrasion to multiple extremities.

swelling to knees

refusing to have wound care.

### HEENT:

☐ Pupils equal and reactive

☐ TMs with no fluid or erythem

☐ No trauma to head, face, or neck

☐ External canals normal

☐ Pharynx normal

SPENCER, COLE JOSEPH T445334

CHS-0153

page 9

☑ Neck supple

☑ Normal range of motion

☑ Notes

Notes:

patient states neck pain. On palpation of lateral sides of neck is where pain is located. Normal ROM. Right pupils appears to be slightly smaller than the left. Patient A&O. States severe pain from incident.

## Dental:

Mouth Pain?

☐ Yes

☑ No

## Dentition

◉ Normal

○ Poor dentition without infection/abscess

○ Poor dentition with infection/abscess

Comments:

Oral Hygiene education provided to patient?

☑ Yes

☐ No

Patient instructed to submit Health Needs Request for dental services?

☑ Yes

☐ No

## Cardiovascular:

◉ Regular rate and rhythm, no murmur

○ Abnormal Findings

Abnormal Findings:

## Respiratory:

☑ Respirations even, unlabored, and normal rate

☑ Lung sounds clear and equal in all lung fields

☐ Abnormal Findings

Abnormal Findings:

## Abdominal:

SPENCER, COLE JOSEPH T445334

CHS-0154

Page 10

☐ Abdomen soft, nontender, nondistended

☐ No hernia or masses palpated

☐ Bowel sounds active and normally pitched

☑ Exam not indicated

☐ Abnormal Findings

Abnormal Findings:

## Musculoskeletal:

☑ Grossly normal strength

☑ Gait normal with no limitations for ADL's

☑ No injuries or infections on extremeties

☐ Abnormal Findings

Abnormal Findings:

## Special Needs:

☐ Cast/Splint

☐ Cane

☐ Catheter Care

☐ CPAP

☐ Crutches

☐ Dietary Changes

☐ Fall Risk

☑ LB/LT

☐ Ostomy Care

☐ Oxygen

☐ Walker

☐ Wheelchair - Lift Van

☐ Wheelchair - Out of Facility Only

☐ Wheelchair - Regular transport

☐ Wound Care

☐ Other

Describe accommodation:

ambulates with ease.

## Assessment/Plan:

☑ No medical contraindications to segregation/safe cell placement at this time.

Additional Comments:

SPENCER, COLE JOSEPH T445334

CHS-0155

Patient A&OX3 responding appropriately. States severe pain from trama to head. Skin color adequate for patient. Breathing non labored. Denies DTS/DTO. History of A-fib with medication taken. Denies severe drug/alcohol withdrawal history such as seizure, DT's or hospitalizations but says he s withdrawing from alcohol. No sign of withdrawal currently. Provider T. Collon, PAC contacted VO as follows:

1) Metoprolol 25mg PO QD Xs 30 days

2) ASA 81mg PO QD Xs 30 days

3) Ranitidine 150mg PO QD PRN Xs 30 days

4) Tramadol 100mg PO BID PRN Xs 7 days

5) Tramadol 50mg PO BID PRN Xs 7 days starting on 3/31/18

RAV.

SPENCER, COLE JOSEPH T445334



Page 12

T445334

"BLUE CHEMICALLY SENSITIVE PAPER | HOLLOW "VOID" PANTOGRAPH | MICROPRINT BORDER | HEAT-SENSITIVE LOGO (on back)"

# BANNER DESERT MEDICAL CENTER
1400 South Dobson Road
Mesa, AZ 85202
(480)412-3000



WPC: 340B00929400DM

**Patient Name:** SPENCER, COLE JOSEPH

| | | | |
|---|---|---|---|
| Birthdate: 10/23/1985 13:01 | Age: 32 Years | Sex: Male | MRN: 2012266 |

**Allergies:** PEANUT, No known MEDICATION allergies

Pharmacist please note—Allergy list may be incomplete.

| Patient Address: | 2144 S VISTA RD, | Home Phone: | NONE |
|---|---|---|---|
| | APACHE JUNCTION, AZ 85119 | Work Phone: | |

---

**New Prescription:**                                              **Date Issued: 03/23/2018**

**Rx:** oxycodone 5 mg oral tablet                                 Date Written: 03/23/2018

   SIG:         **5 mg PO Q4H for 5 day(s) PRN Pain – Moderate (4–7)**

Dispense/Supply: **<30 tab>**

Refill: None

---

DISPENSE AS WRITTEN                              x _____

                                        SUBSTITUTION PERMITTED

Prescribed by: **WHITNEY MINER, PA**                    DEA # M H336147
              1450 S Dobson Rd Ste A200
              Mesa, AZ 85202
              (480) 629-5167

Supervising Physician: **JOSEPH M MCCLAIN, MD**
              2945 S Dobson Rd
              Mesa, AZ 85202
              (480) 629-5167

                                    NPI #: 1073564985

This prescription should only be accepted if it is printed on security paper.

This prescription is valid when signed electronically (E–Sig.) or signed by hand by the prescriber.

If you feel, for any reason, this prescription is not valid, please contact the prescriber immediately.

1bhrxreqgen, 9/27/2017

SPENCER, COLE JOSEPH T445334

This blue document is protected by security features listed on the back.   Standard Register, all rights reserved

ER 076

T445334

as a substitute for professional medical care. Always follow your healthcare professional's instructions.

Yes - Patient/Parent/Guardian/Legally Authorized Representative
verbalizes understanding of discharge instructions.
Additional Comments for verbalizing understanding of instructions Comment:

Electronically Signed By:MINER PA, WHITNEY



Patient: SPENCER, COLE JOSEPH
Mar/23/2018 09:50:58

SPENCER, COLE JOSEPH T445334



Privacy Office
One CVS Drive
Woonsocket, RI 02895
Mail Code 1165

**Private and Confidential**
**Intended for Addressee Only**

3756041
MARICOPA COUNTY CORRECTIONS
201 S. 4TH AVE
PHOENIX AZ 85001

03/27/2018

Re : 6022534931
SPENCER, COLE

Enclosed, please find the patient prescription profile obtained using the
information as specified per your request.

To cover the expense of processing these records, please remit a payment of $0.00
or as stipulated by applicable regulation to CVS/pharmacy, One CVS Drive,
Woonsocket, RI 02895, Attn: Privacy Office.
The Federal Tax ID number is 05-03-40626.

If you have questions regarding this report you may contact the Privacy Office at
1-800-287-2414 or e-mail us at PrivacyOffice@cvs.com.

Sincerely,
CVS/pharmacy Privacy Office

---------------------------------------------------------------------------------------------------------

### INVOICE

MARICOPA COUNTY CORRECTIONS

| Request Nbr | Date | Amount Due: | Payment(s): | Balance Due: |
|---|---|---|---|---|
| 3756041 | 03/27/2018 | $0.00 | $0.00 | $0.00 |

**Payment Amount:**

$_____

**Payment Due Upon Receipt**

**Mail payment to:**
CVS/pharmacy
Privacy Office
One CVS Drive
Woonsocket, RI 02895
Mail Code 1165

Make Checks Payable to: CVS/pharmacy
Include Request Number and customer
name on check.

SPENCER, COLE JOSEPH T445334

CHS-0031

Fax Server

3/27/2018  9:01:36  AM   PAGE   3/006   Fax Server

**CVS PHARMACY**
**PATIENT PRESCRIPTION RECORD**
BETWEEN 09/26/2017 AND 03/26/2018
PHARMACY # 33

PHARMACY NAME:
ADDRESS:        1750 E BROADWAY RD
CITY, ST, ZIP:   TEMPE        AZ 85282

PATIENT KEY:     332039280
PATIENT NAME;    SPENCER COLE
ADDRESS          919 E BROADWAY RD
CITY, ST, ZIP:   MESA AZ 85204

TELEPHONE:  0 - -
BIRTHDATE:   10/23/1985

PAGE:        1  of   2
RUN DATE: 03/27/2018 TIME: 08:53:03
REQUEST NBR:          3756041

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | QUANT DISP. | PATIENT PD AMT | PAYER # | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|
| 657409 | 1 | 60505267303 | ARIPIPRAZOLE 5 MG TABLET | SINGER, VIRGINIA M | 10/17/2017 | 30 | 0.00 | 31010 | 172904300720116998 |
| 658391 | 1 | 50428173013 | CVS NICOTINE 14 MG/24HR PATCH | DENNISON, TYLER S | 10/24/2017 | 28 | 0.00 | 18630 | 172974494406068998 |
| 659235 | 0 | 57664022388 | OXYCODONE HCL 5 MG TABLET | YALE, BROOKE A | 09/30/2017 | 60 | 0.00 | 18630 | 172734181701036999 |
| 664075 | 0 | 68180012202 | CEPHALEXIN 500 MG CAPSULE | KAPLAN, ANDREW J | 10/24/2017 | 9 | 0.00 | 18630 | 172978444716192899 |
| 668218 | 0 | 00378001801 | METOPROLOL TARTRATE 25 MG TAB | WINCHELL, JOSEPH W | 11/17/2017 | 60 | 0.00 | 18630 | 173215333937137999 |
| 668576 | 0 | 50428271531 | CVS ASPIRIN EC 81 MG TABLET | MADAY, ANALYN R | 12/07/2017 | 30 | 0.00 | 18630 | 173413788681187999 |
| 668576 | 1 | 50428271531 | CVS ASPIRIN EC 81 MG TABLET | MADAY, ANALYN R | 01/11/2018 | 30 | 0.00 | 18630 | 180113800968073999 |
| 671441 | 0 | 47335077991 | AZELASTINE 0.1% (137 MCG) SPRY | MILLER, CHRISTINA | 12/06/2017 | 30 | 0.00 | 18630 | 173405433011057999 |
| 671441 | 1 | 47335077991 | AZELASTINE 0.1% (137 MCG) SPRY | MILLER, CHRISTINA | 01/11/2018 | 30 | 0.00 | 18630 | 180113802975123999 |
| 671442 | 0 | 68462024805 | RANITIDINE 150 MG TABLET | MILLER, CHRISTINA | 12/06/2017 | 60 | 0.00 | 18630 | 173405446258139999 |
| 671442 | 1 | 68462024805 | RANITIDINE 150 MG TABLET | MILLER, CHRISTINA | 01/11/2018 | 30 | 0.00 | 18630 | 180113798099074998 |
| 671443 | 0 | 00054327099 | FLUTICASONE PROP 50 MCG SPRAY | MILLER, CHRISTINA | 12/06/2017 | 16 | 0.00 | 18630 | 173405450449070999 |
| 671443 | 1 | 00054327099 | FLUTICASONE PROP 50 MCG SPRAY | MILLER, CHRISTINA | 01/11/2018 | 16 | 0.00 | 18630 | 180113804596195999 |
| 671763 | 0 | 50428173013 | CVS NICOTINE 14 MG/24HR PATCH | DENNISON, TYLER S | 12/07/2017 | 28 | 0.00 | 18630 | 173417617071166999 |
| 671918 | 0 | 00378001801 | METOPROLOL TARTRATE 25 MG TAB | BELL, MEREDITH E | 12/18/2017 | 60 | 0.00 | 18630 | 173524142616110999 |
| 671918 | 1 | 00378001801 | METOPROLOL TARTRATE 25 MG TAB | BELL, MEREDITH E | 01/13/2018 | 60 | 0.00 | 18630 | 180130398117184999 |
| 673181 | 0 | 00093221001 | SUCRALFATE 1 GM TABLET | KALFUS, STEVEN R | 12/14/2017 | 120 | 0.00 | 18630 | 173485807250136999 |
| 673181 | 1 | 00093221001 | SUCRALFATE 1 GM TABLET | KALFUS, STEVEN R | 01/16/2018 | 120 | 0.00 | 18630 | 180164471936119999 |
| 673282 | 0 | 28300022019 | MONTELUKAST SOD 10 MG TABLET | MOSTAFAVI, HOMAN | 12/15/2017 | 30 | 0.00 | 18630 | 173494155644062999 |
| 673653 | 0 | 68180035309 | SERTRALINE HCL 100 MG TABLET | DENNISON, TYLER S | 12/18/2017 | 30 | 0.00 | 18630 | 173524209807095999 |
| 673654 | 0 | 50111043301 | TRAZODONE 50 MG TABLET | DENNISON, TYLER S | 12/18/2017 | 30 | 0.00 | 18630 | 173524212068120999 |
| 673655 | 0 | 00093001298 | PANTOPRAZOLE SOD DR 40 MG TAB | DENNISON, TYLER S | 12/18/2017 | 30 | 0.00 | 18630 | 173524217158112999 |
| 679058 | 0 | 68180035309 | SERTRALINE HCL 100 MG TABLET | DENNISON, TYLER S | 01/15/2018 | 30 | 0.00 | 18630 | 180153678976190999 |
| 679059 | 0 | 50111043301 | TRAZODONE 50 MG TABLET | DENNISON, TYLER S | 01/15/2018 | 30 | 0.00 | 18630 | 180153683085188999 |
| 679060 | 0 | 00093001298 | PANTOPRAZOLE SOD DR 40 MG TAB | DENNISON, TYLER S | 01/15/2018 | 30 | 0.00 | 18630 | 180153684264120999 |

SPENCER, COLE JOSEPH T445334

CHS-0032

Fax Server

PHARMACY NAME:
ADDRESS:        1750 E BROADWAY RD
CITY, ST, ZIP:   TEMPE          AZ 85282

PATIENT KEY:    332039280
PATIENT NAME:   SPENCER COLE
ADDRESS         919 E BROADWAY RD
CITY, ST, ZIP:   MESA AZ 85204

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 09/26/2017 AND 03/26/2018
PHARMACY # 33

TELEPHONE:  0 - -
BIRTHDATE:   10/23/1985

PAGE:      2  of   2
RUN DATE: 03/27/2018  TIME: 08:53:03
REQUEST NBR:      3756041

SCRIPT COUNT: 25        TOTAL PATIENT PAID:    0.00

3/27/2018 9:01:36 AM PAGE 4/006 Fax Server

SPENCER, COLE JOSEPH T445334

CHS-0033

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 09/26/2017 AND 03/26/2018
PHARMACY # 17256

PAGE:   1   of   2
RUN DATE: 03/27/2018  TIME: 08:53:03
REQUEST NBR:   3756041

PHARMACY NAME:
ADDRESS:          1800 E RIO SALADO PKWY STE 120
CITY, ST, ZIP:    TEMPE          AZ 85281

PATIENT KEY:      17256150560
PATIENT NAME:     SPENCER COLE
ADDRESS           919 E BROADWAY RD
CITY, ST, ZIP:    MESA AZ 85204

TELEPHONE:  0 - -
BIRTHDATE:   10/23/1985

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | QUANT DISP. | PATIENT PD AMT | PAYER # | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|
| 144107 | 2 | 00093001298 | PANTOPRAZOLE SOD DR 40 MG TAB | DENNISON, TYLER S | 09/29/2017 | 30 | 0.00 | 18630 | 172724598437092999 |
| 144108 | 2 | 68180035309 | SERTRALINE HCL 100 MG TABLET | DENNISON, TYLER S | 09/29/2017 | 30 | 0.00 | 18630 | 172734004413166999 |
| 144109 | 2 | 50111043301 | TRAZODONE 50 MG TABLET | DENNISON, TYLER S | 09/29/2017 | 30 | 0.00 | 18630 | 172724592235146999 |
| 145058 | 2 | 00093221001 | SUCRALFATE 1 GM TABLET | MAGALONA, SHARON | 09/30/2017 | 120 | 0.00 | 18630 | 172734004557159999 |
| 153127 | 0 | 68180035309 | SERTRALINE HCL 100 MG TABLET | DENNISON, TYLER S | 10/26/2017 | 30 | 0.00 | 18630 | 172990908360183999 |
| 153127 | 1 | 68180035309 | SERTRALINE HCL 100 MG TABLET | DENNISON, TYLER S | 11/21/2017 | 30 | 0.00 | 18630 | 173254544263143999 |
| 153128 | 0 | 00093001298 | PANTOPRAZOLE SOD DR 40 MG TAB | DENNISON, TYLER S | 10/26/2017 | 30 | 0.00 | 18630 | 172990908507196999 |
| 153129 | 0 | 50111043301 | TRAZODONE 50 MG TABLET | DENNISON, TYLER S | 11/21/2017 | 30 | 0.00 | 18630 | 173250543088224999 |
| 153129 | 1 | 50111043301 | TRAZODONE 50 MG TABLET | DENNISON, TYLER S | 10/26/2017 | 30 | 0.00 | 18630 | 172990908096136999 |
| 155498 | 0 | 00603389021 | HYDROCODON-ACETAMINOPHEN 5-325 | BELL, MEREDITH E | 10/26/2017 | 15 | 0.00 | 18630 | 173254542252171999 |
|  |  |  |  |  |  |  | 0.00 | 18630 | 172996993027118998 |

SPENCER, COLE JOSEPH T445334

CHS-0034

Concise Employee History

Police Officer-Hta   Aaron Prest Pew [/19183]

ID Number: 19183  Hire date: Jan 16, 2012
Current assignment(s):
      Bureau: Police
      Division: Swat 10
      Squad: Swat 10

Involved Employee: Citizen complaint          File Number:   2013-020
Received: Jan 29, 2013 15:36
                                              DR Number:    20130200137

    Incident disposition/finding: Exonerated
    Policy outcome: Not yet entered

    Allegations:

       Excessive Force – Use of Force – Exonerated – Jun 14, 2013

Involved Employee: Citizen complaint          File Number:   2013-154
Received: Dec 30, 2013
                                              DR Number:    20133610124

    Incident disposition/finding: Exonerated
    Policy outcome: Not yet entered

    Allegations:

       Excessive Force – Use of Force – Exonerated – Jun 23, 2014

    Actions taken:

       : Jun 23, 2014 – Exonerated

Involved Employee: Citizen complaint          File Number:   2016-110
Received: May 31, 2016 08:04
                                              DR Number:    20161460309

    Incident disposition/finding: Policy Failure
    Policy outcome: Not yet entered

    Allegations:

    Less Lethal Shotgun Protocols – Less Lethal Shotgun Protocols – Policy Failure – Feb
28, 2017
          Animal Related Incidents – Animal Related Incidents – Policy Failure – Feb 28, 2017

    Actions taken:

       : Feb 28, 2017 – Policy Failure/Policy Improvement

Involved Employee: Departmental               File Number:   2016-141
Received: Jul 13, 2016 15:00

    Incident disposition/finding: Sustained
    Policy outcome: Not yet entered

    Allegations:

       MPD Buildings and Property – MPD Buildings and Property – Sustained – Feb 28, 2017

Mesa/Spencer 000187

Actions taken:

   : Feb 28, 2017 - Sustained/Written Reprimand

**Involved Employee: Citizen complaint**          **File Number:   2018-037**
**Received: Mar 27, 2018 17:17**
                                                   **DR Number:    20180800614**

   Incident disposition/finding: Not Sustained
   **Policy outcome: Not yet entered**

   Allegations:

      #61-Unnecessary or improper use of force - Code of Conduct - Not Sustained - Oct 01,
2018

   Actions taken:

      : Oct 01, 2018 - Not Sustained

**Involved Employee: Citizen complaint**          **File Number:   2019-138**
**Received: Jun 19, 2019**
                                                   **DR Number:    20180460017**

   Incident disposition/finding: Admin Closed
   **Policy outcome: Not yet entered**

   Allegations:

      #61-Unnecessary or improper use of force - Code of Conduct - Admin Closed - Aug 12, 2019

   Actions taken:

      : Aug 12, 2019 - Administratively Closed

**Involved Employee: Citizen complaint**          **File Number:   2019-172**
**Received: Jul 24, 2019**
                                                   **DR Number:    20191880471**

   Incident disposition/finding: Admin Closed
   **Policy outcome: Not yet entered**

   Allegations:

      DPM 1.4.74 Biased-Based Policing - Other Policy - Admin Closed - Aug 27, 2019
      #43-Discourtesy; using disrespectful/vulgar/obscene/profane/insolent
language/gestures to any Dept. member/citizen - Code of Conduct - Admin Closed - Aug 27, 2019

   Actions taken:

      : Aug 27, 2019 - Administratively Closed

Mesa/Spencer 000188

Concise Employee History

Police Officer Jacob Micha Rozema [/15724]

ID Number: 15724  Hire date: Oct 09, 2003
Current assignment(s):
      Bureau: Police
      Division: Swat 10
      Squad: Swat 10


**Involved Employee: Departmental**                    File Number:   2016-141
**Received: Jul 13, 2016 15:00**

    Incident disposition/finding: Sustained
    **Policy outcome: Not yet entered**

    Allegations:

        MPD Buildings and Property - MPD Buildings and Property - Sustained - Feb 28, 2017

    Actions taken:

        : Feb 28, 2017 - Sustained/Written Reprimand

**Involved Employee: Citizen complaint**               File Number:   2018-013
**Received: Jan 24, 2018 09:00**
                                                       DR Number:    20180120234

    Incident disposition/finding: Admin Closed
    **Policy outcome: Not yet entered**

    Allegations:

        Police Service - Police Service - Admin Closed - Apr 24, 2018

    Actions taken:

        : Apr 24, 2018 - Administratively Closed

**Involved Employee: Citizen complaint**               File Number:   2018-037
**Received: Mar 27, 2018 17:17**
                                                       DR Number:    20180800614

    Incident disposition/finding: Not Sustained
    **Policy outcome: Not yet entered**

    Allegations:

        #61-Unnecessary or improper use of force - Code of Conduct - Not Sustained - Oct 01,
2018

    Actions taken:

        : Oct 01, 2018 - Not Sustained


Mesa/Spencer 000186

| MESA POLICE<br><br>Department<br>Policy Manual | **Use of Force Reporting<br>Protocols** | DPM 2.1.45<br>Effective<br>11/29/2012<br>Revised<br>04/06/2020 |
|---|---|---|
| Approved by:<br>**Chief of Police** | | Page:<br>**1 of 7** |

## 1. PURPOSE

- This order provides Mesa Police Department (MPD) personnel with general guidelines for use of force reporting protocols and should not be considered as all inclusive.
- Refer to **DPM 2.1.1 Use of Force Philosophy & Definitions** for an explanation of use of force terms.
- Refer to **DPM 2.1.5 Use of Force** for force options and guidelines.

## 2. NON-DEADLY FORCE POLICE INCIDENTS

### General Guidelines

- Refer to **DPM 2.1.5 Use of Force** for further information regarding use of force protocols.

### Definitions:

- **Reportable Use of Force Applications:**
  - All instances in which a Department member uses force on a subject shall be reported.
    Exceptions:
      - Verbal commands.
      - Handcuffing.
      - Control hold techniques used while applying handcuffs.
      - Empty hand control holds.
  - Take downs are reportable.
  - When a member uses force and a person is injured, or thought to be injured, or the person complains of injury and requests medical aid.

### Officer Responsibilities:

- Apprehend suspect(s) and secure scene.
- Provide any medical treatment and/or request emergency services.
- Notify a non-involved supervisor.
- Identify witnesses and include their information in related reports.
- Photograph sustained or complained areas of injury(s), as well as overall photographs of the subject.
- Document the use of force in a department report (GO) or supplemental report, unless directed not to by a Lieutenant or Homicide supervisor.
- Each member that uses reportable force, as defined in **DPM 2.1.5 Use of Force,** shall complete a primary or supplemental report.
- Complete reports as soon as possible after incident, but prior to the end of shift.


Page 1

| **MESA POLICE**<br><br>Department<br>Policy Manual | **Use of Force Reporting Protocols** | **DPM 2.1.45**<br>Effective<br>11/29/2012<br>Revised<br>04/06/2020 |
|---|---|---|
| Approved by:<br>**Chief of Police** | | Page:<br>**2 of 7** |

**Sergeant Responsibilities:**

- Non-involved supervisor immediately responds to the scene on any reported use of force which involves the use of:
  - Strikes to the face, head or neck.
  - Conducted Energy Weapon (CEW).
  - Impact Weapon.
  - Deployment of Police Service Dog (K-9).
  - Carotid Control Technique.
  - Any other use of force causing the subject to be treated at the hospital for a physical injury as defined in **DPM 2.1.1 Use of Force Philosophy & Definitions.**

- **Investigatory Responsibilities:**
  - Obtain basic facts from the involved officer(s).
  - Conduct initial review of the application of use of force.
  - Ensure medical treatment provided.
  - Ensure overall photographs taken, including areas involving visible injury or complaint of pain.
  - Ensure all necessary evidence is collected.

- **Allegation of Excessive Force:**
  - Obtain the subjects statement to include clarification of the allegations being made related to the use of force to be documented in Blue Team.
  - Justification for not speaking with the subject will be documented in **Use of Force.**
  - Immediate notification by phone is required, if subject is transported to the hospital for a serious physical injury (as defined in **DPM 2.1.1** or **ARS 13-105.39**) or is complaining of a serious physical injury to the on-duty Patrol Lieutenant or Specialty Unit Lieutenant, as applicable.
  - The on-duty Patrol Lieutenant or Specialty Unit Lieutenant will immediately notify:
    - Affected Division Commander.
    - Duty Commander (weekends).
    - Professional Standards Lieutenant

**Post Incident Sergeant Responsibilities:**

- If the use of force involves multiple officers or multiple subjects, complete only one **Use of Force Report.**
- Review and approve Records Management System (RMS) report(s).


Page 2

| MESA POLICE | Use of Force Reporting Protocols | DPM 2.1.45 |
|---|---|---|
| Department Policy Manual | | Effective 11/29/2012 Revised 04/06/2020 |
| Approved by: Chief of Police | | Page: 3 of 7 |

- Ensure each member who uses reportable use of force completes a primary or supplemental report prior to the end of shift and the reports are reviewed.
- Review the entire incident. If any other issues other than Use of Force (UOF) are discovered during the review, document action taken in Blue Team prior to forwarding to Lieutenant.
  - Examples: Tactical concerns, discourtesy, legal issues or any other policy issues noted.
- **Injury:**
  Any incidents where the use of force results in an injury or complaint of injury, **prior to the end of shift,** a Supervisor shall electronically complete and submit a Use of Force Report via Blue Team to include a review of all applicable reports and on-body camera footage for any reported use of force incident which involves:
  - Strikes to the face, head or neck.
  - Conducted Energy Weapon (CEW).
  - **Note:** A puncture site only, unless probes are in soft tissue areas (i.e.: neck, face, female breast and/or groin, is not considered an injury for purposes of this policy.
  - Impact Weapons.
  - Deployment of Police Service Dog(K9).
  - Carotid Control Technique.

- **No Injury:**
  For incidents where the use of force does **not** result in any injury or complaint of injury, the review must be completed **within two shifts but prior to regular days off.** The supervisor shall electronically complete and submit a Use of Force Report in Blue Team to include a review of all applicable reports and on-body camera footage for any reported use of force incident which involves:
  - Strikes to the face, head or neck.
  - Conducted Energy Weapon (CEW).
  - Impact Weapons.
  - Deployment of a Police Service Dog (K-9).
  - Carotid Control Technique.
- **Other Reportable Use of Force Incidents:**
  All incidents involving the application of any use of force, **will be completed within two shifts but prior to regular days off.** This includes but is not limited to:
  - Pressure Points.
  - Pain Compliance Techniques.


Page 3

| MESA POLICE | **Use of Force Reporting Protocols** | **DPM 2.1.45** |
|---|---|---|
| Department Policy Manual | | Effective 11/29/2012 Revised 04/06/2020 |
| Approved by: **Chief of Police** | | Page: **4 of 7** |

- o Takedowns.
- o Chemical Agents.
- o Limited Strikes.
- o These incidents are reportable regardless if there is injury or complaint of injury.
- **Routing the Use of Force Report via Blue Team:**
  - o Upon completion of the use of force incident review, indicate the appropriate determination in the "Instructions" box when forwarding the incident to the next level:
    - "No issues identified after initial review."
    - "Additional Review required."
  - o Forward the completed Use of Force Report via Blue Team to the appropriate chain of command Lieutenant.
  - o Or to an equivalent Lieutenant in the Division when the chain of command is unavailable for an extended period to avoid any delay in routing.
  - o Copy (cc) the Division Commander via Blue Team.

**Post Incident Lieutenant Responsibilities**:

- If the subject was transported to the hospital for a serious physical injury or was complaining of serious physical injury, or there is an allegation of Excessive Force make notifications to the following personnel:
  - Professional Standards Lieutenant.
  - Affected Division Commander or Duty Commander (weekend).

- **Use of Force Report via Blue Team:**
  - o Upon receipt of the Use of Force Report, conduct a second level review of all applicable reports and on-body camera forage of the reported use of force incident.
    - If the Use of Force Report was marked as "No issues identified after initial review," the Lieutenant must complete the review within **four shifts but prior to regular days off**.
    - If the Use of Force Report was marked as "Additional Review Required," the Lieutenant must complete the review by **the next shift**.
    - **Any deviation from the time requirement** will be approved by a commander and documented in the Blue Team review (e.g.; unexpected leave).
  - o Upon the Lieutenants completion of the use of force incident review, indicate the appropriate determination in the "Instructions" box when forwarding the incident to the next level.


Page 4

| MESA POLICE | Use of Force Reporting Protocols | DPM 2.1.45 |
|---|---|---|
| Department Policy Manual | | Effective 11/29/2012 Revised 04/06/2020 |
| Approved by: **Chief of Police** | | Page: **5 of 7** |

- If determined "No issues identified after initial review."
  - ➤ Provide final comments to the use of force incident and forward to the Training Section in Blue Team.
  - ➤ Copy (cc) Division Commander in Blue team.
- If determined "Additional review Required."
  - ➤ Forward the completed Use of Force Report via Blue Team to the Division Commander.
  - ➤ Copy (cc) the Advanced Training Lieutenant via Blue Team.
  - ➤ Follow up with Sergeant within two weeks to determine what actions were taken on issues previously discovered during the review described on page 3, outside of the use of force.
    - ○ Examples: Tactical concerns, discourtesy, legal issues or any other policy issues noted.

## Commander Responsibilities:

- **Use of Force Report via Blue Team:**
  - ○ Upon receipt of the Use of Force marked as "Additional Review required", the Commander will conduct a third level review of all applicable reports and on-body camera footage of the reported use of force incident.
  - ○ The Commander will **consult** with the Sergeant and Lieutenant regarding their recommendations for additional actions to be taken such as:
    - Tactical Debriefing.
    - Officer Training.
    - Squad Training.
    - Supervisor Training.
    - Counseling/Workstation File Entry.
    - Corrective Action Plan.
    - Formal Internal Investigation.
  - ○ The Commander will provide final comments in the "Instructions" box when forwarding the use of force incident in Blue Team to the Training Section.
  - ○ This review will be completed **within two business days but prior to regular days off.**
    - **Any deviation from the time requirement** (due to consultation with supervisors) will be documented in the Blue Team review (i.e.: opposing days off, paid time off, etc.).

- **Internal Investigation:**
  - ○ Upon completion of the Commander's review, if a determination is made to conduct an Internal Investigation, the Commander will notify the:


Page 5

| MESA POLICE<br><br>Department<br>Policy Manual | **Use of Force Reporting<br>Protocols** | DPM 2.1.45<br>Effective<br>11/29/2012<br>Revised<br>04/06/2020 |
|---|---|---|
| Approved by:<br>**Chief of Police** | | Page:<br>**6 of 7** |

- Professional Standards Lieutenant.
- Affected Bureau Assistant Chief.

- **Advanced Training Lieutenant Responsibilities:**
  - Review and keep statistics on Department Use of Force:
    - COMPSTAT Reporting.
  - Assist Division Commanders (as requested):
    - Tactical Debriefing.
    - Officer Training.
    - Squad Training.
    - Supervisor Training.
    - Corrective Action Plans.
  - Provide to Executive Staff:
    - Monthly Use of Force Reports.
      - Due on 15th of the following month (or closest date to 15th).
      - Department Overview of use of force.
      - Division Overview of use of force by shift and squad.

    - Recommendation for Department Training to include:
      - Officer Specific Training.
      - Supervisor Specific Training.
      - All Sworn Personnel Training.

## Training Section Responsibilities:

- Blue Team:
  - The Proficiency Skills Unit will review each Use of Force Report generated in Blue Team.
  - If the Use of Force Report information **is incomplete**, the report will be routed to the originating supervisor for corrections.
  - If the Use of Force Report information is **complete,** report will be assigned a file number (i.e.: "UOF2018-178"), marked as "complete" in Blue Team, and uploaded/transferred into IAPro.

- IAPro:
  - The Proficiency Skills Unit will ensure all available use of force data is successfully transferred into IAPro and ensure the applicable Division/shift has been selected.
  - The assigned Proficiency Skills Unit member will mark the report as "complete" and change the report disposition to "completed".

**3. POLICE INCIDENTS INVOLVING DEATH / SERIOUS INJURY**


page 6

| MESA POLICE<br><br>**Department**<br>**Policy Manual** | **Use of Force Reporting<br>Protocols** | **DPM 2.1.45**<br>Effective<br>11/29/2012<br>Revised<br>04/06/2020 |
|---|---|---|
| Approved by:<br>**Chief of Police** | | Page:<br>**7 of 7** |

**General Guidelines**

- Refer to **DPM 2.1.10 Police Incidents Involving Death/Serious Injury** for further information.

**REFERENCES:**

- DPM 2.1.1 Use of Force Philosophy & Definitions
- DPM 2.1.5 Use of Force
- DPM 2.1.10 Police Incidents Involving Death/Serious Injury


page 7





# Use of Force Recommendation 35

*Revise ECD Deployment Procedures*





# Agenda



- Objective
- Recommendation Highlights
- Current Policy
- Gap Analysis
- Industry Trends
- Proposed Action
- Questions

Page 2

# Objective

Review DPM 2.1.35 Electronic Control Device (ECD) Protocols and bring MPD policy in line with industry best practices and current MPD training related to Conducted Energy Weapon (CEW) use.



ER 095

# Recommendation Highlights

Revise policy related to Electronic Control Device deployment procedures to include precise language in line with best practices.

- One cycle and subsequent evaluation to determine if additional cycle required.
- Exposure to ECW longer than 15 seconds may increase risk of death or serious injury.
- Subsequent applications should be independently justified, and the higher risk weighed against other force options.


Page 4

# Current Policy
DPM 2.1.35 Section 5 – Deployment Procedures



- When practical and reasonable, a verbal announcement of the intended use of the CEW and the display of the red aiming laser at the subject shall precede the application of a CEW in order to:
    - Provide subject with a reasonable opportunity to voluntarily comply.
    - Provide other members and individuals with a warning that a CEW may be deployed.
- Do not place self, or others, in jeopardy in order to deliver such warnings.
- When practical, have another officer present with available lethal force when utilizing the CEW.
- Members should not leave cover or put themselves in an otherwise tactically unsafe position in order to deploy the CEW.
- Deploy CEW for one standard discharge cycle.
- Reassess the situation to determine if further applications of the CEW are necessary in order to place the subject into custody.



page 5

# Gap Analysis



Current Policy:

1.  Policy is lacking specific language related to extended CEW exposure.

2.  Policy is lacking specific language related to subsequent applications of the CEW.



## Discussion

<u>HIGHLIGHT 1</u>

Personnel should use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary.

<u>STATUS</u>

- Covered in 2019 CEW training
- Addressed in current MPD policy

## Current Training



 Be able to justify every CEW trigger pull or 5-seconds of discharge under the specific circumstances presented

Avoid repeated or continuous CEW exposures unless necessary to counter immediate threat

 Avoid using CEW on vulnerable or higher risk populations (e.g. small children, elderly, pregnant) unless necessary to counter immediate threat

Monitor subject post-CEW use. As with any use of force, if subject is unresponsive, initiate EMS/CPR protocols

# Discussion

## HIGHLIGHT 2

Personnel should consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury.

## HIGHLIGHT 3

Any subsequent application should be independently justifiable, and the higher risk should be weighed against other force options

## SOURCE

• 2019 Taser Recertification

## Current Training



### AVOID REPEATED/EXTENDED CEW DURATIONS

- Minimize the number and duration of CEW exposures

- CEW exposure is a physically and psychologically stressful event

- Use the shortest duration of CEW exposure objectively reasonable to accomplish lawful objectives

- Avoid repeated or continuous exposures beyond 15 seconds absent reasonably perceived immediate threat and increased justification

- Reassess the subject's behavior before repeating or continuing the exposure, and provide time for compliance

page 8

# Industry Trends



| Agency | Policy on CEW deployment specific to the PERF recommendations | |
|---|---|---|
| IACP | • Specifies one cycle absent exigent circumstances<br>• Specifies 5-seconds for a cycle<br>• Requires medical response for subject exposed to more than three cycles or fifteen seconds<br>• Requires medical response for subjects exposed to more than one CEW simultaneously<br>• Special reporting requirements for drive stuns, multiple or extended exposures, and elevated risk population | ✓ |
| Gilbert | • Does not specify a limit on number of cycles<br>• Specifies each cycle must be independently justifies<br>• Requires a medical evaluation after every CEW deployment, prior to transport<br>• No special reporting requirements for subjects exposed to multiple CEWs | ✓ |
| LVMPD | • Outlines medical considerations<br>• Specifies standard 5-second cycle<br>• Specifies once a subject has been exposed to three 5-second cycles, the CEW will be considered ineffective, unless exigent circumstances exist<br>• Does not specify mandatory medical response<br>• Specifies reporting requirement for CEW deployment | ✓ |
| Scottsdale | • Does not specify a limit on number of cycles<br>• Specifies repeated and prolonged exposures should be avoided<br>• Requires a paramedic response after every CEW deployment<br>• No special reporting requirements for subjects exposed to multiple CEW | ✓ |

Page 9

# Policy Recommendations

DPM 2.1.35 Section 5 – Deployment Procedures



- When practical and reasonable, a verbal announcement of the intended use of the CEW and the display of the red aiming laser at the subject shall precede the application of a CEW in order to:
  - Provide subject with a reasonable opportunity to voluntarily comply.
  - Provide other members and individuals with a warning that a CEW may be deployed.
- Do not place self, or others, in jeopardy in order to deliver such warnings.
- When practical, have another officer present with available lethal force when utilizing the CEW.
- Members should not leave cover or put themselves in an otherwise tactically unsafe position in order to deploy the CEW
- Initial use of the CEW shall be a standard five-second cycle, and then the officer will evaluate the need to apply a second five-second cycle after providing the subject a reasonable opportunity to comply.
- Each subsequent five-second cycle requires separate justification. The justification shall include consideration of the enhanced risks to subjects exposed to multiple and/or prolonged CEW cycles.
- Once the subject has been exposed to three cycles, the CEW shall be deemed ineffective and another use of force option will be considered, unless exigent circumstances exist.

page 10

# Pros & Cons
<u>Revise policy related to ECD deployment</u>

<u>PRO</u>

- Bring policy in line with industry best practice.
- Bring policy in line with MPD training.
- Adds specific language related to extended CEW exposure.
- Adds specific language related to subsequent applications of the CEW.

<u>CON</u>

- None



Page 11

# Proposed Action

1. Adopt proposed policy revisions with specific policy language related to:

   - Exposure to CEW longer than 15 seconds may increase risk of death or serious injury.

   - Subsequent applications of CEW should be independently justified, and the higher risk weighed against other force options.

Page 12



Inmate _____
ADC # _____
Arizona State Prison Complex _____
Unit _____ AZ _____

Exhibit 22

Exhibit 22 [BODY-cam videos] "KEY

• The audio goes in and out in all 4 videos. And the sound quality has been altered. The only way that any observer will be able Hear what is going on Fully, is to use Headphones.

• Because this CD contains "Altered" footage, there is no ide caption in one of the corners that Has a universal clock, t is very difficult to determine which part of the video Is being refered to in these statement disputes. True "Axon" footage would say "Axon Flex" with a serial Number and a running timer/clock.

• And there is [4] videos. There is no way to tell which video is which. All there is, is a description of the [KB] that each file contains. The Next page is a Key to decipher which video is which.

• Macklins footage is broke up in two videos for obvious [self-Serving purposes] He magically shut off the camera while Mr. Spencer was Being strangled and having his head slammed into the ground, which is why there is Two videos.

Video A — (Shalls Body-Cam) Duration: 30min 31sec.
410,939 KB

Video B — (Macklins Body-Cam #1) Duration 1min 37sec
21,819 KB

Video C — (Clarks Body-Cam) Duration 17min 7sec
231,134 KB

Video D (Macklin's Body-Cam #2) Duration 21min 29sec
277,309 KB

° There are times that the videos will be referenced as Evidence and specific times will be in question. I assume that whoever reads this will have a media player similar to the one here at the prison. At times I will ask the veiwer to press the pause button to see the content. At other times I'll ask the viewer to press the 'pause' button then tap the Play/Pause button twice very quickly. This will allow the video to play small incriments at a time. Each tap will play a few Hundredths of a Sec. This will allow the veiwer to see the video in slow-motion.



SPENCER vs PEW, et al.
20-CV-00385
MCSO Body Cam Videos

| MESA POLICE | **Restraining Prisoners** | DPM 2.4.65 |
|---|---|---|
| Department Policy Manual | | Review Date 3/16/2017 |
| Approved by: **Chief of Police** | Chapter: **Arrests & Prisoners** | Page: **1 of 2** |

## 1. PURPOSE

The purpose of this policy is to provide the Mesa Police Department (MPD) with guidelines for restraining prisoners.

## 2. GENERAL GUIDELINES

**General Guidelines for Restraints**

Observe all federal and state laws, city codes, and Department orders regarding prisoner custody.

Keep prisoners secure, treat humanely, and do not subject to unreasonable restraint or force.

Handcuff prisoners with their hands behind their back, with the handcuffs double locked.

- Exceptions may be made when a member cannot handcuff a prisoner's hands behind the back because of health conditions, injuries, or anatomical abnormalities.
- Other exceptions require a supervisor's approval.

**Avoiding Positional Asphyxia**

**Anytime maximum restraint is used, or anytime a suspect exhibits bizarre behavior before, during or after control is applied, watch the suspect closely for breathing difficulties.**

- Bizarre behavior includes but is not limited to delirium; psychosis; violent behavior, self-inflicted injury; superhuman strength; high pulse rate; paranoia or hallucinations.

Sometimes multiple officers are necessary to overcome the strength of a suspect.

- It may be necessary to use the weight of several officers to hold a subject down while handcuffs or other restraints are applied.
- **Once the individual is controlled, quickly remove the weight to allow the subject to breathe freely.**
- Roll subject onto side or into a sitting position as soon as possible.

Transport in an upright/seated position, seatbelt in.

- **Obtain medical care immediately if subject has any breathing difficulties or if requested by the subject.**
- Conduct transport with two officers so that one may continually observe the suspect for medical problems.


Page 1

Mesa/Spencer 000287

| MESA POLICE<br><br>Department<br>Policy Manual | **Restraining Prisoners** | DPM 2.4.65<br><br>Review Date<br>3/16/2017 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>**Arrests & Prisoners** | Page:<br>**2 of 2** |

If the subject is transported to a detention facility:

- Advise the facilities custodian of any pre-existing medical conditions and observations of bizarre behavior.

**Comply with the guidelines and procedures as taught in the most recent positional asphyxia training program, if handling subjects, who have exhibited these symptoms and/or have been subjected to maximum restraints.**

**Head Nets**

The head net **is not** intended to be used on all prisoners.

- Only those who have threatened, or have attempted to spit on or bite an officer, other emergency personnel, or holding facility personnel.

**Use head nets as directed in department approved training.**

**Do not** use the head net on anyone that is vomiting, having difficulty breathing, or is bleeding profusely from the mouth or nose area.

Once the head net is applied, continuously monitor the subject.

- **Do not** leave the subject wearing the head net unattended.

Remove the head net as soon as it is safe to do so, or as directed by a supervisor.

Once the head net is removed, dispose of it.

- **Do not** clean or reuse.
- If the net is visibly contaminated with blood, put in a biohazard bag and place the bag in a biohazard container marked for incineration.

Head nets are available for member use upon completion of department approved training.

- Document any use of a head net in a Departmental Report (DR), including the reason for use.
- Notify a supervisor of any head net use as soon as practical.


Page 2

Mesa/Spencer 000288

# PATIENT CARE REPORT

**Incident Number1:** F2018023638

**Date of Service:** 03/21/2018 17:27:52
**Unit:** E209
**Shift:** B
**Crew:** AMR AMR
John Thein
Justin Worden
Matthew Paul
Michael Clay
Other Other

**Specific Property Use:** Street or road in commercial area
**Incident address:** 8702 E BROADWAY RD
**City:** MARI
**Zip:** 85208

**Chief Complaint:** Assault
**Secondary Complaint:**
**Destination:** Banner Baywood Medical
**Run Disposition:** Treated/Transported
with Medic Ride-in
**Number of Patients at the Scene:**
Single
**Number of Patients Transported:**
**Complaint Reported by Dispatch:**
ASSLT



# CALL TIMES BY UNIT

### UNIT # 1 : E209

| Call Received: | Dispatched: | En Route: | At Scene: | Back in Service: |
|---|---|---|---|---|
| 03/21/2018 17:27:09 | 03/21/2018 17:28:58 | 03/21/2018 17:30:01 | 03/21/2018 17:34:49 | 03/21/2018 18:03:20 |

### UNIT # 2 : UNDEFINED

**At Patient:**
03/21/2018
17:35:27

# PATIENT INFORMATION

**Last Name:** SPENCER
**First Name:** COLE

**DOB:**
**Age:** 32 Years
**Sex:** Male
**Weight:** 190.0 pounds

### CLOSEST RELATIVE/RESPONSIBLE PARTY

# INSURANCE

# MEDICATIONS

pantoprazole

# ALLERGIES

**Medications - NKDA**

# HISTORY

**Duration of Complaint - 20 (Minutes)**
**History - MI; Pacemaker**

# ASSESSMENT

### SET # 1

**Time Taken:**
03/21/2018 17:38:25
**ECG Type:**
4 Lead
**ECG :**
Sinus Tachycardia
**Pain Scale:**
10
**LOC:**
No

**GCS:** E=4 V=5 M=6
**Total=15**
**Qualifier:** GCS has legitimate
values without interventions
**Motor:**
Obeys commands for
movement (6)
**Verbal:**
Oriented (5)
**Eye:**
Spontaneous-open with

**Skin:**
Normal
**Head :**
Pain (Frontal)
**Eye :**
Normal (Bilateral)
**Face:**
Bleeding Controlled (Lip
(Lower), Lip (Upper), Nose);
Pain (Eyebrow, Lip (Lower),

Mesa/Spencer 000276

Page 1

**Responsiveness:**
Alert and Oriented to Person,
Place, Time Event

blinking at baseline (4)

Lip (Upper)); Swelling/Bruising
with Pain (Eyebrow, Nose)
**Neck:**
Normal
**Chest:**
Normal
**Abdomen :**
Normal
**Pelvis/GU :**
Normal
**Back and Spine:**
Normal
**Extremities :**
Normal
**Neurological:**
Normal Baseline for Patient

--- Set # 2 ---

**Time Taken:**
03/21/2018 17:40:49
**ECG Type:**
12 Lead
**ECG :**
Sinus Tachycardia
**Responsiveness:**
Alert and Oriented to Person,
Place, Time Event

**GCS: E=4 V=5 M=6**
**Total=15**
**Qualifier:** GCS has legitimate
values without interventions
**Motor:**
Obeys commands for
movement (6)
**Verbal:**
Oriented (5)
**Eye:**
Spontaneous-open with
blinking at baseline (4)

--- **STROKE SCALE** ---

--- **STROKE SCALE (VAN)** ---

--- **OPQRST** ---

**INJURY**

**Cause of Injury:**
Assault
**Mechanism of Injury:**
Blunt
**Injuries:**

**Trauma Center Criteria:**
Not Applicable
**Injury Risk Factors:**
None

**IMPRESSIONS**

**Provider Impression - Injury of**
face

**VITALS**

--- Set # 1 ---

**Time Taken:**
03/21/2018 17:37:59

**Position:**
Supine

| **BP Systolic:** | **Resp Rate :** | **Pupils-Right Eye:** |
|---|---|---|
| 137 | 18 | Reactive |
| **BP Diastolic:** | **SPO2 %:** | **Pupils-Left Eye:** |
| 61.0 | 99 | Reactive |
| **Pulse:** | **Lung Sounds:** | |
| 139 | Clear All Fields | |

--- Set # 2 ---

**Time Taken:**
03/21/2018 17:43:30

**Position:**
Supine

**BP Systolic:**
130
**BP Diastolic:**
78.0

**Resp Rate :**
18
**SPO2 %:**
99

Mesa/Spencer 000277

*Page 2*

Pulse:
140

─────────────────────── Set # 3 ───────────────────────

| Time Taken: | Position: |
| 03/21/2018 17:58:45 | Sitting |

| BP Systolic: | Resp Rate : | Pupils-Right Eye: |
| 134 | 18 | Reactive |
| BP Diastolic: | SPO2 %: | Pupils-Left Eye: |
| 67.0 | 98 | Reactive |
| Pulse: | Lung Sounds: | |
| 140 | Clear All Fields | |
| Capillary Refill: | | |
| 2 seconds or less | | |

### TREATMENTS

| 17:56:01 | Restraints - Chem/Physical | Matthew Paul | **Restraint Type:** Soft Restraints **Location:** Left Arm; Left Leg; Right Arm; Right Leg **Response:** Improved **Prior to EMS Care:** false |

### CARDIAC ARREST

### NARRATIVE

Fire Unit: E209 rt a call for assault. Ua pt found with Mesa PD and Maricopa Sheriff stating he was in an fight with PD after traffic stop. PT started fighting with police which was cause for evaluation. Pt was complaining of pain in left arm around handcuffs and hematoma on left eyebrow. Pt was A&Ox4 answering questions appropriately and admitting to Methamphetamines, sinus tach on the monitor and vitals stable. Pt had bruising on the eyebrow, swelling on left eye, bleeding from nose and lips. Nothing further found on secondary assessment and no further complaints. PD stated pt was tased after fighting but barbs had already been removed prior to assessment. PD states pt only struck with fists during fight. PD requested pt get follow up assessment from hospital and was transferred to AMR208 for transport to Banner Baywood with Mesa Fire medic ride in. E209 attempted to call Banner Baywood for courtesy notification but no answer on multiple calls.

### CCU

### PRESCRIBED MEDS

### CCS

### TRANSPORTATION

| **How Patient was Moved to Gurney:** Walk with Assistance | **Condition at Transfer:** Improved |
| **How Patient was Moved to Ambulance:** Gurney | |

**Position of Patient During Transport:** Sitting
**Transport Method:** AMR-American Medical Transport
**Transport Unit:** AMR: AMR208
**Transport Mode from Scene:** Code 2
**Ride In Time:** 03/21/2018 17:57:34
**Hospital Arrival Time:** 03/21/2018 18:05:38

### SIGNATURES

Medic/EMT

*[signature]*

Justin Worden
As a crew member of the Mesa Fire and Medical Department, I attest that the foregoing is true and correct.
03/21/2018 17:33:29

Mesa/Spencer 000278

Page 3

Witness

PD

03/21/2018 17:45:21

Medic/EMT 2

John Thein
As a crew member of the Mesa Fire and Medical Department, I attest that the foregoing is true and correct.
03/21/2018 17:45:37

RN Accepting (Facility Representative)

Other Other
The patient named on this form was received by this facility on the date and at the time indicated and this facility furnished care, services or assistance to the patient. My signature is not an acceptance of financial responsibility for the services rendered.
03/21/2018 18:02:35

---

Generated by Zoi - All rights reserved 2009-2020  Date/Time Created: **5/12/2020 6:58**     

295453



**Maricopa County Sheriffs Office - AZ**
**Phoenix, AZ, US**
*Document generated: 26 Oct 2020 - 07:15:46 -07:00 by Dalton, Amanda(B2799)*



## EVIDENCE AUDIT TRAIL

| Evidence | | Source | |
|---|---|---|---|
| Evidence ID | MC18064268 | Device Type | Axon Flex |
| Categories | Other - Categories | Device Name | Shall's Camera |
| Title | AXON Flex Video 2018-03-21 1723 | Serial Number | X78086382 |
| | | Other | Axon Flex |

| | | | |
|---|---|---|---|
| CheckSum | Sha2-<br>87614c22b46d7bc4c95cc6452a1e261289a92ef2a8b4fb14593<br>8f4c098f36981 | | |
| Record Start | 21 Mar 2018 17:23:54 | | |
| Uploaded | 22 Mar 2018 01:29:22 | Usage | |
| Uploader | Shall, Kevin (Badge ID: S1554) | | |
| Unique ID | F7BBD1466414485D84FD5A453FFA50AF | Page views | 13 |
| | | File downloads | |
| | | Video playbacks | 12 |
| | | Last Viewed Or<br>Downloaded On | 26 Oct 2020 07:15:45 |

| # | Date | Time | User | Activity |
|---|---|---|---|---|
| 1 | 22 Mar 2018 | 01:29:22 (-07:00) | System | Evidence Record Created |
| 2 | 22 Mar 2018 | 07:09:38 (-07:00) | System | Tag 'IR18008163' Added |
| 3 | 22 Mar 2018 | 07:09:38 (-07:00) | System | Category 'Other - Categories' Added<br>Deletion is now unscheduled |
| 4 | 22 Mar 2018 | 07:09:38 (-07:00) | System | Tag 'D1' Added |
| 5 | 22 Mar 2018 | 07:09:38 (-07:00) | System | External ID Updated to 'MC18064268' |
| 6 | 22 Mar 2018 | 07:09:38 (-07:00) | System | Retention Level Updated<br>Deletion is now scheduled for 20 Mar 2021 17:23:54 (-<br>07:00) |
| 7 | 22 Mar 2018 | 07:09:38 (-07:00) | System | Tag 'I122' Added |
| 8 | 22 Mar 2018 | 07:09:38 (-07:00) | System | Tag '124' Added |
| 9 | 27 Mar 2018 | 10:12:04 (-07:00) | Jefferys, Christopher (Badge ID: S1010) | Evidence Record Accessed. Client IP Address:<br>156.42.184.219 |
| 10 | 27 Mar 2018 | 10:12:06 (-07:00) | Jefferys, Christopher (Badge ID: S1010) | Media File Buffered by System at Page Load. Client IP<br>156.42.184.219 |
| 11 | 27 Mar 2018 | 10:12:17 (-07:00) | Jefferys, Christopher (Badge ID: S1010) | Evidence Record Streamed. Client IP Address:<br>156.42.184.219 |



MCSO-0652

| #  | Date        | Time                | User                                      | Activity                                                                 |
|----|-------------|---------------------|-------------------------------------------|--------------------------------------------------------------------------|
| 12 | 27 Mar 2018 | 10:21:08 (-07:00)   | Jefferys, Christopher (Badge ID: S1010)   | Media File Buffered by System at Page Load. Client IP 156.42.184.219     |
| 13 | 27 Mar 2018 | 10:27:30 (-07:00)   | Jefferys, Christopher (Badge ID: S1010)   | Evidence Record Accessed. Client IP Address: 156.42.184.219              |
| 14 | 27 Mar 2018 | 10:27:30 (-07:00)   | Jefferys, Christopher (Badge ID: S1010)   | Media File Buffered by System at Page Load. Client IP 156.42.184.219     |
| 15 | 27 Mar 2018 | 10:27:38 (-07:00)   | Jefferys, Christopher (Badge ID: S1010)   | Evidence Record Streamed. Client IP Address: 156.42.184.219              |
| 16 | 27 Mar 2018 | 12:57:36 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence Record Accessed. Client IP Address: 156.42.184.219              |
| 17 | 27 Mar 2018 | 12:57:38 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Media File Buffered by System at Page Load. Client IP 156.42.184.219     |
| 18 | 27 Mar 2018 | 12:57:42 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence Record Streamed. Client IP Address: 156.42.184.219              |
| 19 | 27 Mar 2018 | 13:10:23 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence Record Added to Case 'MC18064268' Deletion is now unscheduled   |
| 20 | 27 Mar 2018 | 13:11:00 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence copy created at agency Mesa Police Dept. - AZ                   |
| 21 | 14 May 2018 | 13:38:47 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence Record Accessed. Client IP Address: 156.42.184.219              |
| 22 | 14 May 2018 | 13:38:49 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Media File Buffered by System at Page Load. Client IP 156.42.184.219     |
| 23 | 14 May 2018 | 13:38:57 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence Record Streamed. Client IP Address: 156.42.184.219              |
| 24 | 14 May 2018 | 13:53:08 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence Record Added to Case 'IR18008163/MC18064268'                    |
| 25 | 14 May 2018 | 13:53:54 (-07:00)   | Wagner, Chad (Badge ID: A8075)            | Evidence copy created at agency Maricopa County Attorneys Office - AZ     |
| 26 | 16 May 2018 | 14:06:35 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Evidence Record Accessed. Client IP Address: 156.42.184.219              |
| 27 | 16 May 2018 | 14:06:38 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Media File Buffered by System at Page Load. Client IP 156.42.184.219     |
| 28 | 16 May 2018 | 14:06:45 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Evidence Record Streamed. Client IP Address: 156.42.184.219              |
| 29 | 18 May 2018 | 02:57:54 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Evidence Record Accessed. Client IP Address: 156.42.184.220              |
| 30 | 18 May 2018 | 02:57:56 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Media File Buffered by System at Page Load. Client IP 156.42.184.220     |
| 31 | 18 May 2018 | 02:58:01 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Evidence Record Streamed. Client IP Address: 156.42.184.220              |
| 32 | 18 May 2018 | 03:05:16 (-07:00)   | Shall, Kevin (Badge ID: S1554)            | Media File Buffered by System at Page Load. Client IP 156.42.184.220     |


page 2

2

MCSO-0653

| MESA POLICE | Electronic Control Device | DPM 2.1.35 |
|---|---|---|
| Department<br>Policy Manual | (ECD) Protocols | Revision Date<br>3/14/2017 |
| **Approved by:**<br>**Chief of Police** | **Chapter:**<br>Use of Force | **Page:**<br>**1 of 6** |

## 1. PURPOSE

- This order provides Mesa Police Department (MPD) personnel with direction and guidelines for the use of the Electronic Control Devices (ECD).
- Refer to **DPM 2.1.1 Use of Force Philosophy & Definitions** for an explanation of use of force terms.
- Refer to **DPM 2.1.5 Use of Force** for force options and guidelines.

## 2. DEFINITIONS

- **Air Cartridge**
  - A replaceable cartridge for the ECD which uses compressed nitrogen to fire two barbed probes on thin connecting wires sending a high voltage/low current signal into a subject.
- **AFIDs**
  - Confetti-like pieces of paper that are expelled from the cartridge when fired. Each anti-felon identification (AFID) tag contains an alphanumeric identifier unique to the cartridge used.
- **Drive Stun**
  - A function of the ECD is to stun a subject by making direct contact with the body after the air cartridge has been expended or removed.
  - A drive stun does not override an individual's motor responses but can be used for pain compliance. Use of the ECD with an air cartridge is preferred.
- **Electronic Control Device (ECD)**
  - An electro-muscular disruption device that disrupts the body's ability to communicate messages from the brain to the muscles causing temporary motor skill dysfunction to a subject.
- **ECD Deployment**
  - An officer has "deployed" an ECD if the officer has displayed the test arc, fired the probes or applied a drive stun. This does not include displaying the test arc to determine if an ECD is operational.

## 3. GENERAL GUIDELINES

### Authorized Equipment

- Authorized members shall only use a Department owned and issued Taser. This is the only ECD authorized for use by the Department.
- Tasers are issued to Department members by the Training Section.
- Only those members who have satisfactorily completed the Department's approved training will be authorized to carry and to use the ECD.


Page 1

Mesa/Spencer 000162

| MESA POLICE<br>Department<br>Policy Manual | **Electronic Control Device (ECD) Protocols** | DPM 2.1.35<br>Revision Date<br>3/14/2017 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**2 of 6** |

- District Coordinators are responsible for:
  - The possession and issuance of unused cartridges.
  - All cartridges shall be logged into the District's log sheet.
- Completed log sheets shall be sent to the Training Section.

**Authorized Use**

- An ECD should only be deployed when reasonably necessary, consistent with **DPM 2.1.5 Use of Force**, to subdue or incapacitate a subject in order:
  - To prevent violent behavior; or
  - To prevent physical harm to the officer or another person; or
  - In response to threats of physical injury to himself/herself or of other persons; or
  - To prevent a subject from committing suicide.
- Members may use an ECD against dangerous animals.

**Deployment Factors**

- An employee authorized to carry an ECD must be able to articulate the following three (3) core factors when deploying an ECD:
  - The severity of the crime at issue; **and**
  - Whether the subject poses an imminent threat to the safety of the employees or others; **and**
  - Whether the subject is actively resisting arrest or attempting to evade arrest by flight.

## 4. RESTRICTIONS

- Members shall not use an ECD on a subject:

  - As a form of coercion or punishment.
  - Known to be or visibly pregnant, elderly, very young, visibly frail, or disabled unless deadly force is the only other option.
  - In an elevated position where a fall is likely to cause substantial injury or death.
  - In a location where the subject could drown.
  - In any environment where an officer knows that a potentially flammable, volatile, or explosive material is present (including, but not limited to OC spray with alcohol or other volatile propellant, gasoline, natural gas, or propane).
  - Operating a motor vehicle or motorcycle when the engine is running or on a bicycle or scooter in motion, unless the subject is displaying overtly assaultive behavior which cannot be reasonably dealt with in any other safer fashion.

Mesa/Spencer 000163


Page 2

| MESA POLICE | Electronic Control Device | DPM 2.1.35 |
|---|---|---|
| Department Policy Manual | (ECD) Protocols | Revision Date 3/14/2017 |
| Approved by: Chief of Police | Chapter: Use of Force | Page: 3 of 6 |

- o  Handcuffed or otherwise restrained, unless displaying assaultive behavior which cannot be reasonably dealt with in any other safer fashion.
- o  To awaken him/her if unconscious or intoxicated.
- o  To prevent the destruction of evidence.
- o  To escort, prod, or jab.
- o  To gain the attention or voluntary compliance of a group of people except as outlined in crowd dispersal guidelines as outlined in **FFS 1.2 Field Force System.**

## 5. DEPLOYMENT PROCEDURES

- When practical and reasonable, a verbal announcement of the intended use of the ECD and the display of the red aiming laser at the subject shall precede the application of an ECD in order to:
    - o  Provide subject with a reasonable opportunity to voluntarily comply.
    - o  Provide other members and individuals with a warning that an ECD may be deployed.
- Do not place self, or others, in jeopardy in order to deliver such warnings.
- When practical have another officer present with available lethal force, when utilizing the ECD.
- Members should not leave cover or put themselves in an otherwise tactically unsafe position in order to deploy the ECD.
- Deploy ECD for one standard discharge cycle.
- Reassess the situation to determine if further applications of the ECD are necessary in order to place the subject into custody.

**Air Cartridge (Attached)**
- The primary target area is the back of the subject, below the neck line.
- Secondary targets include, in order, the side and the front (lower center mass) of the subject.
- When encountering subjects wearing heavy or loose clothing on the upper body, the legs should be considered as a target.

**Drive Stun**
- The primary target area is the back of the subject, below the neck line.
- Secondary targets include, in order, the side and the front (lower center mass) of the subject.
- Once probes have been deployed the groin is an acceptable target area for drive stun.

**Handling Subjects After Deployment**
- Do not approach the subject until it can be done safely in accordance with any other high-risk arrest.

Page 3

| MESA POLICE | **Electronic Control Device** | **DPM 2.1.35** |
|---|---|---|
| Department Policy Manual | **(ECD) Protocols** | Revision Date 3/14/2017 |
| Approved by: **Chief of Police** | Chapter: Use of Force | Page: **4 of 6** |

- Members should take advantage of the window of opportunity while the subject is under the effects of the ECD to handcuff and take the subject into custody.

## 6. POST DEPLOYMENT PROCEDURES

**Medical Assistance**

- As soon as it can be done safely, members shall have medical personnel examine any subject exposed to an ECD activation.
- If the probes penetrate the skin, the puncture site should be brought to their attention.
    - Only medical personnel shall remove the ECD probes that are embedded in soft tissue areas such as the neck, face, female breast and groin.
    - Decisions to remove from other areas are at the discretion of the member carrying the ECD.
- Use a restraint technique that does not impair the subject's respiration, especially in possible excited delirium cases.
- Notify Detention Staff if an ECD was deployed on the subject being booked into MPD Holding Facility.

**Documentation**

- Anytime an ECD is deployed (except in training activities), whether a subject is struck or not, members shall notify a supervisor and document the use of force incident in a Department Report (DR) and DPM 2.1.45F1, Use of Force Report, regardless of injury as outlined in **DPM 2.1.45 Use of Force Reporting Protocols**.

**Evidence Collection & Handling**

- Probes that have been used should be treated as a biohazard and handled accordingly, unless needed as evidence.
- In cases where a subject exposed to ECD activation received serious physical injury, death, or displays behavior associated with excited delirium, the contents of the ECD cartridge shall be collected as evidence.
- The contents of the cartridge must be collected by a Crime Scene Specialist (CSS) or as directed by the scene supervisor.
    - The collected items must include: probes, wires, cartridge body, blast doors, and at least one AFID.
    - The collected probe wires from a deployed cartridge should not be wrapped. Gather the wires and other materials and place in an evidence bag.



Mesa/Spencer 000165

| MESA POLICE | **Electronic Control Device** | **DPM 2.1.35** |
|---|---|---|
| Department<br>Policy Manual | **(ECD) Protocols** | Revision Date<br>3/14/2017 |
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**5 of 6** |

## 7. CARRYING & SECURITY

### Carrying

- All members working in a uniform (sworn or civilian) capacity, who have been assigned an ECD, shall carry the ECD on their person(S) while on duty.
- The carrying of an ECD is optional for detectives, unless the detective position has been designated for mandatory carrying of ECD.
- The ECD shall be carried in:
  - In a secured manner on the support side of the body.
  - An ECD holster or a secured pouch on the vest.

### ECD Authorized Positions

- The Training Section Lieutenant maintains a list of positions that have been authorized by the Chief of Police to carry an ECD.
- Members who leave an authorized ECD position shall return their assigned Taser, ECD holster, and cartridges to the Training Section once they leave their authorized position.
- All Tasers shall be inspected and information downloaded by the Training Section prior to reissuing the Taser.

### Security

- Members assigned an ECD will ensure due care in the security of all Department issued ECDs.
- Any Department issued ECDs not in the immediate possession of the member(s) are to be locked:
  - In a secured location within a Mesa PD building; or
  - In a personal vehicle in a locked garage; or
  - In the member's home when the member is not working.
- Do not secure ECDs in an assigned Department owned/leased vehicle when not working.

## 8. INSPECTIONS & REPAIRS

### Inspections

- Members carrying ECDs will spark test and inspect their ECDs prior to the start of their shift.
- ECD inspections shall be conducted on an annual basis by the Training Section to ensure that all ECDs are operable, to conduct information downloads, and perform any necessary maintenance or repairs.


page 5

Mesa/Spencer 000166

| MESA POLICE | Electronic Control Device | DPM 2.1.35 |
|---|---|---|
| Department Policy Manual | (ECD) Protocols | Revision Date 3/14/2017 |
| Approved by: Chief of Police | Chapter: Use of Force | Page: 6 of 6 |

**Maintenance/Repairs**

- An ECD requiring outside maintenance or repair must be taken to the Training Section and the internal data must be downloaded before the ECD is serviced.

**9. TRAINING**

- All members issued a Department ECD shall attend training and recertification as directed by the MPD Training Section.
- The Training Section manages the ECD program and is responsible for updating, ordering, and distributing equipment as needed.
- The Training Section keeps any and all records on the ECD program and completes an annual status report to the Chief of Police.

References:

- DPM 2.1.1 Use of Force Philosophy & Definitions
- DPM 2.1.5 Use of Force
- DPM 2.1.45 Use of Force Reporting Protocols
- FFS 1.2 Field Force System


Page 6

Mesa/Spencer 000167

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies. The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.



# Arizona Peace Officer Standards and Training Board

## LESSON PLAN COVER SHEET

| COURSE TITLE: Use of Force / Carotid Control Technique Review - 2007 | | HOURS: 1.0 |
|---|---|---|

| DATE FIRST PREPARED: November 6, 2007 | PREPARED BY: Officer Julie Shelley |
|---|---|
| DATE REVISED/REVIEWED: *(Please Circle one)*    09·21·09 | BY: *m. m⁼Clem 12223* |
| DATE REVISED/REVIEWED: *(Please Circle one)*    01·25·11 | BY: *m. m⁼Clem 12223* |
| DATE REVISED/REVIEWED: *(Please Circle one)*    02·19·13 | BY: *m. m⁼Clem 12223* |
| DATE REVISED/REVIEWED: *(Please Circle one)* | BY: |

| LIST ANY PREREQUISITES: Sworn police officer | |
|---|---|

| LEAD INSTRUCTOR: Proficiency Skills Officer | BACK-UP INSTRUCTOR(s): Any current Defensive Tactics Instructor |
|---|---|

APPROVAL NUMBER:  13-051

COURSE DESCRIPTION: Review of the Mesa PD use of force policy, carotid technique, Title 13, AZPOST use of force guidelines.

| INSTRUCTOR REFERENCES: Mesa PD Field Manual, Title 13, DTI manual. | TRAINING AIDS, EQUIPMENT, MATERIALS: PowerPoint presentation |
|---|---|

| METHOD OF INSTRUCTION: Lecture and demonstration | PRE-TEST: | Yes | NoXX |
|---|---|---|---|
| | POST-TEST: | Yes | NoXX |

SUCCESS CRITERIA:

PERFORMANCE OBJECTIVES: At the end of 1.0 hour of instruction, the student will be able to:

1. Identify when supervisors are required to complete a use of force report form.
2. Identify where the carotid control technique falls in the MPD control options chart.
3. Identify 2 safety concerns associated with the use of the carotid control technique.
4. Properly demonstrate the carotid control technique.

| AGENCY APPROVAL | Name (Type or Print) DWAYNE YOUNG #9226 | Signature *Dwayne Young 9226* | Date 11·07·07 |
|---|---|---|---|
| AZ POST APPROVAL | Name (Type or Print) LYNDON A. "LYNN" LARSON Basic Training Administrator | Signature | Date August 2, 2000 |

ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD © 1999

Page 1

Mesa/Spencer 000312

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies. The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.

| Use of Force / Carotid Control Technique Review - 2007 | NOTES: |
|---|---|

**I.   Introduction**

A. Instructor

B. Review of Performance Objectives: At the end of 1.0 hours of instruction, the student will be able to:

1. Identify when supervisors are required to complete a use of force report form.
2. Identify where the carotid control technique falls in the MPD control options chart.
3. Identify 2 safety concerns associated with the use of the carotid control technique.
4. Properly demonstrate the carotid control technique.

C. Purpose / motivator: This course is designed to be a refresher and review of the Mesa Police Department's use of force policy and the carotid control technique.

**II.   Use of force review**

A. Review of FLD 210 (use of force)

1. Limited hard hands vs. hard hands- limited hard hands is strikes to limited parts of the body, generally long bones and major muscle groups
2. Active aggression vs. defensive resistance- the difference involves an assault to the officer
3. Taser drive stun vs. probe deployment- both are the same level on the control options chart. Use the probes in all Taser uses
4. Individual OC use vs. CAS deployment - same level on control chart, but supervisor must approve CAS usage
5. Officers may use any authorized option, if justified

B. Justification for the use of force: Officers may not use force unless other reasonable alternatives have been exhausted or would be clearly ineffective under the circumstances. Members may use that force that is reasonably necessary to accomplish their lawful purpose.

C. Necessity to use deadly force: Two factors are relevant, the presence of an imminent danger and the absence of safe alternatives.

ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD   © 1999

Page 2

Mesa/Spencer 000313

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies. The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.

| Use of Force / Carotid Control Technique Review - 2007 | NOTES: |
|---|---|
| **III.   Use of force reporting**<br><br>A. Notification is required when:<br>  1. We use force AND someone is injured or thought to be injured (soft hands techniques that result in NO injury or suspected injury need not be reported).<br>  2. The Taser is deployed (only exception is on animals).<br>  3. O.C. is deployed on a suspect.<br><br>B. Use of force must be reported:<br>  1. In a DR.<br>  2. The use of force report form (MPD form 124).<br>  3. Check the "Use of Force" box in RMS.<br><br>C. Photograph injuries, or lack of injuries, to document the nature of injuries and protect against unfounded claims.<br><br>**IV.   Use of force variables**<br><br>A. Officer/ suspect size and gender<br><br>B. Age and fitness level<br><br>C. Skill level<br><br>D. Multiple suspects or officers<br><br>E. Proximity of backup<br><br>F. Reaction time and distance<br><br>G. Cover or lack of cover<br><br>H. Proximity of other suspects or threats<br><br>I.  Lighting and weather<br><br>J. Clothing<br><br>K. High danger area<br><br>**V.   Totality of circumstances**<br><br>A. Danger to officer or others | **PO #1** |

ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD  © 1999


Page 3

Mesa/Spencer 000314

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies. The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.

| Use of Force / Carotid Control Technique Review - 2007 | NOTES: |
|---|---|
| B. Drug/ alcohol influence | |
| C. Injury or exhaustion to the officer | |
| D. Officer on ground | |
| E. Mental state of suspect | |
| F. Prior knowledge | |
| **VI. In Custody Death Cases** | |
| A. Treat the event as you would any other major incident | |
| B. Preserve evidence, including Taser cartridge (leave it where it lies and photograph everything) | |
| **VII. Carotid Technique – review** | |
| A. This technique is designed to reduce oxygenated blood flow to the brain. It is NOT A CHOKE HOLD that restricts air flow through the throat. | |
| B. Same level as deadly force on the Mesa PD use of force continuum. | **PO #2** |
| C. The application of a carotid control technique should be restricted to those situations where violent resistance is encountered or where death or serious bodily harm will be the result to the officers. | |
| **VIII. Medical information/considerations** | |
| A. In order to familiarize officers with the carotid control techniques, an understanding of the way the circulatory system functions is essential. | |
| 1. The air entering the lungs contains approximately 21% oxygen. 2. The air being exhaled from the lungs contains approximately 16% oxygen and 4% carbon dioxide ($CO_2$). 3. Blood is oxygenated when the right side of the heart pumps de-oxygenated blood through the lungs for oxygen pick-up and carbon dioxide release. 4. The oxygenated blood then returns to the left portion of the | |

Page 4

Mesa/Spencer 000315

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies. The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.

| Use of Force / Carotid Control Technique Review - 2007 | NOTES: |
|---|---|

heart where it is pumped to the various parts of the body through the arterial system. De-oxygenated blood is returned to the heart through the venous system.

5. Oxygenated blood is supplied to the brain via the internal carotid artery.

6. The carotid arteries (internal/external) are located on both sides of the larynx, just below the lower jaw.

7. The carotid arteries extend from the aorta and travel upward via the left and right common carotid arteries. The vessels then bifurcate into the internal and external carotid arteries, which supply oxygenated blood to the brain and meninges as well as the skin and muscles of the head.

8. When one (1) of the carotid control techniques is applied compressing the carotid arteries, the supply of oxygenated blood to the brain is diminished, concurrently sealing the jugular vein, returning the de-oxygenated blood. The ensuing result of that is fainting. This unconsciousness is accompanied with a slowing of the heart and a rapid loss of blood pressure due to stimulation of the carotid sinus and thus the vagus nerve.

B. Affects:

1. Diminishes blood flow to the brain cells.
   a. *Signs of unconsciousness may occur in as little as three (3) to four (4) seconds after application.*
   b. Usually takes <u>five (5) to fifteen (15)</u> seconds to render the average person unconscious if properly applied. Substance abuse (alcohol and drugs) can affect this time – increase or decrease.
2. The subject may exhibit seizure-like reactions.
   a. Eyes roll back.
   b. Body quivers.
   c. Loss of bladder or bowel control.
3. Recovery time will vary, but usually takes between <u>20 to 30</u> seconds.
   a. The subject will be confused or disoriented.
   b. The subject usually cannot recall what happened.

C. Dangers.

1. *If oxygenated blood flow to the brain is cut off for <u>four (4) to six (6)</u> minutes, irreparable brain damage can occur.*
2. Persons with heart problems could be adversely affected due

NOTES (right column):

PO #3

SPECIAL NOTE: Explain the "chicken choke" (hand grabbing the throat) and that it is

ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD  © 1999

Page 5

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies.  The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.

| Use of Force / Carotid Control Technique Review - 2007 | NOTES: |
|---|---|
| to the stimulation of vagus nerves which run alongside the carotid arteries.<br>3. The carotid control technique should only be applied once.<br>4. Watch the placement of the forearm so that it DOES NOT slip around and place pressure on the throat.<br><br>**IX.   Method of applying**<br><br>A. Get the suspect to a manageable height (kick the back of his knee or otherwise move suspect if necessary)<br><br>B. Begin by placing your armpit on the suspects shoulder, immediately applying pressure with your bicep to the side of the suspect's neck (carotid artery).<br><br>C. Wrap you arm around the suspect's neck.<br><br>D. Insure your chest is in contact with the suspects back, and your elbow is in line with the suspects chin and down on his chest.<br><br>E. Place the hand of the arm that is wrapped around the suspect's neck on the bicep of the free arm.<br><br>F. Place your free hand on the back of the suspect's head.<br><br>G. Tuck your head down to avoid being struck in the face.<br><br>H. Apply pressure to the back of the suspect's head, pressing toward the crook of the elbow that is wrapped around the suspect's neck, and bring your shoulder blades back and together – this is not a shoulder shrug.<br><br>I.   After the suspect is unconscious, hold the control hold for two seconds to ensure that you only have to apply the technique once.<br><br>J. Gently guide the suspect to a prone position by rolling them onto their stomach.<br><br>    1.  You should support the suspect's chin with the hand of the arm that went around the suspect's neck.<br>    2.  Obtain control of the suspect's arm with your other hand by reaching between your body and the suspect's.<br><br>K. Handcuff and roll the suspect on his side to ease breathing. | NOT authorized unless deadly force is authorized. |

ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD   © 1999


Page 6

Mesa/Spencer 000317

This lesson plan and outline is the author's interpretation of this material. Some information may be outdated or conflict with the policy of some agencies.  The City of Mesa Police Department takes no responsibility for the failure of an agency to research current law and agency policy to determine the accuracy of the material.

| Use of Force / Carotid Control Technique Review - 2007 | NOTES: |
|---|---|

L.  Check for pulse and breathing.

    1.  If no signs of a pulse or if the suspect is not breathing, remove the handcuffs and begin CPR.  Summon EMS.
    2.  If the suspect is having difficulty breathing, summon EMS.
M.  Notifications: After applying the technique, officers must make the following notifications.

    1.  Call Fire/ EMS
    2.  Notify supervisor
    3.  Write a DR
    4.  Ensure use of force form is completed
    5.  Notify jail staff

**X.  Practical Application**

A.  Practical application demonstration by instructor

B.  Practical application by students                    **PO #4**

C.  Written Test

**XI.  Conclusion**

A.  Every officer should be extremely familiar with the department's use of force policy and reporting guidelines, and properly apply techniques and tools listed on the department's use of force continuum.

B.  Review of performance objectives: At the end of 1.0 hours of instruction, the student will be able to:

    1.  Identify when supervisors are required to complete a use of force report form.
    2.  Identify where the carotid control technique falls in the MPD control options chart.
    3.  Identify 2 safety concerns associated with the use of the carotid control technique.
    4.  Properly demonstrate the carotid control technique.

C.  Questions and comments.


Page 7

ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD   © 1999

Mesa/Spencer 000318

| MESA POLICE | **Use of Force** | DPM 2.1.5 |
|---|---|---|
| Department Policy Manual | | Review Date 3/14/2017 |
| Approved by: **Chief of Police** | Chapter: Use of Force | Page: **1 of 5** |

## 1. PURPOSE

- This order provides Mesa Police Department (MPD) personnel with guidelines for the:
  - Appropriate and acceptable use of force.
  - High degree of officer safety protocols.
  - Reporting guidelines for all uses of force.
  - Treatment of any injury or complaint of injury arising from the use of force.
- Refer to **DPM 2.1.1 Use of Force Philosophy & Definitions** for explanation of use of force terms.

## 2. ARS GUIDELINES

Per guidelines outlined in **ARS 13-409**, **ARS 13-410.C**, and **ARS 13-410.D**, an officer is justified in threatening to use force, using force or using deadly physical force.

## 3. DEFINITIONS

- **Control Holds**: Techniques that have minimal chance of injury. Examples: OCCS, empty hand escort controls, firm grip, pressure points, takedown, etc.

- **Chemical Agents**: Generally, chemical agents are intended to be used as a low force means of obtaining control. Examples: OC spray, SWAT chemical munitions, etc. Refer to **DPM 2.1.30 Chemical Agents** for further information.

- **Limited Strikes**: Strikes applied to limited target areas. Refer to "Strikes" definition. Example target areas: brachial plexus (tie-in), radial, median, femoral, common peroneal and tibial nerves.

- **Strikes:** Techniques that have more than a minimal chance of injury. Examples: Kicks, elbow, palm or knee strikes, and punches. The officer will consider the totality of circumstances in evaluating which area of the body to strike.

- **TASER (Electronic Control Device):** Generally, the TASER should be considered in circumstances where a reasonable officer would believe that it is immediately necessary to protect him or another from what that officer reasonably believes is an imminent or actual assault, to prevent suicide, or in excited delirium cases. Refer to **DPM 2.1.35 Electronic Control Device (ECD) Protocols** for further information.

Mesa/Spencer 000147


Page 1

| MESA POLICE | Use of Force | DPM 2.1.5 |
|---|---|---|
| Department Policy Manual | | Review Date 3/14/2017 |
| Approved by: Chief of Police | Chapter: Use of Force | Page: 2 of 5 |

- **Impact Weapons**: Generally, impact weapons are used as an offensive or defensive weapon to protect an officer or another from what the officer reasonably believes is an imminent or actual assault or to prevent suicide. Refer to **DPM 2.1.25 Impact Weapons** and **DPM 2.1.40 Less Lethal Shotgun Protocols** for further information.

- **PSD:** Police Service Dogs (K-9) may be used when the PSD Handler reasonably believes the use of the PSD is necessary to apprehend subjects wanted for a serious crime, to protect officers or others from an imminent or actual assault, or in an attempt to prevent suicide. **Refer to DPM 2.10.30 Police Service Dog (PSD)** and **PSD Unit Manual** for further information.

- **Carotid Control Technique:**
  - This technique is authorized to be used by an officer whenever:
    - Deadly force is authorized; OR
    - When a subject is actively assaulting an officer or another person and other control methods have been exhausted or the officer reasonably believes other methods would be ineffective.
  - Ensure medical attention is obtained as soon possible.

- **Deadly Force:**

- Force that is used with the purpose of causing death or serious physical injury or in the manner of its use or intended use is capable of creating a substantial risk of causing death or serious physical injury.

- While the use of a firearm is expressly considered deadly force, other force (vehicles, impact weapons, etc.) might also be considered deadly force if the officer reasonably anticipates that the force applied will create a substantial likelihood of causing death or serious physical injury.

- **Dangerous Fleeing Felon**: The officer reasonably believes that it is necessary to prevent the escape of a fleeing subject and the officer reasonably believes that:

  - The subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death; and

  - The escape of the subject would pose an imminent danger of death or serious physical injury to the officer or to another person.

**4. USE OF FORCE FACTORS**

Mesa/Spencer 000148



| MESA POLICE | **Use of Force** | DPM 2.1.5 |
|---|---|---|
| **Department**<br>**Policy Manual** | | Review Date<br>3/14/2017 |
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**3 of 5** |

- Officers must consider the totality of circumstances in evaluating whether force is necessary and what level of force would be reasonable before using a particular force option.

- Factors that may be considered include, but are not limited to:

  o The risk and reasonably foreseeable consequences of escape.

  o The conduct of the individual being confronted as reasonably perceived by the officer at the time.

  o The seriousness of the suspected offense or reason for contact with the individual.

  o The officer's and subject's factors, including, but not limited to: age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue and number of officers versus subjects.

  o The influence of drugs or alcohol and the mental capacity of the subject.

  o The proximity of weapons.

  o The distance of the subject to the officer.

  o The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

  o Time and circumstances permitting, the availability of other options (what resources are reasonably available to the officer under the circumstances) not inclusive of the following:

    ▪ *The availability of cover.* An armed suspect attempting to gain a position of cover may necessitate the use of deadly force; conversely, an officer in a position of cover may gain additional time to assess the need to use deadly force without incurring significant additional risks.

    ▪ *Time constraints.* The time delay between a suspect's actions and an officer's reaction can determine whether a hesitation in the use of force will place the officer or others at an unacceptable disadvantage. The time delay between the use of force and the "stopping" of the suspect's actions may also play a critical part in determining whether there is a safe alternative to the use of force.

  o The training and experience of the officer.

  o The potential for injury to citizens, officers, and suspects.

Mesa/Spencer 000149


Page 3

| MESA POLICE | | DPM 2.1.5 |
|---|---|---|
| **Department**<br>**Policy Manual** | **Use of Force** | Review Date<br>3/14/2017 |
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**4 of 5** |

     o  Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

     o  Prior knowledge of the subject's propensity for violence.

     o  Any other exigent circumstances.

## 5. MEDICAL TREATMENT AFTER USE OF FORCE

- Ensure medical treatment is provided when appropriate.

- Prior to booking or release, medical assistance shall be obtained for:

     o  Any person who has sustained visible injury; or

     o  Expressed a complaint of injury or continuing pain; or

     o  Has been rendered unconscious.

## 6. REPORTING GUIDELINES

- **Reportable force applications include:**
  - o All instances in which a Department member uses force, other than verbal commands and control holds, on subjects shall be reported; OR
  - o When a member uses force and a person is injured, or thought to be injured, or the person requests medical aid, whether or not an injury is apparent.

- **Officer involved shooting incidents or police incidents resulting in serious injury or death:**

  - o Refer to **DPM 2.1.10 Police Incidents Involving Death/Serious Injury** for member responsibilities and guidelines when responding to an officer involved shooting or police incident resulting in serious injury or death.

- **All other reportable force incidents:**
  - o Any on duty reportable use of force incident by a Department member shall be documented promptly, completely and accurately in an appropriate report. Refer to **DPM 2.1.45 Use of Force Reporting Protocols**.

- **Reportable force application off duty:**
  - o Any officer that uses force in an off duty incident shall immediately notify the appropriate local authorities and his/her chain of chain of command
  - o The officer shall also prepare and submit:

Mesa/Spencer 000150


Page 4

| MESA POLICE | Use of Force | DPM 2.1.5 |
|---|---|---|
| **Department Policy Manual** | | Review Date 3/14/2017 |
| Approved by: **Chief of Police** | Chapter: Use of Force | Page: **5 of 5** |

> - A Department Report (DR) or supplement report if it occurred in City of Mesa (COM). Each officer involved in that use of force incident shall submit a supplemental report.
> - A memo to affected Division Commander documenting the incident if it occurred outside City of Mesa (COM).

**References:**

- DPM 2.1.1 Use of Force Philosophy & Definitions
- DPM 2.1.10 Police Incidents Involving Death/Serious Injury
- DPM 2.1.20 Firearms Use
- DPM 2.1.25 Impact Weapons
- DPM 2.1.30 Chemical Agents
- DPM 2.1.35 Electronic Control Device (ECD) Protocols
- DPM 2.1.40 Less Lethal Shotgun Protocols
- DPM 2.1.45 Use of Force Reporting Protocols
- DPM 1.11.60 Use of Force Board
- DPM 2.10.30 Police Service Dog (PSD)
- PSD Unit Manual

Mesa/Spencer 000151


page 5

## CRIME SCENE UNIT

All images are formatted to fit this report and are distorted

### Notes and Images

**Mesa PD Forensic Services**

LAB CASE NUMBER: FSS032118-0071-0001

**CASE NUMBER: 20180800614**

| Image Name: | Image Added By: | Image Added on: |
|---|---|---|
| 03/22/2018 - Field Notes | Zemojtel, Christopher | 3/22/2018  4:55:12PM |

| Dispatched | Arrived | Cleared call | |
|---|---|---|---|
| 1742 | 1806 | 1923 | DR # 2018-080-0614 |
| Scene Exam Start | Scene Exam End | Arrived at 19-2 | Page 1 of 1 |
| 1806 | 1905 | | Date 03/21/2018 |
| 1840  0312553 | | | |

**CRIME SCENE FIELD NOTES**

| Crime / Incident | Primary Officer | Requesting Officer |
|---|---|---|
| 245 | ROZEMA # 15724  PEW | # 19153 |

**SCENE LOCATION INFORMATION**

| Address | Name of location |
|---|---|
| 1400 S DORSON RD  0312553 | 60644 E. RAYWOOD AVE  ER RM 51 |

**PERSON INFORMATION**

| Name | DOB | Name | DOB |
|---|---|---|---|
| 0312553 | | | |
| KERN, JAMIE P | | | |
| SPENCER, COLE J | | | |

**VEHICLE INFORMATION**

| Year | Make | Model | License | St | VIN | Color |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**LATENT AND PHOTOGRAPHIC IMAGE INFORMATION / OTHER INFO**

| Total Latent Lifts- | DC #13553- Computer DL- | Total Images 60 | LQ-Card # | Total Images- | Integrity Seal # |
|---|---|---|---|---|---|

**NOTES**

| Lot #s | | Lot #s | |
|---|---|---|---|
| Cannabispray-36/12/16 | ☐ | Black Powder #TP082616 | ☐ |
| Cannabispray Paper #07/10 & #3813 | ☐ | Magna Powder #201709203 | ☐ |
| Duquenois Reagent Lot#201412139 | ☐ | White Magna #AC022112 | ☐ |
| Cobalt-Thiocyanate Reagent Lot#201601217 | ☐ | Lizard Q Camera Kit #1 | ☐ |
| Sodium Nitroprusside Reagent Lot#201604001 | ☐ | CAMERA KIT #14 | ☑ |
| Sterile Nanopure Water Lot #HS121516-C | ☐ | BLUE LIGHT #3 | ☐ |

0312553
Initials & ID #



ER 135

MPD Justice Records Request                5/16/20 Released by:NL22731            Released to: K.Gagic



# MESA POLICE DEPARTMENT
# FORENSIC SERVICES
133 N. Morris, Mesa, AZ 85201

**CRIME SCENE UNIT**
**FIELD PROCESSING REPORT**

FSS032118-0071-0001

ZC73455Q1BED9R

**MESA PD**
130 N. Robson
Mesa, AZ 85201

**CASE NUMBER: 20180800614**

| OFFENSE |
|---|
| AGGRAVATED ASSAULT |

| REQUESTING PERSON J. ROZEMA 15724 | DATE & TIME DISPATCHED 03/21/2018 17:42:00 | DATE & TIME ARRIVED 03/21/2018 18:06:00 | DATE & TIME CALL FINISHED 03/21/2018 19:23:00 |
|---|---|---|---|

| ADDRESS OR LOCATION RESPONDED TO |
|---|
| 6644 EAST BAYWOOD AVENUE, MESA, AZ |

| TOTAL NUMBER OF LATENT LIFTS | DATE LATENTS SUBMITTED | TOTAL NUMBER OF DIGITAL IMAGES |  |
|---|---|---|---|
|  |  | 60 |  |

| NAME TYPE | NAME: LAST, FIRST, MIDDLE | DATE OF BIRTH |
|---|---|---|
| SUSPECT | SPENCER, COLE J. |  |
| VICTIM | ROZEMA #15724, OFFICER |  |
| VICTIM | PEW #19183, OFFICER |  |

**NARRATIVE**

**SYNOPSIS**

On the listed date and time, I arrived at Banner Baywood Medical Center at 6644 East Baywood Avenue, in reference to an Aggravated Assault Investigation.

I was briefed by Officer Rozema #15724 who informed me that the suspect, Cole Spencer sustained injuries during the incident. Officer Rozema told me that himself and Officer Pew #19183 both sustained injuries while taking the suspect into custody.

Officer Rozema requested injury photos of the suspect, of Officer Pew and himself.

**SCENE EXAMINATION AND/OR OBSERVATION**

I observed the following injuries on the suspect, Cole Spencer: abrasions on forehead, abrasions on top of head, abrasions

*Chris Zemojtel*

3/29/2018

Christopher Michael Zemojtel, Senior Crime Scene Specialist,                Date

Technical Review:        *RT* 20597
04/02/2018

Administrative Review:        *RT* 20597
04/02/2018



AN ASCLD/LAB-*International* ACCREDITED TESTING LABORATORY SINCE June 11, 2015

MPD 076(F)    Page 2

Page 1 of 2
MESA-0041
Rev. Date: 7/15/2015



# MESA POLICE DEPARTMENT
# FORENSIC SERVICES

**CRIME SCENE UNIT**
**FIELD PROCESSING REPORT**
**CONTINUED**

LAB CASE NUMBER: FSS032118-0071-0001
**CASE NUMBER: 20180800614**

on both side of his face, an abrasion on his nose and abrasions on top of his left hand. I did not see any other injuries on the suspect, Cole Spencer.

I observed the following injuries on the victim, Officer Rozema: red marks on left arm, small red marks on both knees and red stains on his pants. I did not see any other injuries on the victim, Officer Rozema.

I observed the following injuries on the victim, Officer Pew: small red marks on both knees and red stains on both pant legs. I did not see any other injuries on the victim, Officer Pew.

**PHOTOGRAPHY**

I took photos of the suspect, both officers and the above-described injuries. I used a scale in the close-up injury photos.

**FORENSIC PROCESSING**

Not applicable

**EVIDENCE COLLECTION**

Not applicable

No further action requested or taken

*Chris Zemojtel*

3/29/2018

Christopher Michael Zemojtel, Senior Crime Scene Specialist,          Date

Technical Review:          *RT* 20597
04/02/2018

Administrative Review:          *RT* 20597
04/02/2018



AN ASCLD/LAB-*International* ACCREDITED TESTING LABORATORY SINCE June 11, 2015

Page 2 of 2

MPD 076(F)          *Page 3*

MESA-0042 Rev. Date: 7/15/2015



Mesa/Spencer 000139

Page 54



Mesa/Spencer 000140

Page 55



Meta/Spencer 000141

Page 56



Mesa/Spencer 000142

ER 141

Page 57



Mesa/Spencer 000143

Page 58



Mesa/Spencer 000144

Page 59



Mesa/Spencer 000145

Page 60



| DATE/TIME | 03.21.2018 1840 |
| Location | 6644 E BAYWOOD |
| CASE # | 2018.080.0614 |
| Mesa Police | |
| PHOTOGRAPHED BY | C. ZEMOJTEL 2 13553 |

Mesa/Spencer 000146

Page 1 



Mesa/Spencer 000087

Page 2



Mesa/Spencer 000088

page 3



Mesa/Spencer 000089

ER 148

Page 4



Page 5



Mesa/Spencer 000001

Page 6



Meza/Spencer 000090

Page 7



Page 8



Meza/Spencer 000094

Page 9



Meta/Spencer 000096

Page 10



Meza/Spencer 00095



page 11

Metz/Spencer 000099



page 12



Mesa/Spencer 000098

page 13



Mesa/Spencer 000097

Page 14



Mesa/Spencer 000102

page 15



Mesa/Spencer 000103

Page 16



Mesa/Spencer 000101

Page 17



Mesa/Spencer 000100

Page 18



Mesa/Spencer 000106



Page 19



Mesa/Spencer 000105

Page 20



Meta/Spencer 000104

Page 21



Page 22



Mesa/Spencer 000108

ER 167

Page 23



Mesa/Spencer 000109

ER 168

Page 24



Mesa/Spencer 000110

ER 169

Page 25



Page 26



Page 27



Page 28



Mesa/Spencer 000114

Page 29



Mesa/Spencer 000115

Page 30



Mesa/Spencer 000116

Page 31



Mesa/Spencer 000117

Page 32



Mesa/Spencer 000118

ER 177

Page 33



Mesa/Spencer 000119

Page 34



Mesa/Spencer 000120

Page 35



Mesa/Spencer 000121

ER 180

Page 36



Mesa/Spencer 000122

Page 37



Mesa/Spencer 000123

Page 38



Mesa/Spencer 000124



Mesa/Spencer 000125

Page 40



Mesa/Spencer 000126

Page 41



Mesa/Spencer 000127

Page 42



Page 43



Mesa/Spencer 000129

ER 188

Page 44



Mesa/Spencer 000130

ER 189

page 45



Mesa/Spencer 000131

Page 46



Page 47



Page 48



Page 49



Mesa/Spencer 000135

Page 50



Mesa/Spencer 000136

Page 51



Mesa/Spencer 000137

ER 196

Page 52



Mesa/Spencer 000138

Page 53

## Document info

| | |
|---|---|
| Result type: | .Emergency Room Report |
| Result date: | Mar 21, 2018, 06:45 p.m. |
| Result status: | authenticated |
| Performed by: | JOEL BETZ |
| Verified by: | JOEL BETZ |
| Modified by: | JOEL BETZ |

# Facial pain

| Patient: | SPENCER, COLE JOSEPH | DOB: | Oct 23, 1985 |
|---|---|---|---|

Facial pain

Patient: **SPENCER, COLE JOSEPH**     **MRN: 1847185**     **FIN:** 35760669
Age: **32 years**   Sex: **Male**   DOB: **10/23/1985**
Associated Diagnoses: **None**
Author: **BETZ MD, JOEL P**

**Basic Information**
 **History source:** Patient, police.
 **Arrival mode:** Police.
 **History limitation:** None.
 **Additional information:** Chief Complaint from Nursing Triage Note : Patient's Chief Complaint

> 03/21/2018 18:25 MST    Patient's Chief Complaint Pt arrives via EMS in police custody status post altercation with officers. Pt was reported to have been tazed twice, and was forcibly taken down. Gross blood to the face with large hematoma to left eye. No LOC. Pt is altered on a drug called DMT per him.  .

page 1

Provider patient care initiated: 03/21/18 18:23 .Documentation prepared at the direction of and in conjunction with ED medical provider, Steffainy Jessie. 2200. 3/21/2018.Documentation prepared at the direction of and in conjunction with ED medical provider, by scribe Paula Lobato.03/21/2018 18:46.

## History of Present Illness

The patient presents with facial pain. The onset was just prior to arrival. The course/duration of symptoms is constant. Location: Bilateral eye(s) nose. The character of symptoms is "pain". The degree at present is moderate. The exacerbating factor is movement. Risk factors consist of drug abuse. Prior episodes: none. Therapy today: law enforcement. Associated symptoms: nose bleed, No LOC, denies fever and denies chills. Associated injury direct blow.

32 y/o male with hx Hypercholesteremia, Hepatitis, A-flutter, and bradycardia s/p pacemaker presents to the ED by law enforcement. Pt presents with facial pain after getting into a physical altercation with multiple law enforcement officers after resisting arrest and the pt had to be tazed twice. Pt obtained head injury however denies LOC. Police states that initially the pt was lying about his name and they found Heroin in his backpack which is when the pt became violent and began to resist arrest. Police reports that he was more alert on their arrival to the scene however the pt is having a more difficult time answer questions. .

## Review of Systems

**Constitutional symptoms:** No fever, no chills.
**Skin symptoms:** No jaundice, no rash.
**Eye symptoms:** No recent vision problems,
**ENMT symptoms:** No ear pain, no sore throatNose: Bleeding.
**Respiratory symptoms:** No shortness of breath, no cough.
**Cardiovascular symptoms:** No chest pain, no palpitations.
**Gastrointestinal symptoms:** No abdominal pain, no nausea, no vomiting.
**Genitourinary symptoms:** No dysuria, no hematuria.
**Musculoskeletal symptoms:** facial pain, swelling , No Muscle pain,
**Neurologic symptoms:** No headache, no dizziness, no altered level of consciousness.
**Psychiatric symptoms:** No anxiety, no depression.
**Additional review of systems information:** All other systems reviewed and otherwise negative, All systems reviewed as documented in chart.

## Health Status
### Allergies:
Allergic Reactions (Selected)
*High*


Page 2

PEANUT- Anaphylaxis.
No known MEDICATION allergies.

**Medications:** (Selected)

Documented Medications

*Documented*

ASPIRIN 81 MG TABLET,DELAYED RELEASE: PO, DAILY, <EPIC>
Take 81 mg by mouth daily. <EPIC>
PANTOPRAZOLE 40 MG TABLET,DELAYED RELEASE: PO, BID,
<EPIC> Take 40 mg by mouth 2 (two) times daily. <EPIC>
See MPage for additional meds:
aspirin: 81 mg, PO, DAILY
oxycodone 5 mg oral capsule: 5 mg, 1 cap, PO, Q6H, PRN: Pain l
Pain, 0 Refill(s)
pantoprazole: 40 mg, PO, DAILY
sertraline: 100 mg, PO, DAILY
sucralfate: 1 Gm, PO, QIDACHS
sucralfate: 100 mg, PO, QID, 0 Refill(s)
trazodone 50 mg oral tablet: 50 mg, 1 tab, PO, QHS, 0 Refill(s)
trazodone: 50 mg, PO, QHS.

## Past Medical/ Family/ Social History
### Medical history:

Active

Eosinophilic esophagitis (353158012)
Hypercholesteremia (29843A3F-87C1-4D89-A20B-08C3C2B82F81)
Bradycardia (77B8DD6B-CD46-4040-AED2-2E8D9587C96F)
Hypercholesterolaemia (475418015)

Resolved

Atrial flutter (9988012): Resolved.
Hepatitis (474350017): Resolved.
Atrial flutter (9988012): Resolved.
History of heroin abuse (666311000124117): Resolved., Reviewed as
documented in chart.

### Surgical history:

WITH URETERAL STENT INSERTION (Left) on 09/26/2017 at 31 Years.
Comments:
09/26/2017 20:47 - Rose RN, Heather Marie
auto-populated from documented surgical case
URETEROSCOPY (Left) on 09/26/2017 at 31 Years.
Comments:
09/26/2017 20:47 - Rose RN, Heather Marie


Page 3

auto-populated from documented surgical case
CYSTOSCOPY on 09/26/2017 at 31 Years.
   Comments:
   09/26/2017 20:47 - Rose RN, Heather Marie
   auto-populated from documented surgical case
WITH RETROGRADE PYELOGRAM on 09/26/2017 at 31 Years.
   Comments:
   09/26/2017 20:47 - Rose RN, Heather Marie
   auto-populated from documented surgical case
ENDOSCOPY PROCEDURE on 06/19/2017 at 31 Years.
   Comments:
   09/30/2017 09:26 - Contributor_system, HX_EPIC_PR1
   Previous EMR Comment: Surgeon: Eugene Abraham Trowers, MD;
    Procedure: MANOMETRY (ESOPHAGEAL)
ENDOSCOPY PROCEDURE on 11/18/2016 at 31 Years.
   Comments:
   09/30/2017 09:26 - Contributor_system, HX_EPIC_PR1
   Previous EMR Comment: Surgeon: Eugene Abraham Trowers, MD;
    Procedure: ENDOSCOPY UPPER (EGD) ADULT
Ablation (199515017).
Recorder, device- loop recorder (2672093011).
Endoscopy (2644456017).
Ablation (383645018).
   Comments:
   10/24/2017 13:23 - Henshaw RN, Amelia M
   ATRIAL FLUTTER
ppm (384989013).
Cardiac pacemaker (24010014).
CARDIAC SURGERY on 07/04/1800.
   Comments:
   09/30/2017 09:26 - Contributor_system, HX_EPIC_PR1
   Previous EMR Comment: Ablation, Reviewed as documented in chart.
**Family history:** Not significant.
**Social history:** Social History (ST)
**Social History**
Tobacco Status - Current, last 30 days  03/21/18 18:42
Other Substance Use/Abuse Status - Current, last 30 days  03/21/18
18:42
Other Substance Type - Methamphetamines, Other: DMT  03/21/18
18:42
Other Substance Last Use - Less than 12 hours  03/21/18 18:42


page 4

Type of Advance Directive - None  03/21/18 18:42
Advance Directives Education/Requests - Medical advance directive was offered and refused  03/21/18 18:42
Pt Felt Afraid or Concerned About Safety - Cognitively unable to answer 03/21/18 18:42 , Reviewed as documented in chart, Alcohol use: Regularly, Tobacco use: Regularly, Drug use: Heroin, Occupation: Unemployed, Family/social situation: single.

**Physical Examination**

**Vital Signs**

**VITALS**
Temp C - 36.8 DegC
Temp F - 98.2  Deg F
Systolic Blood Pressure - 106 mmHg 03/21/18 18:27
Diastolic Blood Pressure - 70 mmHg 03/21/18 18:27
Heart Rate - 104 bpm 03/21/18 18:27
Respiratory Rate - 18 br/min 03/21/18 18:27
SpO2 - 95 % 03/21/18 18:27
Oxygen Therapy - Room air  03/21/18 18:27

**MAX TEMP 24HRS**
Temp C - 36.8 DegC  .
    Oxygen saturation: 95 %.
OXYGENATION VITAL SIGNS
    03/21/2018 18:19 MST    SpO2                    95 %
                            Oxygen Therapy          Room air

.
Normal O2 Sat.
    **General:** Alert, no acute distress.
    **Glasgow coma scale:** Eye response: 3 /4, verbal response: 4 /5, motor response: 5 /6.
    **Neurological:** No focal neurological deficit observed, CN II-XII intact, normal sensory observed, normal motor observed, Patient was somewhat slurred speech and mildly ataxic on examination. However this seems to be global and not focal in nature..
    **Skin:** Dry, pink, intact, no rash, multiple tattoos.
    **Head:** Normocephalic, multiple facial contusions and abrasions , mid face stable, Not atraumatic,


page 5

**Neck:** Supple, No evidence of nuchal rigidity or jolt accentuation. No meningismal signs. No masses or edema noted over the neck..

**Eye:** Pupils are equal, round and reactive to light, extraocular movements are intact, normal conjunctiva.

**Ears, nose, mouth and throat:** Oral mucosa moist, no nasal septal hematoma.

**Cardiovascular:** Regular rate and rhythm, No murmur.

**Respiratory:** Lungs are clear to auscultation, respirations are non-labored.

**Chest wall:** No tenderness, No deformity, pacemaker in left anterior chest wall no apparent trauma.

**Back:** Nontender, Normal range of motion, Normal alignment.

**Musculoskeletal:** Normal ROM, no tenderness.

**Gastrointestinal:** Soft, Nontender, Non distended, Guarding: Negative, Rebound: Negative, Signs: McBurney's negative.

**Psychiatric:** Cooperative, non-suicidal, not appropriate mood & affect, not normal judgment.

## Medical Decision Making

**Documents reviewed:** Emergency department records, prior records.

**Orders** Import Selected Orders (Selected)

Inpatient Orders

*Ordered*

Apply Cervical Collar:

Bedrest Strict:

ED Transfer to Other Facility:

*Ordered (Dispatched)*

Drug Screen - Abuse - Urine:

*Completed*

.CBC with Diff:

ABSOLUTES-Discern:

AUTOBILL:

Alcohol Level:

CBC-Add'L Parameters - discern:

CT Cervical Spine W/O Contrast:

CT Chest/Abd/Pelvis W/Contrast:

CT Head/Brain/Maxillofacial W/O Contrast:

Careset Utilized:

Comprehensive Metabolic Panel (Includes GFR):

DIFF (Differential Cell Count)-Discern:

Insert Peripheral IV:


page 6

PT:
PTT (APTT):
Patient Transfer Services Request:
Sodium Chloride 0.9% bolus: 1,000 mL, 1000 mL/hr, IV, ONCALL.
**Results review:** Lab results : LABORATORY

| 03/21/2018 18:45 MST | **WBC** | **11.7 K/MM3 H** |
|---|---|---|
| | RBC | 4.63 M/MM3 |
| | HGB | 13.7 g/dL |
| | HCT | 40.4 % |
| | MCV | 87 fL |
| | MCH | 29.6 pg |
| | MCHC | 33.9 g/dL |
| | RDW-CV | 12.4 % |
| | RDW-SD | 39.5 fL |
| | Nucleated RBCs, Automated | 0 % |
| | Platelet | 221 K/MM3 |
| | MPV | 10.8 fL |
| | Differential Method | Automated |
| | **Neutrophils #** | **9.2 K/ul H** |
| | Lymphocytes # | 1.2 K/ul |
| | Monocytes # | 0.7 K/ul |
| | Eosinophils # | 0.4 K/ul |
| | Basophils # | 0.0 K/ul |
| | Immature Granulocytes # | 0.1 K/uL |
| | Neutrophils % | 79 NA |
| | Lymphocytes % | 11 NA |
| | Monocytes % | 6 NA |
| | Eosinophils % | 3 NA |
| | Basophils % | 0 NA |
| | Immature Granulocytes % | 0.5 % NA |
| | Protime | 10.2 second(s) |
| | INR | 0.9 |
| | APTT | 24.4 second(s) |
| | Glucose Level | 70 mg/dL |
| | BUN | 13 mg/dL |
| | Creatinine | 1.06 mg/dL |
| | Estimated Glomerular Filtration Rate | >60 mL/min/1.73 m2 |
| | BUN/Creat Ratio | 12 |
| | Sodium | 137 mmol/L |

page 7

ER 204

| | |
|---|---|
| Potassium | 4.0 mmol/L |
| Chloride | 101 mmol/L |
| **CO2** | **20 mmol/L  L** |
| Anion Gap | 16 |
| Calcium | 9.6 mg/dL |
| Protein, Total | 7.6 g/dL |
| Albumin | 3.5 g/dL |
| **Alb/Glob Ratio** | **0.9  L** |
| Bilirubin Total | 0.3 mg/dL |
| AST | 26 IU/L |
| ALT | 25 IU/L |
| Alkaline Phos | 97 IU/L |
| Ethanol, Plasma | <10 mg/dL |

, Medical Imaging (ST)
**Radiology Results:**

## CT

### _CT Cervical Spine W/O Contrast  - Entered by: Lee, Gyu Won W  - 03/21/2018 20:13

EXAMINATION: CT of the cervical spine without contrast DATE: 3/21/2018 7:56 PMINDICATION: Spine injuryCOMPARISON: NoneTECHNIQUE: Thin section axial noncontrast images were obtained through the cervical spine.  Sagittal and coronal reformatted images were created.  Images were reviewed in bone and soft tissue windows.  CT dose lowering techniques were used, to include: automated exposure control, adjustment for patient size, and or use of iterative reconstruction.? FINDINGS:Osseous:Cervical lordosis is maintained.Vertebral body height and alignment is preserved.No acute fracture or subluxation.No prevertebral soft tissue swelling. The lateral masses of C1 align on C2.Degenerative ChangesC2-3:No significant canal or foraminal stenosis.C3-4:No significant canal or foraminal stenosis.C4-5:No significant canal or foraminal stenosis.C5-6:No significant canal or foraminal stenosis.C6-7:No significant canal or foraminal stenosis.C7-T1:No significant canal or foraminal stenosis.Soft Tissues of the Neck:No focal soft tissue abnormality within the visualized neck.Visualized lung apices are



clear. Visualized airways are patent.IMPRESSION:No acute fracture or subluxation of the cervical spine.

## CT Chest/Abd/Pelvis W/Contrast  - Entered by: Lee, Gyu Won W - 03/21/2018 20:21

EXAM: CT OF THE CHEST, ABDOMEN AND PELVIS WITH IV CONTRASTINDICATIONS: TraumaTECHNIQUE: CT of the chest, abdomen and pelvis was performed following the administration of 75 cc Isovue-370 intravenous contrast. CT dose lowering techniques were used, to include: automated exposure control, adjustment for patient size, and / or use of iterative reconstruction.  COMPARISON: No prior  CTs are available.FINDINGS:CHEST:Vasculature: There is no evidence of acute aortic injury. There is no thoracic aortic aneurysm. Mediastinum / Pleura: There is no mediastinal hematoma. There is no pericardial or pleural effusion. There is no mediastinal, hilar or axillary lymphadenopathy. Airways / Lungs: The central airways are patent.  There is no pneumothorax or consolidative parenchymal disease. ABDOMEN:Liver: The liver is normal in contour without focal lesion. The portal venous system is patent. There is no evidence of laceration.Gallbladder and Bile Ducts: Unremarkable CT appearance of the gallbladder. There is no intrahepatic or extrahepatic biliary ductal dilatation.Spleen: There is homogeneous enhancement without focal lesion. There is no evidence of laceration.Pancreas: The pancreatic parenchyma is unremarkable. There is no pancreatic ductal dilatation.Adrenals: Unremarkable without nodularity.Kidneys: There is symmetric enhancement without hydronephrosis. No focal lesion is demonstrated. There is no evidence of laceration.Vasculature: There is no evidence of acute aortic injury.  No evidence of atherosclerosis or aneurysm.Nodes: Scattered lymph nodes are identified, none enlarged by size criteria.Bowel: The stomach and visualized loops of large and small bowel are unremarkable. An unremarkable appendix is identified.Mesentery/Peritoneum: UnremarkableSoft Tissues: UnremarkablePELVIS:Pelvic Organs: There is no abnormal pelvic mass. The urinary bladder is unremarkable.Bones: There are age indeterminate fractures of


page 9

the left L1 and L2 transverse processes (series 2, images 73 and 80).IMPRESSION:1. Age-indeterminate fractures of the left L1 and L2 transverse processes. Correlation with point tenderness is recommended.2. There is otherwise no evidence of acute traumatic injury to the chest, abdomen or pelvis.

### CT Head/Brain/Maxillofacial W/O Contrast - Entered by: Lee, Gyu Won W - 03/21/2018 20:12

HISTORY: Altercation. Head and spine injury. Left eye hematoma.EXAMINATION: CT brain without contrastTECHNIQUE: Axial images from skull base to vertex were obtained withoutintravenous contrast. Reformatted sagittal and coronal images were generated onthe scanner.COMPARISON: No comparison studiesFINDINGS: Brain parenchyma is normal in appearance without mass lesion,hemorrhage, acute infarction or midline shift. Ventricles are normal in sizeand configuration. No extra-axial fluid collections are present. Basalcisterns are patent. The calvarium is intact. Mastoid air spaces are clear.Reformatted images support the above findings.IMPRESSION: No acute intracranial abnormality.EXAMINATION: CT face without contrastTECHNIQUE: Axial images through the face were reconstructed following a helicalacquisition. Reformatted sagittal and coronal images were generated on thescanner. No contrast was utilized.FINDINGS: There are acute mildly displaced bilateral nasal bone fracture withoverlying soft tissue swelling. The nasal septum is also fractured in its faranterior aspect with minimal displacement. There is an acute fracture of theleft orbital floor without extraocular muscle herniation. The left maxillarysinus is partially opacified with high density material and contains anair-fluid level. There is bilateral facial and periorbital soft tissueswelling. Globes are symmetric in appearance. Intra and extraconal anatomy isnormal. No retrobulbar mass is seen. The optic nerves and orbital apices areunremarkable. The right maxillary sinus is partially opacified with anair-fluid level. Mild bilateral ethmoid sinus and right frontal sinusopacification is noted. Mastoid air spaces are clear. Reformatted images


page 10

support the above findings.IMPRESSION:1.  Acute mildly
displaced fractures of the bilateral nasal bones and theanterior
nasal septum.2.  Left orbital floor fracture without muscle
herniationEXAMINATION: CT cervical spine without
contrastTECHNIQUE: Axial images through the cervical spine
were reconstructed followinga helical acquisition.  Reformatted
sagittal and coronal images were generatedon the scanner.  No
contrast was utilized.  Some images are degraded by
motionartifact.FINDINGS: Vertebral bodies maintain normal
height and alignment without acutefracture.  No significant disc
space narrowing is seen.  Craniocervical junctionis intact.  There
is no prevertebral soft tissue swelling.  Paraspinal softtissues are
unremarkable.  Lung apices are clear.Reformatted images
support the above findings.IMPRESSION: No acute fracture or
malalignment in the cervical spine.The workstation used in
generating this report was SCHANGBANN-PC.

## Impression and Plan

bilateral nasal bone fracture
nasal septum fracture
left orbital floor fracture
L-1 and L-2 transverse process fracture
altered mental status
polysubstance abuse

### Calls-Consults
- 03/21/2018 21:46 , Banner Transfer Services, phone call, Will find a
hospital and bed for the pt. .

### Plan
**Condition:** Stable.

**Disposition:** Transfer to: Facility name: Banner Desert, Accepted by: Dr.
Julie Wynne, Patient care transitioned to: Time: 03/21/2018 22:02,
WYNNE MD, JULIE.

**Counseled:** Patient, Regarding diagnosis, Regarding diagnostic results,
Regarding treatment plan, Patient indicated understanding of
instructions, Police made aware.


page 11

**Notes:** I personally performed the services described in the documentation, reviewed the documentation, as recorded by the scribe in my presence, and it accurately and completely records my words and actions. Dr. Betz, Joel P Signed by:

Steffainy Jessie, scribe. 03/21/2018 2200., I personally performed the services described in the documentation, reviewed the documentation, as recorded by the scribe in my presence, and it accurately and completely records my

words and actions. Betz, Joel P. Signed by Paula Lobato, Scribe. 03/22/2018 0200, 03/21/2018 22:00.


page 12

## Document info

| | |
|---|---|
| Result type: | .Consultation Report |
| Result date: | Mar 23, 2018, 01:11 a.m. |
| Result status: | authenticated |
| Performed by: | EDWARD CHRISTENSEN |
| Verified by: | EDWARD CHRISTENSEN |
| Modified by: | EDWARD CHRISTENSEN |

# Consultation Report

| Patient: | SPENCER, COLE JOSEPH | DOB: | Oct 23, 1985 |
|---|---|---|---|

**Consultation Report**

DATE OF BIRTH: 10/23/1985

Consultation Note

DATE OF SERVICE:
03/22/2018

HISTORY OF PRESENT ILLNESS:
I was asked to consult at Banner Desert Medical Center on a patient that was presented to Banner Baywood Hospital as a transfer from Banner Baywood Hospital after an altercation with the Mesa Police Department while he was under the influence of heroin. The patient was in his vehicle, was pulled over and according to the reports, he was resisting arrest and had to be subdued by multiple officers while he was under the influence of heroin. As a result of this, police having to apprehend this individual, he had some facial abrasions and facial fractures. For this purpose, the patient was taken to Banner Desert Medical Center for evaluation.

PAST MEDICAL HISTORY:
Depression and acid reflux.

PAST SURGICAL HISTORY:

page 13

None.

MEDICATIONS:
Pantoprazole.
Trazodone.

ALLERGIES:
No known drug allergies.

SOCIAL HISTORY:
The patient smokes a half pack of cigarettes a day and denies drinking and uses heroin daily.

PHYSICAL EXAMINATION:
VITAL SIGNS: Stable. The patient is afebrile. HEAD, EYES, EARS, NOSE, AND THROAT: Multiple facial abrasions noted above forehead and cheek region bilaterally and nasal bridge. Eyes: Pupils equal, round, and reactive to light. Extraocular movements are intact. Gross vision is intact. Ears: No hearing deficits noted. Nose: Nares are patent with some mild restriction bilaterally, most likely due to dried blood in the nares. Throat: Oropharynx was not evaluated. Occlusion appears as stable and repeatable. NECK: Aspen C-collar still in place.

IMAGING DATA:
The patient's maxillofacial CT was reviewed. The patient had bilateral nasal bone fractures, minimally displaced and left orbital floor fracture, which was minimally displaced.

ASSESSMENT AND PLAN:
The patient is a 32-year-old male in police custody after resisting arrest while under the influence of heroin, presented to the hospital with multiple facial abrasions, bilateral nasal bone fractures, which are minimally displaced and left orbital floor fracture, minimally displaced.
1. Discussed with the patient his fractures are minimally displaced. At this time, orbital floor does not appear to be needing repair of the bilateral mandible nasal bone fractures. After the swelling has reduced, to reevaluate in 1 week for possible closed reduction of nasal bone fractures.
2. The patient understands that he needs to present to my office in 1 week following discharge and for reevaluation after the swelling has subsided for bilateral nasal bone fracture repair.
3. We would like to repair these facial fractures and nasal bone fracture is in 7 to 10 days if needed or indicated.
4. If there are any questions, please contact my office at 480-659-5977.

Dr. Christensen and oral maxillofacial surgery team will sign off.

page 14

Thank you for the consultation. Call with any questions,

_____

Edward H. Christensen, DDS

EHC:NTS
D:03/23/2018 01:11 MST
T:03/23/2018 01:33 MST
1841179/10354856
Banner Desert Medical Center

cc: Julie L Wynne MD
Tyler S Dennison PA



## Document info

| | |
|---|---|
| Result type: | .Emergency Room Report |
| Result date: | Mar 21, 2018, 11:08 p.m. |
| Result status: | authenticated |
| Performed by: | MICHAEL LUM LUNG |
| Verified by: | MICHAEL LUM LUNG |
| Modified by: | MICHAEL LUM LUNG |

# Trauma - ml*

| Patient: | **SPENCER, COLE JOSEPH** | DOB: | **Oct 23, 1985** |
|---|---|---|---|

Trauma - ml*

Patient: **SPENCER, COLE JOSEPH**     MRN: **2012266**          FIN: **85162253**
Age: **32 years**   Sex: **Male**   DOB: **10/23/1985**
Associated Diagnoses: **None**
Author: **LUM LUNG MD, MICHAEL**

**Basic Information**
   **History source:** EMS.
   **Arrival mode:** Ambulance.
   **History limitation:** None.

Provider patient care initiated: 03/21/18 23:08 ,Documentation prepared at the direction of and in conjunction with ED medical provider, SCRIBE J. Wang.03/21/2018 23:08.

**History of Present Illness**
   The patient presents with facial contusion.  The course of symptoms is constant.  Type of injury: direct blow.  The location where the incident occurred was in the street.  The character of symptoms is pain and bleeding.  The exacerbating factor is movement. Therapy today: emergency medical services.
   32 y/o M w/ h/o hep C, a-fib currently on ASA, sick sinus syndrome s/p pacemaker, and polysubstance abuse, who arrives to the ED via EMS and PD at bedside, presents to this facility for trauma transfer from Banner Baywood, with diagnosis of fractures of the left L1 and L2 transverse processes, mildly displaced fractures of the bilateral nasal bones and the anterior nasal septum, and left orbital floor fracture without muscle herniation. Per EMS report patient was stopped at traffic light by PD with arrest warrant, patient was resisting warrant, and ended up receiving injury during the arrest. .

**Review of Systems**
   **Additional review of systems information:** All other systems reviewed and otherwise negative.

**Health Status**
   **Allergies:**
      Allergic Reactions (Selected)
         *High*
            PEANUT- Anaphylaxis.

page 16

No known MEDICATION allergies.

**Medications:** (Selected)

Documented Medications

*Documented*

ASPIRIN 81 MG TABLET,DELAYED RELEASE: PO, DAILY, <EPIC> Take 81 mg by mouth daily. <EPIC>
PANTOPRAZOLE 40 MG TABLET,DELAYED RELEASE: PO, BID, <EPIC> Take 40 mg by mouth 2 (two) times daily. <EPIC>

See MPage for additional meds:
aspirin: 81 mg, PO, DAILY
oxycodone 5 mg oral capsule: 5 mg, 1 cap, PO, Q6H, PRN: Pain I Pain, 0 Refill(s)
pantoprazole; 40 mg, PO, DAILY
sertraline: 100 mg, PO, DAILY
sucrallate: 1 Gm, PO, QIDACHS
sucralfate: 100 mg, PO, QID, 0 Refill(s)
trazodone 50 mg oral tablet: 50 mg, 1 tab, PO, QHS, 0 Refill(s)
trazodone: 50 mg, PO, QHS.

**Past Medical/ Family/ Social History**

**Medical history:**

Active

Bradycardia (77B8DD6B-CD46-4040-AED2-2E8D9587C96F)
Eosinophilic esophagitis (353158012)
Hypercholesteremia (29843A3F-87C1-4D89-A20B-08C3C2B82F81)
Hypercholesterolaemia (475418015)

Resolved

Atrial flutter (9988012): Resolved.
Atrial flutter (9988012): Resolved.
Hepatitis (474350017): Resolved.
History of heroin abuse (666311000124117): Resolved..

**Surgical history:**

CYSTOSCOPY on 09/26/2017 at 31 Years.
Comments:
09/26/2017 20:47 - Rose RN, Heather Marie
auto-populated from documented surgical case

URETEROSCOPY (Left) on 09/26/2017 at 31 Years.
Comments:
09/26/2017 20:47 - Rose RN, Heather Marie
auto-populated from documented surgical case

WITH RETROGRADE PYELOGRAM on 09/26/2017 at 31 Years.
Comments:
09/26/2017 20:47 - Rose RN, Heather Marie
auto-populated from documented surgical case

WITH URETERAL STENT INSERTION (Left) on 09/26/2017 at 31 Years.
Comments:
09/26/2017 20:47 - Rose RN, Heather Marie
auto-populated from documented surgical case

ENDOSCOPY PROCEDURE on 06/19/2017 at 31 Years.
Comments:
09/30/2017 09:26 - Contributor_system, HX_EPIC_PR1
Previous EMR Comment: Surgeon: Eugene Abraham Trowers, MD;  Procedure: MANOMETRY (ESOPHAGEAL)

ENDOSCOPY PROCEDURE on 11/18/2016 at 31 Years.
Comments:
09/30/2017 09:26 - Contributor_system, HX_EPIC_PR1
Previous EMR Comment: Surgeon: Eugene Abraham Trowers, MD;  Procedure: ENDOSCOPY UPPER (EGD) ADULT

Ablation (199515017).
Ablation (383645018).
Comments:
10/24/2017 13:23 - Henshaw RN, Amelia M
ATRIAL FLUTTER

Cardiac pacemaker (24010014).
Endoscopy (2644456017).
ppm (384989013).
Recorder, device- loop recorder (2672093011).
CARDIAC SURGERY on 07/04/1800.
Comments:
09/30/2017 09:26 - Contributor_system, HX_EPIC_PR1
Previous EMR Comment: Ablation.

Page 17

**Social history:** Alcohol use: Occasionally, Tobacco use: Occasionally, Drug use: abuse hx.

**Physical Examination**

    **Glasgow coma scale:** Eye response: 4 /4, verbal response: 5 /5, motor response: 6 /6, Total score: Total score: 15.

    **Neurological:** Alert and oriented to person, place, time, and situation, CN II-XII intact, pt able to give thumbs up, bilateral, 5/5 strength, good grips, pushes and pulls bilateral UE, bilateral LE with sensation and strength intact, Glasgow coma scale: Eyes open 4 /4, verbal response 5 /5, motor response 6 /6, total score 15.

    **General:** No acute distress, Vital signs reviewed by me, pt placed in c-collar prior to my examination.

    **Skin:** Warm, dry, pink, intact, Normal palpation, abrasions to forehead and R hand, dried blood on face and bilateral nares, laceration to nose bridge.

    **Eye:** Pupils are equal, round and reactive to light, extraocular movements are intact, normal conjunctiva.

    **Ears, nose, mouth and throat:** Tympanic membranes clear, oral mucosa moist, Hearing normal, external ears normal, lac over nose bridge and dried blood from bilateral nares.

    **Neck:** Supple, no tenderness, No thyroid mass appreciated, no midline cervical spine tenderness, no step-offs.

    **Cardiovascular:** Regular rate and rhythm, No murmur.

    **Respiratory:** Lungs are clear to auscultation, respirations are non-labored.

    **Chest wall:** No tenderness, No deformity, thorax is stable, no external evidence of trauma, no abrasions.

    **Back:** Nontender, Normal range of motion, Normal alignment, no CTLS TTP, no step-offs.

    **Musculoskeletal:** Normal ROM, no tenderness, no swelling, pelvis is stable, bilateral LE with FROM.

    **Gastrointestinal:** Soft, Non distended, no external evidence of trauma, no abrasions. , Signs: McBurney's negative.

    **Psychiatric:** Cooperative, appropriate mood & affect.

**Medical Decision Making**

    **Trauma team:** Trauma criteria met.

    **Differential Diagnosis:** Contusion, fracture, sprain, laceration, abrasions.

    **Orders** Import Selected Orders (Selected)

        Inpatient Orders

            *Ordered (Exam Ordered)*

                Wrist 2 View Lt: .

    **Results review:** Lab results : LABORATORY

        03/21/2018 18:45 MST

| Test | Value |
|------|-------|
| WBC | 11.7 K/MM3 H |
| RBC | 4.63 M/MM3 |
| HGB | 13.7 g/dL |
| HCT | 40.4 % |
| MCV | 87 fL |
| MCH | 29.6 pg |
| MCHC | 33.9 g/dL |
| RDW-CV | 12.4 % |
| RDW-SD | 39.5 fL |
| Nucleated RBCs, Automated | 0 % |
| Platelet | 221 K/MM3 |
| MPV | 10.8 fL |
| Differential Method | Automated |
| Neutrophils # | 9.2 K/ul H |
| Lymphocytes # | 1.2 K/ul |
| Monocytes # | 0.7 K/ul |
| Eosinophils # | 0.4 K/ul |
| Basophils # | 0.0 K/ul |
| Immature Granulocytes # | 0.1 K/uL |
| Neutrophils % | 79 NA |
| Lymphocytes % | 11 NA |
| Monocytes % | 6 NA |
| Eosinophils % | 3 NA |
| Basophils % | 0 NA |
| Immature Granulocytes % | 0.5 % NA |
| Protime | 10.2 second(s) |
| INR | 0.9 |
| APTT | 24.4 second(s) |
| Glucose Level | 70 mg/dL |
| BUN | 13 mg/dL |
| Creatinine | 1.06 mg/dL |
| Estimated Glomerular Filtration Rate | >60 mL/min/1.73 m2 |
| BUN/Creat Ratio | 12 |
| Sodium | 137 mmol/L |
| Potassium | 4.0 mmol/L |
| Chloride | 101 mmol/L |

Page 18

| | | |
|---|---|---|
| CO2 | | 20 mmol/L L |
| Anion Gap | | 16 |
| Calcium | | 9.6 mg/dL |
| Protein, Total | | 7.6 g/dL |
| Albumin | | 3.5 g/dL |
| **Alb/Glob Ratio** | | **0.9 L** |
| Bilirubin Total | | 0.3 mg/dL |
| AST | | 26 IU/L |
| ALT | | 25 IU/L |
| Alkaline Phos | | 97 IU/L |
| Ethanol, Plasma | | <10 mg/dL |

, Medical Imaging (ST)
**Radiology Results:**

**DIAGNOSTIC RADIOLOGY**
_Wrist 2 View Lt - Entered by: Casino RT, Samantha K - 03/21/2018 23:36
HISTORY: Left wrist pain with swelling and bruising.COMPARISON: None.TECHNIQUE: AP and lateral views of the left wrist.FINDINGS: There is no acute displaced fracture, dislocation, or radiopaque softtissue foreign body. The joint spaces are relatively well-preserved. If thereis a high clinical suspicion, additional evaluation and follow-up can beperformed with the CT, MRI, or bone scan, if there are no contraindications.IMPRESSION:1. No acute displaced fracture, dislocation or radiopaque soft tissue foreignbody.The workstation used in generating this report was ADAO-PC.

, Interpretation Labs reviewed by me, No clinically significant labs,

CT

_CT Cervical Spine W/O Contrast - Entered by: Lee, Gyu Won W - 03/21/2018 20:13

EXAMINATION: CT of the cervical spine without contrast DATE: 3/21/2018 7:56 PMINDICATION: Spine injuryCOMPARISON: NoneTECHNIQUE: Thin section axial noncontrast images were obtained through the cervical spine. Sagittal and coronal reformatted images were created. Images were reviewed in bone and soft tissue windows. CT dose lowering techniques were used, to include: automated exposure control, adjustment for patient size, and or use of iterative reconstruction.? FINDINGS:Osseous:Cervical lordosis is maintained.Vertebral body height and alignment is preserved.No acute fracture or subluxation.No prevertebral soft tissue swelling. The lateral masses of C1 align on C2.Degenerative ChangesC2-3:No significant canal or foraminal stenosis.C3-4:No significant canal or foraminal stenosis.C4-5:No significant canal or foraminal stenosis.C5-6:No significant canal or foraminal stenosis.C6-7:No significant canal or foraminal stenosis.C7-T1:No significant canal or foraminal stenosis.Soft Tissues of

the Neck:No focal soft tissue abnormality within the visualized neck.Visualized lung apices are clear. Visualized airways are patent.IMPRESSION:No acute fracture or subluxation of the cervical spine.

CT Chest/Abd/Pelvis W/Contrast  - Entered by: Lee, Gyu Won W  - 03/21/2018 20:21

EXAM: CT OF THE CHEST, ABDOMEN AND PELVIS WITH IV CONTRASTINDICATIONS: TraumaTECHNIQUE: CT of the chest, abdomen and pelvis was performed following the administration of 75 cc Isovue-370 intravenous contrast. CT dose lowering techniques were used, to include: automated exposure control, adjustment for patient size, and / or use of iterative reconstruction. COMPARISON: No prior CTs are available.FINDINGS:CHEST:Vasculature: There is no evidence of acute aortic injury. There is no thoracic aortic aneurysm.  Mediastinum / Pleura: There is no mediastinal hematoma. There is no pericardial or pleural effusion. There is no mediastinal, hilar or axillary lymphadenopathy. Airways / Lungs: The central airways are patent.  There is no pneumothorax or consolidative parenchymal disease. ABDOMEN:Liver: The liver is normal in contour without focal lesion. The portal venous system is patent. There is no evidence of laceration.Gallbladder and Bile Ducts: Unremarkable CT appearance of the gallbladder. There is no intrahepatic or extrahepatic biliary ductal dilatation.Spleen: There is homogeneous enhancement without focal lesion. There is no evidence of laceration.Pancreas: The pancreatic parenchyma is unremarkable. There is no pancreatic ductal dilatation.Adrenals: Unremarkable without nodularity.Kidneys: There is symmetric enhancement without hydronephrosis. No focal lesion is demonstrated. There is no evidence of laceration.Vasculature: There is no evidence of acute

page 20

aortic injury. No evidence of atherosclerosis or aneurysm.Nodes: Scattered lymph nodes are identified, none enlarged by size criteria.Bowel: The stomach and visualized loops of large and small bowel are unremarkable. An unremarkable appendix is identified.Mesentery/Peritoneum: UnremarkableSoft Tissues: UnremarkablePELVIS:Pelvic Organs: There is no abnormal pelvic mass. The urinary bladder is unremarkable.Bones: There are age indeterminate fractures of the left L1 and L2 transverse processes (series 2, images 73 and 80).IMPRESSION:1. Age-indeterminate fractures of the left L1 and L2 transverse processes. Correlation with point tenderness is recommended.2. There is otherwise no evidence of acute traumatic injury to the chest, abdomen or pelvis.


CT Head/Brain/Maxillofacial W/O Contrast  - Entered by: Lee, Gyu Won W  - 03/21/2018 20:12

HISTORY: Altercation. Head and spine injury. Left eye hematoma.EXAMINATION: CT brain without contrastTECHNIQUE: Axial images from skull base to vertex were obtained withoutintravenous contrast. Reformatted sagittal and coronal images were generated onthe scanner.COMPARISON: No comparison studiesFINDINGS: Brain parenchyma is normal in appearance without mass lesion,hemorrhage, acute infarction or midline shift. Ventricles are normal in sizeand configuration. No extra-axial fluid collections are present. Basalcisterns are patent. The calvarium is intact. Mastoid air spaces are clear.Reformatted images support the above findings.IMPRESSION: No acute intracranial abnormality.EXAMINATION: CT face without contrastTECHNIQUE: Axial images through the face were reconstructed following a helicalacquisition. Reformatted sagittal and coronal images were generated on thescanner. No contrast was utilized.FINDINGS: There are acute mildly displaced bilateral nasal bone fracture withoverlying soft tissue swelling. The nasal septum is also fractured in its faranterior aspect with minimal displacement. There is an acute fracture of theleft orbital floor

without extraocular muscle herniation. The left maxillarysinus is partially opacified with high density material and contains anair-fluid level. There is bilateral facial and periorbital soft tissueswelling. Globes are symmetric in appearance. Intra and extraconal anatomy isnormal. No retrobulbar mass is seen. The optic nerves and orbital apices areunremarkable. The right maxillary sinus is partially opacified with anair-fluid level. Mild bilateral ethmoid sinus and right frontal sinusopacification is noted. Mastoid air spaces are clear. Reformatted images support the above findings.IMPRESSION:1. Acute mildly displaced fractures of the bilateral nasal bones and theanterior nasal septum.2. Left orbital floor fracture without muscle herniationEXAMINATION: CT cervical spine without contrastTECHNIQUE: Axial images through the cervical spine were reconstructed followinga helical acquisition. Reformatted sagittal and coronal images were generatedon the scanner. No contrast was utilized. Some images are degraded by motionartifact.FINDINGS: Vertebral bodies maintain normal height and alignment without acutefracture. No significant disc space narrowing is seen. Craniocervical junctionis intact. There is no prevertebral soft tissue swelling. Paraspinal softtissues are unremarkable. Lung apices are clear.Reformatted images support the above findings.IMPRESSION: No acute fracture or malalignment in the cervical spine.The workstation used in generating this report was SCHANGBANN-PC..

**Reexamination/ Reevaluation**
Course.

**Impression and Plan**
Acute mildly displaced fractures of the left L1 and L2 transverse spinous process
Acute closed mildly displaced fractures of the bilateral nasal bones and the anterior nasal septum, and left orbital floor fracture without muscle herniation
Acute facial contusions
Abrasions
**Plan**

**Condition:** Stable.
**Disposition:** Admit: Medical/Surgical.
**Notes:** TRAUMA EVAL: 32 y/o M w/ h/o hep C, a-fib currently on ASA, sick sinus syndrome s/p pacemaker, and polysubstance abuse, who arrives to the ED via EMS and PD at bedside, presents to this facility for trauma transfer from Banner Baywood, with diagnosis of fractures of the left L1 and L2 transverse processes, mildly displaced fractures of the bilateral nasal bones and the anterior nasal septum, and left orbital floor fracture without muscle herniation. Per EMS report patient was stopped at traffic light by PD with arrest warrant, patient was resisting warrant, and ended up receiving injury during the arrest. On initial exam the patient had extensive dried blood and abrasions to the face with scattered abrasions to the body. CT imaging was reviewed as noted above. Trauma team assumed primary responsibility for this patient upon arrival. All imaging and lab testing was ordered by trauma surgery and reviewed by same. Spinal transverse process and facial fractures as noted above. Patient will be admitted to the hospital by trauma surgery., I have reviewed all documentation entered above by the scribe and made any needed modifications. I agree with and validate all of the contents of this document , 03/22/2018 00:33.

page 22

## Document info

| | |
|---|---|
| Result type: | Emergency Depart Document |
| Result date: | Mar 21, 2018, 10:21 p.m. |
| Result status: | authenticated |
| Performed by: | Lisa Bruwer |
| Verified by: | Lisa Bruwer |
| Modified by: | Lisa Bruwer |

# Emergency Depart Document

| Patient: | SPENCER, COLE JOSEPH | DOB: | Oct 23, 1985 |
|---|---|---|---|

**Emergency Depart Document**

BANNER BAYWOOD MEDICAL CENTER
6644 E Baywood Ave
Mesa, AZ 85206
(480) 321-2000

**Emergency Department**
**Patient Transfer Instructions and Consent/Request to Transfer for EMTALA**

**Patient Information**
**Name:** SPENCER, COLE JOSEPH **Age:** 32 Years **Date of Birth:** 10/23/1985 1:01 PM
**MRN:** 1847185 **FIN:** 35760669 **Arrival Time:** 3/21/2018 6:16 PM **Checkout Time:**
**Patient Stated Allergies:** No known MEDICATION allergies; PEANUT
**Primary Care Physician**: DENNISON PA, TYLER S
If your Primary Care Physician has changed, please advise the Emergency Department
staff.
**Provider and Nursing Reason for Visit:**

Facial pain,
**Emergency Department Exams/Tests/Procedures**

Page 23

ER 220

If you were cared for in this hospital Emergency Department, you will see the exams, tests and procedures listed on this page.

## ED Procedures

Spine immobilization

### Laboratory

ABSOLUTES-Discern, AUTOBILL, CBC (WITH Differential), CBC-Add'L Parameters - discern, Comprehensive Metabolic Panel (Includes, DIFF (Differential Cell Count)-Discern, Drug Screen - Abuse - Urine, Ethanol Quant, ORD - Discern, PT (Protime)/INR, PTT (APTT),

### Medical Imaging

CT Cervical Spine W/O Contrast, CT Chest/Abd/Pelvis W/Contrast, CT Head/Brain/Maxillofacial W/O Contrast,

### Patient Care

Ambulance Arrival, Apply Cervical Collar, Blood Collect, ED Assessment, ED Intake, ED Quick Look, EMTALA Documentation, Education Social Habits, Insert Peripheral IV, Skin/Wound Assessment - ED, Urine Collect, Weight,

**Durable Medical Equipment/Non Medication Orders:**
No Available Information

**Emergency Department Medications Administration:**
SODIUM CHLORIDE 0.9% (LVP),

BANNER BAYWOOD MEDICAL CENTER
6644 E Baywood Ave
Mesa, AZ 85206
(480) 321-2000

## Physician/Qualified Medical Personnel Certification of Transfer

### ED Transfer to Other Facility:

**Comment:** Accepting: Dr. Julie Wynne Certification of Transfer I confirm the patients condition and the benefits and risks of transfer as stated above and order the transfer of this patient. For unstable patients: Based on the information at the time, I have determined that the medical benefits reasonably expected from the provision of appropriate medical care at the receiving facility outweigh the increased risks to the patient, and in the case of labor, to the unborn child.

**When:** now

**Benefits of Transfer:** Higher Acuity Level

**Patient Condition on Transfer:** Stable for Transfer

**Risk of Transfer:** Condition could worsen during transport

**Risk of Transfer:** Transportation Risk

**Risk of Transfer:** Delay in Treatment due to transfer

page 24

**Transported By:** ALS

**Freetext Diagnosis:** bilateral nasal bone fracture, nasal septum fracture, left orbital floor fracture, L-1 and L-2 transverse process fracture, altered mental status, polysubstance abuse

**Other Transfer to:** Banner Desert

**Specialty not Available:** Trauma

**Electronically Signed By:**
BETZ MD, JOEL P

## Nursing Documentation for Patient Transfer

**Sending the Following Documents to the Receiving Facility :** Banner Facility: Documentation is electronic

## Accepting Facility

Desert Medical Center, 1400 S. Dobson Road, Mesa, AZ 85202 (

**Accepting Physician:** WYNNE MD, JULIE

**Accepting Nurse/RN Report Given to:** Beckerman RN, Jason M

**Accepting Other Staff Name:**

**Time RN Report Called:** 3/21/2018 10:11 PM

**Receiving Nursing Unit & Phone Number:**  Banner Desert Emergency Dept. Phone number 480-412-3710

**Transferring Nurse:** Bruwer RN, Lisa M

**VITALS:**

|  | Date/Time Resulted | First Vitals Documented | Date/Time Resulted | Last Vitals Documented |
|---|---|---|---|---|
| Temperature | 03/21/18 18:19 | 36.8 DegC | 03/21/18 18:19 | 36.8 DegC |
| Temperature Site | 03/21/18 18:19 | Oral | 03/21/18 18:19 | Oral |
| SpO2 | 03/21/18 18:19 | 95 % | 03/21/18 22:08 | 98 % |
| Respirations | 03/21/18 18:19 | 18 br/min | 03/21/18 22:08 | 16 br/min |
| Heart Rate | 03/21/18 18:19 | 104 bpm | 03/21/18 22:08 | 95 bpm |
| Blood Pressure | 03/21/18 18:19 | 106 mmHg/70 mmHg | 03/21/18 22:08 | 136 mmHg/86 mmHg |
| Numeric Rating Pain Scale |  |  |  |  |
| FACES Pain Scale Rating |  |  |  |  |
| Glasgow Coma Score | 03/21/18 18:19 | 0 | 03/21/18 18:25 | 0 |

BANNER BAYWOOD MEDICAL CENTER
6644 E Baywood Ave
Mesa, AZ 85206
(480) 321-2000

Page 25



# Maricopa County Sheriff's Office

Paul Penzone, Sheriff

## INCIDENT REPORT

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Reported Date:** 3/21/2018 | **Reported Time:** 17:24 | **IR #:** IR18008163 | **Original/Supp?** ORIGINAL | **Hand Written?** ☐ Yes | **Info Only** ☑ Yes | **Access Level:** Open | **Case Status:** Exceptionally Cleared | | **MC (Event) #:** MC18064268 |

**EVENT**

| Serial #: S1554 | Last Name: SHALL | | | | Shift Supervisor: S1709 | Name: CLARK, C |
|---|---|---|---|---|---|---|

| Body Camera Activated? **Yes** | Reason not Active: |
|---|---|

| Break in Video? **No** | Reason for break: |
|---|---|

**INCIDENT**

| Radio Code: 9ME ASSIST/TOT MESA PD | | | From Date: 3/21/2018 | From Time: 05:24 | 9-1-1 Tape Requested: |
|---|---|---|---|---|---|
| | | | To Date: | To Time: | |

| Location: E BROADWAY RD/S 86TH ST | City: MESA | ZIP: 85207 | The number of Additional MCSO Personnel On Scene: **2** |
|---|---|---|---|

| Is this IR related to others? **NO** |
|---|

| Additional MCSO Personnel On Scene: | Serial#: **S1709** | Last Name: **CLARK, C** |
|---|---|---|
| Additional MCSO Personnel On Scene: | Serial#: **S1742** | Last Name: **MACKLIN, J** |

### SYNOPSIS

On Wednesday, 03-21-18 at about 1724 hours, I assisted Officers from the Mesa Police Department after Cole Spencer resisted arrest during a traffic stop in the area of Broadway Road, East of 86th Street in Mesa.

| ID: **1** | Type: **SUSPECT** | Name Type: **Individual** | VR Form & Pamphlet Given? | Reason NOT Given: |
|---|---|---|---|---|
| | | | VR_PamphletDeliveryMethod: | |

**PERSON**

| Name - Last: SPENCER | First: COLE | Middle: JOSEPH | Suffix: | DL/ID #: D02384048 | St.: AZ | Status: SUSPENDED |
|---|---|---|---|---|---|---|

| Home | Street Nbr. 919 | Dir. E | Street Name BROADWAY | Suffix RD | Dir. | Unit/Apt | City: MESA | State: AZ | ZIP: 85204 |
|---|---|---|---|---|---|---|---|---|---|

| Cell Phone: | Home Phone: | Email Address: |
|---|---|---|

| Race: WHITE | Sex: M | Ethnicity: NOT HISPANIC OR LATINO | SSN: | DOB: | Age Range: From: 32 To: 32 | Juvenile: No |
|---|---|---|---|---|---|---|

| Resident of Jurisdiction: **NO** | Height Range: From: 600 To: 600 | Weight Range: From: 215 To: 215 | Hair: BROWN - BRO | Eye Color: HAZEL - HAZ |
|---|---|---|---|---|

| Was consent to search the Person requested? **No** | Consent Given? | Person Search Conducted? **Yes** |
|---|---|---|

| Search Options: **Incident to Arrest** |
|---|

| Was this an Investigatory Detention? **No** | Arrested? **Yes** | ARS: **WARRANT** | Type: **Booked** |
|---|---|---|---|

| Work | Work Business Name: | | | | | | Work Phone: | | |
|---|---|---|---|---|---|---|---|---|---|
| | Street Nbr. | Dir. | Street Name: | Suffix | Dir. | Unit/Apt | City: | State: | ZIP: |

| FBI#: | SID: | BK#: | Scanned Address: |
|---|---|---|---|

### NARRATIVE

On Wednesday, 03-21-18 at about 1724 hours, I was traveling East on Broadway Road approaching the Loop 202, when I observed a traffic stop had been conducted by the Mesa Police Department. This stop had taken place on the North side of Broadway Road, East of 86th Street. I observed while their patrol vehicle was unmarked, the two officers conducting the stop were in full uniform. As I drove closer, I observed an officer was on both sides of the vehicle that had been stopped.

Just before I became parallel with the stopped vehicle, I observed a male passenger, who was later identified as Cole Spencer, bolt out of the front passenger side door, and both officers ran towards him. I lost visual of the officers and Cole as I passed by, and I had to conduct a U turn at the Loop 202. Upon driving up to the stop, I activated my MCSO issued body worn camera. I observed both Mesa Officers were on the ground with Cole, who was actively resisting. One of the officers called out to me and asked me to keep an eye on the driver, who was still behind the wheel of the stopped vehicle.

MCSO-0001

page 1

The driver complied with all my orders, and while I focused on him, I observed the two other officers were still struggling with Cole. I heard one of the officers deploy his Tazer during this incident.

Deputy Macklin S1742 soon arrived and assisted the two officers detain Cole, who still resisted. Sergeant Clark S1709 also arrived on scene, and leg chains were applied to Cole's ankles, as he continued to struggle.

Deputy Macklin, Sergeant Clark, and I remained on scene while several other Mesa Officers arrived, along with paramedics. Cole was soon transported to the Banner Baywood Hospital, which concluded our involvement in the matter.

I later conducted a records check through MCSO Communications, and I discovered Cole had valid warrant for his arrest issued by the Mesa City Court.

This report was taken for informational purposes only, nothing further at this time.

| Attachment: | | | | | |
|---|---|---|---|---|---|
| | | | Description: | | |
| **HISTORY** | | | | | |
| Completed By: | S1554 | SHALL, K | | On: 3/21/2018 | At: 20:07 |
| Reviewed By: | S1793 | DALLEY, E | | On: 3/22/2018 | At: 01:12 |
| Approved By: | S1793 | DALLEY, E | | On: 3/22/2018 | At: 01:12 |

MCSO-0002 page 2

## Mesa PD
## Use Of Force Report

**Incident Entered By:** Retiree With Benefits Doucet - 14353
**Assigned Investigator:** [Incident pending assignment]

## Incident Details

| | | |
|---|---|---|
| **Date Received** | **Date of Occurrence** | **Time of Occurrence** |
| 3/23/2018 | 3/21/2018 | 17:17 |
| **Record ID #** | **DR Number** | **File Number** |
| 11495 | 20180800614 | UOF2018-121 |
| **Date/Time Entered** | | |
| 3/23/2018 10:38 | | |

## Incident Summary

See MPD DR#20180800614

## Incident Location

• 8702, Direction: E Broadway Avenue, Mesa, AZ - Location of Occurrence: Maricopa

## Use of Force Specific Information

| | | |
|---|---|---|
| **Reason for Use of Force** | **Service Being Rendered** | |
| Active Aggression | On View: Vehicle Stop | |
| **Weather Condition** | **Lighting Condition** | **Distance to Citizen** |
| Clear | | |
| **Citizen Injured** | **Citizen Taken to Hospital** | **Citizen Arrested** |
| Yes | Yes | Yes |
| **More than 1 Citizen Involved** | | |
| No | | |
| **Citizen's Build** | **Citizen's Height** | |

**Employee Assessment of Citizen Condition During Incident**

Drugs

**Employee(s) Injured**    **Employee(s) Taken to Hospital**

Mesa/Spencer 000266

Yes                              No

# Reporting/Involved Citizen Information

## Cole Joseph Spencer

DOB: ████████   Race: White   Ethnicity:   Gender: Male

**Address**
• 2144, Direction: S Vista, Apache Junction, AZ 85219

**Citizen was homeless at time of their involvement**: [No Response]

**Citizen exhibited limited or no English language proficiency**: [No Response]

**Citizen's primary language**: [No Response]

**Citizen's sexual orientation if known**: [No Response]

**Citizen's gender expression if known**: [No Response]

**Citizen was experiencing mental crisis (Employee Assessment**: [No Response]

**Citizen was experiencing mental crisis (Self Reported)**: [No Response]

**Citizen was armed at the time of incident**: [No Response]

**Role**
•

**Types of Resistance Citizen Used Against Employee(s)**
• Active Aggression
• Active Resistance

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| Bruise/Abrasion | 1 | 1 |
| Broken Bone(s) | 1 | 2 |

Mesa/Spencer 000267



## Involved Employees

### Police Officer-Hta Pew - ID Number: 19183 - Badge Number:
**Assignment at time of incident:** Title: Police Officer-Hta Police/Swat 30/Swat 30

**Video Footage:** [No Response]

**Role**
•

**Force used by this employee against the citizen**
• Strikes - Was force effective: No

Mesa/Spencer 000268

- Carotid Artery Restraint - Was force effective: Yes

**Less Lethal Force used by this employee against the citizen**
- TASER (ECD) - Was Less Lethal Force Used Effective? No
  Serial # - X2900743R
  Cartridge #   C62026NDA, C620268MM

    Projectile/probe contact Yes
      # of air cartridges used - 2
      Number of cycles through probes   2
      Number of probe hits - 4
      Total number of probes deployed - 4
      Did the probe(s) penetrate subjects skin? Yes
      Was an additional cartridge deployed? Yes
      Follow up drive stun conducted Yes
      Duration of cycles - Extended
      Accidental (unauthorized) discharge No

    Statistical Information
      Reason not effective -
      Arc display No
      Was citizen painted with laser / red dot? No

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Strikes | No | 1 | 1 |
| TASER (ECD) | No | 10, 2, 8 | 2, 3, 4 |
| Carotid Artery Restraint | Yes | 2 | 5, 6 |

Mesa/Spencer 000269



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| Bruise/Abrasion | 11, 13, D, F | 1, 2, 3, 4, 5 |

Mesa/Spencer 000270



FRONT    BACK

Condition

**Police Officer Rozema - ID Number: 15724 - Badge Number:**
**Assignment at time of incident:** Title: Police Officer Police/Swat 30/Swat 30

**Video Footage**: [No Response]

**Role**
•

**Force used by this employee against the citizen**
• Strikes - Was force effective: No

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Strikes | No | 1, 8, A | 1, 2, 3 |

Mesa/Spencer 000271

apps-legacy2-pd/BlueTeam/Unrestricted/IncidentReport.aspx?x=FBHp5yT3CnwnaAHuml5Yg3V2qh9sRRY4QN%2bwpVvW5vr%2fqtbOGdePS6PIkeUbiEoQDyUNWgysCEsdjVdWK3ZsFn%2fNu%2fw9C   6/10

ER 230



**FRONT**   **BACK**

**Missed**

**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| Bruise/Abrasion | 10, 13, 4, 5 | 1, 2, 3, 4, 5 |

Mesa/Spencer 000272



**FRONT**          **BACK**

Condition

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

Mesa/Spencer 000273

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| 4/16/2018 | Police Officer Michael McClure | (None Specified) |

**Assignment notes**
Field status changed in IAPro from In chain to Released

**Email sent to receiver**
No email sent

| 4/16/2018 | Police Officer Michael McClure | (None Specified) |
|---|---|---|

**Assignment notes**
Released back to IAPro

**Email sent to receiver**
No email sent

## Chain of Command History

**Routing #1**

| | |
|---|---|
| Sent From: | Retiree With Benefits Doucet |
| Sent To: | Police Commander Walker |
| CC: | (none) |
| Sent Date/Time: | 3/23/2018 11:08 AM |

**Instructions from Retiree With Benefits Doucet to Police Commander Walker:**

Use of Force Incident for your review

**Comments/Response from Police Commander Walker:**

Approved: Approved

Reason:

Comments:
After a review of the departmental report, and circumstances related to this incident, the force utilized was appropriate, necessary, and within Mesa Police Department policy.   At this time no further action(s) are warranted.

**Routing #2**

| | |
|---|---|
| Sent From: | Police Commander Walker |
| Sent To: | PDUseofForce |
| CC: | (none) |

Mesa/Spencer 000274

| Sent Date/Time: | 3/23/2018 2:46 PM |
|---|---|

**Instructions from Police Commander Walker to PDUseofForce:**

For your review

**Comments/Response from (None Specified):**

Approved: N/A

Reason:

Comments:
Routing was NOT completed in BlueTeam.  The incident was moved into IAPro by IAPro user Police Officer
Michael McClure

**Assigned Investigator Signature Line**

_____

[Incident pending assignment]

**Chain of Command Signature Lines**

_____

Police Commander Walker

Mesa/Spencer 000275



# EVIDENCE⊘SYNC™

| **TASER Information** | | **Offline Report** | |
|---|---|---|---|
| **Serial** | X2900743R | **Local Timezone** | US Mountain Standard Time (UTC -07:00) |
| **Model** | TASER X2 | **Generated On** | 19 Apr 2018 15:22:12 |
| **Firmware Version** | Rev. 04.032 | | |
| **Application Version** | 3.15.89 | | |
| **Health** | Good | | |

## Device (X2)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 1 | 19 Apr 2017 11:52:51 | Power Magazine Change | Manufacturing S/N: XXXXX6 Battery capacity: 100% | | | |
| 2 | 19 Apr 2017 11:52:51 | Firmware Update | FW Bundle, Rev. 04.020, 8/4/15 | | | |
| 3 | 19 Apr 2017 11:52:51 | Firmware Update | MC, Rev. 04.019, 8/3/15 | | | |
| 4 | 19 Apr 2017 11:52:51 | Firmware Update | LDR, Rev. 04.013, 12/16/14 | | | |
| 5 | 19 Apr 2017 11:52:51 | Firmware Update | HVM, Rev. 01.005, 8/4/15 | | | |
| 6 | 19 Apr 2017 11:52:51 | Armed | C1: Empty C2: Empty | | 33 | 100 |
| 7 | 19 Apr 2017 11:53:01 | Safe | C1: Empty C2: Empty | 10 | 33 | 99 |
| 8 | 19 Apr 2017 11:53:22 | Power Magazine Change | Standard S/N: 584664 Battery capacity: 87% | | | |
| 9 | 19 Apr 2017 11:53:22 | Armed | C1: 25' Standard C2: Empty | | 33 | 87 |
| 10 | 19 Apr 2017 11:53:23 | Safe | C1: 25' Standard C2: Empty | 1 | 32 | 87 |
| 11 | 19 Apr 2017 11:54:36 | Power Magazine Change | Manufacturing S/N: XXXXX6 Battery capacity: 100% | | | |
| 12 | 19 Apr 2017 11:54:36 | Armed | C1: 25' Standard C2: 25' Standard | | 32 | 100 |
| 13 | 19 Apr 2017 11:54:57 | Trigger | C1: Deployed | 5 | | 100 |
| 14 | 19 Apr 2017 11:55:04 | Trigger | C2: Deployed | 5 | | 99 |
| 15 | 19 Apr 2017 11:55:10 | Trigger | C2: Deployed | 5 | | 99 |
| 16 | 19 Apr 2017 11:55:17 | Trigger | C2: Deployed | 5 | | 99 |
| 17 | 19 Apr 2017 11:55:23 | Trigger | C2: Deployed | 5 | | 99 |
| 18 | 19 Apr 2017 11:55:28 | Trigger | C2: Deployed | 5 | | 99 |
| 19 | 19 Apr 2017 11:55:34 | Trigger | C2: Deployed | 5 | | 99 |
| 20 | 19 Apr 2017 11:55:39 | Trigger | C2: Deployed | 5 | | 99 |

ER 235          Mesa/Spencer 000196

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 21 | 19 Apr 2017 11:55:45 | Trigger | C2: Deployed | 5 | | 99 |
| 22 | 19 Apr 2017 11:55:50 | Trigger | C2: Deployed | 5 | | 99 |
| 23 | 19 Apr 2017 11:55:56 | Trigger | C2: Deployed | 5 | | 99 |
| 24 | 19 Apr 2017 11:56:02 | Trigger | C2: Deployed | 5 | | 99 |
| 25 | 19 Apr 2017 11:56:07 | Trigger | C2: Deployed | 5 | | 99 |
| 26 | 19 Apr 2017 11:56:15 | Trigger | C1: Deployed | 5 | | 99 |
| 27 | 19 Apr 2017 11:56:21 | Trigger | C1: Deployed | 5 | | 99 |
| 28 | 19 Apr 2017 11:56:26 | Trigger | C1: Deployed | 5 | | 99 |
| 29 | 19 Apr 2017 11:56:32 | Trigger | C1: Deployed | 5 | | 99 |
| 30 | 19 Apr 2017 11:56:38 | Trigger | C1: Deployed | 5 | | 99 |
| 31 | 19 Apr 2017 11:56:43 | Trigger | C1: Deployed | 5 | | 99 |
| 32 | 19 Apr 2017 11:56:49 | Trigger | C1: Deployed | 5 | | 99 |
| 33 | 19 Apr 2017 11:56:55 | Trigger | C1: Deployed | 5 | | 99 |
| 34 | 19 Apr 2017 11:57:00 | Trigger | C1: Deployed | 5 | | 99 |
| 35 | 19 Apr 2017 11:57:06 | Trigger | C1: Deployed | 5 | | 99 |
| 36 | 19 Apr 2017 11:57:11 | Trigger | C1: Deployed | 5 | | 99 |
| 37 | 19 Apr 2017 11:57:40 | Safe | C1: Deployed C2: Deployed | 184 | 41 | 99 |
| 38 | 19 Apr 2017 11:57:40 | Configuration | | | | |
| 39 | 19 Apr 2017 12:31:39 | USB Connected | | | | |
| 40 | 19 Apr 2017 12:32:07 | Firmware Update | HVM, Rev. 01.007, 4/5/17 | | | |
| 41 | 19 Apr 2017 12:32:12 | Firmware Update | FW Bundle, Rev. 04.032, 4/7/17 | | | |
| 42 | 19 Apr 2017 12:32:12 | Firmware Update | MC, Rev. 04.032, 4/7/17 | | | |
| 43 | 19 Apr 2017 12:32:12 | Firmware Update | LDR, Rev. 04.025, 7/20/16 | | | |
| 44 | 19 Apr 2017 12:32:13 | Time Sync | 19 Apr 2017 12:32:13 to 19 Apr 2017 12:32:13 | | | |
| 45 | 19 Apr 2017 12:39:40 | Power Magazine Change | Standard S/N: 584621 Battery capacity: 47% | | | |
| 46 | 19 Apr 2017 12:39:40 | Armed | C1: 25' Standard C2: 25' Standard | | 29 | 47 |
| 47 | 19 Apr 2017 12:39:42 | Trigger | C1: Deployed | 5 | | 47 |
| 48 | 19 Apr 2017 12:39:47 | Trigger | C2: Deployed | 5 | | 47 |
| 49 | 19 Apr 2017 12:39:54 | Arc | C1: Deployed C2: Deployed | 2 | | 47 |
| 50 | 19 Apr 2017 12:39:57 | Arc | C1: Deployed C2: Deployed | 3 | | 47 |

Mesa/Spencer 000197

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 51 | 19 Apr 2017 12:40:02 | Safe | C1: Deployed<br>C2: Deployed | 22 | 31 | 47 |
| 52 | 19 Apr 2017 12:40:03 | Configuration | | | | |
| 53 | 19 Apr 2017 12:40:06 | Configuration Exit | | | | |
| 54 | 19 Apr 2017 12:40:06 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 32 | 47 |
| 55 | 19 Apr 2017 12:40:10 | Safe | C1: 25' Standard<br>C2: 25' Standard | 4 | 31 | 47 |
| 56 | 06 Sep 2017 12:00:38 | Power Magazine Change | SPPM S/N: 009977  Battery capacity: 100% | | | |
| 57 | 06 Sep 2017 12:00:38 | Armed | C1: Empty<br>C2: Empty | | 22 | 100 |
| 58 | 06 Sep 2017 12:00:40 | Safe | C1: Empty<br>C2: Empty | 2 | 23 | 99 |
| 59 | 06 Sep 2017 12:00:42 | Armed | C1: Empty<br>C2: Empty | | 23 | 99 |
| 60 | 06 Sep 2017 12:00:43 | Safe | C1: Empty<br>C2: Empty | 1 | 23 | 99 |
| 61 | 06 Sep 2017 12:00:52 | Armed | C1: Empty<br>C2: Empty | | 23 | 99 |
| 62 | 06 Sep 2017 12:00:52 | Safe | C1: Empty<br>C2: Empty | 0 | 23 | 99 |
| 63 | 06 Sep 2017 12:00:53 | Armed | C1: Empty<br>C2: Empty | | 23 | 99 |
| 64 | 06 Sep 2017 12:00:53 | Safe | C1: Empty<br>C2: Empty | 0 | 23 | 99 |
| 65 | 06 Sep 2017 12:00:54 | Armed | C1: Empty<br>C2: Empty | | 23 | 99 |
| 66 | 06 Sep 2017 12:00:54 | Safe | C1: Empty<br>C2: Empty | 0 | 23 | 99 |
| 67 | 06 Sep 2017 12:01:22 | SPPM EOB | SPPM Transmit End | | | |
| 68 | 06 Sep 2017 12:01:31 | Armed | C1: Empty<br>C2: Empty | | 25 | 99 |
| 69 | 06 Sep 2017 12:01:33 | Arc | C1: Empty<br>C2: Empty | 1 | | 99 |
| 70 | 06 Sep 2017 12:01:33 | Arc | C1: Empty<br>C2: Empty | 1 | | 99 |
| 71 | 06 Sep 2017 12:01:35 | Trigger | C1: Empty | 1 | | 99 |
| 72 | 06 Sep 2017 12:01:36 | Safe | C1: Empty<br>C2: Empty | 5 | 25 | 99 |
| 73 | 06 Sep 2017 12:02:05 | SPPM EOB | SPPM Transmit End | | | |
| 74 | 06 Sep 2017 12:02:11 | Armed | C1: Empty<br>C2: Empty | | 26 | 99 |
| 75 | 06 Sep 2017 12:02:11 | Trigger | C1: Empty | 5 | | 99 |
| 76 | 06 Sep 2017 12:02:18 | Safe | C1: Empty<br>C2: Empty | 7 | 26 | 99 |
| 77 | 06 Sep 2017 12:02:21 | Armed | C1: Empty<br>C2: Empty | | 26 | 99 |
| 78 | 06 Sep 2017 12:02:22 | Safe | C1: Empty<br>C2: Empty | 1 | 26 | 99 |
| 79 | 06 Sep 2017 12:02:22 | Armed | C1: Empty<br>C2: Empty | | 26 | 99 |
| 80 | 06 Sep 2017 12:02:23 | Safe | C1: Empty<br>C2: Empty | 1 | 26 | 99 |

Mesa/Spencer 000198

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 81 | 06 Sep 2017 12:02:26 | Armed | C1: Empty<br>C2: Empty | | 26 | 99 |
| 82 | 06 Sep 2017 12:02:28 | Trigger | C1: Empty | 3 | | 99 |
| 83 | 06 Sep 2017 12:02:31 | Safe | C1: Empty<br>C2: Empty | 5 | 27 | 99 |
| 84 | 06 Sep 2017 12:02:31 | Armed | C1: Empty<br>C2: Empty | | 27 | 99 |
| 85 | 06 Sep 2017 12:02:32 | Arc | C1: Empty<br>C2: Empty | 1 | | 99 |
| 86 | 06 Sep 2017 12:02:34 | Safe | C1: Empty<br>C2: Empty | 3 | 26 | 99 |
| 87 | 06 Sep 2017 12:02:41 | Armed | C1: Empty<br>C2: Empty | | 27 | 99 |
| 88 | 06 Sep 2017 12:02:41 | Safe | C1: Empty<br>C2: Empty | 0 | 27 | 99 |
| 89 | 06 Sep 2017 12:03:02 | SPPM EOB | SPPM Transmit End | | | |
| 90 | 06 Sep 2017 12:03:46 | Armed | C1: Empty<br>C2: Empty | | 27 | 99 |
| 91 | 06 Sep 2017 12:03:59 | Safe | C1: Empty<br>C2: Empty | 13 | 27 | 99 |
| 92 | 06 Sep 2017 12:04:00 | Armed | C1: Empty<br>C2: Empty | | 27 | 99 |
| 93 | 06 Sep 2017 12:04:07 | Safe | C1: Empty<br>C2: Empty | 7 | 27 | 99 |
| 94 | 06 Sep 2017 12:04:26 | SPPM EOB | SPPM Transmit End | | | |
| 95 | 06 Sep 2017 12:04:35 | Armed | C1: Empty<br>C2: Empty | | 28 | 99 |
| 96 | 06 Sep 2017 12:04:43 | Safe | C1: Empty<br>C2: Empty | 8 | 28 | 99 |
| 97 | 06 Sep 2017 12:05:06 | SPPM EOB | SPPM Transmit End | | | |
| 98 | 06 Sep 2017 12:09:16 | Armed | C1: Empty<br>C2: Empty | | 27 | 99 |
| 99 | 06 Sep 2017 12:09:16 | Safe | C1: Empty<br>C2: Empty | 0 | 28 | 99 |
| 100 | 06 Sep 2017 12:09:47 | SPPM EOB | SPPM Transmit End | | | |
| 101 | 06 Sep 2017 12:11:29 | Armed | C1: Empty<br>C2: Empty | | 28 | 99 |
| 102 | 06 Sep 2017 12:11:29 | Safe | C1: Empty<br>C2: Empty | 0 | 28 | 99 |
| 103 | 06 Sep 2017 12:12:00 | SPPM EOB | SPPM Transmit End | | | |
| 104 | 06 Sep 2017 12:19:51 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 34 | 99 |
| 105 | 06 Sep 2017 12:19:53 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 99 |
| 106 | 06 Sep 2017 12:19:54 | Safe | C1: 25' Standard<br>C2: 25' Standard | 3 | 34 | 99 |
| 107 | 06 Sep 2017 12:20:22 | SPPM EOB | SPPM Transmit End | | | |
| 108 | 12 Sep 2017 08:22:19 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 35 | 98 |
| 109 | 12 Sep 2017 08:22:20 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 35 | 98 |
| 110 | 12 Sep 2017 08:22:51 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000199

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Cartridge Info<br>[Bay: length in feet/status] | Duration<br>[Seconds] | Temp<br>[Degrees Celsius] | Batt Remaining<br>[%] |
|-------|-------------|--------------|---------------------|----------|------|------|
| 111 | 12 Sep 2017 11:48:49 | Armed | C1: 25' Standard<br>C2: 25' Standard | | | 98 |
| 112 | 12 Sep 2017 11:48:51 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | | 98 |
| 113 | 12 Sep 2017 11:49:20 | SPPM EOB | SPPM Transmit End | | | |
| 114 | 21 Sep 2017 12:07:50 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 38 | 98 |
| 115 | 21 Sep 2017 12:08:30 | SPPM EOB | SPPM Transmit End | | | |
| 116 | 21 Sep 2017 12:27:55 | PowerSave | 20 Min Weapon Timer | | | |
| 117 | 23 Sep 2017 12:44:55 | PowerSave Exit | | | | |
| 118 | 23 Sep 2017 12:55:28 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 25 | 71 |
| 119 | 23 Sep 2017 12:55:28 | Safe | C1: 25' Standard<br>C2: 25' Standard | 0 | 24 | 71 |
| 120 | 23 Sep 2017 12:55:59 | SPPM EOB | SPPM Transmit End | | | |
| 121 | 23 Sep 2017 12:57:19 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 25 | 71 |
| 122 | 23 Sep 2017 12:57:27 | Trigger | C1: Deployed | 5 | | 71 |
| 123 | 23 Sep 2017 12:57:59 | SPPM EOB | SPPM Transmit End | | | |
| 124 | 23 Sep 2017 12:59:40 | Trigger | C2: Deployed | 6 | | 71 |
| 125 | 23 Sep 2017 12:59:48 | Trigger | C2: Deployed | 5 | | 70 |
| 126 | 23 Sep 2017 13:00:10 | SPPM EOB | SPPM Transmit End | | | |
| 127 | 23 Sep 2017 13:00:24 | Safe | C1: Deployed<br>C2: Deployed | 185 | 35 | 70 |
| 128 | 23 Sep 2017 13:00:41 | Armed | C1: Deployed<br>C2: Deployed | | 34 | 70 |
| 129 | 23 Sep 2017 13:00:47 | Safe | C1: Deployed<br>C2: Deployed | 6 | 35 | 70 |
| 130 | 23 Sep 2017 13:00:50 | Armed | C1: Deployed<br>C2: Deployed | | 35 | 70 |
| 131 | 23 Sep 2017 13:00:52 | Safe | C1: Deployed<br>C2: Deployed | 2 | 34 | 70 |
| 132 | 23 Sep 2017 13:01:09 | Armed | C1: Deployed<br>C2: Deployed | | 35 | 70 |
| 133 | 23 Sep 2017 13:01:10 | Safe | C1: Deployed<br>C2: Deployed | 1 | 34 | 70 |
| 134 | 23 Sep 2017 13:01:21 | SPPM EOB | SPPM Transmit End | | | |
| 135 | 23 Sep 2017 14:17:39 | Armed | C1: Deployed<br>C2: Deployed | | 30 | 70 |
| 136 | 23 Sep 2017 14:17:39 | Safe | C1: Deployed<br>C2: Deployed | 0 | 30 | 70 |
| 137 | 23 Sep 2017 14:18:10 | SPPM EOB | SPPM Transmit End | | | |
| 138 | 23 Sep 2017 14:18:13 | Armed | C1: Deployed<br>C2: Deployed | | 32 | 70 |
| 139 | 23 Sep 2017 14:18:13 | Safe | C1: Deployed<br>C2: Deployed | 0 | 31 | 70 |
| 140 | 23 Sep 2017 14:18:44 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000200

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 141 | 23 Sep 2017 14:19:07 | Armed | C1: Deployed C2: Deployed | | 32 | 70 |
| 142 | 23 Sep 2017 14:19:24 | Safe | C1: Deployed C2: Deployed | 17 | 33 | 70 |
| 143 | 23 Sep 2017 14:19:28 | Armed | C1: Deployed C2: Deployed | | 33 | 70 |
| 144 | 23 Sep 2017 14:19:31 | Safe | C1: Deployed C2: Deployed | 3 | 32 | 70 |
| 145 | 23 Sep 2017 14:19:38 | Armed | C1: Deployed C2: Deployed | | 33 | 70 |
| 146 | 23 Sep 2017 14:19:45 | Safe | C1: Deployed C2: Deployed | 7 | 34 | 70 |
| 147 | 23 Sep 2017 14:19:47 | SPPM EOB | SPPM Transmit End | | | |
| 148 | 25 Sep 2017 12:46:54 | Armed | C1: 25' Standard C2: 25' Standard | | 35 | 69 |
| 149 | 25 Sep 2017 12:46:55 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 69 |
| 150 | 25 Sep 2017 12:46:57 | Safe | C1: 25' Standard C2: 25' Standard | 3 | 35 | 69 |
| 151 | 25 Sep 2017 12:47:25 | SPPM EOB | SPPM Transmit End | | | |
| 152 | 26 Sep 2017 16:13:27 | Armed | C1: 25' Standard C2: 25' Standard | | 31 | 69 |
| 153 | 26 Sep 2017 16:14:07 | SPPM EOB | SPPM Transmit End | | | |
| 154 | 26 Sep 2017 16:33:32 | PowerSave | 20 Min Weapon Timer | | | |
| 155 | 01 Oct 2017 10:10:32 | PowerSave Exit | | | | |
| 156 | 14 Nov 2017 16:20:44 | Power Magazine Change | SPPM  S/N: 010925  Battery capacity: 100% | | | |
| 157 | 14 Nov 2017 16:20:44 | Armed | C1: 25' Standard C2: 25' Standard | | 35 | 100 |
| 158 | 14 Nov 2017 16:20:46 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 100 |
| 159 | 14 Nov 2017 16:20:47 | Safe | C1: 25' Standard C2: 25' Standard | 3 | 35 | 99 |
| 160 | 14 Nov 2017 16:20:50 | Armed | C1: 25' Standard C2: 25' Standard | | 35 | 99 |
| 161 | 14 Nov 2017 16:20:52 | Safe | C1: 25' Standard C2: 25' Standard | 2 | 35 | 99 |
| 162 | 14 Nov 2017 16:21:15 | SPPM EOB | SPPM Transmit End | | | |
| 163 | 21 Nov 2017 14:34:59 | Armed | C1: 25' Standard C2: 25' Standard | | 39 | 99 |
| 164 | 21 Nov 2017 14:34:59 | Safe | C1: 25' Standard C2: 25' Standard | 0 | 39 | 99 |
| 165 | 21 Nov 2017 14:35:30 | SPPM EOB | SPPM Transmit End | | | |
| 166 | 21 Nov 2017 20:57:31 | Armed | C1: Empty C2: Empty | | 28 | 99 |
| 167 | 21 Nov 2017 20:57:34 | Arc | C1: Empty C2: Empty | 1 | | 99 |
| 168 | 21 Nov 2017 20:57:37 | Safe | C1: Empty C2: Empty | 6 | 28 | 99 |
| 169 | 21 Nov 2017 20:58:03 | SPPM EOB | SPPM Transmit End | | | |
| 170 | 21 Nov 2017 20:58:15 | Armed | C1: Empty C2: Empty | | 30 | 99 |

Mesa/Spencer 000201

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|-------|----------|-------|-----------|----------|------|------|
| 171 | 21 Nov 2017 20:58:16 | Arc | C1: Empty C2: Empty | 7 | | 99 |
| 172 | 21 Nov 2017 20:58:29 | Trigger | C1: Empty | 6 | | 99 |
| 173 | 21 Nov 2017 20:58:36 | Safe | C1: Empty C2: Empty | 21 | 30 | 98 |
| 174 | 21 Nov 2017 20:58:59 | SPPM EOB | SPPM Transmit End | | | |
| 175 | 21 Nov 2017 21:13:33 | Armed | C1: Empty C2: Empty | | 28 | 98 |
| 176 | 21 Nov 2017 21:13:33 | Safe | C1: Empty C2: Empty | 0 | 28 | 98 |
| 177 | 21 Nov 2017 21:13:34 | Armed | C1: Empty C2: Empty | | 27 | 98 |
| 178 | 21 Nov 2017 21:13:35 | Safe | C1: Empty C2: Empty | 1 | 27 | 98 |
| 179 | 21 Nov 2017 21:13:44 | Armed | C1: Empty C2: Empty | | 28 | 98 |
| 180 | 21 Nov 2017 21:13:45 | Safe | C1: Empty C2: Empty | 1 | 28 | 98 |
| 181 | 21 Nov 2017 21:14:04 | Armed | C1: Empty C2: Empty | | 29 | 98 |
| 182 | 21 Nov 2017 21:14:06 | Safe | C1: Empty C2: Empty | 2 | 29 | 98 |
| 183 | 21 Nov 2017 21:14:12 | Armed | C1: Empty C2: Empty | | 30 | 98 |
| 184 | 21 Nov 2017 21:14:14 | SPPM EOB | SPPM Transmit End | | | |
| 185 | 21 Nov 2017 21:14:40 | Safe | C1: Empty C2: Empty | 28 | 31 | 98 |
| 186 | 21 Nov 2017 21:14:49 | Armed | C1: Empty C2: Empty | | 31 | 98 |
| 187 | 21 Nov 2017 21:14:50 | Safe | C1: Empty C2: Empty | 1 | 31 | 98 |
| 188 | 21 Nov 2017 21:15:20 | SPPM EOB | SPPM Transmit End | | | |
| 189 | 21 Nov 2017 21:23:35 | Armed | C1: Empty C2: Empty | | 28 | 98 |
| 190 | 21 Nov 2017 21:23:36 | Safe | C1: Empty C2: Empty | 1 | 28 | 98 |
| 191 | 21 Nov 2017 21:24:06 | SPPM EOB | SPPM Transmit End | | | |
| 192 | 21 Nov 2017 21:24:30 | Armed | C1: Empty C2: Empty | | 29 | 98 |
| 193 | 21 Nov 2017 21:24:30 | Safe | C1: Empty C2: Empty | 0 | 29 | 98 |
| 194 | 21 Nov 2017 21:24:40 | Armed | C1: Empty C2: Empty | | 29 | 98 |
| 195 | 21 Nov 2017 21:24:41 | Safe | C1: Empty C2: Empty | 1 | 29 | 98 |
| 196 | 21 Nov 2017 21:25:10 | SPPM EOB | SPPM Transmit End | | | |
| 197 | 21 Nov 2017 21:32:09 | Armed | C1: Empty C2: Empty | | 28 | 98 |
| 198 | 21 Nov 2017 21:32:41 | Trigger | C1: Empty | 5 | | 98 |
| 199 | 21 Nov 2017 21:32:48 | Trigger | C1: Empty | 5 | | 98 |
| 200 | 21 Nov 2017 21:33:00 | Safe | C1: Empty C2: Empty | 51 | 32 | 98 |

Mesa/Spencer 000202

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 201 | 21 Nov 2017 21:33:11 | SPPM EOB | SPPM Transmit End | | | |
| 202 | 28 Nov 2017 08:35:56 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 26 | 97 |
| 203 | 28 Nov 2017 08:35:57 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 97 |
| 204 | 28 Nov 2017 08:35:58 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 97 |
| 205 | 28 Nov 2017 08:35:59 | Safe | C1: 25' Standard<br>C2: 25' Standard | 3 | 26 | 97 |
| 206 | 28 Nov 2017 08:36:27 | SPPM EOB | SPPM Transmit End | | | |
| 207 | 04 Dec 2017 12:23:41 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 34 | 97 |
| 208 | 04 Dec 2017 12:23:41 | Safe | C1: 25' Standard<br>C2: 25' Standard | 0 | 35 | 97 |
| 209 | 04 Dec 2017 12:24:12 | SPPM EOB | SPPM Transmit End | | | |
| 210 | 12 Dec 2017 14:28:45 | Armed | C1: Empty<br>C2: Empty | | 31 | 96 |
| 211 | 12 Dec 2017 14:28:46 | Arc | C1: Empty<br>C2: Empty | 1 | | 96 |
| 212 | 12 Dec 2017 14:28:47 | Safe | C1: Empty<br>C2: Empty | 2 | 31 | 96 |
| 213 | 12 Dec 2017 14:29:07 | Armed | C1: Empty<br>C2: Empty | | 31 | 96 |
| 214 | 12 Dec 2017 14:29:09 | Safe | C1: Empty<br>C2: Empty | 2 | 32 | 96 |
| 215 | 12 Dec 2017 14:29:17 | Armed | C1: Empty<br>C2: Empty | | 32 | 96 |
| 216 | 12 Dec 2017 14:29:18 | Trigger | C1: Empty | 1 | | 96 |
| 217 | 12 Dec 2017 14:29:19 | Safe | C1: Empty<br>C2: Empty | 2 | 33 | 96 |
| 218 | 12 Dec 2017 14:29:46 | Armed | C1: Empty<br>C2: Empty | | 33 | 96 |
| 219 | 12 Dec 2017 14:29:48 | SPPM EOB | SPPM Transmit End | | | |
| 220 | 12 Dec 2017 14:29:46 | Trigger | C1: Empty | 2 | | 96 |
| 221 | 12 Dec 2017 14:29:49 | Safe | C1: Empty<br>C2: Empty | 3 | 33 | 96 |
| 222 | 12 Dec 2017 14:29:53 | Armed | C1: Empty<br>C2: Empty | | 33 | 96 |
| 223 | 12 Dec 2017 14:29:54 | Trigger | C1: Empty | 1 | | 96 |
| 224 | 12 Dec 2017 14:29:55 | Safe | C1: Empty<br>C2: Empty | 2 | 33 | 96 |
| 225 | 12 Dec 2017 14:30:07 | Armed | C1: Empty<br>C2: Empty | | 34 | 96 |
| 226 | 12 Dec 2017 14:30:08 | Trigger | C1: Empty | 1 | | 96 |
| 227 | 12 Dec 2017 14:30:09 | Safe | C1: Empty<br>C2: Empty | 2 | 34 | 96 |
| 228 | 12 Dec 2017 14:30:23 | Armed | C1: Empty<br>C2: Empty | | 34 | 96 |
| 229 | 12 Dec 2017 14:30:25 | Safe | C1: Empty<br>C2: Empty | 2 | 34 | 96 |
| 230 | 12 Dec 2017 14:30:33 | Armed | C1: Empty<br>C2: Empty | | 34 | 96 |

Mesa/Spencer 000203

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 231 | 12 Dec 2017 14:30:34 | Trigger | C1: Empty | 1 | | 96 |
| 232 | 12 Dec 2017 14:30:34 | Safe | C1: Empty C2: Empty | 1 | 34 | 96 |
| 233 | 12 Dec 2017 14:30:36 | Armed | C1: Empty C2: Empty | | 34 | 96 |
| 234 | 12 Dec 2017 14:30:36 | Trigger | C1: Empty | 1 | | 96 |
| 235 | 12 Dec 2017 14:30:37 | Safe | C1: Empty C2: Empty | 1 | 34 | 96 |
| 236 | 12 Dec 2017 14:30:38 | Armed | C1: Empty C2: Empty | | 34 | 96 |
| 237 | 12 Dec 2017 14:30:38 | SPPM EOB | SPPM Transmit End | | | |
| 238 | 12 Dec 2017 14:30:38 | Trigger | C1: Empty | 1 | | 96 |
| 239 | 12 Dec 2017 14:30:39 | Safe | C1: Empty C2: Empty | 1 | 34 | 96 |
| 240 | 12 Dec 2017 14:30:42 | Armed | C1: Empty C2: Empty | | 34 | 96 |
| 241 | 12 Dec 2017 14:30:43 | Arc | C1: Empty C2: Empty | 1 | | 96 |
| 242 | 12 Dec 2017 14:30:44 | Safe | C1: Empty C2: Empty | 2 | 34 | 96 |
| 243 | 12 Dec 2017 14:31:03 | Armed | C1: Empty C2: Empty | | 35 | 96 |
| 244 | 12 Dec 2017 14:31:04 | Trigger | C1: Empty | 3 | | 96 |
| 245 | 12 Dec 2017 14:31:07 | Safe | C1: Empty C2: Empty | 4 | 35 | 96 |
| 246 | 12 Dec 2017 14:31:33 | SPPM EOB | SPPM Transmit End | | | |
| 247 | 12 Dec 2017 14:33:46 | Armed | C1: Empty C2: Empty | | 32 | 96 |
| 248 | 12 Dec 2017 14:33:47 | Trigger | C1: Empty | 1 | | 96 |
| 249 | 12 Dec 2017 14:33:48 | Safe | C1: Empty C2: Empty | 2 | 32 | 96 |
| 250 | 12 Dec 2017 14:33:51 | Armed | C1: Empty C2: Empty | | 32 | 96 |
| 251 | 12 Dec 2017 14:33:52 | Safe | C1: Empty C2: Empty | 1 | 32 | 96 |
| 252 | 12 Dec 2017 14:33:54 | Armed | C1: Empty C2: Empty | | 32 | 96 |
| 253 | 12 Dec 2017 14:33:54 | Safe | C1: Empty C2: Empty | 0 | 32 | 96 |
| 254 | 12 Dec 2017 14:34:17 | SPPM EOB | SPPM Transmit End | | | |
| 255 | 12 Dec 2017 14:34:33 | Armed | C1: Empty C2: Empty | | 33 | 96 |
| 256 | 12 Dec 2017 14:34:33 | Arc | C1: Empty C2: Empty | 1 | | 96 |
| 257 | 12 Dec 2017 14:34:34 | Safe | C1: Empty C2: Empty | 1 | 32 | 96 |
| 258 | 12 Dec 2017 14:34:41 | Armed | C1: Empty C2: Empty | | 33 | 96 |
| 259 | 12 Dec 2017 14:34:42 | Arc | C1: Empty C2: Empty | 1 | | 96 |
| 260 | 12 Dec 2017 14:34:42 | Safe | C1: Empty C2: Empty | 1 | 33 | 96 |

ER 243

Mesa/Spencer 000204

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 261 | 12 Dec 2017 14:34:48 | Armed | C1: Empty<br>C2: Empty | | 33 | 96 |
| 262 | 12 Dec 2017 14:34:49 | Safe | C1: Empty<br>C2: Empty | 1 | 33 | 96 |
| 263 | 12 Dec 2017 14:35:18 | SPPM EOB | SPPM Transmit End | | | |
| 264 | 12 Dec 2017 14:36:44 | Armed | C1: 25' Training<br>C2: 25' Training | | 33 | 96 |
| 265 | 12 Dec 2017 14:36:45 | Arc | C1: 25' Training<br>C2: 25' Training | 1 | | 96 |
| 266 | 12 Dec 2017 14:36:46 | Arc | C1: 25' Training<br>C2: 25' Training | 1 | | 96 |
| 267 | 12 Dec 2017 14:36:47 | Safe | C1: 25' Training<br>C2: 25' Training | 3 | 32 | 96 |
| 268 | 12 Dec 2017 14:37:11 | Armed | C1: 25' Training<br>C2: 25' Training | | 32 | 96 |
| 269 | 12 Dec 2017 14:37:12 | Arc | C1: 25' Training<br>C2: 25' Training | 1 | | 96 |
| 270 | 12 Dec 2017 14:37:14 | Safe | C1: 25' Training<br>C2: 25' Training | 3 | 32 | 96 |
| 271 | 12 Dec 2017 14:37:36 | Armed | C1: 25' Training<br>C2: 25' Training | | 33 | 96 |
| 272 | 12 Dec 2017 14:37:38 | Safe | C1: 25' Training<br>C2: 25' Training | 2 | 33 | 96 |
| 273 | 12 Dec 2017 14:37:42 | SPPM EOB | SPPM Transmit End | | | |
| 274 | 12 Dec 2017 14:37:52 | Armed | C1: 25' Training<br>C2: 25' Training | | 33 | 96 |
| 275 | 12 Dec 2017 14:37:56 | Arc | C1: 25' Training<br>C2: 25' Training | 1 | | 96 |
| 276 | 12 Dec 2017 14:38:00 | Arc | C1: 25' Training<br>C2: 25' Training | 1 | | 96 |
| 277 | 12 Dec 2017 14:38:01 | Arc | C1: 25' Training<br>C2: 25' Training | 1 | | 95 |
| 278 | 12 Dec 2017 14:38:03 | Safe | C1: 25' Training<br>C2: 25' Training | 11 | 33 | 95 |
| 279 | 12 Dec 2017 14:38:32 | SPPM EOB | SPPM Transmit End | | | |
| 280 | 12 Dec 2017 14:39:39 | Armed | C1: 25' Training<br>C2: 25' Training | | 32 | 95 |
| 281 | 12 Dec 2017 14:39:41 | Arc | C1: 25' Training<br>C2: 25' Training | 6 | | 95 |
| 282 | 12 Dec 2017 14:39:47 | Safe | C1: 25' Training<br>C2: 25' Training | 8 | 32 | 95 |
| 283 | 12 Dec 2017 14:40:10 | SPPM EOB | SPPM Transmit End | | | |
| 284 | 12 Dec 2017 14:40:11 | Armed | C1: 25' Training<br>C2: 25' Training | | 33 | 95 |
| 285 | 12 Dec 2017 14:40:20 | Safe | C1: 25' Training<br>C2: 25' Training | 9 | 33 | 95 |
| 286 | 12 Dec 2017 14:40:21 | Armed | C1: 25' Training<br>C2: 25' Training | | 33 | 95 |
| 287 | 12 Dec 2017 14:40:22 | Safe | C1: 25' Training<br>C2: 25' Training | 1 | 34 | 95 |
| 288 | 12 Dec 2017 14:40:41 | Armed | C1: 25' Training<br>C2: 25' Training | | 33 | 95 |
| 289 | 12 Dec 2017 14:40:42 | Safe | C1: 25' Training<br>C2: 25' Training | 1 | 33 | 95 |
| 290 | 12 Dec 2017 14:40:51 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000205

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 291 | 12 Dec 2017 14:41:11 | Armed | C1: 25' Training<br>C2: 25' Training | | 34 | 95 |
| 292 | 12 Dec 2017 14:41:13 | Safe | C1: 25' Training<br>C2: 25' Training | 2 | 34 | 95 |
| 293 | 12 Dec 2017 14:41:22 | Armed | C1: 25' Training<br>C2: 25' Training | | 34 | 95 |
| 294 | 12 Dec 2017 14:41:22 | Safe | C1: 25' Training<br>C2: 25' Training | 0 | 34 | 95 |
| 295 | 12 Dec 2017 14:41:30 | Armed | C1: 25' Training<br>C2: 25' Training | | 34 | 95 |
| 296 | 12 Dec 2017 14:41:32 | Safe | C1: 25' Training<br>C2: 25' Training | 2 | 33 | 95 |
| 297 | 12 Dec 2017 14:41:33 | Armed | C1: 25' Training<br>C2: 25' Training | | 34 | 95 |
| 298 | 12 Dec 2017 14:41:34 | Safe | C1: 25' Training<br>C2: 25' Training | 1 | 34 | 95 |
| 299 | 12 Dec 2017 14:41:52 | SPPM EOB | SPPM Transmit End | | | |
| 300 | 12 Dec 2017 14:51:01 | Armed | C1: 25' Training<br>C2: 25' Training | | 30 | 95 |
| 301 | 12 Dec 2017 14:51:03 | Trigger | C1: Deployed | 5 | | 95 |
| 302 | 12 Dec 2017 14:51:09 | Arc | C1: Deployed<br>C2: 25' Training | 1 | | 95 |
| 303 | 12 Dec 2017 14:51:11 | Trigger | C2: Deployed | 5 | | 95 |
| 304 | 12 Dec 2017 14:51:20 | Safe | C1: Deployed<br>C2: Deployed | 19 | 32 | 94 |
| 305 | 12 Dec 2017 14:51:41 | SPPM EOB | SPPM Transmit End | | | |
| 306 | 12 Dec 2017 14:55:05 | Armed | C1: Empty<br>C2: Empty | | 30 | 94 |
| 307 | 12 Dec 2017 14:55:06 | Safe | C1: Empty<br>C2: Empty | 1 | 30 | 94 |
| 308 | 12 Dec 2017 14:55:07 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 309 | 12 Dec 2017 14:55:11 | Safe | C1: Empty<br>C2: Empty | 4 | 31 | 94 |
| 310 | 12 Dec 2017 14:55:23 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 311 | 12 Dec 2017 14:55:23 | Safe | C1: Empty<br>C2: Empty | 0 | 31 | 94 |
| 312 | 12 Dec 2017 14:55:24 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 313 | 12 Dec 2017 14:55:24 | Safe | C1: Empty<br>C2: Empty | 0 | 32 | 94 |
| 314 | 12 Dec 2017 14:55:25 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 315 | 12 Dec 2017 14:55:25 | Safe | C1: Empty<br>C2: Empty | 0 | 31 | 94 |
| 316 | 12 Dec 2017 14:55:26 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |
| 317 | 12 Dec 2017 14:55:26 | Safe | C1: Empty<br>C2: Empty | 0 | 31 | 94 |
| 318 | 12 Dec 2017 14:55:26 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 319 | 12 Dec 2017 14:55:27 | Safe | C1: Empty<br>C2: Empty | 1 | 31 | 94 |
| 320 | 12 Dec 2017 14:55:27 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |

Mesa/Spencer 000206

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|-------|----------------------------------|--------------------|---------------------------------------------|--------------------|-----------------------|--------------------|
| 321 | 12 Dec 2017 14:55:28 | Safe | C1: Empty<br>C2: Empty | 1 | 31 | 94 |
| 322 | 12 Dec 2017 14:55:28 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 323 | 12 Dec 2017 14:55:29 | Safe | C1: Empty<br>C2: Empty | 1 | 31 | 94 |
| 324 | 12 Dec 2017 14:55:53 | SPPM EOB | SPPM Transmit End | | | |
| 325 | 12 Dec 2017 14:56:22 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 326 | 12 Dec 2017 14:56:23 | Trigger | C1: Empty | 1 | | 94 |
| 327 | 12 Dec 2017 14:56:23 | Safe | C1: Empty<br>C2: Empty | 1 | 32 | 94 |
| 328 | 12 Dec 2017 14:56:32 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |
| 329 | 12 Dec 2017 14:56:34 | Safe | C1: Empty<br>C2: Empty | 2 | 32 | 94 |
| 330 | 12 Dec 2017 14:57:02 | SPPM EOB | SPPM Transmit End | | | |
| 331 | 12 Dec 2017 14:57:56 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |
| 332 | 12 Dec 2017 14:57:59 | Safe | C1: Empty<br>C2: Empty | 3 | 32 | 94 |
| 333 | 12 Dec 2017 14:58:00 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 334 | 12 Dec 2017 14:58:01 | Safe | C1: Empty<br>C2: Empty | 1 | 31 | 94 |
| 335 | 12 Dec 2017 14:58:02 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |
| 336 | 12 Dec 2017 14:58:03 | Safe | C1: Empty<br>C2: Empty | 1 | 32 | 94 |
| 337 | 12 Dec 2017 14:58:05 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |
| 338 | 12 Dec 2017 14:58:07 | Safe | C1: Empty<br>C2: Empty | 2 | 32 | 94 |
| 339 | 12 Dec 2017 14:58:36 | SPPM EOB | SPPM Transmit End | | | |
| 340 | 12 Dec 2017 15:00:00 | Armed | C1: Empty<br>C2: Empty | | 31 | 94 |
| 341 | 12 Dec 2017 15:00:03 | Safe | C1: Empty<br>C2: Empty | 3 | 32 | 94 |
| 342 | 12 Dec 2017 15:00:08 | Armed | C1: Empty<br>C2: Empty | | 32 | 94 |
| 343 | 12 Dec 2017 15:00:11 | Arc | C1: Empty<br>C2: Empty | 1 | | 94 |
| 344 | 12 Dec 2017 15:00:12 | Safe | C1: Empty<br>C2: Empty | 4 | 31 | 94 |
| 345 | 12 Dec 2017 15:00:40 | SPPM EOB | SPPM Transmit End | | | |
| 346 | 12 Dec 2017 15:01:39 | Armed | C1: Empty<br>C2: Empty | | 33 | 94 |
| 347 | 12 Dec 2017 15:01:40 | Safe | C1: Empty<br>C2: Empty | 1 | 33 | 94 |
| 348 | 12 Dec 2017 15:01:41 | Armed | C1: Empty<br>C2: Empty | | 33 | 94 |
| 349 | 12 Dec 2017 15:01:41 | Safe | C1: Empty<br>C2: Empty | 0 | 33 | 94 |
| 350 | 12 Dec 2017 15:02:10 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000207

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|-------|----------------------------------|--------------------|---------------------------------------------|--------------------|------------------------|--------------------|
| 351 | 12 Dec 2017 15:02:21 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 33 | 94 |
| 352 | 12 Dec 2017 15:02:22 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 94 |
| 353 | 12 Dec 2017 15:02:23 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 34 | 94 |
| 354 | 12 Dec 2017 15:02:52 | SPPM EOB | SPPM Transmit End | | | |
| 355 | 12 Dec 2017 15:02:57 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 35 | 94 |
| 356 | 12 Dec 2017 15:02:58 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 34 | 94 |
| 357 | 12 Dec 2017 15:03:04 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 34 | 94 |
| 358 | 12 Dec 2017 15:03:05 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 34 | 94 |
| 359 | 12 Dec 2017 15:03:28 | SPPM EOB | SPPM Transmit End | | | |
| 360 | 12 Dec 2017 15:03:29 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 34 | 94 |
| 361 | 12 Dec 2017 15:03:30 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 34 | 94 |
| 362 | 12 Dec 2017 15:03:30 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 34 | 94 |
| 363 | 12 Dec 2017 15:03:31 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 35 | 94 |
| 364 | 12 Dec 2017 15:03:45 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 35 | 94 |
| 365 | 12 Dec 2017 15:03:46 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 35 | 94 |
| 366 | 12 Dec 2017 15:03:46 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 35 | 94 |
| 367 | 12 Dec 2017 15:03:47 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 94 |
| 368 | 12 Dec 2017 15:03:48 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 34 | 94 |
| 369 | 12 Dec 2017 15:04:14 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 35 | 94 |
| 370 | 12 Dec 2017 15:04:15 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 35 | 94 |
| 371 | 12 Dec 2017 15:04:17 | SPPM EOB | SPPM Transmit End | | | |
| 372 | 18 Dec 2017 11:30:45 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 26 | 94 |
| 373 | 18 Dec 2017 11:30:46 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 26 | 94 |
| 374 | 18 Dec 2017 11:31:16 | SPPM EOB | SPPM Transmit End | | | |
| 375 | 26 Dec 2017 17:12:59 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29 | 93 |
| 376 | 26 Dec 2017 17:13:00 | Arc | C1: 25' Standard<br>C2: 25' Standard | 2 | | 93 |
| 377 | 26 Dec 2017 17:13:03 | Safe | C1: 25' Standard<br>C2: 25' Standard | 4 | 29 | 93 |
| 378 | 26 Dec 2017 17:13:30 | SPPM EOB | SPPM Transmit End | | | |
| 379 | 03 Jan 2018 18:07:11 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 30 | 93 |
| 380 | 03 Jan 2018 18:07:11 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 93 |

Mesa/Spencer 000208

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 381 | 03 Jan 2018 18:07:13 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 31 | 93 |
| 382 | 03 Jan 2018 18:07:42 | SPPM EOB | SPPM Transmit End | | | |
| 383 | 10 Jan 2018 16:55:48 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 24 | 92 |
| 384 | 10 Jan 2018 16:55:49 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 92 |
| 385 | 10 Jan 2018 16:56:04 | Safe | C1: 25' Standard<br>C2: 25' Standard | 16 | 25 | 92 |
| 386 | 10 Jan 2018 16:56:28 | SPPM EOB | SPPM Transmit End | | | |
| 387 | 15 Jan 2018 10:15:38 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 25 | 92 |
| 388 | 15 Jan 2018 10:15:38 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 92 |
| 389 | 15 Jan 2018 10:15:40 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 26 | 92 |
| 390 | 15 Jan 2018 10:16:09 | SPPM EOB | SPPM Transmit End | | | |
| 391 | 16 Jan 2018 15:59:36 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 30 | 92 |
| 392 | 16 Jan 2018 15:59:37 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 92 |
| 393 | 16 Jan 2018 15:59:38 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 31 | 92 |
| 394 | 16 Jan 2018 16:00:08 | SPPM EOB | SPPM Transmit End | | | |
| 395 | 18 Jan 2018 12:45:57 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 27 | 92 |
| 396 | 18 Jan 2018 12:45:58 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 92 |
| 397 | 18 Jan 2018 12:45:59 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 28 | 91 |
| 398 | 18 Jan 2018 12:46:28 | SPPM EOB | SPPM Transmit End | | | |
| 399 | 18 Jan 2018 12:48:39 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 28 | 91 |
| 400 | 18 Jan 2018 12:48:42 | Trigger | C1: Deployed | 8 | | 91 |
| 401 | 18 Jan 2018 12:48:51 | Trigger | C2: Deployed | 7 | | 91 |
| 402 | 18 Jan 2018 12:48:57 | Safe | C1: Deployed<br>C2: Deployed | 18 | 30 | 91 |
| 403 | 18 Jan 2018 12:49:05 | Armed | C1: Deployed<br>C2: Deployed | | 30 | 91 |
| 404 | 18 Jan 2018 12:49:07 | Arc | C1: Deployed<br>C2: Deployed | 2 | | 91 |
| 405 | 18 Jan 2018 12:49:36 | Safe | C1: Deployed<br>C2: Deployed | 31 | 31 | 90 |
| 406 | 18 Jan 2018 12:49:37 | SPPM EOB | SPPM Transmit End | | | |
| 407 | 24 Jan 2018 16:49:06 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29 | 90 |
| 408 | 24 Jan 2018 16:49:07 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 28 | 90 |
| 409 | 24 Jan 2018 16:49:37 | SPPM EOB | SPPM Transmit End | | | |
| 410 | 24 Jan 2018 21:08:57 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 26 | 90 |

Mesa/Spencer 000209

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 411 | 24 Jan 2018 21:08:58 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 412 | 24 Jan 2018 21:08:59 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 26 | 90 |
| 413 | 24 Jan 2018 21:09:28 | SPPM EOB | SPPM Transmit End | | | |
| 414 | 25 Jan 2018 10:37:03 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 26 | 90 |
| 415 | 25 Jan 2018 10:37:04 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 416 | 25 Jan 2018 10:37:05 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 26 | 90 |
| 417 | 25 Jan 2018 10:37:35 | SPPM EOB | SPPM Transmit End | | | |
| 418 | 25 Jan 2018 10:54:29 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 26 | 90 |
| 419 | 25 Jan 2018 10:54:30 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 420 | 25 Jan 2018 10:54:35 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 421 | 25 Jan 2018 10:54:42 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 422 | 25 Jan 2018 10:54:43 | Safe | C1: 25' Standard<br>C2: 25' Standard | 14 | 26 | 90 |
| 423 | 25 Jan 2018 10:55:09 | SPPM EOB | SPPM Transmit End | | | |
| 424 | 25 Jan 2018 11:35:13 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 27 | 90 |
| 425 | 25 Jan 2018 11:35:16 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 426 | 25 Jan 2018 11:35:17 | Safe | C1: 25' Standard<br>C2: 25' Standard | 4 | 27 | 90 |
| 427 | 25 Jan 2018 11:35:45 | SPPM EOB | SPPM Transmit End | | | |
| 428 | 25 Jan 2018 11:59:03 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 28 | 90 |
| 429 | 25 Jan 2018 11:59:13 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 430 | 25 Jan 2018 11:59:14 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 431 | 25 Jan 2018 11:59:16 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 432 | 25 Jan 2018 11:59:17 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 433 | 25 Jan 2018 11:59:21 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 434 | 25 Jan 2018 11:59:24 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 90 |
| 435 | 25 Jan 2018 11:59:27 | Safe | C1: 25' Standard<br>C2: 25' Standard | 24 | 29 | 90 |
| 436 | 25 Jan 2018 11:59:43 | SPPM EOB | SPPM Transmit End | | | |
| 437 | 29 Jan 2018 13:06:04 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 38 | 89 |
| 438 | 29 Jan 2018 13:06:05 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 89 |
| 439 | 29 Jan 2018 13:06:07 | Safe | C1: 25' Standard<br>C2: 25' Standard | 3 | 37 | 89 |
| 440 | 29 Jan 2018 13:06:36 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000210

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 441 | 06 Feb 2018 18:53:16 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 28 | 89 |
| 442 | 06 Feb 2018 18:53:18 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 89 |
| 443 | 06 Feb 2018 18:53:19 | Safe | C1: 25' Standard<br>C2: 25' Standard | 3 | 28 | 89 |
| 444 | 06 Feb 2018 18:53:19 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 28 | 89 |
| 445 | 06 Feb 2018 18:53:20 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 89 |
| 446 | 06 Feb 2018 18:53:22 | Safe | C1: 25' Standard<br>C2: 25' Standard | 3 | 28 | 89 |
| 447 | 06 Feb 2018 18:53:38 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29 | 89 |
| 448 | 06 Feb 2018 18:53:38 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 89 |
| 449 | 06 Feb 2018 18:53:40 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 29 | 89 |
| 450 | 06 Feb 2018 18:54:08 | SPPM EOB | SPPM Transmit End | | | |
| 451 | 05 Mar 2018 18:20:47 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 30 | 87 |
| 452 | 05 Mar 2018 18:20:48 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 87 |
| 453 | 05 Mar 2018 18:20:49 | Safe | C1: 25' Standard<br>C2: 25' Standard | 2 | 29 | 87 |
| 454 | 05 Mar 2018 18:21:19 | SPPM EOB | SPPM Transmit End | | | |
| 455 | 06 Mar 2018 17:20:03 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 34 | 87 |
| 456 | 06 Mar 2018 17:20:06 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 87 |
| 457 | 06 Mar 2018 17:20:07 | Safe | C1: 25' Standard<br>C2: 25' Standard | 4 | 35 | 87 |
| 458 | 06 Mar 2018 17:20:37 | SPPM EOB | SPPM Transmit End | | | |
| 459 | 06 Mar 2018 17:24:45 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 33 | 87 |
| 460 | 06 Mar 2018 17:25:00 | Safe | C1: 25' Standard<br>C2: 25' Standard | 15 | 33 | 87 |
| 461 | 06 Mar 2018 17:25:25 | SPPM EOB | SPPM Transmit End | | | |
| 462 | 06 Mar 2018 17:33:40 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 31 | 87 |
| 463 | 06 Mar 2018 17:33:41 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1 | 32 | 87 |
| 464 | 06 Mar 2018 17:34:12 | SPPM EOB | SPPM Transmit End | | | |
| 465 | 06 Mar 2018 18:05:08 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 28 | 87 |
| 466 | 06 Mar 2018 18:05:14 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 87 |
| 467 | 06 Mar 2018 18:05:21 | Safe | C1: 25' Standard<br>C2: 25' Standard | 13 | 30 | 87 |
| 468 | 06 Mar 2018 18:05:48 | SPPM EOB | SPPM Transmit End | | | |
| 469 | 07 Mar 2018 16:31:33 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 28 | 87 |
| 470 | 07 Mar 2018 16:31:34 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1 | | 87 |

Mesa/Spencer 000211

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 471 | 07 Mar 2018 16:31:34 | Safe | C1: 25' Standard C2: 25' Standard | 1 | 27 | 87 |
| 472 | 07 Mar 2018 16:32:04 | SPPM EOB | SPPM Transmit End | | | |
| 473 | 07 Mar 2018 19:12:39 | Armed | C1: 25' Standard C2: 25' Standard | | 27 | 87 |
| 474 | 07 Mar 2018 19:12:41 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 87 |
| 475 | 07 Mar 2018 19:12:58 | Safe | C1: 25' Standard C2: 25' Standard | 19 | 28 | 87 |
| 476 | 07 Mar 2018 19:13:19 | SPPM EOB | SPPM Transmit End | | | |
| 477 | 14 Mar 2018 17:27:04 | Armed | C1: 25' Standard C2: 25' Standard | | 29 | 86 |
| 478 | 14 Mar 2018 17:27:08 | Safe | C1: 25' Standard C2: 25' Standard | 4 | 29 | 86 |
| 479 | 14 Mar 2018 17:27:35 | SPPM EOB | SPPM Transmit End | | | |
| 480 | 14 Mar 2018 18:45:45 | Armed | C1: 25' Standard C2: 25' Standard | | 28 | 86 |
| 481 | 14 Mar 2018 18:45:49 | Safe | C1: 25' Standard C2: 25' Standard | 4 | 28 | 86 |
| 482 | 14 Mar 2018 18:46:16 | SPPM EOB | SPPM Transmit End | | | |
| 483 | 14 Mar 2018 18:47:04 | Armed | C1: 25' Standard C2: 25' Standard | | 28 | 86 |
| 484 | 14 Mar 2018 18:47:12 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 485 | 14 Mar 2018 18:47:13 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 486 | 14 Mar 2018 18:47:17 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 487 | 14 Mar 2018 18:47:19 | Safe | C1: 25' Standard C2: 25' Standard | 15 | 30 | 86 |
| 488 | 14 Mar 2018 18:47:41 | Armed | C1: 25' Standard C2: 25' Standard | | 31 | 86 |
| 489 | 14 Mar 2018 18:47:44 | SPPM EOB | SPPM Transmit End | | | |
| 490 | 14 Mar 2018 18:47:44 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 491 | 14 Mar 2018 18:47:47 | Arc | C1: 25' Standard C2: 25' Standard | 2 | | 86 |
| 492 | 14 Mar 2018 18:47:51 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 493 | 14 Mar 2018 18:47:51 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 494 | 14 Mar 2018 18:47:53 | Safe | C1: 25' Standard C2: 25' Standard | 12 | 31 | 86 |
| 495 | 14 Mar 2018 20:31:22 | Armed | C1: 25' Standard C2: 25' Standard | | 28 | 86 |
| 496 | 14 Mar 2018 20:31:23 | Safe | C1: 25' Standard C2: 25' Standard | 1 | 27 | 86 |
| 497 | 14 Mar 2018 20:31:25 | Armed | C1: 25' Standard C2: 25' Standard | | 28 | 86 |
| 498 | 14 Mar 2018 20:31:29 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 86 |
| 499 | 14 Mar 2018 20:31:32 | Safe | C1: 25' Standard C2: 25' Standard | 7 | 28 | 86 |
| 500 | 14 Mar 2018 20:32:02 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000212

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 501 | 21 Mar 2018 09:39:17 | Armed | C1: 25' Standard C2: 25' Standard | | 24 | 85 |
| 502 | 21 Mar 2018 09:39:18 | Safe | C1: 25' Standard C2: 25' Standard | 1 | 24 | 85 |
| 503 | 21 Mar 2018 09:39:48 | SPPM EOB | SPPM Transmit End | | | |
| 504 | 21 Mar 2018 13:58:00 | Armed | C1: 25' Standard C2: 25' Standard | | 31 | 85 |
| 505 | 21 Mar 2018 13:58:00 | Arc | C1: 25' Standard C2: 25' Standard | 1 | | 85 |
| 506 | 21 Mar 2018 13:58:01 | Safe | C1: 25' Standard C2: 25' Standard | 1 | 31 | 85 |
| 507 | 21 Mar 2018 13:58:31 | SPPM EOB | SPPM Transmit End | | | |
| 508 | 21 Mar 2018 17:33:43 | Armed | C1: 25' Standard C2: 25' Standard | | 26 | 85 |
| 509 | 21 Mar 2018 17:33:43 | Trigger | C1: Deployed | 5 | | 85 |
| 510 | 21 Mar 2018 17:33:45 | Trigger | C2: Deployed | 5 | | 85 |
| 511 | 21 Mar 2018 17:33:50 | Trigger | C2: Deployed | 5 | | 85 |
| 512 | 21 Mar 2018 17:33:56 | Trigger | C2: Deployed | 4 | | 85 |
| 513 | 21 Mar 2018 17:33:59 | Safe | C1: Deployed C2: Deployed | 16 | 28 | 85 |
| 514 | 21 Mar 2018 17:34:12 | Armed | C1: Deployed C2: Deployed | | 28 | 85 |
| 515 | 21 Mar 2018 17:34:13 | Trigger | C1: Deployed | 2 | | 85 |
| 516 | 21 Mar 2018 17:34:15 | Safe | C1: Deployed C2: Deployed | 3 | 28 | 85 |
| 517 | 21 Mar 2018 17:34:20 | Armed | C1: Deployed C2: Deployed | | 28 | 85 |
| 518 | 21 Mar 2018 17:34:22 | Trigger | C1: Deployed | 2 | | 85 |
| 519 | 21 Mar 2018 17:34:24 | Safe | C1: Deployed C2: Deployed | 4 | 28 | 85 |
| 520 | 21 Mar 2018 17:36:02 | Armed | C1: Deployed C2: Deployed | | 29 | 85 |
| 521 | 21 Mar 2018 17:36:02 | Trigger | C1: Deployed | 13 | | 85 |
| 522 | 21 Mar 2018 17:36:16 | Safe | C1: Deployed C2: Deployed | 14 | 31 | 84 |
| 523 | 21 Mar 2018 17:36:42 | SPPM EOB | SPPM Transmit End | | | |
| 524 | 29 Mar 2018 16:03:49 | Armed | C1: Empty C2: Empty | | 33 | 84 |
| 525 | 29 Mar 2018 16:03:50 | Safe | C1: Empty C2: Empty | 1 | 33 | 84 |
| 526 | 29 Mar 2018 16:03:51 | Armed | C1: Empty C2: Empty | | 33 | 84 |
| 527 | 29 Mar 2018 16:03:51 | Safe | C1: Empty C2: Empty | 0 | 32 | 83 |
| 528 | 29 Mar 2018 16:03:51 | Armed | C1: Empty C2: Empty | | 33 | 83 |
| 529 | 29 Mar 2018 16:03:57 | Safe | C1: Empty C2: Empty | 6 | 33 | 83 |
| 530 | 29 Mar 2018 16:04:20 | SPPM EOB | SPPM Transmit End | | | |

Mesa/Spencer 000213

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 531 | 29 Mar 2018 16:04:50 | Armed | C1: Empty<br>C2: Empty | | 34 | 83 |
| 532 | 29 Mar 2018 16:04:57 | Safe | C1: Empty<br>C2: Empty | 7 | 33 | 83 |
| 533 | 29 Mar 2018 16:05:21 | SPPM EOB | SPPM Transmit End | | | |
| 534 | 29 Mar 2018 16:05:38 | Armed | C1: Empty<br>C2: Empty | | 34 | 83 |
| 535 | 29 Mar 2018 16:05:39 | Arc | C1: Empty<br>C2: Empty | 1 | | 83 |
| 536 | 29 Mar 2018 16:05:41 | Arc | C1: Empty<br>C2: Empty | 1 | | 83 |
| 537 | 29 Mar 2018 16:05:41 | Arc | C1: Empty<br>C2: Empty | 1 | | 83 |
| 538 | 29 Mar 2018 16:05:43 | Safe | C1: Empty<br>C2: Empty | 5 | 34 | 83 |
| 539 | 29 Mar 2018 16:06:10 | SPPM EOB | SPPM Transmit End | | | |
| 540 | 17 Apr 2018 18:37:41 | Armed | C1: Empty<br>C2: Empty | | 32 | 82 |
| 541 | 17 Apr 2018 18:37:42 | Safe | C1: Empty<br>C2: Empty | 1 | 31 | 82 |
| 542 | 17 Apr 2018 18:37:42 | Armed | C1: Empty<br>C2: Empty | | 32 | 82 |
| 543 | 17 Apr 2018 18:37:44 | Arc | C1: Empty<br>C2: Empty | 1 | | 82 |
| 544 | 17 Apr 2018 18:37:44 | Safe | C1: Empty<br>C2: Empty | 2 | 32 | 82 |
| 545 | 17 Apr 2018 18:38:14 | SPPM EOB | SPPM Transmit End | | | |
| 546 | 17 Apr 2018 18:38:52 | Armed | C1: Empty<br>C2: Empty | | 33 | 82 |
| 547 | 17 Apr 2018 18:38:53 | Trigger | C1: Empty | 1 | | 82 |
| 548 | 17 Apr 2018 18:38:54 | Safe | C1: Empty<br>C2: Empty | 2 | 33 | 82 |
| 549 | 17 Apr 2018 18:39:23 | SPPM EOB | SPPM Transmit End | | | |
| 550 | 17 Apr 2018 18:41:07 | Armed | C1: Empty<br>C2: Empty | | 32 | 82 |
| 551 | 17 Apr 2018 18:41:09 | Trigger | C1: Empty | 4 | | 82 |
| 552 | 17 Apr 2018 18:41:12 | Safe | C1: Empty<br>C2: Empty | 5 | 32 | 82 |
| 553 | 17 Apr 2018 18:41:39 | SPPM EOB | SPPM Transmit End | | | |
| 554 | 17 Apr 2018 18:44:59 | Armed | C1: Empty<br>C2: Empty | | 30 | 82 |
| 555 | 17 Apr 2018 18:45:03 | Arc | C1: Empty<br>C2: Empty | 1 | | 82 |
| 556 | 17 Apr 2018 18:45:06 | Arc | C1: Empty<br>C2: Empty | 1 | | 82 |
| 557 | 17 Apr 2018 18:45:08 | Arc | C1: Empty<br>C2: Empty | 1 | | 82 |
| 558 | 17 Apr 2018 18:45:11 | Safe | C1: Empty<br>C2: Empty | 12 | 31 | 82 |
| 559 | 17 Apr 2018 18:45:20 | Armed | C1: Empty<br>C2: Empty | | 32 | 82 |
| 560 | 17 Apr 2018 18:45:22 | Trigger | C1: Empty | 5 | | 82 |

Mesa/Spencer 000214

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 561 | 17 Apr 2018 18:45:28 | Trigger | C1: Empty | 3 | | 82 |
| 562 | 17 Apr 2018 18:45:30 | Safe | C1: Empty<br>C2: Empty | 10 | 33 | 82 |
| 563 | 17 Apr 2018 18:45:52 | SPPM EOB | SPPM Transmit End | | | |
| 564 | 17 Apr 2018 18:45:58 | Armed | C1: Empty<br>C2: Empty | | 33 | 82 |
| 565 | 17 Apr 2018 18:45:59 | Arc | C1: Empty<br>C2: Empty | 1 | | 82 |
| 566 | 17 Apr 2018 18:46:01 | Safe | C1: Empty<br>C2: Empty | 3 | 33 | 82 |
| 567 | 17 Apr 2018 18:46:03 | Armed | C1: Empty<br>C2: Empty | | 33 | 82 |
| 568 | 17 Apr 2018 18:46:05 | Trigger | C1: Empty | 5 | | 82 |
| 569 | 17 Apr 2018 18:46:11 | Trigger | C1: Empty | 5 | | 82 |
| 570 | 17 Apr 2018 18:46:17 | Trigger | C1: Empty | 4 | | 81 |
| 571 | 17 Apr 2018 18:46:21 | Safe | C1: Empty<br>C2: Empty | 18 | 34 | 81 |
| 572 | 17 Apr 2018 18:46:34 | Armed | C1: Empty<br>C2: Empty | | 34 | 81 |
| 573 | 17 Apr 2018 18:46:38 | SPPM EOB | SPPM Transmit End | | | |
| 574 | 17 Apr 2018 18:46:34 | Trigger | C1: Empty | 5 | | 81 |
| 575 | 17 Apr 2018 18:46:42 | Safe | C1: Empty<br>C2: Empty | 8 | 34 | 81 |
| 576 | 17 Apr 2018 19:16:35 | Armed | C1: Empty<br>C2: Empty | | 28 | 81 |
| 577 | 17 Apr 2018 19:17:15 | SPPM EOB | SPPM Transmit End | | | |
| 578 | 17 Apr 2018 19:18:01 | Safe | C1: Empty<br>C2: Empty | 86 | 33 | 81 |
| 579 | 17 Apr 2018 19:18:25 | Armed | C1: Empty<br>C2: Empty | | 32 | 81 |
| 580 | 17 Apr 2018 19:18:59 | Safe | C1: Empty<br>C2: Empty | 34 | 32 | 81 |
| 581 | 17 Apr 2018 19:19:05 | SPPM EOB | SPPM Transmit End | | | |
| 582 | 17 Apr 2018 19:19:10 | Armed | C1: Empty<br>C2: Empty | | 33 | 81 |
| 583 | 17 Apr 2018 19:19:16 | Trigger | C1: Empty | 5 | | 81 |
| 584 | 17 Apr 2018 19:19:47 | Safe | C1: Empty<br>C2: Empty | 37 | 33 | 80 |
| 585 | 17 Apr 2018 19:19:50 | SPPM EOB | SPPM Transmit End | | | |
| 586 | 17 Apr 2018 19:24:53 | Armed | C1: Empty<br>C2: Empty | | 29 | 80 |
| 587 | 17 Apr 2018 19:25:33 | SPPM EOB | SPPM Transmit End | | | |
| 588 | 17 Apr 2018 19:27:44 | Safe | C1: Empty<br>C2: Empty | 171 | 36 | 80 |
| 589 | 17 Apr 2018 19:28:41 | Armed | C1: Empty<br>C2: Empty | | 34 | 80 |
| 590 | 17 Apr 2018 19:28:44 | Safe | C1: Empty<br>C2: Empty | 3 | 34 | 80 |

Mesa/Spencer 000215

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 591 | 17 Apr 2018 19:29:12 | SPPM EOB | SPPM Transmit End | | | |
| 592 | 17 Apr 2018 19:29:13 | Armed | C1: Empty<br>C2: Empty | | 33 | 80 |
| 593 | 17 Apr 2018 19:29:53 | SPPM EOB | SPPM Transmit End | | | |
| 594 | 17 Apr 2018 19:29:55 | Safe | C1: Empty<br>C2: Empty | 42 | 35 | 79 |
| 595 | 17 Apr 2018 19:58:14 | Armed | C1: Empty<br>C2: Empty | | 26 | 79 |
| 596 | 17 Apr 2018 19:58:33 | Safe | C1: Empty<br>C2: Empty | 19 | 28 | 79 |
| 597 | 17 Apr 2018 19:58:51 | Armed | C1: Empty<br>C2: Empty | | 28 | 79 |
| 598 | 17 Apr 2018 19:58:54 | SPPM EOB | SPPM Transmit End | | | |
| 599 | 17 Apr 2018 20:00:12 | Safe | C1: Empty<br>C2: Empty | 81 | 32 | 79 |
| 600 | 17 Apr 2018 20:18:44 | Armed | C1: Empty<br>C2: Empty | | 28 | 79 |
| 601 | 17 Apr 2018 20:18:47 | Safe | C1: Empty<br>C2: Empty | 3 | 27 | 79 |
| 602 | 17 Apr 2018 20:19:15 | SPPM EOB | SPPM Transmit End | | | |
| 603 | 19 Apr 2018 15:29:41 | Armed | C1: Empty<br>C2: Empty | | 32 | 79 |
| 604 | 19 Apr 2018 15:29:41 | Safe | C1: Empty<br>C2: Empty | 0 | 32 | 79 |
| 605 | 19 Apr 2018 15:30:12 | SPPM EOB | SPPM Transmit End | | | |
| 606 | 19 Apr 2018 15:32:41 | USB Connected | | | | |
| 607 | 19 Apr 2018 15:21:47 | Time Sync | 19 Apr 2018 15:32:43 to 19 Apr 2018 15:21:47 | | | |

Mesa/Spencer 000216

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| Plaintiff, | ) | |
| v. | ) | CR2018-000814-001 |
| COLE JOSEPH SPENCER, | ) | |
| Defendant. | ) | |
| _____ | ) | |

Phoenix, Arizona

September 27, 2018

2:02 p.m.

BEFORE:   THE HONORABLE KATHLEEN MEAD

REPORTER'S TRANSCRIPT OF PROCEEDINGS

CHANGE OF PLEA

(Copy)

Scott A. Kindle, RPR
Certified Reporter No. 50711

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000045

2

A P P E A R A N C E S


For the Plaintiff:


          MERCEDES TORRES, Deputy County Attorney



For the Defendant:


          MATTHEW LEATHERS









                    SUPERIOR COURT
                   Phoenix, Arizona

   Mesa/Spencer 000046

```
 1                                        Phoenix, Arizona
 2                                        September 27, 2018
 3              THE COURT:  This is the time set for -- it
 4   was set for settlement conference, but I have two plea
 5   agreements in front of me in CR2018-000814-001,
 6   CR2018-126694-001, CR2012-114678-001, all in the matter of
 7   State of Arizona versus Cole Joseph Spencer.  Counsel?
 8              MS. TORRES:  Mercedes Torres for the State.
 9              MR. LEATHERS:  Matthew Leathers representing
10   Cole Joseph Spencer on both matters.  He's present in
11   custody seated to my left, ready to proceed with change of
12   plea.
13              THE COURT:  Sir, could you state your name.
14              THE DEFENDANT:  Cole Joseph Spencer.
15              THE COURT:  And your date of birth?
16              THE DEFENDANT:  10/23/85.
17              THE COURT:  Sir, I have before me two plea
18   agreements.  Both indicate you would like to waive your
19   right to trial and plead guilty.  Is that what you'd like
20   to do?
21              THE DEFENDANT:  Yes, ma'am.
22              THE COURT:  Before I could accept those
23   guilty pleas, I need to make sure you understand your
24   constitutional rights as well as the possible consequences
25   of pleading guilty.
```

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000047

1          Sir, you have the right to plead not guilty and

2    have a jury trial in your matter.

3          You are presumed innocent.  The State has to prove

4    the charges against you beyond a reasonable doubt.  How

5    they would try and do that is by bringing witnesses and

6    exhibits to court.  You through your attorney could

7    question and cross-examine the State's witnesses.  You

8    could bring your own witnesses to court, and if they refuse

9    to come, you could subpoena them and require them to come

10   to court.

11         You could testify on your own behalf at your

12   trial, but you also have an absolute right to remain

13   silent.  If you didn't want to testify, you do not have to.

14   Nobody could use your decision not to testify against you.

15         When you enter into these guilty pleas, you are

16   giving up your right to trial as well as your right to

17   remain silent.

18         You're also giving up your right to have a jury

19   determine any sentencing aggravating factors.  Instead, the

20   sentencing judge, in this case, me, will do that.

21         You're also giving up your right to a direct

22   appeal to a higher court.  Instead, the only review

23   available of this court's decision would be by you filing a

24   petition for post-conviction relief.  You have to do that

25   within 90 days of the day of your sentencing or you lose

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000048

5

```
 1   that right.  If you could not afford it, an attorney,
 2   records, and transcripts would be provided to you free of
 3   cost for that process.
 4           Additionally, and I have to read this to everyone,
 5   if you are not a citizen of the United States, pleading
 6   guilty or no contest to a crime may affect your immigration
 7   status.  Admitting guilt may result in deportation even if
 8   the charge is later dismissed.  Your plea or admission of
 9   guilt could result in your deportation or removal, could
10   prevent you from ever being able to get legal status or
11   U.S. citizenship.
12           Sir, do you understand everything I've just gone
13   over with you?
14                   THE DEFENDANT:  Yes, ma'am.
15                   THE COURT:  Do you have any questions for me
16   or your attorney regarding any of that information?
17                   THE DEFENDANT:  No.
18                   THE COURT:  Do you have a copy of both plea
19   agreements in front of you?
20                   THE DEFENDANT:  Yes.
21                   THE COURT:  Is that your name about the
22   middle of both pleas?
23                   THE DEFENDANT:  Yes.
24                   THE COURT:  As to the top one, is it spelled
25   correctly?
```

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000049

1                   THE DEFENDANT:  Yes.

2                   THE COURT:  Are those your initials on the

3    left-hand side of each page next to each paragraph --

4                   THE DEFENDANT:  Yes.

5                   THE COURT:  -- of the plea?

6                   THE DEFENDANT:  Uh-huh.

7                   THE COURT:  And is that a "Yes"?  Sorry.

8    You're being tape recorded.

9                   THE DEFENDANT:  Yes, ma'am.

10                   THE COURT:  And is that your signature on the

11   page six in the matter ending 814 and page seven in the

12   matter ending 694?

13                   THE DEFENDANT:  Yes.

14                   MR. LEATHERS:  Your Honor, if I may approach,

15   I gave you the wrong ones.  I have the originals.

16                   THE COURT:  Oh, we'll switch those.  I need

17   those.

18              Sir, when you initialed each paragraph of both

19   plea agreements and signed on the last page in both, does

20   that mean you reviewed these completely with your attorney?

21                   THE DEFENDANT:  Yes.

22                   THE COURT:  Do you understand the plea

23   agreements?

24                   THE DEFENDANT:  Yes.

25                   THE COURT:  Do you agree with them?

                          SUPERIOR COURT
                          Phoenix, Arizona

Mesa/Spencer 000050

1          THE DEFENDANT:  Yes.

2          THE COURT:  I'm going to refer you to the

3    plea agreement in the matter ending 814.  There the plea

4    tells me that you are pleading guilty to Count 1,

5    Aggravated Assault, a class 4 non-dangerous felony with one

6    prior felony conviction occurring March 21st, 2018.

7          Counsel, it says on Count 1 that probation is

8    available.  Obviously, it's not available when he's

9    pleading with a prior.  Do you guys have a problem with me

10   adding the word "not"?

11         MR. LEATHERS:  No, Your Honor.  That's fine.

12         MS. TORRES:  No, Your Honor.

13         THE COURT:  That's just a clerical error.

14   Probation is not available under the law when you plead

15   with a prior, so I am adding the word "not."  Sir, when you

16   plead guilty to a class 4 with a prior, probation is not

17   available.  You will be sentenced to a term in the

18   Department of Corrections.  The presumptive term is four

19   and a half years.  The maximum is seven and a half years.

20   And the minimum is two and a quarter years.

21         You could be fined up to $150,000 plus a

22   surcharge.

23         You would be ordered to submit to DNA testing and

24   pay the costs of that.

25         You would be required under the terms of this plea

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000051

1  to submit to disease testing and release the results to the

2  victim.

3          In your case, the agreement is that you would be

4  sentenced to a mitigated term of three years in the

5  Department of Corrections.  It will be concurrent, at the

6  same time, as any sentence imposed in the other matter.

7          You would have to pay for -- you would have to

8  submit to and pay for DNA testing.

9          And you would have to do that disease testing as

10  we just -- as I just mentioned.

11          Sir, is that your understanding as well?

12              THE DEFENDANT:  Yes.

13              THE COURT:  The State's agreed to dismiss

14  Counts 2, 3, and 4; the allegation of other prior felony

15  convictions; and the allegation that you were on probation

16  at the time of this offense.  Do you understand all of

17  that?

18              THE DEFENDANT:  Yes.

19              THE COURT:  And, sir, you need to know that

20  you will be found in automatic violation of your probation.

21  You would be sentenced in that matter as well.  You could

22  be reinstated on probation.  You could be sentenced to a

23  term in the Department of Corrections.  I believe that's a

24  class 4 felony.  The presumptive term is two and a half

25  years.  The maximum is three and three-quarter years.  The

SUPERIOR COURT
Phoenix, Arizona

1    minimum is one year.  If you are sentenced to the

2    Department of Corrections, any sentence could be ordered to

3    be served concurrently; it could be ordered to be served

4    consecutively; and that decision will be made by me at

5    sentencing.  Do you understand all of that?

6                    THE DEFENDANT:  Yes, ma'am.

7                    THE COURT:  Okay.  I'm going to refer you to

8    paragraph five where you tell me you have no more than nine

9    prior felony convictions.  You were on probation but not on

10   release, parole, or community supervision at the time of

11   this offense.  And to your knowledge, the only other

12   pending felony matters you have are the ones currently

13   before me.  Is all of that correct?

14                   THE DEFENDANT:  Yes.

15                   THE COURT:  Has anybody promised you anything

16   or threatened you to get you to plead guilty other than the

17   promises in these plea agreements?

18                   THE DEFENDANT:  No.

19                   THE COURT:  Have you had any drugs, alcohol,

20   or medication in the last 24 hours?

21                   THE DEFENDANT:  No.

22                   THE COURT:  I'm going to refer you to the

23   plea agreement in the matter ending 694.  There the plea

24   tells me you're pleading guilty to Count 1, Burglary in the

25   Second Degree, a class 3 non-dangerous felony with one

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000053

1   prior felony conviction occurring on February 18th, 2018.

2   Again, when you plead guilty to a felony with a prior,

3   probation is not available.  You will be sentenced to a

4   term in the Department of Corrections.  For Count 1, the

5   presumptive term is six and a half years.  The maximum is

6   16 and a quarter years.  And the minimum is three and a

7   quarter years.  You have also agreed to plead guilty to

8   Count 2, Burglary in the Third Degree, a class 4 felony

9   occurring March 11th, 2018.  In that matter --

10          Counsel, why -- oh, he's not pleading with a

11   prior, so --

12          MS. TORRES:  I apologize, Your Honor.  That's

13   also a typo.

14          THE COURT:  So get rid of the "not"?

15          MS. TORRES:  Correct.

16          MR. LEATHERS:  Yes.

17          THE COURT:  In that matter, probation is

18   available.  And in fact, the agreement is that you will be

19   placed on supervised probation upon your release from the

20   Department of Corrections.  If you were to later violate

21   your probation, you could be sentenced to a term in the

22   Department of Corrections for the class 4 felony.  It's the

23   same as what you're on probation for; presumptive, two and

24   a half; the maximum, 3.75; and the minimum is one year.

25          You have agreed to have no contact with the

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000054

 1    victims, to pay -- to submit to DNA testing and pay the

 2    costs of that.

 3              These pleas are all contingent upon each other.

 4              You would be required to pay restitution to the

 5    victims in an amount not over $50,000, including a

 6    specified restitution amount of $1,000.43 to Dani Mecham.

 7              As to Count 1, the agreement is that you will be

 8    sentenced to an aggravated term of nine years in the

 9    Department of Corrections, and it will be concurrent, at

10    the same time, as the prison term to be imposed in your

11    other matter.  As to Count 2, again, you would be placed on

12    supervised probation.  If you reject probation, any

13    sentence must be served consecutively.

14              The State's agreed to dismiss Counts 3, 4, and 5;

15    the allegation of additional priors; the fact that you were

16    on felony probation at the time of this offense; and

17    they've agreed not to file additional charges stemming from

18    the cited Scottsdale police report.

19              Sir, is all of that your understanding as well?

20                   THE DEFENDANT:  Yes, ma'am.

21                   THE COURT:  And I have already asked you if

22    you've had any drugs, alcohol, or medication in the last 24

23    hours; correct?

24                   THE DEFENDANT:  Yeah.

25                   THE COURT:  And the answer was no; correct?

                       SUPERIOR COURT
                       Phoenix, Arizona

                         Mesa/Spencer 000055

1            THE DEFENDANT:  Yeah.  The answer is no.

2            THE COURT:  Thank you.  Sir, knowing

3    everything we talked about, knowing that you're going to be

4    found in automatic violation of your probation, how do you

5    plead in the matter ending 814 to Count 1, Aggravated

6    Assault, a class 4 non-dangerous felony with one prior

7    felony conviction occurring March 21st, 2018?  Tell me, are

8    you guilty or not guilty.

9            THE DEFENDANT:  Guilty.

10           THE COURT:  And how do you plead in the

11   matter ending 694 to Count 1, Burglary in the Second

12   Degree, a class 3 non-dangerous felony with one prior

13   felony conviction occurring February 18th, 2018?

14           THE DEFENDANT:  Guilty.

15           THE COURT:  And how do you plead to Count 2

16   in that same matter, Burglary in the Third Degree, a

17   class 4 non-dangerous felony occurring March 11th, 2018?

18           THE DEFENDANT:  Guilty.

19           THE COURT:  Counsel, would you state the

20   factual basis.

21           MR. LEATHERS:  Yes, Your Honor.  On the

22   matter ending in 814, on March 21st, 2018, within Maricopa

23   County, Cole Joseph Spencer knowingly did place a police

24   officer in reasonable apprehension of imminent physical

25   harm.  He had reason to know that person was a police

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000056

13

```
 1    officer.  It was a Mesa police officer wearing a full

 2    standard uniform issued by the department.

 3            He is pleading with a prior felony.  Specifically,

 4    he committed the crime of Burglary in the Third Degree, a

 5    class 4 felony, for which he was convicted on March 24th,

 6    2014, in Maricopa County Superior Court Cause No.

 7    CR2013-436843-001.  The date of that offense was

 8    September 21st, 2011.  He was represented by counsel.

 9            THE COURT:  And what exactly did he do to be

10    guilty of aggravated assault?  You just said he placed him

11    in reasonable apprehension.

12            MR. LEATHERS:  Oh, he made a -- he pushed the

13    officer and made a movement.

14            THE COURT:  Okay.  And I thought that you

15    said that the prior occurred on March 24th, and the plea

16    says March 28th, so --

17            MR. LEATHERS:  I'm sorry.  March 28th.

18            THE COURT:  Sir, is everything your attorney

19    just said correct?

20            THE DEFENDANT:  Yes, ma'am.

21            THE COURT:  Does either counsel have any

22    concerns regarding voluntariness or factual basis as to

23    this matter?

24            MS. TORRES:  Your Honor, as to Count 1, the

25    defendant was indicted as intentionally, knowingly or
```

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000057

1    recklessly causing physical injury.  I just wanted to

2    clarify that there was physical injury to at least one of

3    the police officers.

4              THE COURT:  Okay.  And what was the nature of

5    that injury?

6              MS. TORRES:  The officer is currently

7    receiving -- he has injuries to his hip and also multiple

8    abrasions and cuts, Your Honor.

9              THE COURT:  And there's no dispute?

10             MR. LEATHERS:  No dispute.

11             THE COURT:  Okay.  Have victims' rights been

12   complied with?

13             MS. TORRES:  Yes, Your Honor.

14             THE COURT:  I do find that Mr. Spencer has

15   made a knowing, voluntary, and intelligent plea of guilty

16   to Count 1, Aggravated Assault, a class 4 non-dangerous

17   felony with one prior felony conviction occurring

18   March 21st, 2018.  There is a factual basis for the plea.

19   It is made with full knowledge of the possible

20   consequences.  That plea is accepted and entered of record.

21             And sir, I'm going to refer you -- or counsel, do

22   you want to lay the factual basis for the matters in 694?

23             MR. LEATHERS:  Sure.  The matter ending 694,

24   as to Count 1, on February 18th, 2018, within Maricopa

25   County, Cole Joseph Spencer knowingly did enter the

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000058

 1   residential structure of another and remained there

 2   unlawfully, did so with the intent to commit a felony or

 3   theft therein.  His conduct violated Arizona law.  He's

 4   pleading with the same prior previously mentioned in the

 5   matter ending in 814.  Do you need me to restate it?

 6              THE COURT:  No.

 7              MR. LEATHERS:  Okay.  And then as to Count 2,

 8   on March 11th, 2018, within Maricopa County, Cole Joseph

 9   Spencer knowingly did enter the nonresidential structure of

10   another with the intent to commit a felony or theft

11   therein.  His conduct violated Arizona law.

12              THE COURT:  And just so I know, what was the

13   nonresidential structural?

14              MR. LEATHERS:  A vehicle.

15              THE COURT:  Sir, is everything your attorney

16   told me correct?

17              THE DEFENDANT:  Yes, ma'am.

18              THE COURT:  Does either counsel have any

19   concerns regarding voluntariness or factual basis?

20              MS. TORRES:  No, Your Honor.

21              THE COURT:  Have victims' rights been

22   complied with?

23              MS. TORRES:  Yes, they have.

24              THE COURT:  I do find that Mr. Spencer has

25   made a knowing, voluntary, intelligent plea of guilty to

SUPERIOR COURT
Phoenix, Arizona

                    Mesa/Spencer 000059

```
 1   Counts 1 and 2 in the matter ending 694.  There is a
 2   factual basis for both counts.  Victims' rights have been
 3   complied with.  It's ordered accepting the pleas of guilt
 4   and entering them of record.  We'll set this for
 5   sentencing.  I got the date of October 30th.  Does that
 6   work for everybody?
 7                MS. TORRES:  Yes, Your Honor.
 8                MR. LEATHERS:  Yes.
 9                THE COURT:  It's ordered revoking the
10   defendant's release status pursuant to Rule 7.2.  We're
11   going to order a presentence report.  Sir, that means
12   you're going to meet with the probation officer.  They're
13   going to make a report to the court about what they
14   recommend happens.
15                Counsel, do you wish to be present?
16                MR. LEATHERS:  No, Your Honor.
17                THE COURT:  Okay.  Counsel waives his
18   presence.  And is there anything else from either counsel?
19                MS. TORRES:  No, Your Honor.
20                MR. LEATHERS:  No, Your Honor.
21                THE COURT:  All right.  This matter is
22   adjourned.
23                MR. LEATHERS:  Thank you.
24                MS. TORRES:  Thank you.
25                THE COURT:  Oh, counsel, hold on.
```

SUPERIOR COURT
Phoenix, Arizona

Mesa/Spencer 000060

1           Keep me on the record.

2           I didn't find -- I further find the defendant in

3    automatic violation of his probation in Cause No.

4    CR2012-114678.  It's ordered setting this for disposition

5    on that same date.  Sorry.

6                MR. LEATHERS:  Okay.

7                MS. TORRES:  Thank you, Your Honor.

8                (Whereupon the matter concluded at 2:17 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT
Phoenix, Arizona

          Mesa/Spencer 000061



# Incident/Investigation Report

### Case Number: 2018-0800614

### Agency: Mesa Police Department

---

## Narrative

===========================================================================

Cole's warrant:

WARRANT:18009477

OCA#: 18009477

RELATED DR # 2018-0800614

COURT: Mesa City

ISSUE DATE/TIME: 02-14-18

CHARGES: 1st degree trespassing

BOND: $500

ARS CODE: unk

JUDGE: unk

1  On 03-21-18 at 1717 hours I was on routine patrol in an unmarked Chevrolet Tahoe in the area of 300 S. 90th Pl. in Mesa, AZ.  Officer Pew was
2  driving southbound and we both observed a vehicle pull out of a residential driveway on the east side of the street.  The vehicle backed up quickly
3  and made a 90 degree turn to face/go southbound on 90th Pl.  The driver did not appear to check the roadway and Officer Pew had to aggressively
4  hit the brakes to avoid a collision with the vehicle.

5  We followed the vehicle and activated our overhead lights as the vehicle crossed the 202 overpass on Broadway Rd.  The vehicle continued west
6  and pulled over in front of 8702 E Broadway Rd on the roadway.  Officer Pew made contact with the driver who identified himself verbally as
7  Jamie Kern          .  A routine records check showed Jamie had a misdemeanor warrant for his arrest and a valid license status.  I spoke to the
8  front seat passenger who identified himself verbally as Kenneth Cory (          ).  The front passenger told me he did not know his SSN.  Based
9  upon my training and experience I knew there was a high likelihood the passenger was lying about his name.  I ran a records check on Kenneth
10  Cory.  I ran the MVD photograph, which looked nothing like the front seat passenger.  I went back to the vehicle and asked Kenneth to step out of
11  the vehicle.  The passenger stepped out and I told him to turn around and put his hand behind his back.  I then reached for the passenger's right
12  arm and as I grabbed it- he spun around, pushed me, and tried to run in a north direction.  I immediately tackled the passenger-later identified as
13  Cole Joseph Spencer (          ).  Cole flung his arms back at me and nearly struck my face as I tried to gain control of his arm.  Cole kept
14  resisting my attempt to handcuff him, so I punched him one time on the left cheek of his face with my closed right fist.  The strike to the face did
15  not seem to have any effect.

16  Officer Pew ran around the vehicle to assist me in the fight with Cole.  Officer Pew applied a strike with his foot to Cole's face.  Cole still would
17  not comply.  I later used my right knee to the back and left side of Cole's face.  At some point, Officer Pew transitioned to his taser.  Officer Pew
18  tased Cole several times, I do not know exactly how many times or all locations.  However, I do know he tased Cole in the neck and back area.
19  Cole was flinging his legs throughout the fight and seemed to have an amazing amount of pain tolerance.  Cole was able to roll over to his back
20  despite me and Officer Pew's best efforts to control him.  I delivered one fist strike to Cole's stomach at this time.  I was eventually able to get

---

Date:3/22/2018 20:05:54

Page 11 of 13


page 1

Mesa/Spencer 000011



# Incident/Investigation Report
**Case Number:** 2018-0800614

Agency: Mesa Police Department

## Narrative

1 Cole rolled over to his stomach and controlled his right arm. I was physically exhausted and asked Officer Pew to tase Cole one more time in an
2 effort to gain compliance. It took a significant amount of time to finally force his left arm behind his back, but I eventually got his left arm behind
3 his back and got him handcuffed. Based on my training and experience I believed Cole was under the influence of drugs at the time of the fight. I
4 told Cole around ten times throughout the fight to put his hands behind his back, but he never gave up. Part way through the fight Cole advised he
5 had a pace-maker, I told Cole he needed to put his hands behind his back in order for the fight to end. I would estimate that Cole fought for about
6 three minutes straight. Shortly into the fight, MCSO deputies arrived to assist us with the fight. Even with the assistance of Officer Shall #1554
7 controlling Cole's legs it took well over a minute straight of fighting to handcuff Cole (total of 3 officers in the fight). Officer Macklin #1742 also
8 arrived and kept an eye on Jamie Kern who was still seated in the vehicle at the time. MCSO's report # is 18-008163.

9 The vehicle was towed due to public caretaking for it was blocking Broadway westbound curb lane and both occupants were being arrested.
10 Officer Pew inventoried the vehicle prior to tow and located brown substance and a white crystal substance in plastic baggies. There was also a
11 syringe. These items were in a backpack that was on the passenger floorboard, where Cole was seated. I believed the substance to be heroin based
12 on my prior training and experience. The brown substance later field tested positive by Palmer #11483 for the presence of heroin, and the white
13 crystal substance also tested positive for the presence of methamphetamine. There was no identification in the backpack, but based upon the
14 location of the backpack at Cole's feet, I felt it was his backpack.

15 Cole would not provide his name after the fight was over and he was later identified by Morpho fingerprint scanner as Cole Joseph Spencer. Cole
16 had a mesa city warrant for his arrest, which I confirmed with dispatch. I also confirmed Jamie Kern's warrant. Officer Hermosillo transported
17 Jamie to the Mesa jail. Officer Hermosillo later informed me that Jamie had a white crystal substance located by Jail staff inside the jail. The
18 substance was hidden in Jamie's shoe. Officer Hermosillo later gave me the white powdery substance at Banner Baywood Hospital while I waited
19 with Cole. I believed the substance to be methamphetamine from my prior training and experience. The substance later field tested positive for
20 methamphetamine by Palmer #11483. See Detention Officer Padilla's supplement for further details.

21 Cole was treated on scene by Mesa Fire and taken by Southwest Ambulance to Banner Baywood for evaluation. Cole was read Miranda at 1913
22 hours and he said, "Yeah" when asked if he understood his rights. Cole told me the following: He had smoked "DMT" four minutes before being
23 pulled over at Jamie's house. He explained DMT is little crystals that are a hallucinogen and it makes him "out of it." Cole said he was unaware
24 of there being a warrant for his arrest, but he heard the Police were "looking for me," so that's why he lied about his name. I asked him if it was
25 his plan to try to run and fight with the Police. Cole said he didn't have a plan and he didn't remember the fight due to being under the influence
26 of DMT. However, I later overheard Cole explain to hospital staff that he "struggled a bit with the police" and he got "the shit kicked out of him."
27 Cole denied the white crystal substance, syringe, or brown substance belonged to him.

28 I find probable cause to charge with Cole with the following: aggravated assault on P.D., resisting arrest, possession of narcotic drug, possession
29 of dangerous drug, possession of drug paraphernalia, and a false reporting to law enforcement. I find probable cause to charge Jamie with
30 possession of dangerous drugs, possession of drug paraphernalia, and introducing contraband to jail.

31 Cole's injuries, along with myself and Officer Pew's were photographed by CSS Zemojtel at Banner Baywood Hospital. I received abrasions to
32 both knees and by left bicep. I also had pain in my right hip causing me to limp and pain in my right hand. I had blood exposure on my pants and

---

Date: 3/22/2018 20:05:54

Page 12 of 13

page 2

Mesa/Spencer 000012



# Incident/Investigation Report

**Case Number:** 2018-0800614

**Agency:** Mesa Police Department

## Narrative

a small cut near my right thumb. Officer Pew had pain in his left ankle, scrapes on both knees and elbows, and a large amount of blood exposure on his pants. Officer Pew struggled to walk due to the injury to his left ankle after this incident.

Cole and Jamie both had money that was placed into property for safekeeping and signed off by Detention Supervisor Markey. All of the drugs and paraphernalia were also put into property as evidence at the main station.

Cole Spencer was transported from Banner Baywood hosptial to Banner Desert Hospital since he needed to be seen by a trauma surgeon. I rode in the ambulance from Baywood to Desert and Officer Pew followed behind. I was told that Cole had several fractures to his face and nose and also had fractures in his back. He also likely had a broken or at least injured left wrist, but it had not been x-rayed at Banner Baywood. I spoke to Sgt. Simon who spoke to Lt. Russell and agreed to have a patrol graveyard unti stand-by with Cole until he was medically cleared. I was told Cole could potentially be cleared tomorrow or it could be several days.

NFI-CLEARED ARREST

---

Date: 3/22/2018 20:05:54

Page 3

Mesa/Spencer 000013

ER 275



# Incident/Investigation Report

**Case Number:** 2018-0800614

**Agency:** Mesa Police Department

## Supplement Information

| Supplement Date | Supplement Type | Supplement Approving | Approval Date |
|---|---|---|---|
| 03/21/2018 00:00:00 | INVESTIGATION | (19183) PEW, A | 03/27/2018 07:57:55 |
| | | Approving Supervisor | Approval Date |
| | | (14353) DOUCET, P | 03/27/2018 07:58:59 |

---

## Supplement Notes

1 On 03/21/18 at approximately 1717 hours, I was in the area of 300 S 90th Pl with Officer Rozema in an unmarked police vehicle. I was driving
2 south and observed a vehicle displaying AZLP WCJMA07 quickly back out of a driveway and angle to also drive south. I had to quickly hit the
3 breaks to avoid a collision with the vehicle. The vehicle appeared to be occupied by two people. They eventually made their way west onto
4 Broadway. I initiated a traffic stop on the vehicle as it traveled west across the 202. The vehicle continued to travel west on Broadway and
5 eventually stop on the road near 8702 W Broadway Rd.

6 I made contact with the driver of the vehicle who verbally identified himself to me as Jamie Kern (⬛⬛⬛). Officer Rozema got verbal
7 identification from the passenger, returned to the police vehicle to run the occupants and conduct an investigation. I remained with the occupants
8 standing on the driver's side of the vehicle. I asked them if there was anything illegal inside the vehicle which they both stated no. I noticed the
9 passenger, who was later identified as Cole Spencer, appeared to be extremely nervous. I noticed Cole was heavily sweating where Jamie was not
10 sweating at all. Based on my experience, I believed he was either on drugs or planning on making bad decisions and running or fighting with us. I
11 then noticed Cole began looking around to the north towards the houses and a wall which lead to a neighborhood. This further caused me to
12 believe he was planning on fleeing. Right about this time, Officer Rozema relayed to me the ID Cole had provided was false which increased my
13 thought of him fleeing or fighting. Based on my experience, people provide false names and information when they are attempting to avoid arrest
14 from warrants or pending charges.

15 Officer Rozema approached from the passenger side and told Cole to exit the vehicle. As soon as Cole exited the vehicle, Officer Rozema told
16 Cole to turn around and place his hands behind his back. Cole started to turn then made a fast movement towards the north as if he was trying to
17 run. Officer Rozema was able to grab an arm to prevent Cole from getting away. As soon as Cole realized Officer Rozema had a hold of him, he
18 turned and impact pushed Officer Rozema in the chest. I ran around the vehicle to assist Officer Rozema. I lost sight of them as I ran around the
19 vehicle, but when I got to the passenger side of the vehicle, I noticed they were both on the ground. Cole was on his back facing Officer Rozema
20 and I observed Cole throw a punch which appeared to have hit Officer Rozema. I then saw Cole immediately grab at Officer Rozema's vest and
21 chest area.

22 At this point I considered the following: Cole had provided false information. Based on my experience, I believed Cole was lying to avoid arrest
23 because of a warrant or other charges. Cole, when asked to place his hands behind his back, attempted to flee from the police. When Cole could
24 not flee, he immediately went to violence by impact pushing, punching and grabbing at Officer Rozema. It was obvious to me Cole was willing to
25 do anything, including active violence towards a police officer to avoid arrest of what I thought had to be serious due to the level of Cole's actions.
26 I was going to assist Officer Rozema causing all our attention to be on Cole while leaving our back an unknown male with unknown weapons
27 inside the vehicle.

28 Due to the above considerations, I delivered three kicks to Coles face and shoulder. This had no effect on Cole. I attempted to control Cole's arm

---

Page 1

Mesa/Spencer 000014



# Incident/Investigation Report

**Case Number:** 2018-0800614

**Agency:** Mesa Police Department

1 but I was unable to get control of his arm. I delivered 3-4 knee strikes to Coles head. Again, this had no effect on Cole as I attempted to control
2 his arm. I could see Officer Rozema attempting to gain control of Cole's arm with negative results. Despite our attempts to control Cole, he was
3 able to roll onto his back and face us. Multiple commands were given for him to stop resisting and to place his hands behind his back. At this
4 time, I retrieved my Taser and deployed a set of probes to Cole's legs and immediately to his upper body. I was hoping I could get enough spread
5 on the taser deployments to cause his body to lock up so we could place him into handcuffs. I held the trigger of the taser and moved it to contact
6 another part of his body but still had negative results. The taser had no effect on Cole. At one point Cole moved his arms and grabbed the taser in
7 what appeared to be an attempt to move it off his body. I dropped the taser on the ground and again attempted to control Coles arms. I gained
8 control of his arm and forcibly moved it behind him but he was able to turn his body and free his other arm. I again delivered 3-4 knee strikes to
9 Coles face with negative results. At this time an MSCO deputy arrived on scene to assist take Cole into custody. Even with all three trying to take
10 him into custody, Cole was still able to get up on his knees. Officer Rozema stated he wanted Cole tased again. I retrieved the taser from the
11 ground, stuck it on Cole's neck near his carotid and held the trigger. This had no effect on Cole. Cole ripped his hand out of Officer Rozema's
12 control and brought it up near next to me. There was a handcuff on his wrist. Officer Rozema retrieved another pair of handcuffs in an attempt to
13 make it easier to handcuff Cole.

14 During the fight, Cole was able to move his legs around multiple times and kicked at us several times. I was kicked at least two times by Coles
15 kicks. The kicks hit me in my upper legs.

16 At this time I noticed the MSCO deputy and Office Rozema were fatigued. They were both out of breath and I could tell in their voices they were
17 exhausted. I was also fatigued and out of breath. I felt as if we had exhausted all our options and nothing was working. I believed due to drugs,
18 Cole was not feeling any pain and had superhuman strength. I then shoved Coles face into the ground 3-4 times, which had negative results. We
19 could not gain control his Cole to get him into handcuffs. At this point Cole was actively fighting with us for what I believed was several minutes.
20 I believed we were not going to control Cole unless he was unconscious. At this time, I placed Coles head between my knees with his head face
21 down, put by thumbs on the back of his neck placed my hands on the sides of his neck where I believed his carotid artery was located and
22 squeezed. I continued to squeeze hoping Cole would go unconscious, so we could control him. They were eventually able to get his hands behind
23 his back and into handcuffs.

24 Cole was treated by MFD and transported to the hospital.

25 I assisted in inventorying the vehicle for a tow. On the passenger floorboard where Cole was seated and between his legs was a black backpack.
26 Inside the black backpack was a crystal white substance and a brown tar substance. I recognized the items as heroin and meth. I also located a
27 used syringe and several small baggies. I gave the items to Officer Rozema.

28 At the hospital, I heard Cole excitedly uttered that he was on drugs when we stopped him and that he usually is not a violent person.

29 Due to the fight with Cole, I received multiple injuries including scratches to my knees, legs, and elbows. My left foot/ankle also was injured
30 causing a high amount of pain when walking which caused me to go to the hospital.

NFI



Mesa/Spencer 000015

# Notarial
# Jurat

Type / Title of Document: _Declaration of Cole Spencer_

Document Date: _12-08-2020_

Pages Attached: _5_

Other Information: _Hand written on lined paper_

Printed Name: _Cole Joseph Spencer_

Signature: _Cole Joseph Spencer_

STATE OF ARIZONA

COUNTY OF YUMA

Subscribed and sworn (or affirmed) before me this

_8th_ day of _December_, 2020,

_Doug Swanson_

NOTARY PUBLIC

DOUGLAS SWANSON
Notary Public - Arizona
YUMA COUNTY
Commission # 577791
Expires January 20, 2024

<u>Declaration Of Cole Spencer</u>

I Cole Joseph Spencer, declare under penalty of perjury that the following is true and correct:

1. This declaration is based on my personal Knowledge relevant to the Arizona District Court case [Spencer V. Pew et. al. (2:20-CV-00385-DGC-CDB)

2. I am currently incarcerated in the Arizona Deportment of corrections in Yuma, AZ. Prior to being here I was a resident of East Mesa and Apache Jct. for the last 25 years.

3. On March 21st, 2018, Jamie Kern (Driver) and I pulled out of Jamie's driveway and immediatly were followed by a white Chevy Tahoe.

4. I was instantly nervous, as my friends Roger Shoemaker, Chance Ellington and Jessie Busch were pulled over a week prior leaving Jamie's residence and were repeatedly questioned about my whereabouts. I was puzzled because I had only a misdemeanor warrant and there was no reason Mesa police should be looking for me.

5. My assumptions were correct when the Tahoe following us turned out to be an unmarked-undercover vehicle. We were then pulled over. I was very nervous considering all the media attention surrounding the Mesa pd. and the claims of police brutality by the citizens of Mesa.

6. I noticed that both officers were swat team members and very big as well as very aggressive in their tone and overall approach. I was intimidated and not willing to give them my real name as I feared that these could be the same officers that had harrassed my friends. So I told them my name was Kenneth William Cory.

7. The officer later identified as Jacob Rozema, went to the Tahoe, then came back and asked me to step out of the vehicle. I stepped out and put my hands behind my back. Mr. Rozema grabbed my left wrist and bent my hand in a direction it did not bend and simultoneously said "yer under Arrest C.J."

8. At this point I panicked, as there was no way he could have known my name, and the amount of force he applied to my wrist was borderline unnessecsary, so I nudged him with my shoulder to create Seporation between us. My attempt failed and Rozema never let go of my left wrist. I was then punched in my left cheek and face several times. I instantly fell to the ground.

2

9. I was face down trying to block punches that I was recieving. I was then Kicked in my face multiple times. From this moment till well after the incident, I could not see. Blood had filled my Eyes, face and mouth and I repeatedly said "ok, ok" but the beating continued.

10. At this point I moved as much as I could to avoid being hit. I was in Survival mode. I was then electrocuted. The defendants shot probes in my leg, back, hip and neck. The electrocution lasted for what seemed like 30-45 seconds, with no breaks. The officer was also shocking me with the tip of the stun-gun in my Carrotid Artery which I was able to move off my neck as it was making it hard to breath.

11. I had little to no control over my body. My legs and arms were going in and out of being locked up. At this point one of the officers was pinning my arms down, while the other was punching and Kicking my face.

12. I was able to roll over to my knees to try and block their strikes. At this time I was electrocuted 2 more times. I had a heart attack in 2015 and felt like I was going into cordiac arrest again, so I pleaded with the officers to stop by informing them I had a Pace-maker as well as informing them that my hands were locked up but, this was ignored and the beating continued

3

13. Around this time I felt an officer on top of me. then I was kneed in my face 7 or 8 times. My body was in shock and my motor functions were locked up. At this time an officer wrapped his hands around my throat and slammed my face into the ground at least 7-12 times. I was having trouble breathing.

14. Then I was electrocuted again through the probes in my legs and back as well as through the tip of the stun-gun as the officer said "take him for another ride" and stuck the gun to my carrotid artery and electrocuted me for what seemed like 15-20 seconds. My heart felt like it was going to give out.

15. As soon as the electrocution was over an officer wrapped his hands around my throat and squeezed as I layed in the dirt face down. I could not breathe and it felt like my throat was being crushed. I was strangled till I went unconcsious. (It should be noted that I went unconscious a couple times During this incident but would come back when the officer began to faze me).

16. When I gained consciousness, I was handcuffed and my face was being pushed into the ground and I pleaded with the officers and informed them I "Couldn't Breath". Then an officer began driving his knee into the back of my neck with all of his body

4

weight which made it even harder to breath. As he did this he said "Next time tell me your Name". My arm also felt like it was broke, I informed the officer and he yanked up on the handcuffs, bending the arm in question and said "if you move I'm gonna fuck you up".

17. By the end of this incident I had not thrown a punch, a kick or any type of strike towards any officer. This was easily the most traumatic experience of my life. The amount of force these officers used in this incident was unnecessary and in-humane.

18. After the beating, these officers repeatedly asked me questions pertaining to items found in the vehicle I was in. On Scene I informed them that I owned nothing in the vehicle and the vehicle was not mine. Sometime after the paramedics arrived I went unconscious. I briefly remember a doctor attempting to wake me up at the hospital.

19. Also, multiple times I was asked if the Meth and Heroin that was found was mine. I told the officers, "NO" it was not. I then heard an officer tell the E.M.T. that I admitted that the "Meth" found in the car was mine. I was not under the influence of drugs of any kind at the time of this incident.

5        Cole Spencer    12-8-2020
         Cole Spencer                ER 283

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING

REFERENCE CIVIL 547.1(a)(1)
(Rule Number/Section)

RECEIVED ___ COPY

DEC 2 8 2020

CLERK US DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT ARIZONA

Cole J. Spencer
          (Plaintiff)

CV-20-00385-DGC-CDB

V.

Aaron Pew et. al.,
          (Defendants)

Plaintiffs Additional Material
Facts supporting opposition to
defendants Motion for Summary
Judgment


(PAMF) "Plaintiffs Additional Material Facts"


PAMF #1  - Both defendants have conveniantly left out
the fact that this incident involved the use of lethal force.
Their Declorations and statement of facts fail to mention this
fact. The first mention of this lethal/Deadly force comes in
officer Pew's original Report [Exhibit 2-page 2-lines 16-23]
Pew admits to wrapping his hands around Spencers neck/throat
and squeezing the plaintiffs carrotid artery. Instead, he was
crushing Spencers throat as well as cutting off the Blood supply
to his brain which ultimatly rendered him unconscious. See
[Exhibit 1-paragraph 15]. Also see [Exhibit 9-page 4] This is
the "use-of-force report" submitted by the defendants 2 days
after the incident. It clearly states that the defendants admit
to deploying a carrotid artery restraint. [Exhibit 16-page 2]

ER 284

is Mesa Police Department Policy [DPM 2.1.5 use of Force]
which authorizes the use of the carrotid control technique
under 2 circumstances. ① when deadly force is authorized. ② when
a subject is actively assaulting an officer or another person and
other control methods have been exhausted or the officer
reasonably beleives other methods have been exhausted and
would be ineffective. Neither of these circumstances were
present at any time during this incident. It should also be
noted that what officer Pew did to Mr. Spencer, was not
a carrotid artery restraint. It was strongulation. [ARS 13-1204]
is the Arizona code for aggrevated Assault. One of the definitions
reads "Any act that impedes another individuals ability to
breathe" is defined as aggrevated assault [Exhibit 17-page 6]
outlines the acceptable method of applying this lethal type of
chokehold. Wrapping your honds around a suspects throat is not
an acceptable method. In addition to this being on illegal form
of the choke-hold, Mr. Spencer had been tased [7] times prior
to being choked unconscious. (Total of 36 seconds). [Exhibit 18-
page 4] under "Post Deployment Procedures" it explains how an officer
is to handle a suspect who has just been tased. It clearly
states: "use a restraint technique that does not impair the
subjects respiration..." Pew was crushing Spencers throat, and Spencer
told him multiple times that he could not breathe after being
tazed, but the beating and force contined. See [Exhibit 1 - paragraphs
13, 15, 16]. This part of the force is layed out in the Body-Cam
Videos. The following is where you will find the lethal force in
the videos. **** First - [Exhibit 22 - video B] This video is
2

only. 1 min 37 sec. So pointing out specific times is unnecessary. It should be noted that the final strongulation that rendered Spencer unconscious is not in this video, but nonetheless Pew still wraps his hands around Spencers throat and slams spencers face into the ground. From [01:25 - 01:37] of video 'B' you can hear spencer choking. You might have to listen a couple times because the audio is spotty. Maklins Body-Com footage is split into two videos. This is not allowed. There is no reason that an officer should turn his Body-cam off during an incident, especially when a fellow officer is choking and slamming an unarmed man who is on the grounds, face. [Exhibit 22 - video 'D'] This is the second part of the video. [Macklin]. The first [7] seconds is completly silent. This is one of the many edited sections in these videos. At the [00:08] mark, you will hear Rozema tell Pew "Give him another ride". Spencer is then tased for 13 Seconds. The tasing ends at [00:27]. At [00:28] Pew wraps his hands around spencers throat and holds it for 20-30 Sec's. The best footage of Pew's strongulation is in Clarks Body-cam footage. [Exhibit 22 - video 'C'] AT [01:16] Rozema tell's Pew to "Give him another ride". Then at [01:37] Pew wraps his hands around Spencers throat and Squeezes. And it should noted that. mr. Spencers throat was being crushed. He could not brethe. The amount of force that Pew was squeezing with was considerable. This is evident in a few of the crime scene photos taken an hour after the incident at the hospital. See [Exhibit 12 - pages - 4, 6, 7, and 17] You'll have to look at the left side of spencers throat as well as Directly on each side of his

3

ER 286

adam's apple. There you will see strongulation marks. These marks were so deep that you could see them 3 days later in Spencer's mugshot photo, only now the marks had turned black and blue. See [Exhibit 24].

(Pam F) #2 - To fully understand how deceptive the defendants are and how monipulative they can be, you will have to analize their original Incident reports in Depth. Before we do this see [Exhibit 25 -page 1] These are Mesa PD Policy Pertaining to "Reporting Protocols" for use of force. Under the [OFFICER Responsibility] it states: "Document the use of force in a department report or supplemental report..." also says... "Each member that uses reportable force, as defined in [DPM 2.1.5] shall complete a primary or supplemental report." as well as... "Complete reports as soon as possible after incident, BUT PRIOR TO THE END OF SHIFT" This is important. Officers are asked to do this to combat against officers corroborating stories and manipulating evidence. Which is exactly what the defendants did in this case. See [Exhibit 4 -page 1] look in the bottom left corner. The date and time that Rozema drafted his report is as follows: [3-22-2018 at ~~obdsdm~~ 20:05:54] so he waited untill 8pm the day after the incident. Not a serious violation but not what policy calls for. The next step that the officers took was on the 23rd. This is 2 days after the incident. Both defendants filled out a use of Force Report. See [Exhibit 9] Examine the entire report. You will notice that both officers filled out information in the report. To this point officer Pew had not filled out an Incident

4

ER 287

report. Which is puzzling because [Exhibit 25-page 2 and 3] under "Post Incident Sergeant Responsibilities" states that the sergeant is to "Ensure each member who uses reportable use of force completes a primary or supplemental report prior to the end of shift and the reports are reveiwed." So in other words the sergeant was supposed to review both defendants reports and their Joint "use of force report" and submit them to "Blue Team" which is the independent entity that reveiws use of force cases. But this did not happen. Pew did not submit a report.... at least not at this point. There was no reason for him to. His Sergeant obviously wasn't going to make him follow Policy. The only thing that would light a fire under Pew and compel him to give his version of this incident was when MCSO deputies sent the body-cam footage from this incident to Mesa PD. SEE [Exhibit 19-page 2] This is the "Axon Evidence Audit Trail" for the footage. As you will see on page [2], the footage was sent to Mesa PD on 3-27-2018, - 6 Days after the incident. Then low and behold on 4-03-2018, officer Pew decides to write an incident report - 13 days after the incident. Now that Pew and his superior officers at MPD have viewed the footage, he is now obligated to write a report. This is the first example where the stakes raise in this incident. Now that we have an understanding of the chain of events, we will now look at how Mr. Spencers level of resistance elevates when Pew decides to write his report and we'll compare it to Rozemas report that was wrote 2 weeks prior! - Multiple times we have asked the court to read the defendants original

5

reports. Read [Exhibit 4] in its entirety. The following are key points that are left out. ① Rozema never mentions that lethal force was used in this incident, but does in Exhibit 9. ② Never mentions that Spencer threw any types of punches ③ Never mentions that Spencer grabbed at his vest. ④ Never mentions that Spencer attempted to throw him off spencers body. ⑤ Only states that spencer was kicked once and punched twice. Then after the footage surfaced, Pew is now obligated to detail the brutal strikes seen in the videos [Exhibit 22 - videos A - D]. He admits to: ① 3 kicks to spencers face ② 8 knee strikes to spencers face ③ multiple taser cycles ④ slamming spencers face into the ground ⑤ and ultimatly strangling spencer unconscious. This is all laid out in [Exhibit 2] Read this in full. In this version of the incident Spencer now has thrown a punch. [see Exhibit 2 - page 1 - lines 19-20]. Then Pew states that spencer grabed at Rozemas vest and chest area where Rozemas service weapon was. [see exhibit 2 - lines 20 -21 - page 1]. Then he states that spencer had "Superhuman strength". see [Exhibit 2 - page 2 - lines 18] [Exhibit 25] Reporting protocols exist to prevent this exact senario from happening. The defendants waited till after the end of their shift and fabricated there stories and drafted reports weeks after they were due to suit their needs. Not the actions of a reasonable officer.

#3 (PAMF) The following is two separate instances where the defendants lie to individuals providing healthcare to Mr. Spencer immediatly after the incident. First - when the beating

6

was over and the fire Department had arrived, the defendants told the E.M.T.'s the following: [see Exhibit 20 page 3]. "P.D. states patient only struck with fists during fight". This is not true. [Exhibit 2] is filled with Kicks and knee strikes. See also [Exhibit 1] in its entirety. As well as all of [Exhibit 22 - videos A-D]. This is important because police have an obligation to inform medical personnel all available info so they can effectivly treat their patient. Instead they lied. Also in [Exhibit 20 - page 3] it states that, "Patient was answering Questions appropriatly and admitting to Methamphetimines". We will address How appropriatly spencer was answering questions. In two of the Body-cam videos [exhibit 22 - videos 'A' and 'D'] both show spencer having a conversation with an EMT. First Go to [video D] (D) at [10:45 to 10:55]. Play it Back a few times because its hard to hear. Then go to [video A] at [12:40 to 12:55] and do the same. What you will hear is the EMT ask spencer "where are you at"? Spencer says - "Apache Junction". Spencer didn't even Know where he was. They were 5 miles from apache Junction. This casts serious doubts as to whether these EMT's credibility is reliable and is very obvious that the defendants were able to use their position as Police officers to manipulate what was written in [Exhibit 20]. Second, The Methamphetamines. Spencer never admitted that the meth was his. Rozema admits this in [Exhibit 4 - page 2 - line 27]. But the defendants still felt the need to tell the EMT's that spencer did in fact admit to the Meth. [SEE Exhibit 1 - paragraph 19]. Also, the EMT's never mentions that Spencer was under the influence of Meth.

7

the second false statement that the defendants gave to the medical personnel came at Banner Baywood Hospital. See [exhibit 11 - page 2]. Here the defendants tell the hospital staff that "patient had to be tased twice". This is false. [Exhibit 8 - page 18] Spencer was tased (7) times. They also told medical staff [Exhibit 11 - page 2] that there was "NO LOC" (loss of consciousness) after admitting as much in (Exhibit 2 - page 2 - lines 20-23). I assume whoever is reading this has already read the disputed statement of facts and knows that when the defendants were at the hostpital when the statements in [page 2] [Exhibit 11] were made, spencer was unconscious. The Defendants were speaking for him. Finally on [page 2] the defendants go on to tell the medical staff, "Police states that initially patient was lying about his name and they found Heroin in his backpack which is when the patient became violent and began to ~~abou~~ resist arrest." What? How many different stories are the defendants going to tell. Officer Pew didn't find drugs untill after the beating was over. See [Exhibit 2 - page 2 - line 25-27] and spencer made it clear to the officers that the drugs were not his. SEE [Exhibit 4 - page 2 - line 27].

#4 (PAMF) - In Pew and Rozema's original reports, nowhere do the defendants ever mention that Rozema was kicking and punching spencer while Pew held Spencer down. Spencer mentions it in [Exhibit 1 - paragraph 11]. [Exhibit 22 - video `B'] captures proof of this scenario. I must note that the only way to see this is to go to [video B] at [00:34]

8

ER 291

and pause the video. Then start tapping the Play/Pause button really fast and do that all the way through [00:38] You will see Rozema kicking and punching Spencer while Pew holds down spencer's arms. Then you will see look up and realize that an officer was walking up and he lets go of Spencer. This is important because it shows that Rozema was just as much of an active participant as his partner Pew.

#5 (PaMF) [Exhibit 2b] is the disciplinary records for both officers. As you will see, both officers have Excessive force complaints filed against them. Pew has over 5 incidents in less than 6 years. This shows that what happened in this case was not an anomoly. It was one of many similiar incidents these officers were involved in. This shows that these officers have a history of beating citizens in Mesa.

#6 (PAMF) Although it is spencer's beleif that the punches, kicks and tasing was excessive by themselves, the strangulation was the most egregeous act of excessive force that the defendants commited. An important question to ask is: was Mr. Spencer Subdued when Pew applied lethal Force? — The easiest way to determine this is to watch [Exhibit 22 - video 'C'] Watch it from the beginning. Clark was the 3rd MCSO Deputy to arrive on scene. So when he arrived there were 3 mcso deputy's and 2 mesa pd Swat officers (Pew, Rozema). As you will see in the video, when clark arrives on scene, officer shall

9

is standing off to the side watching the incident. Deputy Mocklin is laying on the back of Mr. Spencer while spencer was face down. Spencer's head was between Pew's legs and spencers left arm was being pulled by officer Rozema, who had 2 pairs of handcuffs on spencers left wrist. [Video C - at 01:13] will reveal the exact senario Just explained in this paragraph. Immediatly following the [01:13] mark, Rozema tells Pew to "Give him another ride. As you have read throught these paragraphs, Pew sticks the taser to spencers Neck at tazes him for 13 seconds and then applies the lethal force. There is no scenario that a reasonable minded observer could ever come to the conclusion that Spencer wasn't Subdued prior to being strangled.

#7 (PAMF) The defendants have given many stories surrounding the "punch" that they say Spencer threw. They claim that spencer was on his Back and spencer threw a punch then they tased spencer. This is explained in detail in "Plaintiffs disputed Statement Of Facts" #18-21. From doing the Math we Know that Spencer was being tazed in Video 'A' from (00:27) to (00:46). Go to (00:56) and press 'pause'. You will see spencer's "Adidas" shoe upside down. Spencer is on his stomach. This punch is fabricated, along with much of the defendants story.

#8 (PAMF) The following is about the actions of Aaron Pew, surrounding his treatment of Cole Spencer immediatly

10

proceeding the strangulation of Spencer in [Exhibit 22- video 'D']. The strangulation begins at [00:28]. The part of the video that will be discussed in this incident takes place from [00:28] to [03:52]. Spencer was strangled for 20-30 Seconds. He went unconscious and can be heard breathing very heavy as is waking up. (USE HEADPHONES TO LISTEN) Mr. Spencer was trying to tell the officers that his arm was hurting and Pew told Spencer "if you move I'll fuck you up!" This happens from [01:10] to [01:20]. From this point to [03:52] Pew drives his knee into Spencers neck while Spencer tells him he "Cant Breathe". Because of the George Floyd incident, many americans have heard of positional asphyxiation. But at the time of this incident this wasn't the case. In fact, in March of 2018 there were many Police Departments that were not trained in the adverse effects that Positional Asphyxiation can have on a suspect. Unfortunatly for the defendants, Mesa PD is not one of those Departments. Mesa PD Policy goes in depth about "Positional Asphyxiation". See [Exhibit 21-page 1] under "Avoiding Positional Asphyxia". It states: "It may be necessary to use the weight of several offices to hold a suspect down while handcuffs or other restraints are applied". Then says.... "Once a suspect is controlled, quickly remove the weight to allow the subject to breathe freely". As you will see in video [D] Pew violated department policy and intentionaly suffocated Spencer for over 2 minutes. Pew's actions during this part of Video [D] are appalling but, the worst part happens During video [D] from

11

ER 294

[01:21] to [01:45]. From [01:28] to [01:31] Spencer tells Pew .... "I'm DYING"! To which Pew replies at [01:32] to [01:35] "Then next time tell me your name" or "Then next time don't lie about your name". It's hard to hear exactly what was said. Mr. Spencer was pleading with Pew, telling pew, "I Cant Breathe" Multiple times. Then Pew switches positions and is heard saying "Are you gonna tell me your Name?" Almost as if he is playing a game of "Say Uncle" with Mr. Spencer in an attempt to get spencer to say his name. It should be noted that this display of wild behavior was all a show to play off the fact that he did not know who Spencer was. Pew's partner (Rozema) Had already called Spencer by his Name - [C.J.]. See [Exhibit 1 - paragraph 7]. Pews actions during this part of the incident were sadistic in nature and were carried out with the intent and purpose to cause harm.

#9 (PAMF) The defendants have made claims that spencer was on multiple drugs the day of this incident and have leaned on the narritive that he was hullucinating and because of that fact, the defendonts applied the force out of necessity. This is false. The truth about Spencers drug use is very easy to tell. It is a story that many families in America Know all to well. [Exhibit 27 - page 1 and 2] is Spencers prescription list at 1 of a couple pharmacies he would frequent in the months leading up to the incident. As you will see, highlited

12

on those pages, Spencer was prescribed Oxycodone and Hydrocodone. Both are prescription opiates. Spencer had been sober since 2012 from other recreational drugs and had never used heroin. Then His Primary care physician sent him to Pain managment and there he was prescribed the opiates in [Exhibit 27]. like many americans, Spencer fell victim to the opiate epidemic. In the months leading up to this incident mr. Spencer was using presciption opiates and occassionaly heroin. Before Spencer went to bed the night Before the incident he had used a small amount of heroin and prescription Oxycodone. When spencer was being released from Banner Baywood and Banner Desert hospitals the doctor had wrote a prescription for Oxycodone [see Exhibit 28]. The Doctors knew that he was going through withdraw's and had given him the oxycodone for pain and to manage his withdraw side effects that could aggrevate his heart condition. When spencer left the hospital in Police custody he was taken to Maricopa County Jail. During his intake the medical personnel informed him that he would not be recieving the Oxycodone medication that the doctor prescribed him. He was informed that he would be recieving "Tramadol". SEE [Exhibit 29 - page 12] At the bottom of the page is spencers prescription list. Tramadol is a non-opiate. Spencers withdraws were not going to drasticly increase, not to mention the intense pain from the beating he endured. This is a common practice of medical care companies who provide Health care to incarcerated individuals. Profit will always influence an inmates Quality of care.

13

Spencer was upset to say the least. He was withdrawing and was willing to tell the medical personnel anything to help ease the pain and take away the withdraws. [Exhibit 30 - page 1] As you will see on the [3-24-2018] encounter, Spencer tells the medical personnel that he is suffering from opiate withraw. Then [Exhibit 30 - page 3] Spencer now tells a technician that it is Heroin and meth. Then before that encounter, Spencer was seen by a separate health care technician on [3/24/2018] at [4:27:35 MST] [see Exhibit 29 - page 1] You will Notice on [page][4] that Spencer tells the Nurse in Questions 13-14-15 that he drinks 10 alcoholic beverages everyday. Then in [Question 16] Denies that he has used an illegal or prescription drug even once. Also denies in [Question 17] that he uses any drugs. Then on page [12] Spencer denies that he is withdrawing from drugs and claims to be withdrawing from Alcohol. But the Nurse documents on page 12 that there is no signs of Alcohol withdraw. Spencer was attempting to tell the medical Nurse that he was on whatever he could to compel them to give him something to ease the side effects of withdraws. When opiate didnt work, he added meth, when that didnt work, he went to alcohol. This was caused by Maricopa County Correctional Health Services failure to give Spencer the proper medication that was prescribed to him by the Doctors at the emergency room at bonner hospital. The defendants can make claims about Spencers drug use all they want. There are logical explainations to every statement made in these medical records. Spencers drug use is irrelevant. All that is relevant is whether

ER 297

14

the defendants actions were objectively reasonable. And in this case, they were not.

#10 (PAMF) Plaintiff has claimed that the body-cam videos that defendants (Shall and Macklin) have produced are altered. Even though Shall and Macklin one employees of Maricopa County Sheriffs Office and Pew and Rozema are defendants and employees of MESA Police Department, they have undeniable common interests. So much so, Shall and mocklin altered the body-camera footage. This interferance and Blue-Code of silence has been occuring since the beginning of this case. MCSO has been withholding body-cam footage since days after the incident. SEE [Exhibit 31 page 1 and 2] This is a letter that was written by an "American Civil liberties Activist" to a City of mesa prosecutor. *** The videos in [Exhibit 22] are strategically altered to benifit the defendants. It must be noted that the videos were altered with a computer program that changes the "Pixel" resolution of the footage. This tactic is used so that it gives everything in the video a distorted image as opposed to on isolated object. For Example. If they wonted to hide the fact that Pew and Rozema were wearing body-cameras. and they blurred out their chest areas, it would be obvious that the video was altered because in the middle of the screen there would be a blurred section around their chest. Its the same as if you walked into on empty Bedroom and all there was, was a Red baloon. It would be obvious. But if you

15

walked in that same bedroom and it was filled with red baloons, that original baloon would not stick out. So what they did was alter the images around the important parts of the video so that the blurred images appear to be Global rather than focal. Here are examples of the altered images. This is Just a few of Many, [Exhibit 22 -video 'D'] from [01:54 to 01:59] on the ground besides Spencer and the officers. The ground goes blurry. Next go to [video 'A'] from [05:55] to [06:45]. Officer shall walks to his car and everything on the ground is blurry, then shall walks back to Spencer and throughout this clip of the video spencers face, the ground and other objects go blurry. Also see [video 'A'] from [08:05] to [8:45] Pay attention to the taser wire that is wrapped and tangled on spencers wrists. It goes blurry! Digital video doesn't Just go blurry all of a sudden. Human Interference! Spencer asked for "un-Altered" footage in his motion to compel earlier in this case. The Defendants disregarded a Court order, and have been lying to the court. Also [Video 'B'] the first 7 seconds is muted as well as the beginning of each video. There are Multiple times that the audio goes out and the listener will hear a distorted Shell. Sound.

IN THE UNITED STATES DISTRICT COURT OF ARIZONA

FILED ___ LODGED
RECEIVED ___ COPY
DEC 2 8 2020
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Cole J. Spencer,
    (Plaintiff)

V.

Aaron Pew, et. Al.
    (Defendants)

CV-20-00385-DGC-CDB

Separate Statement of Facts
in Opposition to Summary
Judgement By Plaintiff

## Plaintiffs Statement Of Facts

1. Mr. Spencer (plaintiff) is currently incarcerated in the Arizona Dept. Of Corrections. [Exhibit 1 - paragraph 2]

2. On March 21st, 2018, Jamie Kern (Driver) and Mr. Spencer pulled out of Jamie's Driveway and immediatly were followed by an unmarked-undercover chevy Tahoe. [Exhibit 1 - paragraph 3 and 5]

3. Mr. Spencer was instantly Nervous because his friends, Roger shoemaker, Chance Ellington and Jessie Busch were pulled over a week prior leaving Jamie Kern's Residence and were repeatedly Questioned about Mr. Spencer's whereabouts. [Exhibit 1 - paragraph 4]

①

ER 300

4. Mr. Spencer and Jamie Kern were pulled over. Mr. Spencer immediatly had Flashes of the many police Police Brutality incidents that had Flooded the local news stations involving Mesa P.D. [Exhibit 1 - Paragraph 5]

5. Two officers approached the vehicle and Mr. Spencer Saw "Swat" team badges. Both Officers were very big and unnessesarily aggressive in their tone and approach. [Exhibit 1 paragraph 6]

6. Mr. Spencer felt intimidated and decided to not give his real name as he feared they were the officers that had harrassed his friends. [Exhibit 1 - paragraph 6]

7. Officer Rozema went to the Chevy Tahoe and came back and asked Mr. Spencer to step out of the vehicle. [Exhibit 1 - paragraph 7]

8. Rozema asked Spencer to put his hands behind his back. Spencer complied. Rozema grabbed Spencer's left wrist and aggressively bent and grabbed it. [Exhibit 1 - Paragraph 7]

9. As Rozema bent Spencer's wrist, Rozema informed Spencer, "yer under arrest "c.j."". [Exhibit 1- paragraph 7]

(2)

10. Mr. Spencer had not told Rozema his real name (c.J.) so he panicked and pushed Rozema with his left shoulder in an attempt to create separation between the two of them. [Exhibit 1 - paragraph 8]

11. This attempt by Mr. Spencer failed and Rozema never let go of Spencer's wrist. [Exhibit 1 - paragraph 8]

12. Rozema then punched Spencer Multiple times in the face. [Exhibit 1 - paragraph 8]

13. Spencer was face down blocking punches and was then Kicked in his face multiple times. From this moment he was blinded for the duration of the incident. [Exhibit 1 - paragraph 9]

14. Mr. Spencer said "o.K." Pleading with the officers, but the defendants proceeded with the beating. [Exhibit 1 - paragraph 9]

15. At this Point Mr. Spencer was in Survival mode. Spencer was then shot with a tazer. Probes were shot into his leg, hip, Neck and Back. [Exhibit 1 - paragraph 10]

16. The officer tazed Mr. Spencer for what seemed like 30 seconds straight as well as shocking him in the Carrotid artery with the tip of his stun gun which was making it hard to breath for Mr. Spencer. [Exhibit 1 - paragraph 10]

17. After the First Four Electrocution cycles, Mr. Spencer had little to no control control over his body. He was on his back while his arms were being pinned down. At the same time officer Rozema was punching and Kicking Mr. Spencer in the Face. [exhibit 1 - paragraph 11] See also [Exhibit 22 - video B - (Macklins 1st Body cam) at 00:36 and 00:38]

18. Mr. Spencer ended up on his Knees in an attempt to block the officers strikes, and was electrocuted 2 more times. See [Exhibit 1 - paragraph 12] and [exhibit 8 - page 18- Seq # 515 and #518]

19. Mr. Spencer informed the officers that he had a pacemaker as he felt that he was going into cardiac arrest. [Exhibit 1 - paragraph 12] and [Exhibit 22 - video A - (Shall's Body - Cam) at 01:00 to 01:15        ]

4                                    ER 303

20. Shortly after an officer was laying on top of Mr. Spencer and had Flatened him out. Spencer was then Knee'd in his face 6-7 times. [exhibit 1 paragraph 13] and [Exhibit 22-video's B, D- (Mocklins 1st and 2nd Body-cam's)

21. Mr. Spencer was in shock and loosing his motor function ability's. During this time an officer wrapped his hands around Mr. Spencer's Neck and slammed Spencer's face into the ground repeatedly. [Exhibit 1-paragraph 13] and [Exhibit 22-video's B, D (Mocklin's 1st and 2nd Body-cam's)

22. Then Mr. Spencer felt the probes in the back of his body begin to electrocute him for the 7th time. At the same time the officer stuck the stun-gun to his carrotid artery and held it there for what seemed like 20 seconds. [exhibit 1-paragraph 14] and [exhibit 8-page 18-seq #52] and [Exhibit 22-video's B, D (macklin's 1st and 2nd Body cam's]

23. At this time Mr. Spencer's heart felt like it was going to give out. [Exhibit 1 paragraph 14]

5

24. Mr. Spencer was face down in the ground and two hands were wrapped around his throat and he was strangled untill he went unconscious. [Exhibit 1 - paragraph 15] and [Exhibit 22 - videos B, C, D (Macklin's 1st and 2nd Body cams and Clarks Body cam)

25. When Mr. Spencer woke up, he was handcuffed and an officer was driving his knee/foot into Mr. Spencers Neck with all of his body weight. [Exhibit 1 - paragraph 16] and [Exhibit 22 - video's A, C, D (Macklins 2nd, clark's, and Shall's Body-cams)]

26. By the end of the incident Mr. Spencer had not thrown a single punch/strike and to this day this incident stands as the most traumatic experience of Mr. Spencer's life. [Exhibit 1 - paragraph 17]

27. Mr. Spencer was reapeatedly asked about illegal drugs found in the vehicle. Mr. Spencer denied the drugs were his. [Exhibit 1 - paragraph 18]

28. Mr. Spencer heard one of the defendants tell the E.M.T's that Mr. Spencer admitted that the "Meth" found in the car was his. [exhibit 1 - paragraph 19]

b

29. Mr. Spencer was not under the infuence of any drugs at the time of this incident. [exhibit 1 - paragraph 19]